Docket No. 14-1827

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

GOOGLE INC.,

Third Party Plaintiff–Appellee,

v.

BENEFICIAL INNOVATIONS, INC.,

Plaintiff–Appellant,

v.

ADVANCE PUBLICATIONS, INC., ALM MEDIA PROPERTIES, LLC, AMAZON.COM, INC., AMERICAN MEDIA, INC., AUTOTRADER.COM, INC., DELL, INC., DEMAND MEDIA, INC., EXPEDIA, INC., RODALE, INC., SCRIPPS INTERACTIVE LLC, VIACOM, INC., VILLAGE VOICE MEDIA HOLDINGS, LLC, SCRIPPS NETWORKS LLC,

Defendants.

---

Appeal from the United States District Court for the Eastern District of Texas in case no. 2:11-cv-229-JRG-RSP, Judge Rodney Gilstrap.

---

## CORRECTED BRIEF OF PLAINTIFF–APPELLANT BENEFICIAL INNOVATIONS, INC.

Julien A. Adams
Gregory S. Dovel
Dovel & Luner, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
*Counsel for Plaintiff–Appellant*

David E. Rosen
Murphy Rosen LLP
100 Wilshire Blvd., Suite 1300
Santa Monica, CA 90401
(310) 899-3300
*Counsel for Plaintiff–Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff–Appellant Beneficial Innovations, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Beneficial Innovations, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

<u>Dovel & Luner, LLP</u>: Gregory S. Dovel and Julien A. Adams
<u>Murphy Rosen LLP</u>: David E. Rosen
<u>Capshaw DeRieux, LLP</u>: S. Calvin Capshaw, Elizabeth L. DeRieux, and Jeffrey Rambin

January 16, 2015                                         Respectfully submitted,

*/s/ Julien A. Adams*
Julien A. Adams
Dovel & Luner, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
julien@dovellaw.com

*Counsel for Plaintiff–Appellant*
*Beneficial Innovations, Inc.*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

I.     Statement of related cases ................................................................ 1

II.    Statement of jurisdiction ................................................................. 1

III.   Statement of the issues .................................................................... 1

IV.    Statement of the case. ..................................................................... 1

       A.    Preliminary statement ............................................................ 1

       B.    Proceedings below .................................................................. 5

       C.    Statement of facts. .................................................................. 6

             1.    The invention. ................................................................ 6

             2.    The prior lawsuits .......................................................... 9

             3.    Google's intervention .................................................. 10

V.     Summary of the argument. ............................................................ 10

ARGUMENT ........................................................................................ 11

VI.    Standard of review. ....................................................................... 11

VII.   The jury's verdict must be reversed because Google presented
       insufficient evidence to establish indirect infringement ................ 12

       A.    Google failed to present substantial evidence of direct
             infringement. ........................................................................ 12

             1.    Proving direct infringement requires evidence that
                   compared the accused websites to properly construed
                   claims. ......................................................................... 13

             2.    Google failed to present evidence that compared the
                   accused websites to properly construed claims. .......... 15

             3.    The trial court's reliance on the *Evans Cooling* doctrine
                   is misplaced. ................................................................ 23

B.    Google failed to present substantial evidence of contributory infringement. ...................................................................................25

    1.    Google failed to present substantial evidence that it knew DoubleClick was especially made or adapted to be used in a combination that infringe Beneficial's patents. .................26

    2.    Google failed to present substantial evidence that DoubleClick was a non-staple article with no substantial non-infringing uses. ................................................................37

C.    Google failed to present substantial evidence of inducement............42

    1.    Google failed to show that it induced each limitation of the asserted claims. ................................................................42

    2.    Google failed to prove that it had the affirmative intent to induce infringement. ..............................................................48

VIII.    Conclusion....................................................................................50

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
　377 U.S. 476 (1964) .......................................................................29

*Cambridge Toxicology Grp., Inc. v. Exnicios*,
　495 F.3d 169 (5th Cir. 2007) ..........................................................11

*Commil USA, LLC v. Cisco Sys., Inc.*,
　720 F.3d 1361(Fed. Cir. 2013) ........................................................34

*Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
　424 F.3d 1293 (Fed. Cir. 2005) ........................................ 25, 28, 30, 37

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
　363 F.3d 1263 (Fed. Cir. 2004) ................................................. 13, 22

*eBay Inc. v. MercExchange, L.L.C.*,
　547 U.S. 388 (2006) .......................................................................43

*Evans Cooling Cooling Sys., Inc. v. General Motors Corp.*,
　125 F.3d 1448 (Fed. Cir. 1997) ............................................. 23, 24, 25

*Fast Memory Erase, LLC v. Spansion, Inc.*,
　2009 U.S. Dist. LEXIS 117462 (N.D. Tex. 2009) .............................19

*Fujitsu Ltd. v. Netgear Inc.*,
　620 F.3d 1321 (Fed. Cir. 2010) ......................................................29

*Giannone v. U. S. Steel Corp.*,
　238 F.2d 544 (3d Cir. 1956) ...........................................................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
　131 S. Ct. 2060 (2011) ......................................................... 29, 33, 48

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
　365 F.3d 1054 (Fed.Cir.2004) ................................................... passim

*i4i Ltd. Partnership v. Microsoft Corp.*,
　598 F.3d 831 (Fed. Cir. 2010) ........................................................11

*Interstate Brands Corp. v. Celestial Seasonings, Inc.*,
　576 F.2d 926 (C.C.P.A. 1978).........................................................17

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
　134 S. Ct. 2111 (2014) ...................................................................13

iv

*Liquid Dynamics Corp. v. Vaughan Co.*,
    449 F.3d 1209 (Fed. Cir. 2006) ............................................................................14

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .................................................. 28, 30

*MercExchange, LLC v. eBay, Inc.*,
    401 F.3d 1323 (Fed. Cir. 2005) .................................................. 43, 47

*O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, Inc.,
    467 F.3d 1355 (Fed. Cir. 2006) ............................................................................19

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) .................................................. 13, 41

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
    522 F.3d 1279 (Fed. Cir. 2008) ............................................................................42

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*,
    661 F.3d 1378 (Fed. Cir. 2011) ............................................................................25

*TiVo, Inc. v. Echostar Communs. Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008) ............................................................................14

*Vanmoor v. Wal-Mart Stores, Inc.*,
    201 F.3d 1363 (Fed. Cir. 2000) .................................................. 23, 24

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009) ............................................................................37

*Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ............................................................................30

*Z4 Technologies, Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007) .................................................. 12, 13

**Statutes**

28 U.S.C. §1338(a) ..............................................................................1

35 U.S.C. § 271(c) ..............................................................................27

## I.    Statement of related cases.

There are no related cases.

## II.    Statement of jurisdiction.

The district court had jurisdiction over this breach of patent license agreement matter in which the right to relief necessarily depended on the resolution of substantial questions of federal patent law pursuant to 28 U.S.C. §1338(a).

The judgment appealed from was a final judgment disposing of all parties' claims.  A0001.  The final judgment was entered on August 26, 2014.  Appellant timely filed a notice of appeal on September 12, 2014.  A1446.

## III.    Statement of the issues.

1.      Whether Google presented sufficient evidence at trial to prove that it indirectly contributed to its customers' infringement of the asserted claims of Beneficial's patents by its sale of the DoubleClick ad serving technology?

2.      Whether the trial court properly denied Beneficial's motion for judgment as a matter of law?

## IV.    Statement of the case.

### A.    Preliminary statement

The issue raised by this appeal is whether a plaintiff with the burden of proving contributory infringement or inducement can meet this burden where (i) the only evidence of direct infringement are the allegations in a complaint and the

contentions in infringement contentions that were prepared prior to claim

construction, (ii) there was no evidence that the plaintiff knew that the component

that it sold was especially made or adapted for use in a combination that was

infringing, and (iii) the plaintiff failed to present evidence that it induced each

limitation of an asserted claim and admitted there was no intent to induce

infringement.

In August 2011, Beneficial Innovations, Inc. (Beneficial) filed a patent

infringement lawsuit accusing various defendants of operating websites that

infringed four claims in two of Beneficial's patents—U.S. Patents Nos. 6,712,702

and 7,496,943 (the '702 and '943 patents are collectively referred to as the

"Patents"). A0292. Five of the defendants in that lawsuit used ad serving

technology, DoubleClick , that they acquired from Google, Inc.

One year prior, Google and Beneficial settled two patent infringement

lawsuits that accused Google's websites or infringing the Patents, and executed a

written settlement agreement. A1892. Under the terms of the settlement

agreement, Beneficial granted a license to Google's customers, but only to the

extent that the customers' use of a Google product on their websites would make

Google liable for direct or indirect infringement of a claim of the Patents. A1893.

This appeal arises from Google's intervention in Beneficial's lawsuit against

Google's customers.  Google alleged that that Beneficial's lawsuit was a breach of

2

a settlement agreement between Beneficial and Google because Google argued that by providing DoubleClick to its customers, Google indirectly infringed the Patents. A0006-A0008.

After trial, the jury returned a verdict in favor of Google for breach of contract, and award Google $1 in damages. A0003. The trial court denied Beneficial's motion for judgment as a matter of law under Rule 50(a) and its renewed motion under Rule 50(b). A0005; A0034.

The jury's verdict and the trial court's denial of Beneficial's JMOL must be reversed because Google failed to meet its burden at trial. To prevail on its breach of contract claim, Google had the burden of presenting sufficient evidence to establish that (i) Google's customers directly infringed the Patents and (ii) Google contributed to or induced that infringement. A0008. Google did not do so.

*First*, to prove that its customers directly infringed the Patents, the law required that Google present evidence from which the jury could compare the customers' accused websites to properly construed claims. Instead of presenting this evidence, the only evidence that Google relied upon at trial to prove direct infringement were (i) the allegations in Beneficial's second amended complaint and (ii) the contentions in Beneficial's preliminary infringement contentions. A0009. Because both of these documents were prepared prior to Beneficial receiving any discovery regarding how the defendants' websites worked and

importantly, prior to claim construction, this evidence was insufficient, as a matter of law, for a jury to find that Google's customers directly infringed any asserted claim of the Patents.  Google's failure to meet its burden of proving direct infringement requires reversal of the jury's verdict and the court's denial of Beneficial's JMOL.

*Second*, in addition to proving direct infringement, Google had to prevail on one of its theories of indirect infringement—contributory or inducement.  A0008. Google failed to meet its burden of presenting substantial evidence on either theory.

To prove contributory infringement, Google had to establish that (i) it knew that the combination for which DoubleClick was especially made or adapted was patented and infringing and (ii) that DoubleClick had no substantial non-infringing uses.  Google argued at trial that the law did not require that it present evidence that it knew that DoubleClick was especially made or adapted to be used in an infringing combination, but merely that it knew of the patent and that there were no substantial non-infringing uses.  Google is wrong.  As a result, Google presented no evidence to show that it knew that the combination for which DoubleClick was especially made or adapted was both patented and infringing.  Google's failure to present this evidence requires reversal of the jury's verdict and the trial court's denial of Beneficial's JMOL.

*Finally*, to establish inducement, Google had to show that it induced its customers to infringe each limitation of an asserted claim. Encouraging or instructing its customers to do an act that would infringe just one (or less than all) of the limitations of the asserted claims is insufficient, as a matter of law, to prove inducement. At trial, Google also disagreed with this law, and only presented evidence that it instructed its customers regarding the use of the DoubleClick ad serving technology. The overwhelming evidence established, however, that Google's instruction related to one claim term in the Patents—advertising related information—and this claim term related to just one limitation of the asserted claim of the '702 patent, and less than all of the asserted claims of the '943 patent. Moreover, Google admitted at trial that it had no intent to induce infringement of the Patents when it sold DoubleClick. Google's failure to present substantial evidence that it encouraged inducement of all of the limitations of an asserted claim or that it intended to induce infringement requires reversal of the jury's verdict and the trial court's denial of the Beneficial's JMOL.

## B.  Proceedings below.

The relevant proceedings are below.

On August 11, 2011, Beneficial Innovations, Inc. filed a Second Amended Complaint for patent infringement against various defendants, including five defendants that were customers of Google, Inc. A0292.

5

On January 6, 2014, the court issued its claim construction order.  A0343.

On January 7, 2014, the pretrial conference was held.  A0519.

On January 10, 2014, the court issued an order with its rulings on the admissibility of exhibits and deposition designations.  A0056.

The jury trial began on January 21, 2014, and ended on January 23, 2014. A0713-A1376.

On January 22, 2014, the trial court denied Beneficial's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  A0034.

On January 23, 2014, the jury rendered its verdict.  A0003.

On August 21, 2014, the court issued a memorandum and order denying Beneficial's renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).   A0005.

On August 26, 2014, judgment was entered against Beneficial.  A0001.

On July 14, 2014, the court issued an order resolving an outstanding claim construction dispute.  A1433.

## C.    Statement of facts.

### 1.    The invention.

The inventions in the Patents stem from a common specification.  The Patents teach and claim a novel apparatus and method for presenting a service and advertisements to multiple users requesting a service on a communications

network such that the apparatus (i) dynamically and automatically selects and combines the advertising related data and service related data so that the advertisements are integrated and displayed concurrently with the requested service, and (ii) has a store of user-identifying data, which data can then be used to dynamically target different ads to different users.  A1630; A1687.

The asserted claim of the '702 patent is claim 53.  Claim 53 reads on "an apparatus for a service on a communications network," and it includes nine limitations.   A1674.  The asserted claims of the '943 patent—claims  1, 49, and 67—are method claims that similarly read on an apparatus for a service on a communications network.  Each of the asserted claims of the '943 patent also has multiple limitations.  A1731-A1732; A1734; A1736.

Each of the asserted claims includes the claim term "advertising related information."  In the '702 patent, this term is found in one of the nine claim limitations as follows:

> "One or more programmatic elements for combining <u>advertising related information</u> with service related information to obtain a resulting combination that is in a format: (a) acceptable for being transmitted on the network by the SPNAN to at least the first user, and (b) processed by the first network accessible node so that, as a consequence of such processing, a display of an advertising presentation corresponding to said <u>advertising information</u> is provided on said first network accessible node, said display occurring concurrently with a display of one of the corresponding service representations for the instance of the first service, said advertising presentation presenting advertising related to the purchase of a product or service"

7

A1674.

In asserted claim 1 of '943 patent, the term "advertising related information" is found in one of the 11-claim limitations as follows:

> "activating one or programmatic elements, at the providing node, for combining: the information for the interactive service, and (2) <u>advertising related information</u> for use in presenting one of: (i) the first advertising presentations, and (ii) the additional advertising presentations"

A1732.

In asserted claim 67 of the '943 patent, the term "advertising related information" is found in two of the 10-claim limitations as follows:

> wherein first <u>advertising related information</u> is received by the user node, via the subsequent Internet connection session, as a consequence of Internet transmissions by the service providing node for displaying the particular display presentations, wherein the first <u>advertising related information</u> is combined, prior to transmission to the user node, with information for displaying the particular display presentation P1, said first <u>advertising related information</u> replaceable with alternative information without changing a content: (i) of the particular display presentation P1 and (ii) to which the user input is responsive for the service;

> wherein one or more additional advertising presentations are presented at the user node after presentation of a first advertising presentation corresponding to the first <u>advertising related information</u>, each said additional advertising presentation being for providing information related to one of a product and a service, wherein at least one of said additional advertising presentations is received by the user node, as a consequence of Internet transmissions by the service providing node.

A1736.

## 2.     The prior lawsuits.

In 2010, Google and Beneficial settled two patent infringement lawsuits in which Beneficial alleged that Google's websites—google.com and youtube.com—infringed U.S. Patent Nos. 6,712,702 and 7,496,943.  A1630; A1687.  The parties' settlement resulted in the execution of a written settlement agreement. A1892.  Under the settlement agreement, the parties agreed that, in addition to granting a license to Google, Google's customers were also licensed, but only to the extent that those customers used a Google product, and only to the extent that the use of that product would <u>constitute direct or indirect infringement by Google</u>.  A1892.

In 2011, Beneficial filed a patent infringement lawsuit against various companies that owned and operated websites, again alleging that those websites infringed the Patents (the "Underlying Lawsuit").  Five of those defendants were Google's customers because they used Google's DoubleClick ad serving technology (referred to as an "ad tag") to present advertisements on their websites.  Google's DoubleClick ad tag is a snippet of code that is used by Google and other third party ad servers to serve ads on websites.  A1022:22-24; A1023:14-25.  Google's ad tag relates solely to the "advertising related information" limitation in the asserted claims. A1229:25-A1231:8.

9

### 3.     Google's intervention.

Google intervened in the Underlying Lawsuit, alleging that Beneficial breached the terms of the parties' settlement agreement by suing Google's customers.  Google argued that its customers were licensed because Google contributed to their infringement and induced their infringement by provided them with its DoubleClick technology.

## V.     Summary of the argument.

To prevail at trial, Google had the burden of presenting sufficient evidence to establish that (i) Google's customers directly infringed the Patents and (ii) Google contributed to or induced that infringement.  A0008.

The jury's verdict and the trial court's denial of Beneficial's JMOL must be reversed because:

(1)     Proving infringement is a two-step process that requires (i) properly construing the claims of the patent and (ii) comparing the properly construed claims to the accused device.  Google's sole reliance of the allegations in Beneficial's complaint and preliminary infringement contentions to prove direct infringement is insufficient evidence from which a jury could find infringement because these documents were prepared prior to Beneficial receiving any discovery regarding how the defendants' websites worked and importantly, prior to claim construction.

(2)    Google failed to prove contributory infringement because it failed to present evidence that (i) it knew that the combination for which DoubleClick was especially made or adapted was patented and infringing and (ii) that DoubleClick had no substantial non-infringing uses.

(3)    Google failed to prove inducement because it failed to show that it instructed its customers to infringe each limitation of an asserted claim. In addition, Google admitted that it did not intend to induce infringement.

## ARGUMENT

## VI.    Standard of review.

This Court reviews the denial of a motion for judgment as a matter of law ("JMOL") following a jury verdict by applying the district court's standard of review. *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010) aff'd, 131 S. Ct. 2238 (2011). The Fifth Circuit reviews the denial of JMOL de novo. *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 179 (5th Cir. 2007).

In the Fifth Circuit, JMOL is appropriate after a jury trial only when a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *I4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010) (quoting Fed. R. Civ. P. 50(a)(1) in applying Fifth Circuit law).

The jury's verdict has a legally sufficient evidentiary basis only if it is supported by substantial evidence, which is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007).

## VII. The jury's verdict must be reversed because Google presented insufficient evidence to establish indirect infringement.

To prove that Beneficial breached the terms of the settlement agreement, Google had to prove a case within a case. That is, Google could prevail in its breach of contract claim against Beneficial only if Google prevailed in an infringement case. Specifically, Google had to prove (i) that its customers directly infringed Beneficial's patents and (ii) that Google contributed to or induced that infringement.

Because, as shown below, Google failed to present substantial evidence to sustain a jury finding of indirect infringement, the jury's verdict and the trial court's denial of Beneficial's judgment as a matter of law ("JMOL") must be reversed.

### A. Google failed to present substantial evidence of direct infringement.

To prevail on either theory of indirect infringement—contributory or inducement—Google had to present evidence sufficient to establish that Google's

customers directly infringed a claim of Beneficial's patents.  *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2116 (2014); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement.").

Google failed to present substantial evidence to support the jury's verdict of direct infringement.  *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007).

**1.    Proving direct infringement requires evidence that compared the accused websites to properly construed claims.**

Google had the burden of proving that its customers directly infringed the asserted claims of Beneficial's patents.  A0008.  Proving direct infringement is a two-step process. "In infringement cases, the court first interprets the claims to determine their scope and meaning."  *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1358 (Fed. Cir. 2012).  "Next, the jury compares the properly construed claims to the allegedly infringing device."  *Id*.; *see Dynacore Holdings Corp. v. U.S. Philips Corp*., 363 F.3d 1263, 1273 (Fed. Cir. 2004) (internal citations omitted) ("A determination of patent infringement requires a two-step analysis. The court must first interpret the claims to determine

their scope and meaning. It must then compare the properly construed claims to the allegedly infringing device.").

For example, the most common manner in which a plaintiff proves direct infringement is through the opinion of an expert that has examined the accused device and has compared the accused device to the claims as they have been construed by the court. The requirement that the expert's opinion be based on a proper claim construction is so fundamental that this Court routinely upholds the exclusion of expert testimony that is based on improper claim construction. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (holding that district court properly "excluded the expert opinion evidence as irrelevant because it was based on an impermissible claim construction"); *TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d 1290, 1311-12 (Fed. Cir. 2008) (affirming exclusion of expert opinion evidence based on an impermissible claim construction).

Accordingly, to prove that its customers directly infringed Beneficial's patents, Google was required to present evidence from which the jury could compare the defendants' websites to claims that were properly construed by the court.

### 2. Google failed to present evidence that compared the accused websites to properly construed claims.

Despite the fact that Google retained a technical expert, and called that expert as a witness at trial, Google chose not to establish that its customers' websites infringed Beneficial's patents through this witness. Google's expert, Dr. Alexander, offered no opinions on whether Google's customers directly infringed the asserted claims of the '702 or '943 patents. A1099:20-23; A1132:8-24.

Google also did not introduce testimony from any of its customers to establish direct infringement by its customers' websites. Google did not, for example, present testimony in the form of admissions of its customers that their websites practice the methods of the asserted claims of the '943 patent or meet each of the limitations of claim 53 of the '702 patent as those claims were properly construed by the court. Rather, Beneficial presented evidence from each of the customers in which each admitted that they do not infringe any of the asserted claims. A2405, A2453, A2380, A2392, A2474.

Google also did not elicit expert testimony from Beneficial's technical expert, Dr. Almeroth, to establish direct infringement of Google's customers. Instead, to prove direct infringement by its customers, Google relied solely on two pieces of evidence—the allegations contained in Beneficial's second amended complaint and the contentions in Beneficial's preliminary infringement contentions.

15

Google admitted:

> Page 115
> 6          Other than the infringement contentions, other
> 7  than the complaint, do you have any other evidence, any
> 8  other piece of documents that you can present to this
> 9  jury to establish any of the websites that we've accused
> 10  and we've filed complaints against infringe the '702 and
> 11  the '943 patent?
> 12      A.  No, sir.

A0912:6-12.

Both of these documents, however, were insufficient to meet Google's burden of proving direct infringement because they contained statements from Beneficial that were made without the benefit of claim construction and prior to the time that Beneficial took discovery of the defendants to determine exactly how the accused websites operated.  A0908:25-A0909:5, A928:1-7.  And, as shown below, the contentions assumed interpretations of the claims that were in fact contrary to the claims as later construed by the trial court.

Over Beneficial's objection (A0056), the trial court allowed the introduction of Beneficial's complaint and infringement contentions, and allowed the jury to rely on this evidence to establish that Google's customers infringed Beneficial's patents.  The trial court erred in allowing those documents in evidence.   And the trial court erred in denying Beneficial's JMOL because, to the extent the statements in Beneficial's complaint and preliminary infringement contentions are admissions by Beneficial, they are not admissions sufficient to establish the fact

16

that Google's customers directly infringe.  We analyze each of these documents below.

### a.    The allegations in Beneficial's complaint are insufficient to establish direct infringement.

In denying Beneficial's JMOL, the trial court identified two paragraphs in the complaint (¶¶ 19 and 26) that it concluded contained admissions on which the jury could rely to find that Beneficial admitted that Google's customers infringed the patents.[1]  A0011.

The trial court agreed that a substantial portion of the statements in ¶¶ 19 and 26 were not admissions by Beneficial because they constituted legal conclusions.  Specifically, the trial court found the allegations that Google's customers "have 'infringed' and 'will continue to infringe'" Beneficial patents to be legal conclusions.  A0011.  These statements, therefore, could not be considered by the jury. *See Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 929 (C.C.P.A. 1978) (in a trademark appeal, "that confusion is unlikely to occur" held as a legal conclusion and not an "admission"); *see also Giannone v. U. S. Steel Corp.*, 238 F.2d 544, 548 (3d Cir. 1956) ("[L]egal conclusions are not admissions.")

---

[1]    ¶ 19 contained Beneficial's allegations related to the '702 patent.  ¶ 26 contained the same allegations related to the '943 patent.  Accordingly, for the sake of brevity, we will only address the allegations contained in ¶ 19

The trial court found that only one statement could be deemed an admission by Beneficial: "the allegation that the Accused Google Customers have been using the patented methods on their websites, 'without a license or permission from Plaintiff' is a factual one." A0011. The trial court does not conclude that this statement, taken alone, is substantial evidence that Google's customers infringed the patents. And the court cites to no authority that has held that a plaintiff can simply rely on an allegation in a complaint that the plaintiff believe the accused infringer was using the patented method without a license or permission to meet its burden of proving direct infringement, because there is none.

Because this statement was made "on information and belief," without any analysis of the accused infringer's websites (*i.e.*, before Beneficial received any discovery regarding how the defendants' websites worked), and without any comparison of those websites to claims that were properly construed by the court, it is insufficient to meet Google's burden of presenting evidence from which the jury could find that Google's customers in fact directly infringed the patents.

As shown below, the court's constructions of the claims had a determinative effect on whether Google's customers were infringing the claims of the patents. Accordingly, the complaint was not substantial evidence from which a jury could conclude that Google's customers met the claims of the patents as properly construed.

**b.    Beneficial's infringement contentions are insufficient to establish direct infringement.**

The trial court agreed that "[i]n a patent infringement case, a plaintiff cannot prove infringement based on contentions alone, and must proffer sufficient evidence supporting the allegations set forth in the infringement contentions." A0011-A0012 (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, Inc., 467 F.3d 1355, 1369 (Fed. Cir. 2006) (affirming a district court's grant of summary judgment of non-infringement when the plaintiff failed to provide evidence supporting its infringement contentions); *see, e.g., Fast Memory Erase, LLC v. Spansion, Inc.*, 2009 U.S. Dist. LEXIS 117462 at *12 (N.D. Tex. 2009) ("the purpose of preliminary infringement contentions is to provide notice of the accusing party's specific theories of infringement. A contention, no matter how detailed, is not evidence") (citations omitted) (emphasis added).

As explained above, a plaintiff with the burden of proving direct infringement must present evidence that allows the trier of fact to compare the accused devices with properly construed claims.   Google could not simply rely on Beneficial's preliminary infringement contentions because those contentions did not contain an analysis that compared the accused devices with claims that have been properly construed by the court.  In fact, in the contentions introduced at trial, Beneficial expressly stated that its analysis was done without the benefit of discovery and was prior to claim construction.  A1951.

Accordingly, a jury could not simply look to Beneficial's contentions and conclude that Google's customers' websites infringed the patents because none of the statements in the contentions compared the accused websites to the construed claims.

The error in allowing a jury to simply rely on preliminary infringement contentions (*i.e.*, contentions that are not made by comparing the accused device to properly construed claims), is illustrated by reference to Beneficial's contentions regarding the claims of the '943 patent. Claim 1 of the '943 patent includes the following limitation in the preamble:

> "overlapping with a display of said one of the display presentation, P1 at the user node is a display of a first one or more advertising presentations for providing information      related to one or more of a product and a service."

A2021.

When Beneficial prepared its preliminary infringement contentions, Beneficial wrote: "In this context, an advertising presentation 'overlaps' with a display of the display presentation if it overlaps in time with the display presentation." A2021.

Beneficial's entire analysis of infringement of this claim in its preliminary contentions was based on this construction. Beneficial's analysis, however, was not based on its comparison of the accused websites to <u>properly construed claims</u>. During claim construction, Beneficial argued for a construction of "overlapping"

consistent with the analysis that it set forth in its preliminary infringement contentions.  Defendants, on the other hand, argued that "overlapping" meant: "extending over or past and covering a part of."  A0364.  The trial court rejected Beneficial's construction and agreed with the Defendants' construction. *Id.*  As a result, under the court's construction of overlapping, use of DoubleClick's ad tag would not infringe the claims of the '943 patent.  A1033:5-18.  And after the court issued its claim construction, Beneficial dismissed its claims against the defendants based on the '943 patent.  A1188:6-17.

The same point is true for the '702 patent.  Beneficial's analysis regarding whether the accused websites comprised a "service providing network accessible node (SPNAN)" as required by claim 53 of the '702 patent was based on the contention that "a SPNAN" was "each of the web portals or websites own or operated by Defendants."  A1962.  Accordingly, during claim construction, Beneficial argued that "a SPNAN" should be construed as "a device or devices used for providing a service that is accessible via the Internet," so that Beneficial could establish infringement based on multiple devices comprising the SPNAN.  A0359.  The Defendants argued that the SPNAN was comprised of "one device."  A0360 ("Defendants contend that the node is a single device.").

In response to a motion to resolve the claim construction dispute regarding the meaning of the article "a" in the context of "a SPNAN" in the underlying

21

infringement lawsuit against Amazon, Inc., the trial court construed "a SPNAN" to mean "one device used for providing a service that is accessible via the communications network." A1433. Beneficial's analysis in its infringement contentions was wrong because it did not apply the proper construction of the term "a SPNAN." Beneficial's contentions contained no analysis that applied the requirement that a SPNAN was "one device" that performed all of the functions of the SPNAN, as contrasted with numerous servers and devices that make up an entire web portal or website.[2]

Accordingly, Beneficial's infringement contentions contained no evidence from which a jury could conclude that the requirement of a SPNAN, as properly construed, was met. The jury was presented with <u>no evidence</u> in Beneficial's preliminary infringement contentions from which it could compare the Defendants' websites to the phrase "a SPNAN," as properly construed by the court. Because neither Beneficial's second amended complaint nor its preliminary infringement contentions  contained any analysis of properly construed claims to the accused websites, or any admissions by Beneficial that its theories of infringement were based on its comparison of the accused website to properly construed claims, Google failed, as a matter of law, to present substantial evidence of direct infringement. *Dynacore Holdings*, 363 F.3d at 1273.

---

[2]    After the court's construction, Beneficial dismissed its lawsuit against Amazon.  A1445.

Accordingly, the trial court's denial of Beneficial's JMOL must be reversed.

### 3.    The trial court's reliance on the *Evans Cooling* doctrine is misplaced.

Although the trial court agreed that "infringement contentions are mere procedural tools for providing notice of a plaintiff's specific theories of infringement, and thus cannot be offered as evidence" (A0011), the court found that the jury could properly rely on Beneficial's infringement contentions as substantial evidence of direct infringement under this Court's decisions in *Evans Cooling Cooling Sys., Inc. v. General Motors Corp.*,125 F.3d 1448 (Fed. Cir. 1997) and *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363 (Fed. Cir. 2000).  The trial court is wrong, because the rule set forth in these opinions, generally known as the *Evans Cooling* doctrine, simply does not apply here.

In *Evans Cooling*, the plaintiff alleged that the defendant infringed its patents by selling a certain type of engine in its cars. *Evans Cooling*, 125 F.3d at 1450.  The defendant argued that because it marketed the same allegedly infringing device prior to the asserted patent's critical date, the patent was invalid due to the on-sale bar.  *Id*.  In that case, the defendant admitted, for purposes of summary judgment, that its product met each and every limitation of the asserted patents.  *Id*. The Federal Circuit reasoned that "[a]lthough [defendant] bore the burden of proving that the [infringing device] embodied the patented invention or rendered it obvious for purposes of the summary judgment motion, this burden is met by

Evans' allegation, forming the sole basis for the complaint, that the [infringing

device] infringes." *Id*. at 1451. The Court reasoned that, although the defendant

had denied infringement in its answer, "<u>by conceding infringement</u> for purposes of

the summary judgment motion and its on sale defense, [the defendant] properly

pled in the alternative." *Id*. (emphasis added).

Similarly, in *Vanmoor*, the plaintiff filed a complaint alleging that a number

of retailers and manufacturers of caulking products infringed his patent. *Vanmoor*,

201 F.3d at 1364-65. The defendants denied the allegations and filed a motion for

summary judgment claiming the asserted patent was invalid because the same

accused caulking cartridges were sold and used prior to the critical date of the

asserted patent. *Id*. at 1365. In that case, like *Evans Cooling*, the defendants

"conced[ed] infringement for purposes of the summary judgment motion and

[their] on sale defense." *Id*.

Accordingly, a fundamental requirement of the *Evans Cooling* doctrine is

that allegations of the complaint have been accepted as true. Where the defendant

has admitted the allegations of the complaint, those allegations become stipulated

facts and, therefore, it is appropriate to allow the defendant to rely on plaintiff's

allegations of infringement to meet its burden. As this Court explained, "Because

[defendant] <u>conceded infringement</u> for the limited purpose of its summary

judgment motion, and because [plaintiff] maintains the allegation of infringement

upon which its suit is based, <u>it is undisputed</u> for the purpose of this appeal that

[defendant's product] <u>is an embodiment</u> within the scope of the asserted claims.

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*, 661 F.3d 1378, 1382 (Fed.

Cir. 2011) (emphasis added) (citing *Evans Cooling*, 125 F.3d at 1451).

The *Evans Cooling* doctrine has no application here because none of the

circumstances necessary for that doctrine to apply exists.  Most importantly, there

is no evidence that Google, or any of Google's customers, conceded for any

purpose that their websites meet the limitations of the asserted claims of

Beneficial's patents.  Accordingly, the trial court erred in finding that under these

cases, it was appropriate to deviate from the general rule that a plaintiff cannot

prove infringement based on contentions alone.

### B.    Google failed to present substantial evidence of contributory infringement.

Google had the burden of proving that it contributed to its customers'

infringement of the asserted claims of the patent when it provided its customers

with Google's DoubleClick ad serving technology.  To meet this burden, "in

addition to proving an act of direct infringement, plaintiff must show that

defendant 'knew that the combination for which its components were especially

made was both patented and infringing' and that defendant's components have 'no

substantial non-infringing uses.'" *Cross Med. Products, Inc. v. Medtronic Sofamor

Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005)(quoting *Golden Blount, Inc. v.*

*Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed.Cir.2004) (internal quotations omitted).

Google failed to present sufficient evidence to prove either of these two requirements.

> **1.    Google failed to present substantial evidence that it knew DoubleClick was especially made or adapted to be used in a combination that infringe Beneficial's patents.**
>
> > **a.    Google was required to present evidence that Google sold DoubleClick "knowing the same was especially made or adapted for use in an infringement" of Beneficial's patents.**

Beneficial argued in its JMOL that Google was required, but failed, to present substantial evidence that it sold DoubleClick knowing that DoubleClick was especially made or adapted to be used in a website that infringed Beneficial's patents.[3]  In response, Google argued that it did not have to establish that it knew that DoubleClick was especially made or adapted for use in Beneficial's patents.

---

[3]    The trial court mischaracterized Beneficial's argument: "Beneficial argues that to satisfy the 'especially made' requirement of contributory infringement, Google must prove <u>that DoubleClick was especially made to infringe each and every limitation</u> of Beneficial's patents." A0017 (emphasis added).  The trial court concluded that no authority "imposes such a rigid requirement" and Google need only show that it sold DoubleClick with "knowledge that the components would be used in an infringing system." *Id*. (internal quotes omitted).  Here the trial court attacked a strawman—Beneficial had never argued that proof was required that Google knew <u>DoubleClick would infringe</u> every element.  Rather, Beneficial had argued that Google was required to prove that it sold DoubleClick knowing "that DoubleClick was especially made or adapted to be used <u>on a website that met each of the limitations of Beneficial's patents</u>." A1397; A1401. (emphasis added).

Google contended that "to satisfy the 'especially made' language, all Google had to do (and did do) is present evidence upon which a reasonable jury could conclude that DoubleClick has no substantial non-infringing uses." A1423. Google's assertion is contrary to controlling authority.

Section 271 (c) provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).

A contributory infringement claim thus requires proof of an act of direct infringement and three essential elements:

(1) defendant sold a component "constituting a material part of the invention,"

(2) defendant sold such component "knowing the same to be especially made or especially adapted for use in an infringement of such patent," and

(3) the component was "not a staple article or commodity of commerce suitable for substantial non-infringing use."

27

The second element and the third element are two separate elements.  The statutory language is crystal clear on this issue and this court has repeatedly so held:

> "Thus, Blount must show that Peterson knew that the combination for which its components were especially made was both patented and infringing."

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (internal quotes and cites omitted); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009) ("In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant knew that the combination for which its components were especially made was both patented and infringing and that defendant's components have 'no substantial non-infringing uses." (internal quotes and citations omitted)); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) (same).

Moreover, the knowledge element for contributory infringement is not satisfied merely by proof that defendant knew of the patent and knew its component was especially adapted to be used in a particular product; in addition, plaintiff must prove that when defendant sold the component, defendant had *knowledge that the product infringed the patent*.  This was the holding of the Supreme Court in *Aro*:

Was Aro 'knowing' within the statutory meaning because—as it admits, and as the lower courts found—it knew that its replacement fabrics were especially designed for use in the 1952—1954 Ford convertible tops and were not suitable for other use? Or does the statute require a further showing that Aro knew that the tops were patented, and knew also that Ford was not licensed under the patent so that any fabric replacement by a Ford car owner constituted infringement?  On this question a majority of the Court is of the view that s 271(c) does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing.

*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964).

In *Global-Tech*, the Supreme Court confirmed the vitality of Aro: "In *Aro II*, a majority held that a violator of § 271(c) must know 'that the combination for which his component was especially designed was both patented and infringing,'" and as we explain below, that conclusion compels this same knowledge for liability under § 271(b)."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2067 (2011) (quoting *Aro*, 377 U.S. at 488) (internal cites omitted).

This Court has repeatedly applied and reaffirmed that holding.  *E.g., Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) ("However, we disagree with Philips' claim that it need only show that Netgear knew of the patent and of the relevant acts, not whether these acts constituted infringement. Our case law is clear that Philips must show that Netgear knew that the combination for which its components were especially made was both patented and infringing." (internal quotes omitted); *Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609

F.3d 1308, 1317 (Fed. Cir. 2010) ("Wordtech fails to identify proof of elements required for contributory infringement. …The record also fails to show that any parts that Defendants may have sold were especially designed for infringing products. … Wordtech identifies no evidence that these items are … especially made or especially adapted for use in an infringement of such patent"); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009) ("In order to succeed on a claim of contributory infringement … plaintiff must show that defendant knew that the combination for which its components were especially made was both patented and infringing…." (internal quotes and citations omitted)); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) ("In order to succeed on a claim of contributory infringement… plaintiff must show that defendant knew that the combination for which its components were especially made was both patented and infringing…." (internal quotes omitted)); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) ("Thus, Blount must show that Peterson knew that the combination for which its components were especially made was both patented and infringing." (internal quotes and cites omitted)).

As shown below, the record contained no evidence that when Google sold DoubleClick, Google knew that it was especially made or adapted for use in infringing Beneficial's patents.

b.    **Google presented no evidence that when it sold DoubleClick it knew that DoubleClick was especially made or adapted for use in a website that was patented and infringing.**

Google was required to present sufficient evidence to establish that DoubleClick was especially made or adapted for use in a product and that, at the time Google sold DoubleClick, Google "knew that the combination for which its components were especially made was both patented and infringing." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (internal quotes and cites omitted).   Google presented no evidence on that issue. Indeed, Google presented no evidence to establish the date that it sold DoubleClick to any of the five customers that were purported direct infringers, much less evidence as to Google's state of knowledge on that date.  The only evidence adduced on the issue was adduced by Beneficial.  That evidence established that (i) Google's state of knowledge was that using DoubleClick did not infringe the patents, and (ii) DoubleClick was not especially adapted for use in a website that infringed Beneficial's patents.

None of Google's witnesses testified that when Google sold DoubleClick to its customers, it did so with the knowledge that its customer would use DoubleClick in a combination that infringed Beneficial's patents.  Indeed, Google's witnesses testified that Google did not believe, and has never formed the

opinion, that its sale of DoubleClick to any of its customers constitutes indirect

infringement by Google.  A0940:13-18.

The trial court, in denying Beneficial's JMOL, summarized its reasoning as

follows:

> Here, Google went through two prior lawsuits where Beneficial
> accused its subsidiary (Youtube) of infringing the '702 and '943
> Patents, based at least in part on Youtube's use of DoubleClick.
> Therefore, Google knew that, if it provided DoubleClick to another
> customer without alteration, that customer would use DoubleClick in
> an "infringing combination," just as Beneficial had alleged.

A0017.  This reasoning, respectfully, has two fundamental flaws.

*Flaw 1*: This reasoning does not permit the inference that Google had

knowledge that a <u>customer's website</u> would meet each limitation of Beneficial's

patent claims.  The only claim language that DoubleClick was potentially relevant

to was the "advertising related information" required by the claims.  A1230:20-

A1231:8.  To infringe a claim of the patents, however, it is not enough for a

website to have "advertising related information."  Instead, a website must contain

nine different major elements, each of which contains numerous limitations.  *See,

e.g.* A1674; A1731-1732; A1734; A1736.  Therefore, that Google "provided

DoubleClick to another customer without alteration" (A0017) would at most allow

the inference that the "advertising related information" limitation was met by the

customer's website (assuming there was also evidence that Google knew that

DoubleClick provided "advertising related information" as used in the claims).

But Google's provision of DoubleClick without alteration permits no inference

about the operation of all other aspects of the customer's website, much less an

inference that the customer's website would meet the numerous other limitations of

the claims of Beneficial's patents.  Contributory infringement requires proof not

about defendant's knowledge of its component, but rather that defendant "knew

that the combination for which its components were especially made was both

patented and infringing." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d

1054, 1061 (Fed. Cir. 2004) (internal quotes and cites omitted).

*Flaw 2*: The trial court reasoned that from an "accusation" that YouTube

infringed we may infer Google's knowledge that YouTube infringed.  Under

controlling law, however, this reasoning will work only if the evidence is in one of

two states.  The trial court's inference might work if there were a complete absence

of evidence on what Google did in response to that accusation.  With such an

evidentiary vacuum, it might be reasonable to infer that Google remained willfully

blind to the truth of the accusations, and willful blindness is sufficient to establish

knowledge.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068

(2011) (holding that "the same knowledge is needed for induced infringement

under § 271(b)" as under § 271(c), and such knowledge may be established by

proving defendants' "knowledge under the doctrine of willful blindness").

Alternatively, the trial court's inference would work if there were evidence that,

although Google did not ignore the accusation, Google did not have a good faith, reasoned basis to conclude YouTube did not infringe. *See Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367-68 (Fed. Cir. 2013) (noting that "a good-faith belief of non-infringement is relevant evidence" to show an accused inducer's lack of intent), *cert. granted in part*, 135 S. Ct. 752 (2014).

Neither state applies here. Rather than evidence of willful blindness or lack of good faith, the undisputed evidence was that Google actively investigated the accusation and concluded, based on reasoned analysis, that neither DoubleClick nor Youtube met the limitations of the claims. For example, Google's in house patent litigation attorney, who oversaw Google's participation in its previous trials against Beneficial and was instrumental in negotiating Google's settlement with Beneficial, testified that, based on Google's expert's analysis of its system and the asserted patents, Google has always held the opinion that the DoubleClick ad tag did not meet the asserted patents' limitation of "advertising related information." A0852:3-A0857:24; A0910:22-A-0911:6; A0936:21-A0937:7. And the jury was presented with Google's interrogatory responses in which Google explained why the YouTube website does not meet numerous limitations required in the claims. A1887; A0856:4-A0857:20; A0860:5-16; A0862:13-20; A0857:21-24; A0862:25-A0864:25; A0936:13-0937:7; A0910:22-A0911:6.

Google has never contended—much less pointed to record evidence to establish—that Google's analysis, belief, and opinions that DoubleClick and YouTube did not meet the elements were frivolous or held in bad faith. Therefore, the evidence is undisputed that Google believed in good faith that neither DoubleClick nor YouTube met the elements of the claims. Accordingly, it was improper to infer from the bare <u>accusation</u> of YouTube's infringement that Google had knowledge that YouTube infringed. And it was even more improper to take the next step and infer that Google knew its customers' websites would infringe Beneficial's patents.

Because the record contains no evidence that Google knew when it sold DoubleClick that DoubleClick would be used in a website that infringed the Beneficial's patents, Google's attempt to show contributory infringement fails as a matter of law.

> **c.    The evidence established that Google knew that DoubleClick was not "especially made or adapted for use" in an infringing website.**

Google not only failed to present substantial evidence that it knew that DoubleClick was especially made or adapted for use in the infringing patents; the overwhelming evidence presented at trial demonstrated the opposite. In fact, the evidence was undisputed that DoubleClick was Google's version of a common

commercial product that Google designed to be used on a variety of platforms that do not infringe—and have never been accused of infringing—Beneficial's patents.

Google's corporate representative, Mr. Bellack, testified that DoubleClick was not especially adapted for use on websites that undertake the special requirements of Beneficial's patents.  Instead, he testified, DoubleClick was designed for use with websites that would not meet the limitations of the asserted claims, including on websites:  "that [do] not store information that's used to identify a user" (A0998:4-7); "that do not ask a user any information about themselves" (A0998:12-15); and "that don't use cookies."  A0999:1-3.  Mr. Bellack likewise testified that DoubleClick can be used to serve ads on websites that do collect user information, but where the user has not provided the website with any user information (A0998:8-19); and to serve ads to users that have blocked or disabled cookies.  A1000:11-17.  He confirmed, in fact, that DoubleClick was designed to serve ads on <u>any</u> website.  A0995:18-A0996:1 ("there is no website that cannot display[] ads served by DoubleClick"); A0965:1-15 (customers of DoubleClick are "really anyone who is in the business of selling online advertisements alongside content or services").

Moreover, DoubleClick was designed to be "flexible" so that it could serve ads on apparatuses that are not even websites, and therefore could not infringe Beneficial's patents, including mobile applications, digitally connected televisions,

and video games.  A0996:20-A0997:8; A1050:11-24.  DoubleClick was designed

"to serve ads on any device that is capable of connecting to the Internet."

A0997:12-16.

* * * *

Because the record contains no evidence that Google sold DoubleClick

"knowing the same was especially made or adapted for use in an infringement" of

Beneficial's patents, Google cannot establish contributory infringement.

>    **2.    Google failed to present substantial evidence that
>         DoubleClick was a non-staple article with no substantial
>         non-infringing uses.**

To prevail on its theory of contributory infringement, Google also had the

burden of presenting substantial evidence that DoubleClick was a non-staple article

with no substantial non-infringing uses.[4]  *Cross Med. Prods., Inc. v. Medtronic*

*Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005)(citing *Golden Blount,*

*Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004)).  "Non-

infringing uses are substantial when they are not unusual, far-fetched, illusory,

impractical, occasional, aberrant, or experimental."  *Vita-Mix Corp. v. Basic*

*Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009) (emphasis added).  Despite

---

[4]    The evidence presented to the jury was that Google's DoubleClick ad tag is
merely Google's commercial version of a stock product that has many uses.  For
example, Google admitted that an "ad tag" is simply a snippet of code that is not
only used by Google, but is used by other third-party ad servers, to serve ads on
websites.  A1022:22-24; A1023:14-25.

having the burden of proof, Google failed to present sufficient evidence on which a reasonable fact finder could conclude that DoubleClick has no substantial non-infringing uses.  Google chose a trial strategy designed to evade the issue by switching the burden to Beneficial.  This strategy is accurately summed up in its counsel's closing argument.  In closing, Google's counsel never argued that Google presented evidence to prove this element.  Instead, Google argued that *Beneficial did not prove* that DoubleClick had substantial non-infringing uses.  The entirety of counsel's argument is reproduced here:

```
 2          Third element:  Component is not a common
 3   or staple item and has no substantial non-infringing
 4   use.
 5          And there are instructions on this, but
 6   at its core, this is an argument by Beneficial
 7   suggesting that they have proven that there's no
 8   contribution, because they claim Google's DoubleClick
 9   has substantial non-infringing uses under their theory
10   of this -- of the infringement.
11          However, if you listen closely to the
12   evidence and review closely the evidence and review in
13   your memory the testimony of the witnesses, you'll
14   recall that the evidence put forward on substantial
15   non-infringing uses, much of it only applied to some of
16   the claims at issue, not all.
17          And if Beneficial sued on even one of
18   those claims with respect to which there were no
19   substantial non-infringing uses, that's breach.
20          Secondly, we know that the evidence they
21   put forward on substantial non-infringing use wasn't
22   substantial at all.  We heard testimony on, for example,
23   on whether or not users disable cookies.  That is
24   something that is very infrequently done, and we heard
25   that from Mr. Bellack himself.
                                                    55
```

```
 1          So, ladies and gentlemen, that -- that
 2   establishes that Google's DoubleClick is not a common or
 3   staple item and has no substantial non-infringing use
 4   under Beneficial's theory.
```

A1334:2-A1335:4.

Consistent with this argument, at trial Google focused solely on the sufficiency of the evidence produced by Beneficial to establish that DoubleClick *has* substantial non-infringing uses, and completely ignored the fact that Google had the burden of proving that DoubleClick has *no* substantial non-infringing uses.

Despite having that burden, none of Google's witnesses presented evidence that Double-Click had no substantial non-infringing uses.

Google's first witness, Mr. Trinh, was asked no questions, and provided no testimony, regarding whether DoubleClick had no substantial non-infringing uses. A0852-A0955.   Google's second witness, Mr. Bellack, was never asked to provide testimony about whether DoubleClick had no substantial non-infringing uses. Instead, Google limited his testimony to rebutting whether the non-infringing uses identified by Beneficial were substantial.[5]   And Mr. Bellack provided no testimony to rebut two substantial non-infringing uses—serving advertisements on websites that do not have a store for storing user identification ('702 patent) and serving interstitial or pop-up ads ('943 patent).   Moreover, on cross-examination, Mr. Bellack provided testimony that supported Dr. Almeroth's opinion.   Mr. Bellack admitted that DoubleClick can be used to serve ads on a website:  "that does not store information that used to identify a user" (A0998:4-7) "that do not ask a user any information about themselves" (A0998:12-15); and that collect user information, but where the user has not provided the website with any user information (A0998:8-19).

---

[5]     Beneficial introduced the expert testimony of Dr. Almeroth, who provided his opinions regarding three substantial non-infringing uses for DoubleClick:  (i) serving ads to users who have disabled cookies; (ii) serving ads to websites that did not have a store for storing user identification or to users that did not provide user identification; and (iii) serving ads non-concurrently with the service presentation, such as interstitial ads.   A1208:2-A1209:15; A1216:19-A1218:1.

Google's third witness was its technical expert, Dr. Alexander, who admitted

he did not "offer an opinion on whether DoubleClick has non-infringing uses."

A1130:18-A1131:10.  Nor did Dr. Alexander provide any other testimony during

his examination from which a jury could conclude that DoubleClick has no

substantial non-infringing uses.  In fact, Dr. Alexander admitted that he does not

know how any of the Google customer websites operate.  A1132:16-20.

Therefore, Dr. Alexander necessarily would have no basis to know whether those

websites are capable of serving ads in non-infringing ways.  Accordingly, the

testimony of Dr. Alexander could not serve as a basis for a jury to conclude that

DoubleClick has no substantial non-infringing uses.

The trial court reasoned that Google established no substantial non-

infringing use based on "Beneficial's infringement contentions, which identified

123 websites."  A0018; *id*. ("a reasonable jury could have found that [Google's]

customers only used DoubleClick in an infringing fashion as described in detail in

Beneficial's infringement contentions.").  But Beneficial's infringement

contentions compared the websites to the unconstrued claims, not to the claims as

construed.  As demonstrated above, a determination of whether a website infringes

must, as a matter of law, be based on comparing the website to the claims as

construed.  *Presidio Components*, 702 F.3d at 1358.  Moreover, as described

above, the court's construction of the claims had a material effect on determining

infringement.  Accordingly, Beneficial's infringement contentions provided no evidence on whether the websites met the claims as construed, and, therefore, no evidence on whether those particular websites constituted non-infringing uses of DoubleClick.

Moreover, if there were 123 websites that infringed the claims, that fact would not imply anything about whether DoubleClick has substantial non-infringing uses, because it tell us only about the small fraction of websites that were selected as websites that infringe the patents.  It tells us nothing about the websites that were not selected.  If anything, the reasonable inference is that such non-accused websites do not infringe.

### C.    Google failed to present substantial evidence of inducement.

To prove that it induced its customers to infringe the patents-in-suit, Google had to establish that it (1) knowingly induced infringement of the asserted claims of Beneficial's patents, and (2) had the specific intent to encourage the Accused Google Partners to infringe those patents. *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1292 (Fed. Cir. 2008).  Google failed to present substantial evidence to establish either of these requirements.

### 1.    Google failed to show that it induced each limitation of the asserted claims.

Having the requisite intent to cause direct infringement requires that the inducer intend to induce infringement of *each* limitation of the asserted claim, not

just one. *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005) vacated and remanded on other grounds *sub nom. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). In *MercExchange*, the plaintiff accused defendant eBay of actively inducing ReturnBuy, an entity that owned a website hosted by eBay, to infringe plaintiff's patents. *MercExchange*, 401 F.3d at 1325-26. The Federal Circuit found that the only testimony that was relevant to whether eBay encouraged or induced ReturnBay to infringe any claim of the asserted patents was testimony that eBay worked with ReturnBay to facilitate posting goods for sale through eBay. *Id*. The Federal Circuit held, however, that this evidence was insufficient to establish eBay's intent to induce infringement because "[p]osting goods for sale . . . is relevant to only one limitation of the claims, i.e., 'a communications means for communicating with the market.'" *Id* at 1332. Because there was no evidence in the record to establish that eBay intended to induce any other limitations of the asserted claims, the Federal Circuit reversed the portion of the judgment finding eBay liable for induced infringement. *Id*. at 1333.

Accordingly, Google was required to prove that it induced infringement of the '702 and '943 patents. Google could not merely present evidence that it encouraged its customers to infringe one limitation of the asserted claims.

43

For example, the only part of claim 53 that related to Google's DoubleClick was a limitation that required programmatic elements for combining "advertising related information" with service related information.



Similarly, some but not all of the claims 1, 49, and 67 contain limitations that require the use of "advertising related information."  A1687.

To induce infringement claim 53 of the '702 patent, Google had to present substantial evidence that it instructed or encouraged its customers with respect to *each of the limitations* of that claim, including the limitations that the customer's website (a) has a store for storing user identification for first and second user, (b) has a network interface for transmitting first information (*e.g.*, cookies) to the user, (c) has a network interface for receiving first responsive information (*e.g.*, cookies) from the user that identifies the user, (d) uses the first responsive information to provide the user with access to a service offered by the website, (e) has one or

more programmatic elements for combining advertising related information with service related information and transmitting that combined data over the network to the user's computer in a format that results in the concurrent display of the service and the advertisement; and (f) has a controller for providing a first and second user with access to an instance of a service offered by the customer's website.

To induce infringement of asserted claims 1, 49, and 67 of the '943 patent, Google had to present substantial evidence that it encouraged or instructed its customers to infringe each limitation of those claims, including for example, that it instructed its customers to use a method of advertising that infringed the following limitations:

- two or more display presentations from the information are presented are displayed on at least a portion of a display of the user node, wherein at least two of said display presentations are successively displayed. (Claims 1, 49);

- overlapping with a display of said one of the display presentations, P1, at the user node is a display of a first one or more advertising presentations for providing information related to one or more of a product and a service. (Claim 1, 49);

- transmitting, via the Internet, data (e.g., cookies) related to communications between: (a) the interactive service and (b) the user. (Claim 49, 67)

- receiving a responsive Internet transmission (e.g., cookies) indicative of the first information being present on the user node.  (Claim 49, 67).

Google presented no such evidence.

The trial court acknowledged that under *MercExchange*, "one who 'encouraged activities related to some but not all limitations of the asserted claims' cannot be held liable for active inducement."  A0026.  The court erroneously concluded, however, that *MercExchange* was "readily distinguishable," because in *MercExchange*, "all eBay did was to allow the accused direct infringer to post goods on its website, which acts pertained to only one limitation of the asserted claims."  A0027.  The trial court found that this case is distinguishable from *MercExhchange* because unlike the defendant in *MercExchange*, "Google provided to its customers the entire DoubleClick product, which had been accused of infringing *each and every* limitation of the asserted patents."  A0027 (emphasis in original].  The trial court is simply wrong.

*First*, the trial court cites to no evidence to support its conclusion that DoubleClick "had been accused of infringing *each and every* limitation" in the prior lawsuits, because there is none.  In its complaint, Beneficial does not identify DoubleClick, or include any allegation that DoubleClick is accused of infringing each and every limitation of Beneficial's patents.  A0292.  Similarly, Beneficial's infringement contentions do not identify DoubleClick as an infringing device or

46

component.  And because none of the asserted claims require the use of advertising related information (*i.e.*, the claim term that would be satisfied by DoubleClick) *in each and every limitation*, Beneficial's infringement contentions necessarily do not include any contention, for any claim, that accused DoubleClick of infringing each and every limitation.

*Second*, Google did not even attempt to establish that it induced its customers to infringe each and every limitation of the asserted claims.  In fact, in response to Beneficial's JMOL, Google argued that it was not required to meet this burden.  A1427. ("Moreover, Beneficial misstates the law when it claims that 'Google had to present substantial evidence that it encouraged or instructed its customers to infringe *each* limitation of a claim of those patents.").  As a result, the only evidence that Google presented to meet its burden that it induced its customers to infringe the asserted claims of Beneficial's patents was that Google instructed its customers regarding how to use its ad serving technology, DoubleClick.  A1034:11-A1035:4; A1331:2-13.  As explained above, however, instructing its customers how to use DoubleClick ad tags would, at best, result in instructing them how to infringe one part of one limitation of claim 53 of the '702 patent, and only some of the limitations of the '943 patent.  One who encouraged activities related to some but not all limitations of the asserted claims, cannot be held liable for active inducement.  *MercExchange, Inc.*, 401 F.3d at 1332.

### 2. Google failed to prove that it had the affirmative intent to induce infringement.

In *Global-Tech*, the Supreme Court held "that induced infringement under §

271(b) requires knowledge that the induced acts constitute patent infringement."

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2067 (2011).  This is

the "same knowledge for liability" for contributory infringement under section

271(c).  *Id.*, 131 S. Ct. at 2068.  The jury was presented with the following

substantial evidence that Google had a good faith belief that it did not infringe

Beneficial's patents:

(1) Google's interrogatory response:  In response to interrogatories asking

Google to set forth each fact that supports its contention that it did not infringe the

asserted patents, Google provided a detail, multi-page response that included the

entire basis upon which Google believed that it did not infringe the asserted claims.

A1876.

(2) testimony from Google's in-house patent litigation counsel:  Google's

witnesses, Mr. Trinh, was Google's in-house patent litigation counsel with the

"day-to-day responsibility" for overseeing Beneficial's patent infringement

lawsuits against Google.  A0856:4-A0857:20; A0860:5-16; A0862:13-20.  In this

capacity, Mr. Trinh was intimately familiar with the allegations in Beneficial's

complaint and the contentions in Beneficial's preliminary infringement

contentions.  A0857:21-24; A0862:25-A0864:25.  Mr. Trinh admitted that as of the

48

date of trial, four years after Google settled its lawsuit with Beneficial, Google still did not believe that it was infringing the patent either directly or indirectly. A0936:13-0937:7.

The trial court denied Beneficial's JMOL, however, because it concluded that "nothing in the record suggests that Google's belief was formed in good faith." A0030. The trial court stated that, in particular, "there is no evidence showing that Google ever obtained an opinion of counsel finding non-infringement." A0030. The trial court's reasoning fails at two levels.

*First*, it was Google, not Beneficial that had the burden of proof. The undisputed evidence was that Google had consistently believed and opined that neither DoubleClick nor its customer's websites infringed the patents. Accordingly, for Google to show that Google had knowledge that the induced acts constitute patent infringement, it was incumbent on Google to prove that its belief was formed in bad faith. Google submitted no such evidence.

*Second*, the undisputed evidence was that Google's belief was in good faith and was supported by opinions of counsel. Google's in-house counsel, Mr. Trinh, testified that Google maintained its non-infringement belief after Google had the opportunity to have its experts analyze its system and compare it to the claims of the patents. A0910:22-A0911:6.

Because Beneficial presented substantial evidence that Google held a good-faith belief that (i) the DoubleClick ad tags that it provided to its customers do not satisfy the limitations of the asserted patents and (ii) Google does not and has never directly or indirectly infringe the assert claims, the jury could not have found that Google had the affirmative intent to induce infringement.

## VIII.    Conclusion.

For the foregoing reasons, this Court should reverse the jury's verdict and the trial court's order denying Beneficial's motion for judgment as a matter of law.

Appellant requests its costs on appeal.

January 16, 2015                                Respectfully submitted,

                                                */s/ Julien A. Adams*
                                                Julien A. Adams
                                                Gregory S. Dovel
                                                Dovel & Luner, LLP
                                                201 Santa Monica Blvd., Suite 600
                                                Santa Monica, CA 90401
                                                (310) 656-7066
                                                julien@dovellaw.com
                                                greg@dovellaw.com

                                                David E. Rosen
                                                Murphy Rosen LLP
                                                100 Wilshire Blvd., Suite 1300
                                                Santa Monica, CA 90401
                                                (310) 899-3300
                                                drosen@murphyrosen.com

                                                *Counsel for Plaintiff–Appellant*
                                                *Beneficial Innovations, Inc.*

# <u>ADDENDUM</u>

# TABLE OF CONTENTS

**Addendum Page**

Judgment (Aug. 26, 2014) ...............................................................A0001

Jury Verdict (Jan. 23, 2014)............................................................A0003

Memorandum and Opinion Denying Beneficial's Motion for JMOL
(Aug. 21, 2014) ...............................................................................A0005

Memorandum Opinion and Order Granting in Part and Denying in
Part Google's Motion for Attorneys' Fees, Costs and Expenses
(Aug. 26, 2014) ...............................................................................A0040

Order regarding Admissibility of Exhibits at Trial (Jan. 10, 2014) ................A0056

Order Denying Beneficial's Motion for Reconsideration of the
January 10, 2014 Order regarding Admissibility of Exhibits at Trial
(Jan. 20, 2014)................................................................................A0058

U.S. Patent No. 6,712,702 B2.........................................................A1630

U.S. Patent No. 7,496,943 B1.........................................................A1687

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

GOOGLE INC.,                                    §
                                               §
    *Third-Party Plaintiff*,                  §
                                               §
    v.                                        §
                                               §   Civil Action No. 2:11-cv-00229-JRG-RSP
BENEFICIAL INNOVATIONS, INC.,                  §
                                               §
    *Plaintiff.*                              §
                                               §
    v.                                        §
                                               §
ADVANCED PUBLICATIONS, INC., a                 §
New York corporation; ALM MEDIA               §
PROPERTIES, LLC, a Delaware limited           §
liability company; AMAZON.COM, INC., a        §
Delaware corporation; AMERICA MEDIA,          §
INC., a Delaware corporation;                 §
AUTOTRADER.COM, INC., a Delaware              §
corporation; DELL INC., a Delaware            §
corporation; DEMAND MEDIA, INC., a            §
Delaware corporation; EXPEDIA, INC., a        §
Delaware corporation; RODALE INC., a          §
Pennsylvania corporation; SCRIPPS             §
NETWORKS, LLC, a Delaware                     §
corporation; VIACOM INC., a Delaware          §
corporation; VILLAGE VOICE MEDIA              §
HOLDINGS, LLC, a Delaware corporation,        §
                                               §
    *Defendants.*                             §

## <u>JUDGMENT</u>

A jury trial commenced in this case on January 21, 2014 between Google Inc. ("Google")

and Beneficial Innovations, Inc. ("Beneficial").   The jury returned a unanimous verdict on

1

January 23, 2014, finding as follows:

1.      Beneficial breached the 2010 Settlement Agreement between Beneficial and Google by bringing a lawsuit against the Accused Google Customers[1] for infringement of United States Patent Nos. 6, 712,702 (the "'702 Patent") and 7,496,943 (the "'943 Patent") based on these customers' use of Google's DoubleClick product.

2.      Google is entitled to recover nominal damages in the amount of one dollar for Beneficial's breach of the Settlement Agreement.

(Dkt. No. 514.)

In accordance with the jury's verdict and the entirety of the record available to the Court, and pursuant to Rule 54(b) of the Federal Rule of Civil Procedure, it is hereby **ORDERED, ADJUGED** and **DECREED** and the Court **ENTERS JUDGMENT** as follows:

1.      Beneficial is liable to Google for breach of the 2010 Settlement Agreement between Beneficial and Google.

2.      Google shall recover from Beneficial and Beneficial shall pay to Google nominal damages in the amount of one dollar for Beneficial's breach of the Settlement Agreement.

3.      Google shall recover from Beneficial and Beneficial shall pay to Google a total of **$ 1,302,673.27** for Google's reasonable attorneys' fees, costs and expenses.

**So ORDERED and SIGNED this 26th day of August, 2014.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[1] As used herein, the "Accused Google Customers" refer to Advance Publications, Inc., ALM Media Properties, LLC, American Media, Inc., Autotrader.com, Inc., and Demand Media, Inc. collectively.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| GOOGLE INC. ,<br><br>    PLAINTIFF,<br><br>V.<br><br>BENEFICIAL INNOVATIONS, INC.,<br><br>    DEFENDANT. | CIVIL ACTION NO. 2:11-CV-229-JRG-RSP<br><br>JURY TRIAL REQUESTED |

## VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's charge.  As used herein, "Google" means Google Inc.  As used herein, "Beneficial" means Beneficial Innovations, Inc.  As used herein, the "Accused Google Customers" refer to Advance Publications, Inc., ALM Media Properties, LLC, American Media, Inc., Autotrader.com, Inc., and Demand Media, Inc. collectively.

**Question No. 1:**

In answering these questions, you are to follow all of the instructions I have given you in
the Court's charge. Did Beneficial breach the Settlement Agreement between Beneficial and Google by bringing a lawsuit against the Accused Google Customers for infringement of the '702 and '943 patents based on their use of Google's DoubleClick product?

**Answer YES or NO**  _Yes_

1

IF YOU ANSWERED "YES' TO QUESTION NO. 1, THEN ANSWER QUESTION NO. 2.

IF YOU ANSWERED "NO" TO QUESTION NO. 1, THEN DO NOT ANSWER QUESTION

NO. 2.


**Question No. 2:**

Is Google entitled to recover nominal damages in the amount of one dollar?

**Answer YES or NO** _Yes_


Signed this _23rd_ day of _JAN._ , 201_4_.

_____
JURY FOREPERSON

2

A0004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| GOOGLE INC., | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 2:11-cv-00229-JRG-RSP |
| | § | |
| BENEFICIAL INNOVATIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## <u>MEMORANDUM AND OPINION</u>

On January 23, 2014, after a three day jury trial, a jury reached a verdict regarding Google Inc.'s ("Google") breach of contract claim against Beneficial Innovations, Inc. ("Beneficial"). (*See* Dkt. No. 514.) The jury found that (1) Beneficial had breached the prior Settlement Agreement between Beneficial and Google by bringing a lawsuit against certain Google customers for infringement of United States Patent Nos. 6, 712,702 (the "'702 Patent") and 7,496,943 (the "'943 Patent") based on the customers' use of Google's DoubleClick product; and (2) Google was entitled to recover nominal damages in the amount of one dollar. (*Id.*) Beneficial now seeks judgment as a matter of law to overturn the jury's verdict. (*See* Dkt. No. 541.) Having reviewed the parties' written submissions, and for the reasons stated below, the Court **DENIES** Beneficial's motion.

## I.      BACKGROUND

In 2007 and 2009 respectively, Beneficial sued Google (among others) in this Court alleging infringement of the '702 and '943 Patents. (*See* Joint Final Pre-Trial Order, Dkt. No.

1

445, Uncontested Facts.)   Google and Beneficial entered into a settlement agreement in 2010 (the

"Settlement Agreement"), which resolved Beneficial's infringement claims against Google in both

the 2007 and 2009 cases.   (*Id.*)   Paragraphs II.A and II.B of the Settlement Agreement provide as

follows regarding the license Google and its customers obtained under the agreement (the

"license"):

> A. Beneficial and its Affiliates grant a worldwide, royalty-free, non-exclusive, non-transferable (except as provided below) fully paid-up, perpetual, license under the Licensed Patents to (i) Google, YouTube, NBC Universal ("Defendants"), and their past, current, and future Affiliates, including a license for prior activities of future Affiliates, and (ii) ***Defendants and their Affiliates' past, current and future Partners, whether direct or indirect, <u>but only to the extent</u> that Partner's role in making, having made, using, selling, offering for sale, or importing any products or services of Defendants or their Affiliates <u>and only to the extent</u> such act by such Partner would constitute direct or indirect infringement of a claim of the Licensed Patents by Defendants or their Affiliates but for this license.***

> B. For the avoidance of doubt, ***the license in subparagraph (ii) above does not license a direct or indirect customer of Defendants or their Affiliates simply because the customer uses a product or service supplied by Defendants or their Affiliates if such use does not constitute direct or indirect infringement of the Licensed Patents by Defendants or their Affiliates.***   For example, assume (a) claim "x" of a Licensed Patent covers some activity of a Third Party's website, (b) the Third Party uses products or services provided by Google when engaging in the infringing activity, and (c) the provision of those products or services would not constitute direct or indirect infringement by Google of claim "x."   In this example, the Third Party is not licensed under claim "x" to engage in such activity because only the Google products or services are licensed.

> (PTX 1 (emphasis added).)

Beneficial subsequently filed the instant case against a number of entities for infringing the

'702 and '943 Patents.   Some of the named Defendants were and remain Google customers (the

"Accused Google Customers").   Google intervened and answered on behalf of these Accused

Google Customers and raised an affirmative claim for breach of contract against Beneficial.   (*See*

Google's Complaint in Intervention, Dkt No. 193.)   Google claims that Beneficial breached the

Settlement Agreement by bringing a lawsuit against the Accused Google Customers for infringing

the '702 and '943 Patents based on their use of Google's DoubleClick product.   On December 10,

2013, the Court granted all parties' Joint Stipulation to Bifurcate Trial, and bifurcated Google's

claim for breach of contract into a separate trial.   (*See* Dkt. No. 460.)   The resulting verdict is at

issue here.

## II.      LEGAL STANDARD

A motion for judgment as a matter of law should be granted if there is no legally sufficient

evidentiary basis for a reasonable jury to find for a party.   *See* Fed. R. Civ. P. 50.   Upon a party's

renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether

"the state of proof is such that reasonable and impartial minds could reach the conclusion the jury

expressed in its verdict."   Fed. R. Civ. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*,

378 F.3d 482, 487 (5th Cir. 2004).   A jury verdict must stand unless there is lack of substantial

evidence to support the jury's factual findings, or the legal conclusions implied from the jury's

verdict cannot, in law, be supported by those findings.   *Id.*   "Substantial evidence is defined as

evidence of such quality and weight that reasonable and fair-minded men in the exercise of

impartial judgment might reach different conclusions."   *Threlkeld v. Total Petroleum, Inc.*, 211

F.3d 887, 891 (5th Cir. 2000).   "[A] mere scintilla of evidence is insufficient to present a question

for the jury."   *Id.*   In evaluating a motion for judgment as a matter of law, a court must "draw all

reasonable inferences in the light most favorable to the verdict and cannot substitute other

inferences that [the court] might regard as more reasonable."   *E.E.O.C. v. Boh Bros. Const. Co.,*

*L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted).

## III.     ANALYSIS

3

Beneficial argues that it is entitled to a judgment as a matter of law because Google has not met its burden of proving that the Accused Google Customers' use of DoubleClick would constitute indirect infringement by Google.   According to the Settlement Agreement, the license only covers Google customers' use of a product or service *to the extent* that such use "would constitute direct or indirect infringement" by Google but for the license.   (*See* Settlement Agreement, PTX1 ¶ II. A.)   At the jury trial, Google presented two theories of indirect infringement – contributory and induced infringement.   Beneficial, however, contends that Google has failed to present substantial evidence establishing either of its indirect infringement theories.

In a footnote, Beneficial also renews its arguments made in its Rule 50(a) motion at the conclusion of the evidence that Google has failed to present sufficient evidence of direct infringement.   (*See* Dkt. No. 541 at 7.)   Given that there can be "no indirect infringement without direct infringement," the Court will first address the direct infringement issue.   *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2116 (2014).

## A.      Direct Infringement

Beneficial contends that it is entitled to judgment as a matter of law because Google has not met its burden to prove that the Accused Google Customers' use of Google's DoubleClick directly infringed the asserted patents.   Without proving direct infringement, Google would not be able to prove indirect infringement.   *See Limelight*, 134 S. Ct. at 2116.

The parties do not dispute that Google, as the party alleging breach of the Settlement Agreement, bears the burden to prove that the Accused Google Customers' use of DoubleClick would constitute indirect infringement by Google but for the license.   Accordingly, Google bears

4

the burden to prove that the use of DoubleClick would, without the license, directly infringe the asserted patents.   To satisfy such burden, Google proffered the following evidence at trial: (1) Beneficial's Second Amended Complaint accusing each of the Accused Google Customers of infringing the asserted patents; (PTX 4, ¶¶ 19, 26.)   (2) Beneficial's Infringement Contentions which included an element-by-element claim chart matching each element of the asserted claims to a certain feature on the Accused Google Customers' websites; (PTX 8; PTX 9.)   and (3) Beneficial's responses to two sets of interrogatories in this case.   (PTX 12 at 4; PTX 88 at 3.)   All these exhibits were admitted into evidence over Beneficial's objection.   (*See* Dkt. No. 501.)

Beneficial now argues that none of Google's supporting material constitutes evidence of direct infringement.   First, Beneficial asserts that its Second Amended Complaint is not evidence of infringement.   In the complaint, Beneficial alleges that each of the Accused Google Customers has "infringed" and "will continue to infringe" the '702 and '943 Patents because they used the patented methods on their websites "without a license or permission from Plaintiff."   (PTX 4 ¶¶ 19, 26.)   The complaint then goes on to identify a list of alleged infringing websites, including those of the Accused Google Customers.   (*Id.*)   Beneficial does not appear to dispute that, "[a]s a general rule," pleadings made in the same action is admissible "as admissions of the pleading party to *the facts* alleged therein."   *Continental Ins. Co. of New York v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) (emphasis added); *Hardy v. Johns-Manville Sales Corp.*, 851 F.2d 742 (5th Cir. 1988) (same).   Beneficial's position is that its complaint contains only legal conclusions regarding infringement, but no factual allegations that may properly be considered as "admissions."   (*See* Dkt. No. 541 at 7 n.1.)

Courts generally distinguish between "legal conclusion" and "factual allegation" when

5

assessing the probative value of party admissions.   Some courts have held that while "facts alone may be admitted," a legal conclusion cannot be an admission.   *See Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 929 (C.C.P.A. 1978) (in a trademark appeal, "that confusion is unlikely to occur" held as a legal conclusion and not an "admission"); *see also Giannone v. U. S. Steel Corp.*, 238 F.2d 544 (3d Cir. 1956) ("[L]egal conclusions are not admissions.")   Other courts, recognizing the fine line between factual pleadings and legal conclusions, have held that, where facts are in dispute, a party admission, even one akin to a "legal conclusion" rather than an "admission of fact," would be "an important factor in resolving the conflict in the evidence."   *See Borel v. U.S. Cas. Co.*, 233 F.2d 385, 388 (5th Cir. 1956); *Kiepfer v. Beller*, 944 F.2d 1213, 1219 (5th Cir. 1991) (admissions made in trial court pleadings that an individual "was a duly authorized agent" and that his actions were taken "within the scope of his duties" held to be evidence of the matter admitted).

Here, Beneficial contends that, on the issue of direct infringement, all that is contained in its complaint are legal conclusions which cannot constitute a party admission.   This Court disagrees.   It is axiomatic that a complaint must plead "enough *factual* matter that, when taken as true, states a claim to relief that is plausible on its face."   *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).   A complaint claiming direct infringement based solely on "legal conclusions" would have failed the threshold requirement of Federal Rule of Civil Procedure 8(a)(2).   *See id.*   Here, Beneficial's complaint is one that closely follows the sample complaint for direct patent infringement as set forth in Form 18, which requires, among other things, "a statement that defendant has been infringing the patent "by

6

making, selling, and using [the accused device] embodying the patent." *K-Tech Telecomm., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1283 (Fed. Cir. 2013) (emphasis added). Beneficial's complaint alleges that each of the Accused Google Customers has "infringed" and "will continue to infringe" the asserted patents by using the patented methods on their websites, "without a license or permission from Plaintiff." (PTX 4 ¶¶ 19, 26.) That the Accused Google Customers have "infringed" and "will continue to infringe" appear to be legal conclusions. *See id.* (Wallach, J., concurring) (that the defendant "is infringing" found to be legal conclusions). However, the allegation that the Accused Google Customers have been using the patented methods on their websites, "without a license or permission from Plaintiff" is a factual one. *See id.* (that the defendant is "making, selling and using electric motors that embody the patented invention" found to be a factual allegation). Therefore, Beneficial's complaint does not contain only legal conclusions on the question of infringement. This Court concludes that the factual allegations identified above, though closely intertwined with the ultimate legal conclusion, were properly considered by the jury as Beneficial's admission of the matter alleged. *See Continental*, 439 F.2d at 1298.

Beneficial next argues that its infringement contentions, which match each element of the asserted claims to a certain feature on the Accused Google Customers' website, are not evidence of direct infringement. (*See* PTX 8; PTX 9.) According to Beneficial, infringement contentions are mere procedural tools for providing notice of a plaintiff's specific *theories* of infringement, and thus cannot be offered as evidence. The Court agrees that infringement contentions are generally used as Beneficial describes. In a patent infringement case, a plaintiff cannot prove infringement based on contentions alone, and must proffer sufficient evidence supporting the allegations set

7

forth in the infringement contentions.  *See, e.g.*, *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006) (affirming a district court's grant of summary judgment of non-infringement when the plaintiff failed to provide evidence supporting its infringement contentions).

However, there have been situations where infringement contentions were properly admitted as evidence in a patent infringement case, and such contentions alone may suffice to prove that a particular device embodied each and every element of the asserted claims.  *See Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448 (Fed. Cir. 1997); *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363 (Fed. Cir. 2000).   In *Vanmoor*, the defendants moved for summary judgment of invalidity on the basis that the accused product had been on sale before the critical date of the asserted patents.  *See Vanmoor*, 201 F.3d at 1365.   Despite the patentee's objection that the defendants had failed to prove the accused product disclosed each and every element of the asserted claims, the district court granted summary judgment of invalidity, which the Federal Circuit affirmed.  *See id.* at 1366-67.   The Federal Circuit held that, when the item identified as anticipating prior art is the same as that which the patentee contended to be infringing, the patentee's infringement contentions alone satisfy the accused infringer's burden to prove anticipation.  *See id.* at 1367.   Essentially, "the patentee's accusations of infringement serve as a *binding admission*" that the accused device embodies each and every element of the asserted claims.  *Gammino v. Sprint Commc'ns Co. L.P.*, CIV. 10-2493, 2011 WL 3240830, at *2 (E.D. Pa. July 29, 2011) (citing *Vanmoor*, 201 F.3d 1363) (emphasis added).

*Vanmoor* is instructive in the instant case.  Here, Beneficial alleged that each of the Accused Google Customers infringed the '702 and '943 Patents by presenting advertisements on

8

their websites.   (*See, e.g.*, PTX 12 at 4.)   Beneficial's infringement contentions set forth in detail

how each and every element of the asserted claims were allegedly practiced by these customers' ad

presentations.   (*See* PTX 8 at 2-46; PTX 9 at 2-43.)   Although the contentions did not specifically

identify Google's DoubleClick as the accused infringing product, it is undisputed that all Accused

Google Customers used DoubleClick to present ads on their websites.   (Trial Tr. Jan. 21, 2014

PM at 87:3-7 (Trinh).)   According to Google's witness Mr. Mike Trinh, Beneficial's infringement

contentions describe precisely "what DoubleClick did and what [Google] told [its] customers to do

with DoubleClick."   (*Id.* at 93:25-94:7.)   Beneficial's own discovery response confirms that,

while its infringement contentions did not identify any specific technology, the contentions fully

apply to Google's ad-presentation product (i.e., DoubleClick).   (*See* PTX 12 at 3.)   Like the

defendants in *Vanmoor*, who relied on the plaintiff's infringement contentions to prove that the

accused product embodied each and every element of the asserted claims, Google is entitled to use

Beneficial's contentions in the same regard.   *See Vanmoor*, 201 F.3d at 1367.   In both cases, the

plaintiffs' accusations of infringement serve as a "binding admission" which may properly be

considered as evidence by the jury.   *See Gammino*, 2011 WL 3240830, at *2.

In summary, contrary to Beneficial's assertion, both its complaint and infringement

contentions may properly serve as evidence of direct infringement.   Based on this evidence, a

reasonable jury could have found that the Accused Google Customers' use of DoubleClick

constituted direct infringement but for the license.   Accordingly, the Court **DENIES** Beneficial's

renewed motion for judgment as a matter of law that Google failed to present substantial evidence

of direct infringement.

## B.    Contributory Infringement

As noted above, the Settlement Agreement granted a license to the Accused Google Customers *only to the extent* that a customer's use of Google products would constitute direct or indirect infringement by Google.  (*See* PTX 1.)   At trial, Google argued that such condition is satisfied, because the Accused Google Customers' use of DoubleClick constituted either contributory or induced infringement by Google but for the license.   Beneficial now contends that Google failed to present sufficient evidence on either of these indirect infringement theories.   The Court will address each theory in turn.

Contributory infringement prohibits sale and importation into the United States of a component or apparatus for use in a patented process that has no use except through practice of the patented method.   *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1374 (Fed. Cir. 2003).   35 U.S.C. § 271(c) sets forth the framework for proving contributory infringement:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).

The parties do not dispute that Google, as the party alleging breach of the Settlement Agreement, bears the burden to prove that, by supplying DoubleClick to the Accused Google Customers, it either contributed to or induced the infringement of the asserted patents, but for the license.   Beneficial asserts that Google failed to carry this burden with respect to contributory infringement, because (1) Google failed to introduce sufficient evidence establishing that DoubleClick was especially made or adapted to infringe Beneficial's patents; (2) Google failed to

10

present sufficient evidence that DoubleClick has no substantial non-infringing use.

In order to prove contributory infringement, it must be shown that the alleged infringer "knew that the combination for which its components were especially made was both patented and infringing," and that those components have "no substantial non-infringing use." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) ("*Golden Blount I*"). Such "staple article of commerce doctrine codified in § 271(c) was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held for that infringement." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1338 (Fed. Cir. 2008) (citing *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-24 (2005)).

### a. Especially made for use in infringing a patent

At trial, Mr. Sheldon Goldberg, the inventor of the asserted patents and also the sole owner of Beneficial, testified (via video deposition) that the claims asserted in this case "deal with the display of an advertisement, along with website information at the same time" and "in one webpage" to the user. (Trial Tr. Jan 22, 2014 AM at 61:5-11, 66:11-25 (Goldberg).) Google's DoubleClick, on the other hand, is "a set of products that Google provides to advertisers" for displaying advertisements on their websites.[1] (Trial Tr. Jan. 21, 2014 PM at 68:17-20 (Trinh).) Google intended its customers to use DoubleClick to "serve advertisements alongside content and services," much like Mr. Goldberg's description of the asserted claims. (Trial Tr. Jan. 22, 2014 AM at 40:6-14 (Bellack).) In the 2007 and 2009 lawsuits, Beneficial sued Google and a Google subsidiary, Youtube, (among others) for infringing the '702 and '943 Patents respectively. (Trial

---

[1] DoubleClick used to be a separate company before it was acquired by Google in 2008. (Trial Tr. Jan. 21, 2014 PM at 69:1-11 (Trinh).)

Tr. Jan. 21, 2014 PM at 63:9-16 (Trinh).)    According to Mr. Trinh, DoubleClick (the product) was part of those prior lawsuits because Youtube was then using DoubleClick to provide advertisements on its website.  (*Id.* at 68:1-9.)  During the discovery process in such prior lawsuits, DoubleClick (the company) provided documentation to Beneficial, and Beneficial also examined Google engineers who worked with DoubleClick.  (*Id.* at 68:10-15.)  Google and Beneficial eventually settled the 2007 and 2009 lawsuits in 2010.  (*See* PTX 1; Trial Tr. Jan 21, 2014 PM at 74:12-22 (Trinh).)  Google, however, made no major changes in the way it teaches its customers how to use DoubleClick after the 2009 lawsuit.  (Trial Tr. Jan. 22, 2014 AM at 40:24-41:3 (Bellack).)

The evidence establishes that Google had knowledge of both the '702 and the '943 Patents no later than the time Beneficial initiated the 2009 lawsuit.[2]  By 2009, Google had acquired DoubleClick (the company) and started offering DoubleClick as a Google product for its customers to use in displaying ads on their websites.  In both the 2007 and 2009 lawsuits, Beneficial accused Youtube, a Google subsidiary, of infringing the '702 and '943 Patents, based at least in part on Youtube's presentation of ads via DoubleClick.  DoubleClick was the subject of extensive discovery in those prior lawsuits.  Also, certain Google engineers who were then working with DoubleClick were examined by Beneficial during the discovery process.  Accordingly, since at least the 2009 lawsuit, Google knew that, when a customer, such as Youtube, used DoubleClick for its intended purpose, i.e., to display ads on the customer's website, such use would be accused of infringing both the '702 and the '943 Patents.  In other words, since at least the 2009 lawsuit and based on Beneficial's infringement accusations against Youtube, Google knew that using DoubleClick to display ads on a customer's website was "both patented and

---

[2] The '702 Patent was asserted in the 2007 lawsuit and the '943 Patent was asserted in the 2009 lawsuit.

infringing." *See Golden Blount*, 365 F.3d at 1061. Accordingly, a reasonable jury could have found that Google possessed the requisite knowledge that DoubleClick was "especially made or especially adapted" for use in infringing Beneficial's patents.

Beneficial argues that to satisfy the "especially made" requirement of contributory infringement, Google must prove that DoubleClick was especially made to infringe each and every limitation of Beneficial's patents. (*See* Dkt. No. 541 at 21.) Beneficial failed to provide any authority, and the Court is aware of none, which imposes such a rigid requirement on the "especially made" prong of the test for contributory infringement. Indeed, in *Pollock v. Thunderline-Z, Inc*., the Federal Circuit held that the accused infringer's knowledge that the component it supplied "was used in an infringing combination…is enough to establish contributory infringement." *Pollock v. Thunderline-Z, Inc.*, 215 F.3d 1351 (Fed. Cir. 1999); *see also Preemption Devices, Inc. v. Minnesota Min. & Mfg. Co.*, 803 F.2d 1170, 1174 (Fed. Cir. 1986) (knowledge that the components would be used in an infringing system was held sufficient to satisfy the "especially made" requirement). Here, Google went through two prior lawsuits where Beneficial accused its subsidiary (Youtube) of infringing the '702 and '943 Patents, based at least in part on Youtube's use of DoubleClick. Therefore, Google knew that, if it provided DoubleClick to another customer without alteration, that customer would use DoubleClick in an "infringing combination," just as Beneficial had alleged. *See Pollock*, 215 F.3d 1351. Despite such knowledge, Google continued providing DoubleClick to more customers and did not alter the way it instructed its customers to use DoubleClick. Such is sufficient to establish Google's knowledge that DoubleClick was "especially made or adapted" to infringe Beneficial's patents. *See id*.

13

### b. Substantial non-infringing uses

Beneficial next contends that Google has failed to introduce sufficient evidence demonstrating that DoubleClick has no "substantial non-infringing use." As noted above, Google bears the burden to prove that its customers' use of DoubleClick constitutes contributory infringement by Google, and accordingly bears the burden to prove that DoubleClick has no substantial non-infringing uses. Once Google makes out a *prima facie* showing that DoubleClick is not "suitable for substantial non-infringing use," the burden shifts to Beneficial to "introduce some evidence that end-users *actually*" used DoubleClick in a non-infringing way. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006) (emphasis added).

Here, Google cites Beneficial's infringement contentions, which identified 123 websites. All these websites used DoubleClick to display ads, and all of them, according to Beneficial's own admission, infringed each and every limitation of the asserted patents. (*See, e.g.*, PTX 8.) Google's witness Mr. Trinh testified that Beneficial's infringement contentions describe precisely "what DoubleClick did and what [Google] told [its] customers to do with DoubleClick." (Trial Tr. Jan. 21, 2014 PM at 93:25-94:7, 167:19-25 (Trinh).) Google's witnesses further testified that Google intended its customers to use DoubleClick to "serve advertisements alongside content and services," which is a "distinguishing" feature of the asserted patents as identified by Mr. Goldberg, the inventor. (Trial Tr. Jan 22, 2014 AM at 61:5-11, 66:11-25 (Goldberg); Trial Tr. Jan. 22, 2014 AM at 40:6-14 (Bellack); Trial Tr. Jan. 21, 2014 PM at 95:18-21 (Trinh).) Based on the above, a reasonable jury could have found that, per Google's instructions, its customers only used DoubleClick in an infringing fashion as described in detail in Beneficial's infringement contentions. Google has made out a *prima facie* showing that DoubleClick is not "suitable for

14

substantial non-infringing use."

      *i.*     *Using DoubleClick to serve ads to users who have disabled cookies*

To rebut Google's *prima facie* showing, Beneficial's expert Dr. Kevin Almeroth presented three purported "substantial non-infringing uses" of DoubleClick. First, Dr. Almeroth testified that "DoubleClick can be used to serve ads to users who have disabled cookies." (Trial Tr. Jan. 22, 2014 PM at 89:7-16 (Almeroth).) According to Dr. Almeroth, such is a non-infringing use to Claim 53 of the '702 Patent, and Claims 49 and 67 of the '943 Patent. (*Id.*) This is because these claims all require that "[o]n the subsequent network communication, the responsive information is provided back to" the service providing network accessible node ("SPNAN"). (*Id.* at 38:23-39:5.) Dr. Almeroth explained that, in order for the responsive information to be transferred from the user back to the website as claimed, a cookie needs to be established. (*Id.* at 40:15-24.) As such, Dr. Almeroth opined that using DoubleClick to serve ads to users who have disabled cookies is a substantial non-infringing use.

Google's witness Mr. Bellack admitted that DoubleClick "can be used to serve ads on websites that don't use cookies." (Trial Tr. Jan. 21, 2014 PM at 202:1-3 (Bellack).) However, he testified that he personally did not know of any Accused Google Customers who disable cookies, because a lot of features of DoubleClick "stop working without the cookies." (*Id.* at 180:3-13; Trial Tr. Jan. 22, 2014 AM at 38:8-23 (Bellack).) Google's expert Dr. Peter Alexander also testified that, based on his own opinion and knowledge, "it's an extremely small percentage of users who disable cookies." (Trial Tr. Jan. 22, 2014 AM at 97:7-13 (Alexander).) Based on this testimony, a reasonable jury could have found that, although DoubleClick *can* be used in a non-infringing way, i.e., to serve ads to users who have disabled cookies, such use is clearly less

15

than "substantial." Accordingly, a reasonable jury could have found that serving ads to users who have disabled cookies is not a *substantial* non-infringing use of DoubleClick.

<div style="text-align:center">ii.</div> *Using DoubleClick to serve ads to a website that does not store user identification*

Second, Dr. Almeroth testified that serving ads to a website that does not store user identification or serving ads to users that do not provide user identification is another substantial non-infringing use of DoubleClick. (Trial Tr. Jan. 22, 2014 PM at 56:19-57:18 (Almeroth).) Claim 53 of the '702 Patent is an apparatus claim which requires, among other things, that the apparatus (i.e., a website) contain a "store for storing user identification." (PTX 29, Col. 39:49.) At trial, Dr. Almeroth identified an actual website, MomsWhoThink, which used DoubleClick to serve ads without providing a function for user registration. (Trial Tr. Jan. 22, 2014 PM at 55:3-56:3 (Almeroth).) Thus, MomsWhoThink did not contain a "store for storing user identification." Dr. Almeroth further testified that there are other websites like MomsWhoThink, which are "informational sites that don't require registration and just allow a user to access information." (*Id.* at 57:15-18.) Dr. Almeroth also testified that, even with websites which do collect user identification information, many users would go to such websites without providing any information about themselves. (*Id.* at 57:6-8.)

Google's witness Mr. Bellack agreed that DoubleClick can be used to serve ads on a website that "does not store information that's used to identify a user," on a website that does not ask a user any information about themselves, and when users don't provide their identification information. (Trial Tr. Jan. 21, 2014 PM at 201:4-7, 12-19 (Bellack).) However, Mr. Goldberg, inventor of the asserted patents, testified that, although he was "constantly on the Internet" looking for "websites that appear to be violating the patent[s]," he was "personally…not aware of any

<div style="text-align:center">16</div>

website that shows advertising where the underlying web server stores no data about its user[s.]" (Trial Tr. Jan. 22, 2014 AM at 57:11-21, 73:25-74:7 (Goldberg).)   Indeed, by Beneficial's own admission, each of the 123 websites identified in its infringement contentions had a "store for storing user identification."   (*See* PTX 8 at A6-A9.)

The Court finds that serving ads to users who do not provide identification information is not necessarily a non-infringing use.   Claim 53 of the '702 Patent is an apparatus claim which requires "a store for storing user identification."   So long as the underlying website is "reasonably capable" of collecting and storing user identification, it may be found to infringe such limitation of Claim 53, even if certain users ultimately decline to provide their information.   *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001); *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) ("[I]nfringement is not avoided merely because a non-infringing mode of operation is possible.").

On the other hand, using DoubleClick to serve ads on a website that does not ask users information about themselves, and thus has no "store for storing user identification" is indeed a non-infringing use.   Both sides appear to agree on this point.   They diverge, however, as to whether such use is "substantial."   "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."   *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (citation omitted).   In assessing whether a use is substantial, the fact-finder may consider "the use's frequency,…the use's practicality, the invention's intended purpose, and the intended market."   *Id.*   Here, Beneficial presented some favorable evidence, such as MomsWhoThink's non-infringing use of DoubleClick, which demonstrates that such use is not "impractical."   *See Toshiba*, 681 F.3d at 1362.   In opposition,

17

however, Google presented substantial evidence establishing that the purported non-infringing use is at least "unusual" or "occasional."  *See id.*  Mr. Goldberg, inventor of the asserted patents, testified that, despite his constant monitoring of the relevant market of the invention, he personally was not aware of any website which shows advertising without storing user data.  While Dr. Almeroth identified a single website (MomsWhoThink) which used DoubleClick without having a "store for storing user identification," Google presented and relied upon Beneficial's infringement contentions which identified 123 separate websites, all of which (by Beneficial's own admission) embodied this claim limitation.  A reasonable jury could have weighed Google's evidence demonstrating a very low frequency of the non-infringing use, against Beneficial's evidence of the practicality of such use, and concluded that Google has carried its burden of showing that the non-infringing use while occasional is not substantial.  *See id.*

<div align="center">

*iii.*　　*Non-infringing use to Claims 1, 49 and 67 of the '943 Patent*

</div>

Lastly, Beneficial contends that *every* use of DoubleClick is a non-infringing use to Claims 1 and 49 of the '943 Patent, because, under the Court's claim construction, ads presentation by DoubleClick does not "overlap[] with" the display presentation, as required by these claims. (PTX 30, Col. 30: 45-46.)   Beneficial made a similar argument regarding Claim 67 of the '943 Patent, asserting that every use of DoubleClick is a non-infringing use to such claim because the following claim limitations are not met: (1) "said first advertising related information (*e.g.*, ad tag) replaceable with alternative information without changing a content: (i) of the particular display presentation P1, and (ii) to which the user input is responsive for the service"; (PTX 30, Col. 40: 8-12.) and (2) "an action by the user, in response to an advertisement (*e.g.*, clicking on a link in an ad)…results in data being transmitted: (a) from said user node, and (b) to a terminal destination

<div align="center">18</div>

node of the Internet."   (PTX 30, Col. 40:22-28.)

Beneficial's argument regarding Claims 1, 49 and 67 of the '943 Patent is, in essence, an argument that, under the Court's claim construction, Google has not proved direct infringement of the claim limitations identified above.   Beneficial argues that Google has proffered no evidence establishing that these claim limitations are met.   This Court disagrees.   As explained above, Beneficial's complaint and infringement contentions are both party admissions which may properly serve as evidence of direct infringement.   The infringement contentions set forth in detail how each of the above claim limitations is practiced by the 123 websites Beneficial identified. (*See* PTX 8; PTX 9.)   Beneficial's own discovery responses confirm that the infringement contentions fully apply to Google's ad-presentation product (i.e., DoubleClick).   (*See* PTX 12 at 3.)   Beneficial now argues that the Court's subsequent claim construction invalidates certain of its earlier infringement contentions made without the benefit of the Court's construction.   For example, Beneficial cites to Mr. Bellack's testimony that, under the Court's construction of the term "overlapping," the "general way that DoubleClick works" is that ads do not overlap with services, and thus does not infringe the "overlapping" limitation of Claims 1 or 49 of the '943 Patent.   (Trial Tr. Jan. 22, 2014 AM at 19:5-18 (Bellack).)   However, the fact that infringement contentions were made without the benefit of the Court's claim construction does not diminish their evidentiary value as party admissions.   *See Vanmoor*, 201 F.3d at 1366 (the patentee's infringement contentions alone held sufficient to establish that the accused device embodied each and every limitation of the asserted claims).   A reasonable jury could have weighed Beneficial's infringement contentions against Mr. Bellack's testimony, and concluded that they believed what Beneficial had put in writing in an official court document, as opposed to Mr. Bellack's oral

19

testimony.   Under such circumstances, it is improper for this Court to replace the jury's finding with the contrary result, which Beneficial now promotes.   *See E.E.O.C.*, 731 F.3d at 451.   Therefore, the Court finds that a reasonable jury could have concluded that the claim limitations of Claims 1, 49 and 67 of the '943 Patent, as identified above, have been satisfied by the Accused Google Customers' use of DoubleClick.   Accordingly, Beneficial's argument that every use of DoubleClick is a non-infringing use of such claims must fail.

In summary, the Court finds that Google has made a *prima facie* showing that DoubleClick is substantially used only in an infringing fashion.   While Beneficial has identified two specific non-infringing uses (i.e., serving ads to users who have disabled cookies; serving ads to a website that does not store user identification), Google proffered sufficient evidence in opposition to convince a reasonable jury that such uses are not substantial.   Finally, Beneficial's argument that every use of DoubleClick is a non-infringing use to Claims 1, 49 and 67 of the '943 Patent fails as noted above.   Therefore, a reasonable jury could have concluded that Google has met its burden to demonstrate that DoubleClick has no substantial non-infringing use.

To recount the Court's findings regarding contributory infringement, the Court finds that a reasonable jury could have concluded that (1) the Accused Google Customers' use of DoubleClick would constitute direct infringement of Beneficial's patents, but for a license; (2) Google knew DoubleClick was "especially made or adapted" to infringe Beneficial's patents; and (3) DoubleClick has no substantial non-infringing use.   Therefore, a reasonable jury could have found that, by supplying DoubleClick to its customers for ads presentation, Google would contribute to the infringement of Beneficial's patents, but for the license.   Accordingly, the Court **DENIES** Beneficial's motion for judgment as a matter of law that Google failed to prove its

20

customers' use of DoubleClick constituted contributory infringement by Google but for the license.

## IV.    Induced Infringement

Beneficial next argues that Google has failed to meet its burden of proving that its customers' use of DoubleClick would constitute induced infringement by Google, but for the license.   Specifically, Beneficial asserts that Google failed to present substantial evidence that it actively encouraged its customers to infringe the asserted claims, or that it specifically intended its customers to infringe Beneficial's patents.

A finding of inducement requires both knowledge of the existence of the patent and "knowledge that the induced acts constitute patent infringement."   *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013).   The "intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement."   *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).   Rather, inducement requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."   *Id.*   Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.   *Id.*

Beneficial argues that Google has failed to present sufficient evidence establishing its intent to induce infringement.   According to Beneficial, to prove such requisite intent, Google must present "substantial evidence that it induced infringement of *each limitation* of the asserted claims."   (*See* Dkt. No. 541 at 27.)   Beneficial contends that Google only instructed its customers regarding one limitation of the claims, i.e., how to insert an ad tag into the HTML code transmitted

21

to a user such that the user is presented with ads and content on the same page.    Based on such, Beneficial urges the Court to find, as a matter of law, that Google has failed its burden to prove the intent requirement for induced infringement.

Beneficial relies on *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, which in turn relied on the Federal Circuit's opinion in *MercExchange, LLC v. eBay, Inc*, for the proposition that one who "encouraged activities related to some but not all limitations of the asserted claims" cannot be held liable for active inducement.    *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, 492 F. Supp. 2d 608, 635 (E.D. Tex. 2007); *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005) *vacated and remanded on other grounds sub nom. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).    In *MercExchange*, on-line auction website eBay was accused of actively inducing another entity to infringe the plaintiff's patents which were directed at conducting on-line sales.    *MercExchange*, 401 F.3d at 1325-26.    There, the plaintiff presented the following evidence attempting to establish eBay's intent for inducement: (1) eBay invested in the accused direct infringer and had an "observer" on such entity's board; (2) eBay granted such entity the right to post goods in volume on eBay's website; (3) eBay was the "primary venue" for such entity's sales; and (4) eBay supplied engineers to work with the accused direct infringer to facilitate posting goods for sale through eBay.    *See id.* at 1332.    The Federal Circuit held that such evidence was insufficient to demonstrate eBay's intent to induce infringement.    *See id.*    The Federal Circuit noted that, while eBay might have encouraged the alleged direct infringer to post goods for sale on eBay's website, such act was "relevant to only one limitation of the claims."    *Id.*    Finding no evidence in the record showing that eBay intended to induce any other limitations of the asserted claims, the Federal Circuit reversed the portion of the judgment finding

22

eBay liable for induced infringement. *Id.* at 1333.

*MercExchange*, however, is readily distinguishable from the instant case. There, all eBay did was to allow the accused direct infringer to post goods on its website, which acts pertained to only one limitation of the asserted claims. *See id.* at 1332. In contrast, Google provided to its customers the entire DoubleClick product, which had been accused of infringing *each and every* limitation of the asserted claims in Beneficial's 2007 and 2009 lawsuits. As a defendant in both lawsuits, Google was well aware of Beneficial's infringement accusations. Despite such knowledge and despite the fact that DoubleClick had never been cleared of infringement, Google continued supplying the same DoubleClick product to its customers and instructed the customers to use the product in the exact same way as prior to the 2009 lawsuit. Among other things, Google instructed its customers to use DoubleClick to "serve advertisements alongside content and services," which is a "distinguishing" feature of the asserted patents as identified by the inventor. (*See* Trial Tr. Jan 22, 2014 AM at 61:5-11, 66:11-25 (Goldberg); Trial Tr. Jan. 22, 2014 AM at 40:6-14 (Bellack); Trial Tr. Jan. 21, 2014 PM at 95:18-21 (Trinh).) Based on this evidence, a reasonable jury could have concluded that Google possessed the specific intent to induce infringement and did in fact encourage its customers to use DoubleClick in an infringing fashion.

Beneficial next argues that Google could not have intended to induce infringement because Google believes that its DoubleClick ad tags do not satisfy the limitations of the asserted claims. Beneficial cited the following trial testimony of Mr. Trinh:

Q. Sure. One of the things that Google asserted, when the lawsuit was filed against them by Beneficial, was that that Claim Limitation (h) that I put on the board

23

several times that requires the programmatic elements for combining advertising-related information with search-related information, Google's position has always been that they provide ad tags, and those ad tags do not meet the claim language advertising related information, true?

A. Correct.

Q. And Google maintains that today, right?

A. Correct.

(Trial Tr. Jan. 21, 2014 PM at 139:21-140:7 (Trinh).)

Q. Sure. Google has never formed the opinion that based on their analysis of the claim language and their analysis of the way their system works that providing DoubleClick to any of its customers constitutes indirect infringement by Google, right?

A. Correct. We have never reached that.

(*Id.* at 143:12-18.)

Mr. Trinh, however, also testified as follows regarding Google's belief of whether or not DoubleClick infringed the asserted patents:

A. By suing our customers for the use of our products, they deprived -- they deprived us of the peace and the resolution that we bargained for. They – *if these products actually infringed, they would be licensed.* If they weren't, there'd be no reason to sue [the customers].

(*Id.* at 100:21-101:1 (emphasis added).)

24

Q. And you read through that language before, but I'd like to particularly draw your attention to the last part where it says: Would constitute direct or indirect infringement of a claim of the licensed patents by Defendants or affiliates but for the license. Do you have that in mind: Would? Starting with: Would?

MS. ANDERSON: If we could have that highlighted. Thank you.

A. Yes, ma'am.

Q. (By Ms. Anderson) And going on to the end. *Does this language I've identified have any relationship one way or another with the answers you were giving to the questions about Google's mindset as to whether or not it believed any of our customers infringed?*

A. Yes, ma'am. So like I said, this -- this entire agreement was about resolving the disputes between the parties, and -- and this language is there because the *– the reason Beneficial would sue us or our partners is for direct or indirect infringement of their patents.*

Q. Okay. And what, if any, relationship does the word would or but for this license have to the -- to the answers you are giving to questions about Google's mindset as to whether or not there was infringement?

A. Yes, ma'am. It was never my -- *it was never my mindset that a customer would have to go through a -- a legal process and get a finding of infringement before it was licensed.*

(*Id.* at 153:3-154:8 (emphasis added).)

Mr. Trinh's testimony regarding Google's belief of whether or not DoubleClick infringed

25

the asserted claims was not entirely consistent throughout the trial. On the one hand, he testified that it has always been Google's position that providing DoubleClick ad tags does not meet the advertising-related claim limitations. (Trial Tr. Jan. 21, 2014 PM at 139:21-140:7 (Trinh).) On the other hand, he appeared to suggest that Beneficial suing the Accused Google Customers alone is enough proof to establish actual infringement. (*See, e.g.*, *id.* at 100:23-24 ("if these products actually infringed, they would be licensed."); 153:22-24 ("the reason Beneficial would sue us or our partners is for direct or indirect infringement of their patents."); 154:5-8 ("it was never my mindset that a customer would have to go through a legal process and get a finding of infringement before it was licensed.").) Mr. Trinh's testimony did raise some doubt about Google's alleged intent to induce infringement. *See Commil*, 720 F.3d at 1367-68 ("Under our case law, it is clear that a good-faith belief of non-infringement is relevant evidence that tends to show that an accused inducer lacked the intent required to be held liable for induced infringement."). Judgment as a matter of law, however, is inappropriate here. As noted above, Google presented substantial evidence demonstrating its specific intent to induce infringement, including its continued sale of the same product that had been accused of infringing the '702 and '943 Patents in two prior lawsuits. While "a good-faith belief of non-infringement" is relevant evidence tending to negate an accused inducer's intent to induce infringement, nothing in the record suggests that Google's belief was formed in good faith.[3] *See id.* Beneficial has not established that lack of intent to induce infringement is the only reasonable conclusion that can be drawn from these facts.

Finally, Beneficial argues that Google's instruction regarding DoubleClick cannot constitute inducement, as a matter of law, because that instruction can also encourage

---

[3] For example, there is no evidence showing that Google ever obtained an opinion of counsel finding non-infringement.

non-infringing acts. Beneficial relies on *Warner-Lambert*, where the Federal Circuit rejected the patentee's argument that intent to inducement infringement could be inferred from the fact that 2.1% or fewer than "1 in 46 sales" of the accused product were for infringing uses. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003). The Federal Circuit held that "[e]specially where a product has substantial non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Id.* Beneficial's reliance upon *Warner-Lambert* rests on its claim that DoubleClick has substantial non-infringing uses. However, as explained above, the Court finds that Google presented sufficient evidence for the jury to conclude that DoubleClick has no substantial non-infringing uses. Beneficial's reliance on *Warner-Lambert* is misplaced.

Further, Federal Circuit cases more recent than *Warner-Lambert* have clarified that, "even where a product has substantial non-infringing uses…liability for active inducement may be found where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1059 (Fed. Cir. 2010). In *AstraZeneca*, the Federal Circuit found that intent to induce infringement could be inferred where the accused inducer was on notice that the product's proposed label could cause "potential infringement problems," but nevertheless decided to proceed with the label. *Id. AstraZeneca* demonstrates that, to prove intent to induce infringement, the Court need not find that the accused inducer's acts would cause infringement in every instance, so long as those acts "would inevitably lead some consumers to practice the claimed method." *Id.* at 1060; *see also Genentech, Inc. v. Trustees of University of Pennsylvania*, 871 F. Supp. 2d 963, 978 (N.D. Cal. 2012) (same). Here, much like

27

the accused inducer in *AstraZeneca*, Google was well aware that DoubleClick had been accused of infringing the '702 and '943 Patents, based on, among other things, Beneficial's claims against Youtube in the 2007 and 2009 lawsuits. Google, however, continued supplying DoubleClick without any substantive alterations. Such conduct goes well beyond the mere knowledge that DoubleClick "may be put to infringing uses," and instead demonstrates that Google's "actions [were] directed to promoting infringement." *Id.* at 1059. This is true even while acknowledging that DoubleClick may have some non-infringing uses. *See id.* The Court disagrees with Beneficial's contention that it should find, as a matter of law, that Google lacked the intent to induce infringement.

In summary, the Court finds that a reasonable jury could have concluded that Google possessed the specific intent to induce infringement. Beneficial has failed to persuade the Court otherwise. Accordingly, the Court **DENIES** Beneficial's motion for judgment as a matter of law that Google has failed to prove its customers' use of DoubleClick would constitute induced infringement by Google, but for the license.

## V.    CONCLUSION

For the reasons set forth above, the Court finds that Google has presented substantial evidence demonstrating that its customers' use of DoubleClick would constitute indirect infringement (both contributory and induced infringement) by Google, but for the license. Under the terms of the Settlement Agreement, once such condition has been satisfied, the Accused Google Customers are licensed to use Beneficial's patented technologies. Therefore, the jury's verdict that Beneficial breached the Settlement Agreement by bringing the instant lawsuit against the Accused Google Customers must stand. The Court hereby **DENIES** Beneficial's motion for

28

judgment as a matter of law in its entirety.[4]   (*See* Dkt. No. 541.)

**So Ordered and Signed on this**

**Aug 21, 2014**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[4] By the instant motion, Beneficial also seeks a judgment as a matter of law that Google is not entitled to any declaratory relief.   (*See* Dkt. No. 541 at 32-33.)   No declaratory relief is included within or provided by means of the jury's verdict.   (*See* Dkt. No. 514.)   The Court will address such issue in a separate opinion, together with Google's motion for entry of judgment (Dkt. No. 540).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GOOGLE INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 2:11-cv-00229-JRG-RSP |
| | § | |
| BENEFICIAL INNOVATIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Third-Party Plaintiff Google Inc.'s ("Google") Motion for Attorneys' Fees, Costs and Expenses and Motion for Entry of Judgment.  (Dkt. Nos. 537, 540.)  Having considered the parties' written submissions, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Google's Motion for Attorneys' Fees, Costs and Expenses, and **GRANTS-IN-PART** and **DENIES-IN-PART** Google's Motion for Entry of Judgment.

## I.     BACKGROUND

This is a breach of contract case arising from a Settlement Agreement that Google and Beneficial Innovations, Inc. ("Beneficial") entered into in 2010 ("Settlement Agreement"). Google claims, among other things, that Beneficial breached the Settlement Agreement by bringing a lawsuit against certain Google customers (the "Accused Google Customers") for infringing United States Patent Nos. 6, 712,702 (the "'702 Patent") and 7,496,943 (the "'943 Patent") based on their use of Google's DoubleClick product.

On January 23, 2014, after a three day jury trial, a jury reached a verdict regarding

1

Google's breach of contract claim.  (*See* Dkt. No. 514.)  The jury found that (1) Beneficial breached the prior Settlement Agreement between Beneficial and Google by bringing a lawsuit against the Accused Google Customers for infringement of the '702 and '943 Patents based on these customers' use of Google's DoubleClick product; and (2) Google is entitled to recover nominal damages in the amount of one dollar.  (*Id.*)  On August 22, 2014, the Court denied Beneficial's motion for judgment as a matter of law in its entirety.  (*See* Dkt. No. 634.)

Google now seeks to recover attorneys' fees and all other reasonable costs and expenses under the Settlement Agreement.  (*See* Dkt. No. 537.)  Google also moves for an entry of judgment against Beneficial, including a declaratory judgment.  (*See* Dkt. No. 540.)

## II.  GOOGLE'S MOTION FOR ATTORNEYS' FEES

The Settlement Agreement between Google and Beneficial contains a prevailing-party attorneys' fees clause as follows:

> The prevailing party in any action or proceeding alleging breach of this agreement shall be entitled to recover from the Party who breaches the Agreement, not only the amount of any judgment or order, but also such other costs and expenses as may be reasonably incurred by said Party, including court costs and reasonable attorney fees and all other reasonable cost[s] and expenses, whether taxed or otherwise, incurred in connection with said action or proceeding.  Such additional recovery, provided for in this Section, will be contingent upon a finding of the Court that the recovering Party was the prevailing Party in the action and that the breach giving rise to the recovery was a material breach of this Agreement.

(PTX 1, Settlement Agreement, § VIII.)

According to such clause, a party to the Settlement Agreement may recover attorneys' fees and other reasonable costs provided that (1) the recovering party is the prevailing party in an action alleging breach of the Settlement Agreement; and (2) the breach giving rise to the recovery was a material breach of the agreement.

Here, Beneficial does not dispute that, pursuant to the jury verdict, the breach giving rise to

2

Google's claim for attorneys' fees was a material breach of the Settlement Agreement.   Beneficial

does contend, however, that Google is not the prevailing party in this case.   The Settlement

Agreement expressly provides, and the parties agree, that it should be construed and controlled by

California law.   (*See id.*)

## A.   Legal Standard

California Civil Code § 1717(a) permits an award of attorneys' fees to the prevailing party

in a breach of contract action.   It provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and
> costs, which are incurred to enforce that contract, shall be awarded either to one of the
> parties or to the prevailing party, then the party who is determined to be the party
> prevailing on the contract, whether he or she is the party specified in the contract or not,
> shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717.

When a party obtains a "simple, unqualified win" by "completely prevailing on, or defeating, the

contract claims in the action," and the contract contains a provision for attorneys' fees, the

successful party is entitled to attorneys' fees "as a matter of right," eliminating the trial court's

discretion to deny fees under § 1717.   *Hsu v. Abbara*, 9 Cal. 4th 863, 875-76 (1995); *Silver Creek,*

*LLC v. BlackRock Realty Advisors, Inc.*, 173 Cal. App. 4th 1533, 1538 (Cal. Ct. App. 2009).   "If

neither party achieves a complete victory on all the contract claims, it is within the discretion of the

trial court to determine which party prevailed on the contract or whether, on balance, neither party

prevailed sufficiently to justify an award of attorney fees."   *Scott Co. of California v. Blount, Inc.*,

20 Cal. 4th 1103 (1999).   "Because the statute allows such discretion, it must be presumed the

trial court has also been empowered to identify the party obtaining *a greater relief* by examining

the results of the action in relative terms: the general term 'greater' includes 'larger in size than

3

others of the same kind' as well as 'principal' and 'superior in quality.'"   *Silver Creek*, 173 Cal.

App. 4th at 1538 (citations omitted).

In deciding whether there is a "party prevailing on the contract," the trial court is to

"compare the relief awarded on the contract claim or claims with the parties' demands on those

same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening

statements, and similar sources."   *Hsu*, 9 Cal. 4th at 876.   Further, "in determining litigation

success, courts should respect substance rather than form, and to this extent should be guided by

equitable considerations."   *Id.* at 877 (internal quotations omitted).

**B.   Analysis**

**a.   Google is the prevailing party because it has obtained a greater relief on the contract**

Google was not an original party but intervened in this case on behalf of the Accused

Google Customers, who were sued by Beneficial for allegedly infringing the '702 and '943

Patents.   In its Complaint for Intervention, Google answered Beneficial's infringement claims

against the Accused Google Customers, raising, among other things, "license" and "exhaustion" as

affirmative defenses.   (*See* Complaint for Intervention, Dkt. No. 193 at 7-8.)   In addition, Google

asserted a single breach of contract counterclaim against Beneficial based on the Settlement

Agreement.   (*Id.* at 9.)   Google sought the following relief in its counterclaim:

(i) that Beneficial recover nothing and that its complaint be dismissed with prejudice;

(ii) that the Court deny any injunctive relief in favor of Beneficial and against Google or

the Accused Google Partners;

(iii) that the Court find that Google and the Accused Google Partners do not infringe the

'702 and '943 patents because of a license;

4

(iv) that the Court find that Beneficial materially breached the terms of the Settlement

Agreement granting a license to Google and the Accused Google Partners;

(v) awarding Google and the Accused Google Partners costs, fees, and expenses incurred

by Google and the Accused Google Partners in enforcing the Settlement Agreement

including the damages resulting from enforcing the Settlement Agreement.

(*Id.* at 14-15 (emphasis added).)   After Google intervened, all the Accused Google Customers

settled with Beneficial, and Beneficial's patent infringement claims against those customers were

dismissed with prejudice.   (*See, e.g.*, Dkt. No. 358, Order of Dismissal.)   Google nonetheless

proceeded to trial with its breach of contract counterclaim, where it obtained a jury finding of

breach against Beneficial and was awarded one dollar as nominal damages.

To determine whether Google is the prevailing party, this Court needs to compare the relief

awarded as to Google's breach of contract claim with the relief which Google demanded on the

same claim and its "litigation objectives as disclosed by the pleadings, trial briefs, opening

statements, and similar sources."   *See Hsu*, 9 Cal. 4th at 876.   The scope of Google's requested

relief, however, has not remained consistent throughout this litigation.   While Google's complaint

appears to focus on relief pertaining only to the Accused Google Customers, but as the settlement

and dismissal of those parties accelerated, Google began advocating for a much broader relief.

(*See* Complaint for Intervention at 14 ("(iii) that the Court finds that Google and *the Accused*

*Google Partners* do not infringe the '702 and '943 patents because of a license"; "(iv) that the

Court finds that Beneficial materially breached the terms of the Settlement Agreement granting a

license to Google and *the Accused Google Partners*.") (emphasis added).)   For example, Google

contended in its trial brief that the license it had obtained under the Settlement Agreement

5

"exhausted Beneficial's rights to assert its patent against *any of Google's customers*" using Google's advertising products and serves.  (*See* Dkt. No. 488 at 3.)   As such, Google sought a broad declaratory relief "not limited to its sales of advertising products and services to the Accused Google Partners."[1]   (*See id*.; *see also* Dkt. No. 445, Joint Final Pretrial Order at 8 ("Google also seeks a declaratory relief that its customers are licensed under the Settlement Agreement.")) Furthermore, in its Complaint for Intervention, Google asserted patent exhaustion solely as an affirmative defense to Beneficial's infringement claims against the Accused Google Customers, and not as some independent issue which could survive to dismissal of those customers.   (*See* Complaint for Intervention at 2, 7-8.)   As the litigation progressed toward trial, however, Google began arguing that patent exhaustion was also one of the bases for Google's breach of contract claim.   (*See* Dkt. No. 488 at 2.)   Google's changing position throughout the course of this litigation makes it more difficult to assess its true litigation objective.   However, for purposes of determining whether Google is the prevailing party, the Court will take Google's request for relief "at [its] most exuberant."   *De La Cuesta v. Benham*, 193 Cal. App. 4th 1287, 1296 (Cal. Ct. App. 2011).   Specifically, the Court finds that Google has demanded the following relief on its breach of contract claim: (1) a finding that Beneficial breached the Settlement Agreement by bringing the instant case against the Accused Google Customers, and an award of one dollar in nominal damages; (2) an award of attorneys' fees and reasonable costs in enforcing the Settlement Agreement against Beneficial; and (3) a declaratory relief that all Google customers everywhere are licensed under the Settlement Agreement "by operation of patent exhaustion law."

It is undisputed that Google succeeded on its first request for relief.   The jury clearly found that "Beneficial breach[ed] the Settlement Agreement between Beneficial and Google by

---

[1] Google never sought to amend its complaint by incorporating such request for a broad declaratory relief.

bringing a lawsuit against the Accused Google Customers for infringement of the '702 and '943 patents based on their use of Google's DoubleClick product."   (Dkt. No. 514, Jury Verdict at 1.) When asked whether Google was entitled to recover nominal damages in the amount of one dollar, the jury answered "YES."   (*Id.* at 2.)

Beneficial asserts that it has prevailed on Google's second request for relief, i.e., attorneys' fees and costs, because the Court rejected Google's argument that such damages constitute general damages, and precluded Google's expert from testifying to such matter at trial.   (*See* Dkt. No. 483, Order on Motions *in Limine* at 1-2.)   However, the fact that the Court precluded Google from presenting its fee request directly to the jury during trial does not determine which party prevailed on this claim.   The Court precluded Google's claim for attorneys' fees partly out of concern that the attorneys' fees "will continue to accrue through the trial," and to avoid adjudicating the fee issue in a piece-meal fashion.   (*Id.* at 2.)   The Court did not foreclose the possibility that Google may recover such fees by post-trial motions.   Therefore, Beneficial did not "prevail on" Google's claim for attorneys' fees and costs.   Indeed, prior to the Court issuing this instant order, neither party has prevailed on such claim.

Finally, Beneficial contends that it has prevailed on Google's exhaustion claim, citing the Court's order dismissing the issue of patent exhaustion from this case.   (*See* Dkt. No. 497.) There, the Court found that, because Beneficial had dismissed with prejudice all infringement claims against all the named Accused Google Customers, that patent exhaustion – presented by Google as an affirmative defense to such claims – was no longer a live, justiciable issue.   (*See id.* at 2-3.)   Additionally, the Court rejected Google's invitation to read patent exhaustion into the contract dispute.   (*See id.* at 3-7.)   The Court specifically noted that patent exhaustion or

language describing the same was never part of the Settlement Agreement.   Given that the

agreement "completely and unambiguously" defined the scope of Google customers' license, the

Court concluded that it was improper for it to alter the express terms of the license, or rewrite the

contract, by unilaterally inserting an implied license under the patent exhaustion doctrine.   The

Court, however, made it clear that its ruling does not impede a different Google customer's right to

raise exhaustion as an affirmative defense should Beneficial sue that customer for patent

infringement in the future.   (*Id.* at 6.)   "Nor does [the ruling] prevent Google from filing a

declaratory judgment action, in a venue of its choosing, seeking a judicial declaration that

Beneficial's patent right has been exhausted with respect to certain of Google's products."   (*Id.* at

6-7.)

     The Court disagrees with Beneficial that its prior order in preparation for trial on the

contract claim makes Beneficial the "prevailing party" on the exhaustion issue.   A determination

of the prevailing party must await the "final resolution" of the relevant claims.   *In re Estate of*

*Drummond*, 149 Cal. App. 4th 46, 51 (Cal. Ct. App. 2007) (citing *Hsu*, 9 Cal. 4th at 876).

"Final", however, does not mean "final for purposes of a particular lawsuit."   *Id.*   Status as the

"party prevailing on the contract" is ascertained "not by technicalities of pleading and procedure

but by a pragmatic assessment of the parties' *ultimate* positions vis a vis their litigation

objectives[.]"   *Id.* (emphasis added).   If a party obtains only "an interim victory," based, for

example, on another party's attempt to pursue his claims in the wrong forum, such does not

support a finding of prevailing party under § 1717.   *Id.* at 51-52; *see also Bautista v. Park W.*

*Gallery*, 388 F. App'x 635, 636-37 (9th Cir. 2010) (same).

     Here, the Court rejected Google's attempt to transform its affirmative defense of patent

8

exhaustion into one of the bases for its breach of contract claim.   As a result, Google did not obtain the broad declaratory relief it had sought on behalf all customers everywhere using Google's advertisement products and services.   However, this scenario does not constitute a "final resolution" on the exhaustion issue, as Google may yet seek the same relief based on exhaustion as an independent action in "a forum of its choosing."   *See Drummond*, 149 Cal. App. 4th at 51; Dkt. No. 497 at 6-7.   Beneficial only obtained an "interim victory" by successfully excluding the exhaustion issue *from this case*.   An attempt to determine prevailing party status as to the exhaustion issue is premature, and must await a future ruling that clarifies the parties' "ultimate positions."   *Drummond*, 149 Cal. App. 4th at 51.   Accordingly, as relates to the instant case, neither Google nor Beneficial prevails on the exhaustion issue.

In summary, Google requested three specific types of relief.   It clearly succeeded with its first request by obtaining a favorable jury verdict as to breach of contract.   Beneficial did not prevail on Google's claim for attorneys' fees and costs because the Court allowed Google to seek such fees by post-trial motions.   Neither Beneficial nor Google prevailed on the issue of patent exhaustion.   While Beneficial might argue that this result falls short of a "complete victory" for Google, Google undoubtedly is the party who has obtained "a greater relief" in this litigation.   *See De La Cuesta*, 193 Cal. App. 4th at 1294-95.   Therefore, the Court finds that Google is "the party prevailing on the contract" and accordingly finds that Google is entitled to recover reasonable attorneys' fees in addition to other costs.   Cal. Civ. Code § 1717(a); *Silver Creek*, 173 Cal. App. 4th at 1538.

### b.   The attorneys' fees requested by Google are reasonable

Beneficial next complains that the attorneys' fees requested by Google are unreasonable.

9

Specifically, Beneficial contends that (1) the Court should apportion the fees between Google's affirmative claim for breach of contract and the affirmative defense of exhaustion; and (2) the hourly rates sought by Google's trial counsel are unreasonable. The Court will address each of Beneficial's arguments in turn.

Beneficial urges the Court to apportion Google's requested fees between the fees incurred as to the breach of contract claim and those incurred as to the affirmative defense of exhaustion. Beneficial asserts that breach of contract and patent exhaustion are "two separate and distinct" claims justifying the apportionment. The Court disagrees. "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under Civil Code section 1717 only as they relate to the contract action." *Abdallah v. United Sav. Bank*, 43 Cal. App. 4th 1101, 1111 (Cal. Ct. App. 1996) (citing *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129 (1979).). However, "attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." *Id.* A court may reasonably decline to apportion fees, when the various underlying claims are "inextricably intertwined," making it "impracticable, if not impossible, to separate the multitude of conjoined activities into compensable or noncompensable time units." *Id.*

The Court disagrees that Google's breach of contract claim is "separate and distinct" from the patent exhaustion issue. As set forth in detail in the Court's order denying Beneficial's motion for judgment as a matter of law, the parties' principal disputes center around whether the Accused Google Customers' use of DoubleClick would constitute contributory or induced infringement by Google, but for the license. (*See* Dkt. No. 634.) In resolving such dispute, the

A0049

Court examined, among other things, whether Google's DoubleClick product "constitut[ed] a material part of" of Beneficial's invention, and whether DoubleClick has "no substantial noninfringing use." *See* 35 U.S.C. § 271(c) (setting forth the framework for proving contributory infringement). These issues are common to both the determination of contributory infringement – Google's contract claim – *and* the affirmative defense of patent exhaustion. *See Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013) ("[M]ethod claims are exhausted by an authorized sale of an item that *substantially embodies the method* if the item (1) has *no reasonable noninfringing use* and (2) includes all inventive aspects of the claimed method.") Given that the parties' contract dispute centers on the nature and use of Google's DoubleClick product, as does the affirmative defense of patent exhaustion, the contract claim and exhaustion defense are "inextricably intertwined," making it impracticable for this Court to separate the various "conjoined activities into compensable or noncompensable time units." *See Abdallah*, 43 Cal. App. 4th at 1111. Accordingly, the Court declines to apportion Google's requested attorneys' fees between its claim for breach of contract and the affirmative defense of exhaustion.[2]

Beneficial next complains that the hourly rates sought by Google for its trial counsel are unreasonable. Where a contract provides for attorneys' fees but does not specify a particular sum, it is within the trial court's discretion to determine what constitutes reasonable attorneys' fees.

---

[2] Google further argues that the attorney fees clause in the Settlement Agreement is "broad enough to cover tort as well as contract cause of action," citing three California cases *Santisas*, *Johnson* and *Cruz*. (*See* Dkt. No. 550 at 5-6.) These cases, however, do not necessarily support Google's position. In *Santisas* and *Johnson*, the attorney fees clause specified that fees were recoverable in any action or proceeding "*arising out of*" the contract, regardless of whether the action sounded in contract or in tort. *See Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) (emphasis added); *Johnson v. Siegel*, 84 Cal. App. 4th 1087, 1100 (Cal. Ct. App. 2000). Likewise, in *Cruz*, the contract stated broadly that attorney fees were recoverable in "civil action[s]…*in connection with*" the contract. *See Cruz v. Ayromloo*, 155 Cal. App. 4th 1270, 1277 (Cal. Ct. App. 2007). Here, in contrast, the Settlement Agreement stipulated that attorney fees are only recoverable in actions or proceedings "*alleging breach of this agreement*." (PTX 1, Settlement Agreement, § VIII (emphasis added).) Unlike in *Santisas*, *Johnson* or *Cruz*, the attorney fees clause here focuses on a contract cause of action, as opposed to, for example, an action in tort. Therefore, the Court is not persuaded that such clause is clearly "broad enough to cover tort as well as contract cause of action."

11

*Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1507 (Cal. Ct. App. 1987) (citations omitted). The major factors a court must consider in determining an attorneys' fee award include: "the nature of the litigation and its difficulty; the amount of money involved in the litigation; the skill required and employed in handling the litigation; the attention given to the case; the attorney's success, learning, age and experience in the particular type of work demanded; the intricacy and importance of the litigation; the labor and necessity for skilled legal training and ability in trying the case; and the amount of time spent on the case." *Id.* "When apprised of the pertinent facts, the trial court may rely on its own experience and knowledge in determining the reasonable value of the attorney's services." *Id.* (citation omitted). Here, after examining the hour rates sought by Google's trial counsel, the total amount of fees Google has requested, and comparing such against the factors identified above, the Court concludes that Google's fee request is reasonable. Accordingly, the Court declines to unilaterally reduce the amount of Google's requested attorneys' fees.

### c.    Google is not entitled to recover the costs for its expert witness

Finally, Beneficial contends that Google's expert witness fees are not recoverable costs under California law. California Code of Civil Procedure § 1033.5(a) specifies items of costs that a prevailing party may recover in an action or proceeding, while § 1033.5(b) specifies items not recoverable. *See* Cal. Civ. Proc. Code § 1033.5. "Fees of experts not ordered by the court" are disallowed as costs under § 1033.5(b)(1). "[A]n undefined general contractual provision entitling the prevailing party to 'reasonable attorney's fees and costs' must be interpreted in light of Code of Civil Procedure section 1033.5's limited definition of costs." *Hsu v. Semiconductor Sys., Inc.*, 126 Cal. App. 4th 1330, 1341 (Cal. Ct. App. 2005). Nevertheless, "[w]hile it is reasonable to

12

interpret a general contractual cost provision by reference to an established statutory definition of costs," the California legislature did not intend to "prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses." *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1065 (Cal. Ct. App. 2010). Recovery of such costs provided by contract, however, must ordinarily be "specially pleaded and proven at trial," and not awarded by a post-trial memorandum of costs. *Hsu*, 126 Cal. App. 4th at 1341; *Jones v. Union Bank of California*, 127 Cal. App. 4th 542, 550-51 (Cal. Ct. App. 2005).

Here, the Settlement Agreement stipulates that the prevailing party on the contract may recover:

> not only the amount of any judgment or order, but also such other costs and expenses as may be reasonably incurred by said Party, including court costs and reasonable attorney fees and *all other reasonable cost[s] and expenses*, whether taxed or otherwise, incurred in connection with said action or proceeding.

> (PTX 1, Settlement Agreement, § VIII (emphasis added).)

The contract does not specify that expert fees are recoverable costs. Google argues that, despite the statutory prohibition of recovery of expert fees as costs, it is entitled to such costs pursuant to the "all other reasonable costs and expenses" language in the parties' agreement. Applying California law, this Court disagrees.

Google relies on *Arntz*, where the court allowed a prevailing party to recover costs beyond those specified under § 1033.5(a), in light of the contract providing recovery of "all costs, charges and expenses." *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.Arntz*, 47 Cal. App. 4th 464, 491-92 (Cal. Ct. App. 1996). Google's reliance on *Arntz* is misplaced. The *Arntz* court allowed recovery of non-statutory costs because those costs were "specially pleaded and proven at

13

trial." *Id.* In this case, however, while Google's Complaint in Intervention did pray for recovery of costs, the costs for expert witnesses were never proven. (*See* Complaint in Intervention at 13.) California cases more recent than *Arntz* have clarified that "[b]ecause costs other than those allowed under section 1033.5 are not based on statute, they must be specifically pleaded and proved at trial rather than included in a memorandum of costs." *Jones*, 127 Cal. App. 4th at 551. The reason for this pleading and proof requirement is that "the proper interpretation of a contractual agreement for shifting litigation costs is a question of fact that turns on the intentions of the contracting parties." *First Nationwide Bank v. Mountain Cascade, Inc.*, 77 Cal. App. 4th 871, 879 (Cal. Ct. App. 2000) (citing *Davis v. KGO-T.V., Inc.*, 17 Cal. 4th 436, 447 (1998)). Unless a contractual provision clearly and unambiguously specifies that certain costs are recoverable under the contract, "[a]dverse parties must be put on notice through the pleadings that this contractual theory will be asserted, and the issue must be submitted to the trier of fact for resolution pursuant to a prejudgment evidentiary proceeding, not a summary postjudgment motion." *Id.*; *Thrifty Payless, Inc.*, 185 Cal. App. 4th at 1067 ("[W]e deem it unnecessary to specially plead and prove expert witness fees, at least in a case where expert fees are explicitly included in the contract as recoverable costs.").

Here, the Settlement Agreement does not specify that expert fees are recoverable costs. Therefore, Google must prove that such fees are recoverable through an adverse proceeding. *See First Nationwide Bank*, 77 Cal. App. 4th at 879. The Court previously precluded Google's expert from testifying to the issue of attorneys' fees and costs at trial, partly out of concern that such fees would continue to accrue during trial. By the instant motion, Google sought recovery of attorneys' fees and costs under California Civil Code § 1717(a). It, however, did not offer to

14

prove any non-statutory costs such as expert fees. For instance, Google did not submit any evidence reflecting "the intentions of the contracting parties" that expert fees should be recoverable under the Settlement Agreement. *See First Nationwide Bank*, 77 Cal. App. 4th at 879. The only supporting materials Google submitted together with this motion are itemized fees and costs that it has incurred in this litigation. Given that the Settlement Agreement does not explicitly include expert fees as recoverable costs, and Google did not prove that such fees are recoverable under the contract, the Court is bound by § 1033.5. Pursuant to the California statute, Google's expert fees are not recoverable costs as they are "not ordered by the court." Cal. Civ. Proc. Code § 1033.5(b).

In summary, the Court finds that (1) Google is the prevailing party on the contract under California Civil Code § 1717(a), and therefore is entitled to recover attorneys' fees from Beneficial; (2) Google's requested attorneys' fees are reasonable. However, Google is not entitled to recover expert fees as costs. Accordingly, the Court **REDUCES** Google's total fees and costs request by $ 101,324.50 – the amount Google paid to its expert Dr. Alexander – and **AWARDS** Google a total of $ 1,302,673.27 for fees and costs. (*See* Dkt. No. 538 at 10-11.)

## III.    GOOGLE'S MOTION FOR ENTRY OF JUDGMENT

Pursuant to Federal Rule of Civil Procedure 54(b) and 58(b)(2)(A), Google requests that this Court enter a final judgment including an express declaration that "Beneficial breached the Settlement Agreement between Beneficial and Google by bringing a lawsuit against the Accused Google Customers for infringement of the '702 and '943 patents based on their use of Google's DoubleClick product." (*See* Dkt. No. 540-1 at 2.)

Google's request is an exact duplication of the jury's verdict. It is this Court's practice to

15

fully and accurately recite the jury's findings in its final judgment. As such, including Google's proposed declaration in the final judgment would be redundant. Additionally, the jury's factual findings are not judicial declarations, in and of themselves. For these reasons, the Court denies Google's request for recital of its requested declaration, but otherwise grants its motion for entry of judgment.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Google's Motion for Attorneys' Fees, Costs and Expenses, and **GRANTS-IN-PART** and **DENIES-IN-PART** Google's Motion for Entry of Judgment. (*See* Dkt. Nos. 537, 540.) The Court will proceed to enter a final judgment between Google and Beneficial consistent with the rulings herein. *See* Fed. R. Civ. P. 54(b).

**So ORDERED and SIGNED this 26th day of August, 2014.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

A0055

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GOOGLE INC. | § | |
| | § | |
| v. | § | Case No. 2:11-CV-229-JRG-RSP |
| | § | |
| BENEFICIAL INNOVATIONS, INC. | § | |

<u>**ORDER**</u>

On January 7, 2014, the Court held a pretrial conference and heard argument from Google Inc. and Beneficial Innovations, Inc. regarding exhibits and deposition designations. At the pretrial conference, the Court carried its decision on certain exhibit objections. At the pretrial conference, the Parties also represented to the Court that they had reached agreement on certain exhibits and deposition designations. The Court requested that the Parties submit amended lists of exhibits and deposition designations reflecting their agreements and the Court's rulings by January 9, 2014.

The Court hereby rules on the remaining carried objections as follows:

**Plaintiff Google's Exhibits:**

- 2-4 – Admitted, objection overruled

- 8 and 9 – Admitted, objection overruled

- 11 – Excluded

- 17-21 – Excluded, 403 juror confusion (the Court finds that these documents would not constitute proper impeachment evidence)

- 17 and 28 – Excluded, 403 juror confusion

- 31 and 32 – Admitted, objection overruled

- 36 and 37 – Admitted, objection overruled

- 71 and 72 – Not admitted, requires authentication prior to use

- 110-112 – Excluded, 403 juror confusion

**Defendant Beneficial's Exhibits:**

- 504-507 – Excluded, 403 juror confusion

- 508-512 – Admitted, adopted admissions under 801.

- 513 and 514 – Excluded, 403 juror confusion

The Parties should update their exhibit lists to reflect the above rulings by Sunday, January 12 2014.

   **SIGNED this 10th day of January, 2014.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| GOOGLE INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:11-CV-229-JRG-RSP |
| | § | |
| BENEFICIAL INNOVATIONS, INC., | § | |
| | § | |
| *Defendants.* | § | |

## ORDER

Before the Court is both Beneficial Innovations' Objections to, and Motion for Reconsideration of, the January 10, 2014 Order Re Admissibility of Exhibits at Trial (Dkt. No. 499, filed January, 19 2014) and Google Inc.'s Response to Plaintiff's Objections to, and Motion for Reconsideration of, the January 10, 2014 Order Re Admissibility of Exhibits at Trial (Dkt. No. 500, filed January 20, 2014.)

## APPLICABLE LAW

This Court reviews timely motions for reconsideration of the nondispostive rulings of the magistrate judge to determine whether they are clearly erroneous or contrary to law. *See* F.R.C.P. § 72(a); Local Rule CV-72(b).

FRE 402 provides that:

> Relevant evidence is admissible unless any of the following provides otherwise:
>
> - the United States Constitution;
>
> - a federal statute;
>
> - these rules; or
>
> - other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible.

FRE 403 provides that:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

## DISCUSSION

On the eve of trial, Beneficial Innovations, Inc. ("Beneficial") seeks reconsideration of part of Magistrate Judge Payne's ruling (Dkt. No. 487), which overruled Beneficial's objections, on the admissibility of five exhibits: Exhs. 8 and 9 (Beneficial's infringement and supplemental infringement contentions in this action) and Exhs. 2-4 (Beneficial's original, first amended, and second amended complaints in this action). (Mtn. at 1). As a result, these exhibits were pre-admitted in advance of trial. Beneficial asserts that the documents "do not constitute evidence of infringement," "are wholly irrelevant to any issue to be decided in the case" and "[a]t the very least, the documents should be excluded under FRE 403." (*Id.*) In the final paragraph of its motion, Beneficial also argues that the documents should be excluded under FRE 402. (*Id.* at 4). The grounds Beneficial gave to Magistrate Judge Payne for objecting to the admission of the documents were "Relevance 402/Prejudice 403." (Dkt. No. 486-1 at 1-2).

### Admissibility under FRE 402

Beneficial does not point to a specific statute or rule barring the admission of the documents under FRE 402. Beneficial's argument under FRE 402 is solely that documents are irrelevant.

The case between Google and Beneficial is a breach of contract action concerning a license granted by a Settlement Agreement. (*See* Dkt. Nos. 193, Google's Complaint in Intervention, and 455, Joint Final Pretrial Order). The Settlement Agreement is specific that

- 2 -

Google's customers are not generally licensed "simply because the customer uses a product or service supplied [by Google]."  (*See* Dkt. No. 497 at 4-5 (discussing the scope of the parties' license)).  Google's customers are only licensed if the customer's act (e.g. use) "would constitute direct or indirect infringement of a claim of the Licensed Patents by [Google] . . . ."  As Google contends that Beneficial breached the Settlement Agreement by bringing suit against its customers under specific theories of infringement, the documents at issue (Beneficial's complaint and infringement contentions), which allege infringement on the part of Google's customers and set out specific theories of infringement, are relevant to the breach of contract dispute before the Court.

**Admissibility under FRE 403**

Only one sentence of Beneficial's motion describes the possible danger of prejudice outweighing the probative value of these documents: "the probative value is far outweighed by the risk of confusing the jury into believing the infringement contentions and complaint are somehow relevant to whether Google's customers directly infringe the patents." (Mtn. at 4). Beneficial's motion has not sufficiently articulated a clear danger of prejudice or juror confusion which, in the Court's view, outweighs the probative value of the documents.

- 3 -

## CONCLUSION

For the foregoing reasons, Beneficial has not demonstrated that Magistrate Judge Payne's ruling was clearly erroneous or contrary to law. "Beneficial Innovations' Objections to, and Motion for Reconsideration of, the January 10, 2014 Order Re Admissibility of Exhibits at Trial" (Dkt. No. 499) is hereby **DENIED**.


So ORDERED and SIGNED this 20th day of January, 2014.



_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE



US006712702B2

(12) **United States Patent**
Goldberg et al.

(10) Patent No.: **US 6,712,702 B2**
(45) **Date of Patent:** **Mar. 30, 2004**

(54) **METHOD AND SYSTEM FOR PLAYING GAMES ON A NETWORK**

(76) Inventors: **Sheldon F. Goldberg**, 3360 E. Serene, Henderson, NV (US) 89014; **John Van Antwerp**, 110 E. Perry St., Pittsfield, IL (US) 62363

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 151 days.

(21) Appl. No.: **09/811,173**

(22) Filed: **Mar. 16, 2001**

(65) **Prior Publication Data**

US 2003/0060247 A1 Mar. 27, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/140,979, filed on Aug. 27, 1998, now Pat. No. 6,264,560, and a continuation-in-part of application No. 09/105,401, filed on Jun. 26, 1998, now Pat. No. 6,183,366, which is a continuation of application No. 08/759,895, filed on Dec. 3, 1996, now Pat. No. 5,823, 879.

(60) Provisional application No. 60/058,006, filed on Aug. 28, 1997, provisional application No. 60/010,361, filed on Jan. 19, 1996, and provisional application No. 60/010,703, filed on Jan. 26, 1996.

(51) Int. Cl.⁷ ................................................. **A63F 9/24**

(52) U.S. Cl. ..................................................... **463/42**

(58) **Field of Search** ............................. 463/26, 27, 11, 463/12, 13, 14, 15, 7, 30, 31, 35; 273/236, 237

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,796,433 A | 3/1974 | Fraley et al. | |
| 3,848,193 A | 11/1974 | Martin et al. | 325/53 |
| 3,987,398 A | 10/1976 | Fung | 325/309 |
| 4,166,413 A | 9/1979 | Meszaros | 358/164 |
| 4,170,782 A | 10/1979 | Miller | 368/84 |
| 4,224,644 A | 9/1980 | Lewis et al. | 360/72.2 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 733983 | 4/1943 | 21/72 |
| DE | 29 18 846 | 11/1980 | H04N/5/64 |
| DE | 33 25 810 C2 | 10/1985 | H04N/6/64 |
| DE | 36 21 263 A1 | 7/1988 | G11B/21/0808 |
| EP | 660179 | 11/1980 | |
| EP | 0113022 A2 | 11/1983 | H04M/11/08 |
| EP | 279297 | 8/1988 | |
| EP | 290207 | 11/1988 | |
| EP | 307925 | 3/1989 | |
| EP | 370146 | 5/1990 | |

(List continued on next page.)

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/502,285, Goldberg et al., filed Feb. 11, 2000.

(List continued on next page.)

*Primary Examiner*—Kim Nguyen
(74) *Attorney, Agent, or Firm*—Grossman & Flight, LLC

(57) **ABSTRACT**

The present invention is a game playing method and apparatus for automating games such as blackjack, poker, craps, roulette, baccarat and pai gow, wherein players may play continuously and asynchronously, and information related to advertised items can be exchanged between players and advertisers. In one embodiment, each instance of a game is likely unique from all other current game instances. The games do not require a manual dealer and in one embodiment, played in a gaming establishment using low cost gaming stations. The present invention may also, be used to play such games on the Internet or an interactive cable television network wherein a game controller communicates with players at network nodes in their homes and at their leisure since there is no game tempo requirement. During a game, advertising is selectively provided by comparing player personal information with a desired demographic profile. Player responses to advertising are used for evaluating advertising effectiveness. The invention is useful for test marketing of products, advertisements, and reduces advertising costs.

**54 Claims, 14 Drawing Sheets**



## US 6,712,702 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,283,709 A | 8/1981 | Lucero et al. | 340/147 |
| 4,287,592 A | 9/1981 | Paulish et al. | 370/88 |
| 4,288,809 A | 9/1981 | Yabe | 358/12 |
| 4,305,101 A | 12/1981 | Yarbrough et al. | 360/69 |
| 4,307,446 A | 12/1981 | Barton et al. | 364/200 |
| 4,338,644 A | 7/1982 | Staar | 360/132 |
| 4,339,798 A | 7/1982 | Hedges et al. | 364/412 |
| 4,347,498 A | 8/1982 | Lee et al. | 340/825.02 |
| 4,355,806 A | 10/1982 | Buck et al. | 463/7 |
| 4,381,522 A | 4/1983 | Lambert | 358/86 |
| 4,405,948 A | 9/1983 | Griffis | 358/192.1 |
| 4,429,385 A | 1/1984 | Cichelli et al. | 370/92 |
| 4,466,179 A | 8/1984 | Kasten | 358/88 |
| 4,467,424 A | 8/1984 | Hedges et al. | 364/412 |
| 4,476,488 A | 10/1984 | Merrell | 358/88 |
| 4,494,197 A | 1/1985 | Troy et al. | 364/412 |
| 4,528,643 A | 7/1985 | Freeny, Jr. | 364/900 |
| 4,531,187 A | 7/1985 | Uhland | 364/412 |
| 4,536,791 A | 8/1985 | Campbell et al. | 358/122 |
| 4,575,579 A | 3/1986 | Simon et al. | 178/4 |
| 4,602,279 A | 7/1986 | Freeman | 358/86 |
| 4,614,342 A | 9/1986 | Takashima | 273/85 |
| 4,616,030 A | 10/1986 | Vincent et al. | 364/900 |
| 4,623,122 A | 11/1986 | Gambetta | 340/825.28 |
| 4,636,951 A | 1/1987 | Harlick | 364/412 |
| 4,641,205 A | 2/1987 | Beyers, Jr. | 360/33.1 |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. | 358/84 |
| 4,690,321 A | 9/1987 | Spaeth | 380/20 |
| 4,691,351 A | 9/1987 | Hayashi et al. | 380/10 |
| 4,691,354 A | 9/1987 | Palminteri | 360/15 |
| 4,701,794 A | 10/1987 | Froling et al. | 358/147 |
| 4,706,121 A | 11/1987 | Young | 358/142 |
| 4,745,468 A | 5/1988 | Von Kohorn | 358/84 |
| 4,751,578 A | 6/1988 | Reiter et al. | 358/183 |
| 4,751,669 A | 6/1988 | Sturgis et al. | 364/800 |
| 4,760,527 A | 7/1988 | Sidley | 364/412 |
| 4,768,110 A | 8/1988 | Dunlap et al. | 360/30.1 |
| 4,775,935 A | 10/1988 | Yourick | 364/101 |
| 4,821,102 A | 4/1989 | Ichikawa et al. | 358/183 |
| 4,829,569 A | 5/1989 | Seth-Smith et al. | 380/10 |
| 4,842,275 A | 6/1989 | Tsatskin | 273/1 R |
| 4,845,739 A | 7/1989 | Katz | 379/92 |
| 4,856,787 A | 8/1989 | Itkis | 273/237 |
| 4,868,866 A | 9/1989 | Williams, Jr. | 380/49 |
| 4,873,662 A | 10/1989 | Sargent | 364/900 |
| 4,875,164 A | 10/1989 | Monfort | 364/412 |
| 4,876,592 A | 10/1989 | Von Kohorn | 358/84 |
| 4,891,011 A | 1/1990 | Cook | 358/141 |
| 4,902,020 A | 2/1990 | Auxier | 273/256 |
| 4,906,707 A | 3/1990 | Yukimoto et al. | 358/147 |
| 4,908,713 A | 3/1990 | Levine | 385/335 |
| 4,926,255 A | 5/1990 | Von Kohorn | 358/84 |
| 4,926,327 A | 5/1990 | Sidley | 364/412 |
| 4,974,149 A | 11/1990 | Valenti | 364/200 |
| 4,975,904 A | 12/1990 | Mann et al. | 370/85.1 |
| 4,975,905 A | 12/1990 | Mann et al. | 370/85.1 |
| 4,977,455 A | 12/1990 | Young | 358/142 |
| 4,987,486 A | 1/1991 | Johnson et al. | 358/86 |
| 4,992,940 A | 2/1991 | Dworkin | 364/401 |
| 4,994,908 A | 2/1991 | Kuban et al. | 358/68 |
| 5,001,554 A | 3/1991 | Johnson et al. | 368/86 |
| 5,008,853 A | 4/1991 | Bly et al. | 364/900 |
| 5,009,429 A | 4/1991 | Auxier | 273/240 |
| 5,034,807 A | 7/1991 | Von Kohorn | 358/84 |
| 5,038,022 A | 8/1991 | Lucero | 235/380 |
| 5,057,915 A | 10/1991 | Von Kohorn | 358/84 |
| 5,058,108 A | 10/1991 | Mann et al. | 370/65.1 |
| 5,073,931 A | 12/1991 | Audebert et al. | 380/23 |
| 5,075,771 A | 12/1991 | Hashimoto | 358/84 |
| 5,077,607 A | 12/1991 | Johnson et al. | 358/86 |
| 5,083,271 A | 1/1992 | Thacher et al. | |
| 5,093,918 A | 3/1992 | Heyen et al. | 395/725 |
| 5,099,319 A | 3/1992 | Esch et al. | 358/86 |
| 5,105,184 A | 4/1992 | Pirani et al. | 340/721 |
| 5,133,075 A | 7/1992 | Risch | 395/800 |
| 5,141,234 A | 8/1992 | Boylan et al. | |
| 5,151,789 A | 9/1992 | Young | 365/194.1 |
| 5,159,549 A | 10/1992 | Hallman, Jr. et al. | 364/412 |
| 5,177,680 A | 1/1993 | Tsukino et al. | 364/401 |
| 5,182,640 A | 1/1993 | Takano | 358/86 |
| 5,187,787 A | 2/1993 | Skeen et al. | 395/600 |
| 5,200,823 A | 4/1993 | Yoneda et al. | 356/146 |
| 5,220,420 A | 6/1993 | Hoarty et al. | 358/86 |
| 5,220,501 A | 6/1993 | Lawlor et al. | 364/408 |
| 5,220,657 A | 6/1993 | Bly et al. | 395/425 |
| 5,224,706 A | 7/1993 | Bridgeman et al. | 273/85 |
| 5,227,874 A | 7/1993 | Von Kohorn | 358/84 |
| 5,230,048 A | 7/1993 | Moy | 395/600 |
| 5,231,493 A | 7/1993 | Apitz | 358/146 |
| 5,233,533 A | 8/1993 | Edstrom et al. | 364/468 |
| 5,241,465 A | 8/1993 | Oba et al. | 395/158 |
| 5,257,789 A | 11/1993 | LeVasseur | 273/309 |
| 5,257,810 A | 11/1993 | Schorr et al. | 273/292 |
| 5,261,042 A | 11/1993 | Brandt | 396/156 |
| 5,265,033 A | 11/1993 | Vajk et al. | 364/514 |
| 5,283,639 A | 2/1994 | Esch et al. | 348/6 |
| 5,283,731 A | 2/1994 | Lalonde et al. | 364/401 |
| 5,283,734 A | 2/1994 | Von Kohorn | 364/412 |
| 5,283,856 A | 2/1994 | Gross et al. | 395/51 |
| 5,285,272 A | 2/1994 | Bradley et al. | 348/6 |
| 5,301,028 A | 4/1994 | Banker et al. | 348/570 |
| 5,305,195 A | 4/1994 | Murphy | 364/401 |
| 5,319,455 A | 6/1994 | Hoarty et al. | 348/7 |
| 5,319,707 A | 6/1994 | Wasilewski et al. | 380/14 |
| 5,320,356 A | 6/1994 | Cauda | 273/292 |
| 5,321,241 A | 6/1994 | Craine | 235/380 |
| 5,326,104 A | 7/1994 | Pease et al. | 273/138 |
| 5,337,155 A | 8/1994 | Cornelis | 348/473 |
| 5,339,239 A | 8/1994 | Manabe et al. | 364/401 |
| 5,343,239 A | 8/1994 | Lappington et al. | 348/12 |
| 5,343,300 A | 8/1994 | Hennig | 348/478 |
| 5,345,594 A | 9/1994 | Tsuda | 455/18 |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,351,970 A | 10/1994 | Fioretti | 273/439 |
| 5,353,218 A | 10/1994 | De Lapa et al. | 364/401 |
| 5,355,480 A | 10/1994 | Smith et al. | 395/600 |
| 5,357,276 A | 10/1994 | Banker et al. | 348/7 |
| 5,377,354 A | 12/1994 | Scannell et al. | 395/650 |
| 5,381,393 A | 1/1995 | Ohtani | 395/650 |
| 5,393,067 A | 2/1995 | Paulsen et al. | 273/292 |
| 5,398,932 A | 3/1995 | Eberhardt et al. | 273/138.8 |
| 5,403,015 A | 4/1995 | Forte et al. | 273/304 |
| 5,404,505 A | 4/1995 | Levinson | 395/600 |
| 5,414,773 A | 5/1995 | Handelman | 380/49 |
| 5,426,594 A | 6/1995 | Wright et al. | 364/514 R |
| 5,428,606 A | 6/1995 | Moskowitz | 370/60 |
| 5,429,361 A | 7/1995 | Raven et al. | 273/138 A |
| 5,431,407 A | 7/1995 | Hofberg et al. | 273/292 |
| 5,434,978 A | 7/1995 | Dockter et al. | 385/200 |
| 5,437,462 A | 8/1995 | Breeding | 273/292 |
| 5,440,262 A | 8/1995 | Lum et al. | 345/212 |
| 5,442,771 A | 8/1995 | Filepp et al. | 395/660 |
| 5,471,629 A | 11/1995 | Risch | 395/800 |
| 5,483,466 A | 1/1996 | Kawahara et al. | 364/514 C |
| 5,498,003 A | 3/1996 | Gechter | 273/434 |
| 5,504,675 A | 4/1996 | Cragun et al. | 364/401 |
| 5,505,449 A | 4/1996 | Eberhardt et al. | 273/138 A |
| 5,507,491 A | 4/1996 | Gatto et al. | 273/139 |
| 5,508,731 A | 4/1996 | Kohorn | 348/1 |
| 5,511,160 A | 4/1996 | Robson | 395/162 |
| 5,515,098 A | 5/1996 | Carles | 348/8 |

## US 6,712,702 B2

Page 3

| | | | |
|---|---|---|---|
| 5,526,035 A | 6/1996 | Lappington et al. | 348/13 |
| 5,526,427 A | 6/1996 | Thomas et al. | 360/20 |
| 5,528,490 A | 6/1996 | Hill | 364/600 |
| 5,532,923 A | 7/1996 | Sone | 364/138 |
| 5,537,586 A | 7/1996 | Amram et al. | 395/148 |
| 5,539,450 A | 7/1996 | Handelman | 348/12 |
| 5,539,822 A | 7/1996 | Lett | 380/20 |
| 5,544,892 A | 8/1996 | Breeding | 273/292 |
| 5,549,300 A | 8/1996 | Sardarian | 273/292 |
| 5,557,658 A | 9/1996 | Gregorek et al. | 379/67 |
| 5,557,721 A | 9/1996 | Fite et al. | 395/148 |
| 5,559,312 A | 9/1996 | Lucero | 235/380 |
| 5,561,707 A | 10/1996 | Katz | 379/88 |
| 5,569,082 A | 10/1996 | Kaye | 463/17 |
| 5,572,643 A | 11/1996 | Judson | 395/793 |
| 5,576,951 A | 11/1996 | Lockwood | 395/227 |
| 5,577,266 A | 11/1996 | Takahisa et al. | 455/66 |
| 5,579,537 A | 11/1996 | Takahisa | 455/66 |
| 5,581,479 A | 12/1996 | McLaughlin et al. | 364/614 A |
| 5,583,563 A | 12/1996 | Wanderscheid et al. | 348/9 |
| 5,585,866 A | 12/1996 | Miller et al. | 348/731 |
| 5,586,257 A | 12/1996 | Perlman | 463/42 |
| 5,586,766 A | 12/1996 | Forte et al. | 273/309 |
| 5,586,936 A | 12/1996 | Bennett et al. | 463/25 |
| 5,589,892 A | 12/1996 | Knee et al. | 348/731 |
| 5,592,212 A | 1/1997 | Handelman | 348/12 |
| 5,593,349 A | 1/1997 | Miguel et al. | 463/30 |
| 5,597,162 A | 1/1997 | Franklin | 273/292 |
| 5,597,307 A | 1/1997 | Redford et al. | 434/307 |
| 5,600,364 A | 2/1997 | Hendricks et al. | 348/1 |
| 5,600,366 A | 2/1997 | Schulman | 348/9 |
| 5,603,502 A | 2/1997 | Nakagawa | 273/292 |
| 5,610,653 A | 3/1997 | Abecassis | 348/110 |
| 5,611,730 A | 3/1997 | Weiss | 463/20 |
| 5,613,190 A | 3/1997 | Hylton | 455/3.1 |
| 5,613,191 A | 3/1997 | Hylton et al. | 455/3.1 |
| 5,613,912 A | 3/1997 | Slater | 463/25 |
| 5,617,565 A | 4/1997 | Augenbraun et al. | 395/604 |
| 5,624,265 A | 4/1997 | Redford et al. | 434/307 |
| 5,624,316 A | 4/1997 | Roskowski et al. | 463/42 |
| 5,630,204 A | 5/1997 | Hylton et al. | 455/3.3 |
| 5,635,979 A | 6/1997 | Kostreski et al. | 348/13 |
| 5,638,426 A | 6/1997 | Lewis | 379/90 |
| 5,640,193 A | 6/1997 | Wellner | 348/7 |
| 5,643,088 A | 7/1997 | Vaughn et al. | 463/40 |
| 5,659,350 A | 8/1997 | Hendricks et al. | 348/6 |
| 5,659,793 A | 8/1997 | Escobar et al. | 395/807 |
| 5,660,366 A | 8/1997 | Palmer | 248/9 |
| 5,660,391 A | 8/1997 | Klasee | 273/292 |
| 5,664,948 A | 9/1997 | Dimitriadis et al. | 343/307 R |
| 5,669,817 A | 9/1997 | Tarantino | 463/13 |
| 5,675,752 A | 10/1997 | Scott et al. | 395/333 |
| 5,679,077 A | 10/1997 | Pocock et al. | 463/19 |
| 5,684,863 A | 11/1997 | Katz | 379/88 |
| 5,684,918 A | 11/1997 | Abecassis | 386/83 |
| 5,687,331 A | 11/1997 | Volk et al. | 395/327 |
| 5,687,971 A | 11/1997 | Khaladkar | 273/269 |
| 5,688,174 A | 11/1997 | Kennedy | 463/37 |
| 5,689,431 A | 11/1997 | Rudow et al. | 364/449.7 |
| 5,697,844 A | 12/1997 | Von Kohorn | 463/40 |
| 5,702,104 A | 12/1997 | Malek et al. | 273/292 |
| 5,702,305 A | 12/1997 | Norman et al. | 463/42 |
| 5,707,287 A | 1/1998 | McCrea, Jr. | 463/27 |
| 5,708,780 A | 1/1998 | Levergood et al. | 395/200.12 |
| 5,708,845 A | 1/1998 | Wistendahl et al. | 395/806 |
| 5,709,603 A | 1/1998 | Kaye | 463/17 |
| 5,711,715 A | 1/1998 | Ringo et al. | 473/9 |
| 5,713,574 A | 2/1998 | Hughes | 273/292 |
| 5,713,795 A | 2/1998 | Kohorn | 463/40 |
| 5,717,860 A | 2/1998 | Graber et al. | 395/200.12 |
| 5,718,431 A | 2/1998 | Ornstein | 273/292 |
| 5,722,418 A | 3/1998 | Bro | 128/732 |
| 5,724,091 A | 3/1998 | Freeman et al. | 348/13 |
| 5,724,106 A | 3/1998 | Autry et al. | 348/734 |
| 5,724,424 A | 3/1998 | Gifford | 380/24 |
| 5,724,425 A | 3/1998 | Chang et al. | 380/25 |
| 5,729,212 A | 3/1998 | Martin | 340/870.28 |
| 5,729,279 A | 3/1998 | Fuller | 348/8 |
| 5,732,338 A | 3/1998 | Schwob | 455/158.5 |
| 5,732,949 A | 3/1998 | Josephs | 273/292 |
| 5,734,589 A | 3/1998 | Kostreski et al. | 364/514 A |
| 5,734,853 A | 3/1998 | Hendricks et al. | 395/352 |
| 5,735,525 A | 4/1998 | McCrea, Jr. | 273/309 |
| 5,735,742 A | 4/1998 | French | 463/25 |
| 5,740,369 A | 4/1998 | Yokozawa et al. | 395/200.47 |
| 5,740,549 A | 4/1998 | Reilly et al. | 705/14 |
| 5,746,656 A | 5/1998 | Bezick et al. | 463/42 |
| 5,748,742 A | 5/1998 | Tisdale et al. | 380/49 |
| 5,749,735 A | 5/1998 | Redford et al. | 434/307 |
| 5,749,785 A | 5/1998 | Rossides | 463/25 |
| 5,751,338 A | 5/1998 | Ludwig, Jr. | 348/17 |
| 5,752,160 A | 5/1998 | Dunn | 455/5.1 |
| 5,755,621 A | 5/1998 | Marks et al. | 463/42 |
| 5,759,101 A | 6/1998 | Von Kohorn | 463/40 |
| 5,767,894 A | 6/1998 | Fuller et al. | 348/6 |
| 5,768,382 A | 6/1998 | Schneier et al. | 380/23 |
| 5,770,533 A | 6/1998 | Franchi | 463/42 |
| 5,774,591 A | 6/1998 | Black et al. | 382/236 |
| 5,774,664 A | 6/1998 | Hidary et al. | 395/200.48 |
| 5,774,869 A | 6/1998 | Toader | 705/10 |
| 5,779,242 A | 7/1998 | Kaufmann | 273/459 |
| 5,779,549 A | 7/1998 | Walker et al. | 463/42 |
| 5,781,245 A | 7/1998 | Van Der Weij et al. | 348/563 |
| 5,781,246 A | 7/1998 | Alten et al. | 348/569 |
| 5,787,156 A | 7/1998 | Katz | 379/93.13 |
| 5,788,507 A | 8/1998 | Redford et al. | 434/307 |
| 5,788,574 A | 8/1998 | Ornstein et al. | 463/25 |
| 5,789,892 A | 8/1998 | Takei | 318/687 |
| 5,791,991 A | 8/1998 | Small | 463/41 |
| 5,793,413 A | 8/1998 | Hylton et al. | 348/12 |
| 5,794,210 A | 8/1998 | Goldhaber et al. | 705/14 |
| 5,795,156 A | 8/1998 | Redford et al. | 434/118 |
| 5,796,945 A | 8/1998 | Tarabella | 395/200.9 |
| 5,798,785 A | 8/1998 | Hendricks et al. | 348/1 |
| 5,799,267 A | 8/1998 | Siegel | 704/1 |
| 5,800,268 A | 9/1998 | Molnick | 463/40 |
| 5,802,220 A | 9/1998 | Black et al. | 382/276 |
| 5,805,154 A | 9/1998 | Brown | 345/327 |
| 5,809,481 A | 9/1998 | Baron et al. | 705/14 |
| 5,809,482 A | 9/1998 | Strisower | 705/30 |
| 5,812,769 A | 9/1998 | Graber et al. | 395/200.12 |
| 5,815,551 A | 9/1998 | Katz | 379/88 |
| 5,816,918 A | 10/1998 | Kelly et al. | 463/16 |
| 5,818,438 A | 10/1998 | Howe et al. | 345/327 |
| 5,823,879 A | 10/1998 | Goldberg et al. | 463/42 |
| 5,828,734 A | 10/1998 | Katz | 379/93.13 |
| 5,830,067 A | 11/1998 | Graves et al. | 463/40 |
| 5,830,068 A | 11/1998 | Brenner et al. | 463/42 |
| 5,831,527 A | 11/1998 | Jones, II et al. | 340/540 |
| 5,835,126 A | 11/1998 | Lewis | 348/9 |
| 5,839,725 A | 11/1998 | Conway | 273/244 |
| 5,839,905 A | 11/1998 | Redford et al. | 434/307 R |
| 5,848,396 A | 12/1998 | Gerace | 705/10 |
| 5,848,397 A | 12/1998 | Marsh et al. | 705/14 |
| 5,851,149 A | 12/1998 | Kidos et al. | 463/42 |
| 5,857,911 A | 1/1999 | Fioretti | 463/40 |
| 5,867,700 A | 2/1999 | Ohkura et al. | 380/20 |
| 5,871,398 A | 2/1999 | Schneier et al. | 463/16 |
| 5,875,108 A | 2/1999 | Hoffberg et al. | 364/146 |
| 5,879,233 A | 3/1999 | Stupero | 463/11 |
| 5,880,769 A | 3/1999 | Nemirofsky et al. | 348/12 |
| 5,885,158 A | 3/1999 | Torango et al. | 463/27 |

| | | | | |
|---|---|---|---|---|
| 5,898,762 | A | 4/1999 | Katz | 379/93.12 |
| 5,901,246 | A | 5/1999 | Hoffberg et al. | 382/209 |
| 5,901,287 | A | 5/1999 | Bull et al. | 395/200.48 |
| 5,903,317 | A | 5/1999 | Sharir et al. | 348/589 |
| 5,911,582 | A | 6/1999 | Redford et al. | 434/307 |
| 5,916,024 | A | 6/1999 | Von Kohorn | 463/40 |
| 5,917,725 | A | 6/1999 | Thacher et al. | 364/410.1 |
| 5,917,893 | A | 6/1999 | Katz | 379/93.02 |
| 5,918,213 | A | 6/1999 | Bernard et al. | 705/26 |
| 5,933,811 | A | 8/1999 | Angles et al. | 705/14 |
| 5,934,004 | A | 8/1999 | Koe | 463/40 |
| 5,937,163 | A | 8/1999 | Lee et al. | 395/200.48 |
| 5,948,061 | A | 9/1999 | Merriman et al. | 709/219 |
| 5,957,695 | A | 9/1999 | Redford et al. | 434/307 |
| 5,964,463 | A | 10/1999 | Moore, Jr. | 273/274 |
| 5,971,397 | A | 10/1999 | Miguel et al. | 273/371 |
| 5,987,498 | A | 11/1999 | Athing et al. | 709/203 |
| 5,990,927 | A | 11/1999 | Hendricks et al. | 348/6 |
| 5,996,006 | A | 11/1999 | Speicher | 709/218 |
| 5,999,808 | A | 12/1999 | LaDue | 455/412 |
| 6,005,561 | A | 12/1999 | Hawkins et al. | 345/327 |
| 6,025,837 | A | 2/2000 | Matthews, III et al. | 345/327 |
| 6,035,021 | A | 3/2000 | Katz | 379/93.12 |
| 6,038,554 | A | 3/2000 | Vig | 705/400 |
| 6,081,750 | A | 6/2000 | Hoffberg et al. | 700/17 |
| 6,085,256 | A | 7/2000 | Kitano et al. | 709/303 |
| 6,154,207 | A | 11/2000 | Farris et al. | 345/328 |
| 6,183,366 | B1 | 2/2001 | Goldberg et al. | 463/42 |
| 6,208,805 | B1 | 3/2001 | Abecassis | 386/126 |
| 6,236,360 | B1 | 5/2001 | Rudow et al. | 342/357.13 |
| 6,240,555 | B1 | 5/2001 | Shoff et al. | 725/110 |
| 6,264,560 | B1 | 7/2001 | Goldberg et al. | 463/42 |
| 6,289,319 | B1 | 9/2001 | Lockwood | 705/35 |
| 6,323,894 | B1 | 11/2001 | Katz | 348/15 |
| 6,330,021 | B1 | 12/2001 | Devaux | 348/14.04 |
| 6,335,965 | B1 | 1/2002 | Katz | 379/93.12 |
| 6,349,134 | B1 | 2/2002 | Katz | 379/92.01 |
| 6,446,919 | B1 | 9/2002 | Tsui | 455/6.2 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 566 454 A1 | 8/1993 | H04N/7/087 |
| EP | 680173 | 11/1995 | |
| EP | 680235 | 11/1995 | |
| EP | 0 697 613 A2 | 2/1996 | G02B/27/01 |
| EP | 0 843 272 A1 | 5/1998 | G06F/19/00 |
| EP | 0 871 132 A1 | 10/1998 | G06F/15/28 |
| EP | 1 126 715 A2 | 8/2001 | H04N/7/173 |
| EP | 0 688 489 B1 | 11/2001 | H04N/7/14 |
| GB | 2 034 995 A | 10/1979 | H03J/7/185 |
| GB | 2 141 907 A | 1/1985 | |
| GB | 2 183 882 | 6/1987 | G07F/17/34 |
| GB | 2 186 670 A | 7/1987 | |
| GB | 2 205 188 | 11/1988 | G07F/17/34 |
| GB | 2 207 314 | 1/1989 | G11B/15/02 |
| GB | 2 256 549 | 9/1992 | H04N/5/762 |
| GB | 2 281 434 A | 3/1995 | G10H/1/00 |
| JP | 64-18380 | 1/1989 | H04N/7/08 |
| JP | 320459 | 1/1990 | H04L/29/06 |
| JP | 6314184 | 4/1993 | G06F/3/14 |
| WO | WO 88/04507 | 6/1988 | H04N/7/087 |
| WO | WO 90/07844 | 7/1990 | H04N/05/782 |
| WO | WO 92/12488 | 7/1992 | G06F/15/20 |
| WO | WO 93/09831 | 5/1993 | H04N/1/00 |
| WO | WO 93/19427 | 9/1993 | G06F/15/21 |
| WO | WO 94/14281 | 6/1994 | H04N/7/16 |
| WO | WO 95/31069 | 11/1995 | H04N/7/087 |
| WO | WO 96/30664 | 10/1996 | G06K/13/00 |
| WO | WO 96/36141 | 11/1996 | H04H/1/00 |

### OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/140,979, Goldberg et al., filed Aug. 27, 1998.

U.S. patent application Ser. No. 08/299,620, Auxier et al., filed Sep. 2, 1994.

Advertising brochure for "Trak–21", by Digital Biometics, Inc., Gaming Division, 5600 Rowland Road, Minnetonka, MN 55343.

Advertising page for "Tracker–Plus TP–700 Player Tracking Equipment for Table Games", by Open Technologies, 6520 Platt Ave., Suite 672, West Hills, CA 91307.

Advertising page s (15–16 and Order Form) for QQP game s, in eStrategy Plus, believed to be from 1994.

Estavanik, "Designing On–Line, Mulitplayer Games", in Game Developer, pp. 14–21, Premier 1994.

Horton, "The Power of ImaginNation", in Advertising Age, Mar. 7, 1994.

Information sheet for "Action Tracker Electronic Voucher System".

Marketing Plan for Manifest Destiny, Inc., 1994.

O'Connell, "Advertisers Get Benched", Promo, The International Magazine for Promotion Marketing, p. 96, Mar. 1994.

"PAPA 5"; Feb. 1995; http://www.ece.umd.edu/~dstewart/pinball/PAPA5/guide.txt.

"PAPA 6, 1998 World Pinball Championships"; Feb. 1998; http:www.glue.umd.edu/~dstewart/pinball/PAPA6/.

"Archive of Pervious Versions of My Home Page";Free Software Humor & Jokes Personal; version 3. mid, Oct. 1996 to present; 2 pgs.

"Cash is the Riddler's Draw"; Jun. 8, 1995; 1 pg.

"Free Software & Tips"; Free Software Humor & Jokes Personal; date unknown; 4 pgs.

"List of Some of Rajiv's Technology Related Work"; Home Free Software Humor & Jokes Personal; date unknown; 5 pgs.

Resnick; "WWW>Rotating Sponsorship Banner on WWW Pages"; Net–Happenings Moderator; Oct. 28, 1995; 2 pgs.

"MARKETING: Ads Delivered In Real Time"; Northern Light Technology, LLC; 1997–2002; 2 pgs.

"Licence for Ronald A. Katz Technology Licensing L.P. Patents obtained by HP"; PR News; Mar. 18, 2002; 4 pgs.

Levitz; "Tallahassee free–net: The Keystone of a Florida Network of Community Information Systems"; Journal of Educational Media and Library Science; Summer 1994; 31(4); pp. 364–373.

Abecassis; U.S. Publication No. 2001/0041053A1 Entitked "Content–On Demand Advertisement System"; published Nov. 15, 2001.

Yan et al.; "SIFT: A Tool for Wide–Area Information Dissemination"; USENIX Technical Conference; Jan. 16–20, 1995; pp. 117–186.

Millison; "Games People Play"; Daily Spectrum, Jun. 9, 1995; 7 pgs.

"MARKETING: Ads Delivered in Real Time"; Business Communications Company, Inc.; Jan. 1996; 2 pages.

"Notification of Transmittal of International Preliminary Examination Report"dated Jan. 25, 2001 for International patent application Ser. No. PCT/US99/25131 with an international date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Written Opinion"dated Aug. 16, 2000 for International patent applicatioin Ser. No. PCT/US99/25131 with an international filing date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Notification of Transmittal of the International Search Report or the Declaration"dated Jan. 31, 2000 for International patent application Ser. No. PCT/US99/25131 with an international filing date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Notification of Transmittal of International Preliminary Examination Report"dated Jan. 12, 1998 for International patent application Ser. No. PCT/US99/00872 with an international filing date of Jan. 17, 1997, and a priority date of Jan. 19, 1996.

"Notification of Transmittal of the International Search Report or the Declaration"dated May 12, 1997 for International patent application Ser. No. PCT/US97/00872 with an international filing date of Jan. 17, 1997, and a priority date of Jan. 19, 1996.

"Licence for Ronald A. Katz: Technology Licensing LP. Patents Obtained by MP" *PR New*; Mar. 18, 2002, 4 pages.

24/7 Media Prospectus, Aug. 13, 1998, pp. 1–43

A component and communication model for push systems, presented at ESEC/FSE 00 –Joint 7th European Software Engineering Conference 7th SIGSOFT International Symposium on the Foundations of So, Sep. 6–10, 1999, Toulouse, France, file:///J/13367/–2/references/references(General)push systems.htm.

"A Newspaper with a Difference On The Internet";, *Direct Marketing Magazine*, Mar. 1995, 57(11); p. 11.

Abate; "Advertising Sponsorship is Growing on the Internet", *Bacon's*, Jul. 1, 1995, News clipping.

Abate; "Major Deal To Map Internet Future"; *San Francisco Examiner*, Dec. 12, 1996; 1 page.

Abecassis; U.S. Publication No. 2001/0041053A1 Entitled "Content–On Demand Advertisement System"; published on Nov. 15, 2001.

Abrahams; "Patent Office May Hinder Hopping of Bunny Across Computerscreens"; *Washington Times*, 1997; 2 pages.

Abstracts from files in info–mec/comm/net/web Aug. 16, 1996, file//33671–2/references(general/email/95–96.htm

"Ad–Free"Information Week, n. 614, pp. 68, 70, Jan. 20, 1997, Dialog Accession No. 5498711 in Dialog ©File 2.

ADMedium Newletter, Dec. 1, 1996. file//J/13367/–2/reference/reference.../ADMedium Newsletter (DEC 96 Riddle-.htm.

"Adobe Systems and PicturWeb from alliance –provide consumers with unique digital photo offering" Business Wire Jan. 4, 1996, Dialog Accession No. 00561 in Dialog ©File Jun. 21.

"ADR introduces electronic meeting scheduler–new ADR/ email facility cross time zones and data lines" News Release May 31, 1988, Dialog Accession No. 00192162 in Dialog©File 621.

Alsop; "PointCast and Its Wannabes"; *Fortune*; Nov. 25, 1998; 2 pages.

"An Internet Newcomer is Making Money by *Selling Moving Ads as Part of Screen Saver"; ADMedium Newsletter*, Oct. 1, 1996.

Andrews; "User Friendly: 'Push'Method Could Be The Next Wave"; *Personal Technology*, Dec. 1, 1996, 1 page.

"Ariel Resources first quarter results, revenue increases 109 percent of comparable period last year," Business Wire, Feb. 13, 1997, Dialog Accession No. 00736050, In Dialog©File 621.

Askey; "News You've Asked to Use", *Mediaweek*, Jun. 12, 1995; 5(24); p. 20.

"Atrium Software delivers next phase in internet push technology for sales forces" PR Newswire Mar. 11, 1997, Dialog Accession No. 00744818 in Dialog®File 621.

"BackWeb to provide push technology for Microsoft Internet Explorer 4.0" PR Newswire Mar. 12, 1997, Dialog Accession No. 00746003 in Dialog®File 621.

Bailey, Steve et al., "A Cautionary Tale In The News", Boston Globe, Aug. 13, 1996, p. D1.

Bank; "Microsoft Picks On–Line News From PointCast"; *Wall Street Journal*; Dec. 12, 1996, 1 page.

Banic "Inverted Web; How Net is Becoming More Like Television To Draw Advertiser", *Wall Street Journal*; Dec. 13, 1996; 3 pages.

Bama, Ed., "Make Mone On The Internet, Maybe", Vermont Business Magazine, vol. 24, No. 7, Jul., 1996, page 50.

Barrie et al.; "The World Wide Web As An Instructional Tool"; *Science*; Oct. 18, 1996; 274; pp. 371–372.

Basch; "Interchange Online Network–The Elements for its Success Are Already in Place"; *Link–Up*, May 1, 1995, 12(3), pp. 8–9; Dialog File 233: Microcomputer Abstracts; 0385575.

Bates; "Electronic Clipping Service. A New Life for SDIs"; *Online*, Jul. 3, 1994, 18(4); pp. 43–47, 49–5: Dialog File 202: Information Science Abs.; 00184574.

Bell; The Electronic Scholar's Assistant; *Computer in Lirar-ies*, Oct. 1990; pp. 15–16; Dialog File 61:Lisa; 02087937.

Berst; "Push'Products Redefine Internet"; *PC Week*, Nov. 25, 1996; p. 63.

Bibliografia Utilizzata per la stesure della tesi, http://digi-lander.lol.lt/imesseron/bibliol. htm.

Birma et al., "Exploiting Virtual Synchrony in Distributed Systems" pp. 123–138 1987.

Birman et al., "Programming Your Way Out of the Past; ISIS and the Meta Project"; *Sun Technology*, Summer 1969; pp. 90–94.

"Boeing projects continued airline profitability, traffic growth, rational airline orders," *PR Newswire*, Mar. 6, 1996, Dialog Accession No. 00586684, Dialog©File 621.

Borenstein, "Multimedia Electronic Mail; Will the Dream Become a Reality!"; *Communications of the ACM*; Apr. 1991, 34(4), pp. 117–19.

"Brave New Medium", *Economist*; Jun. 29, 1996; 339(7972); pp. 15–16; UK 17–18.

Brisbin, "AppleSearch: The Latest Version of Apple's Information–Retrieval Tool Makes a Great Internet Clipping Service", *MacUser*, Jun. 1, 1995, 11(6), p. 46, Dialog File 233, Microcomputer Abstracts; 0357029.

Brown; "LapLink Keeps In Touch"; *PC Magazine*; Jan. 7, 1997; p. 60.

Butterman et al., A Structure for Transportable Dynamic Multimedia Documents, Usenix, pp.137–154, 1991.

Carng et al.; "Ziff–Davis Electronic Information Acquires SandPoint"; *PR Newswire San Francisco*; Mar. 1, 1994; 3 pages.

"ClariNet & InterestAlert announce push technology... to ClariNet's 200 ISPs and 1.5 millin users" Business Wire Mar. 10, 1997, Dialog Accession No. 00744113 in Dialog ©File 621.

Clarke; "Cookies"; *Xamax Consultancy Pty Ltd.*; 1996–2001; pp. 1–10.

Cleland; "A Gaggle of Web Guides Vies for Ads"; *Advertising Age*; Apr. 17, 1995; News clipping.

"Clickshare one–built, universal–passwork across... early next year" PR Newswire Sep. 15, 1995, Dialog Accession No. 00544269 in Dialog©File 621.

"CNET and InCommon announce delivery of News.Com.... for desktop deliver of CNET's popular News.Com content–"Business Wire Mar. 10, 1997, Dialog Accession No. 00744544 in Dialog ®File621.

"CompasSearch Web Server Search and Retrieval Tool Available for Internet Publishers; CompassWare server Adds Value to WWW Sites": *Business Wire*; Jan. 3, 1996; Dialog 00560996.

"Comprehensive software directory now available on Newsnet"Aug. 29, 1985, Dialog Accession No. 00115864 in Dialog ®File 621.

Conhalm; "This Year in Review"; *Link–Up*, Nov./Dec. 1996; 13(6); pp. 5, 34.

Continue Reports –Sep. 1995; file:///J/3367/–2/references–(general)riddler –Sep. 1995; htm.

Cooperstock et al.; "Why Use a Fishing Line When You Have a Net?An Adaptive Multicast Data Distribution Protocol"; *USENIX Technical Conference*; Jan. 22–26, 1998; pp. 343–352.

Corcoran: "The Marketers Are On–Lining Up for You: Interactive Ads, Other Gimmicks Kick Off the Internet's New Era"*Bacon's* ; Sep. 27, 1996. Newspaper clipping.

"Data Times Announces Major Ne Search Features; Price Cuts, Search Services & Gateways"; *Database Searcher*, Jun. 1, 1990, 6(5), pp. 27–28; Dialog File 233: Microcomputer Abstracts; 0219625.

Dateline: Princeton, NJ; Financial Times and The Wall Street Journal Together On Dow Jones News/Retrieval; *Information Today*; Apr. 1, 1995, 12(4); p. 1, Dialog File 233; Microcomputer Abstracts; 0382372.

Derringer; "Freemark Delays Release of Free E–Mail Until April"; *Bacon 's*; Feb. 19, 1996, pp. 1, 20.

"Despite summer doldrums, online audience claims 5.6% to 5.52 million"Information & Interactive Services Report, Oct. 7, 1994 v. 15, Dialog Accession No. 02544536 in Dialog ©File 636.

"Dial–up electronic media director®at low cost introduced by PR Data Systems"News Release Fe;b. 10, 1989, p. 1, Dialog Accession No. 02140932 in Dialog ©File 16.

"Diamond Multimedia ships the first K56Flex modems for Macintosh computer"*Business Wire*Apr. 8, 1997, Dialog Accession No. 00757610 in Dialog ®File 621.

"Diamond Multimedia ships its first 56,000... now available at retail"Business Wire Mar. 24, 1997, Dialog Accession No. 00755527 in Dialog ®File 621.

Diebarger, "Browsing The WWW by interacting With a Textual Virtual Envirinment –A Framework for Experimenting With Navigational Metaphors"; *Hypertext 96*; 1996; pp. 170–179.

Digital Espresso for Aug. 27, 1996, http://www.mentorsoft-.com/DE/in96027.html.

EC2®USC–Digital Commerce Center–Internet Advertising, wyslwyg;/2file:/J/3267/–2/references...merce Center –Internet Advertising.htm.

Egan; "Online Clipping Services Deliver. Electronic Tools Retrieve Neww You Can USSE": *PC Today*; Mar. 1, 1995, 9(3), pp. 20–24, Dialog File 233: Microcomputer Abstracts; 0379524.

Eng; "Bits & Bytes"; *Business Week*; Jul. 29, 1996; No. 3466; p. 68A(1).

"eWorksl Inc. announces eWatch WebAlert–powerful, comprehensive efficient web site monitoring designed for the corporate user"PR Newswire, Aug. 20, 1996, Dialog Accession No. 00655743 in Dialog®file 621.

E–mail and voicemail systems. (Evolution of the Paperless Office: Legal Issues Arising out of Technology in the Workplace; part 1). Employee Relations Law Journal, Winter 1995, 21, No. 4, 5–36; Dialog Accession No. 08361735 in Dialog®File 148.

E–Taller's Digest in Gifts & Decorative Accessories. www.etailersdigest.com; Aug. 1996.

Farrow; "A Route To The Internet"*Open Computing*, Jun. 1, 1994, 11(6), pp. 106–107, Dialog File 233: Microcomputer Abstracts; 0351749.

"Federal Reserve Board and Consumer Credit Intelligence from Business Publishers. Inc. enhances Newsnet database"Jun. 10, 1985, Dialog Accession No. 00116869 in Dialog®File 621.

Finnie; "Free News You Can Use"; *PCComputing .Com*; 1 page.

Finnie; "Look, Mal. No. Brower"; *PC Magazine*; Jan. 7, 1997; p. 60.

"First Floor software brings 'push'technology to both busniesses and consumers through deals with Microsoft and America Online"PR Newswire Mar. 13, 1997, Dialog Accession No. 00746694 in Dialog®File 621.

Flaherty, Francis "Cyberspace Swindles; Old Scams, New Twists," The New York Times, Jul. 16, 1994, p. 25.

"Florida business news service names among "World's Best"Internet newspaper publishers by editor & publishers–"Business Wire"Apr. 1, 1997, Dialog Accession No. 00753847 in Dialog®File 621.

Flynn et al.; "The Daily Me; Laying Out Tomorrow's (Electronic) News"; *PC Magazine*; Sep. 14, 1993; 12(15); p. 29(1).

"ForeFront launches WebWhacker 3.0 –... just got better"PR Newswire Mar. 24, 1997, Dialog Accession No. 00750722 in Dialgo®File 621.

Forsdick, et al., "Initial Experience with Multimedia Documents in Diamond"pp. 99–113 (ed. H.T. Smith) 1984.

Frank, Howard, "Telcos and Newspapers must Cooperate To Win," *Networking Management*, vol. 10, No. 7, Jun., 1192, p. 46.

"Free E–mail Service Launched by FreeMark", *Bacon's*; Oct. 1995; News clipping.

"French firm unveils first Lotus add–in... and unattended electronic mail"News Release Nov. 19, 1987, Dialog Accession No. 00175902 in Dialog ®File 621.

Fried; "NewsNet: An Offering of Current and Specialized Information"; *Online*; Jul. 1985; 9(4); pp. 99–105.

Frook; "News to the desktop: Vendors deliver personalized news to useres via the Net"; *CommunicationsWeek, Interactive Age*: Apr. 29, 1996; 3 pages.

Fryxell; "NewsNet Stands Alone–If This Service's 800–Plus Full–Text Industry Newsletters Can't Fill Your Research Needs, Then Nothing Can"; *Link–Up*; Nov. 1, 1994, 11(5), pp. 8–9; Dialog File 233: Microcomputer Abstracts; 0366803.

Gallagher, "Pressing E–mail's Mass–Market Advantage; Printable coupons attached to elec. messages makes 1–1 marketing a possibility"Mill Hollow Corporation, DM News 1995 (Lexis database).

Gambling Online?You Bet !, file:///J/3367/–2/references/references(general)/internetgaming.html, May 3, 1999.

"Gartner Group announces internet–based ovantage service"Business Wire Jan. 2, 1996, Dialog Accession No. 00563106 in Dialog®File 621.

"GE Debuts GErie in Europe, Introduces Corporate Clipping, Service"; Link–Up; Jun. 1, 2990, 7(3); pp. 1, 12, Dialog File 233: Microcomputer Abstracts; 0219292.

Geocrawler, The Knowledge Archive, from Tim Maffett Sep. 4, 1996; re: Chime script –and other Chime news.

Gibson; Skills Count At Network Startup–INS Features Design, Operations Specialists For Hire; PC Week; Jan. 23, 1995, 12(3); p. 100; Dialog File 233: Microcomputer Abstract 0373166.

Gifford et al.; "Boston Community Information System 1987–1988"; Massachusetts Inst. of Tech., Cambridge, Lab. for Computer Science; May 1989; p. 250; Dialog File 6: NTIS; 1415753.

Gifford et al.; "Clipping Service User's Manual (Version 1.2)"; Massachusetts Inst. Of Tech., Cambridge. Lab. for Computer Science; Sep. 1987, p. 28, Dialog File 6: NTIS; 1326877.

Goff, Leslie, "Wash Away Those Job–Hunting Jitters. The Opportunities Are Endless On The Web," Computerworld, Oct. 31, 1996, p. 12.

Goldbert et al.; U.S. Patent Application Ser. No. 09/502,285 Entitled "A Networked System for Presenting Advertising–"filed Feb. 11, 2000.

Goldberg et al.; U.S. Patent Application Ser. No. 09/830,593 Entitled "A Network Advertising System Providing Games and Services"filed Apr. 26, 2001.

Gutman, "New You Need to Succedd: Electronic Newspapers Boost Your Effectiveness"; Success, Mar. 1991, 38(2), p. 12, Dialog File 2: INSPEC; 03905093.

Haar; "Young Turks Point The Way Offline"; CyerMedia; Oct. 14, 1996; 2 pages.

"Harbinger Corporation Announces TrustedLink INP; The most comprehensive solution for easily building and maintaining a corporate Web site,"Business Wire, Mar. 25, 1996, Dialog Accession No. 00595210 in Dialog®File 621.

Harler; "Distribute Coupons Via E–mail"Bacon's ; Jan. 1996; News clipping.

Hassett et al.; "Technical Excellence Online Winner. The PointCast Network"; PC Magazine Online; 1996; 1 page.

Hauss; "Technology Gives Early Warning Of New Breaks"; Public Relations Journal, May 1995; pp. 18–22.

"HFS Incorporated, Century 21 Real Estate Corporation... consumer real–estate information service"Business Wire Jan. 10, 1996, Dialog Accession No. 00564626 in Dialog®File 621.

Hawkins, "Electronic Advertising On Online Information Systems"; Online; Mar. 1994, 18(2); pp. 26–39; Dialog File 15: Abi/Inform; 00836506.

Heckhart et al.; "Data Services Variety Pack or Single Servings"; Network World; Jun. 12, 1995,; 4 pages.

Heywood, "Users Get a Closer Look at Virtual Private Networks –The Lates Monitoring Tools From Service Providers Make Sure Customers Are In The Know About Their Virtual Private Networks"; Data Cmmunications; Jun. 1, 1994, 23(9), pp. 85–90, Dialog File 233: Microcomputer Abstracts; 0351803.

"HFS and Century 21 announce major initiatives... in providing one–stop shopping for consumers," Business Wire, Mar. 12, 1996, Dialog Accession No. 00589418; in Dialog ®File 621.

Hollis, et al.; "Addressing Customers Wireless Data Service Needs"; Telesis; Oct. 1995; No. 100; pp. 56–57.

"Home information videotex services will cost subscribers $78/mo by 1990, according to Intl Resource Development"VideoPrint, Aug. 10, 1981, p. 7, Dialog Accession No. 00679106 in Dialog®File 16.

"Home Information videotex services are expected to be widely available... for the use of the new services"News Release Jul. 27, 1981, pp. 1–61, Dialog Accession No. 00659126 in Dialog®File 16.

"HP Internet Advisor Enhanced to Make Internetwork Testing Quicker and Easier; Window 95, Interface Helps to Isolate Network Problems,"Business Wire, Mar. 15, 1996, Dialog Accession No. 00590687, in Dialog ®File 621.

Huang et al., "Multimedia E–mail: the Evolution Approach Based on Adapters"; Software–Practice and Experience, 24(9); 785–800 1994.

Hyland, IAB Advertising ABC's , "Why Internet Advertising?", http://www.jab.net/advertise/content/adcontent.htm.

"IDG books Worldwide, Inc. and Mecklemedia Corporation sign agreement to publish ten new internet/virtual reality books"PR Newswire Apr. 17, 1985, Dialog Accession No. 00514153 in Dialog ®File 621.

"IDG to launch Javaworld on World Wide Web,"PR Newswire, Feb. 2, 1996, Dialog Accession No. 00576930, in Dialog ®File 621.

"IFN announces instant news service;... ILX to become first distributor"Business Wire Mar. 18, 1997, Dialog Accession No. 00749159 in Dialog ®File 621.

"Implementing On–Line Couooning"; Merchandising /Marketing, 1996 News clipping.

"Indivudual, Inc. elects Michael E. Kolowich as new CEO"News Release, Sep. 3, 1996, Dialog Accession No. 06570702 in Dialog ®File 16.

Individual, Inc., announce agreement to acquire FreeLoader, Inc., News Release Jun. 2, 1996, Dialog Accession No. 06306172 in Dialog ®File 18.

"Individual, Inc. –company report"Investext, May 1, 1996, pp. 1–16, Dialog Accession No. 06289588 in Dialog ®File 16.

"Individual Inc. named breakout company of the year by the information Industry Association "Business Wire Oct. 23, 1995, p. 10231026, Diolog Accession No. 05782514 in Dialog ®File 16.

"Individual, Inc. Files for U.S. Patent"; PR Newswire; Jul. 9, 1992.

"Individual, Inc. Sees Strong Sales, Subscriber Growth"; Electronic Information Report, Feb. 24, 1994; 17(8).

"Information Access Company's 10 online databases to be offered through Mead Data Central services"May 1, 1985, Dialog Accession No. 00117313 in Dialog ®File 621.

"Infoseek delivers personalized, current news via e–mail"PR Newswire Feb. 13, 1997, Dialog Accession No. 00731890 in Dialog ®File 621.

"Interest ALERT provides push technology to Island's web site visitors"Business Wire Feb. 4, 1997, Dialog Accession No. 00733654 in Dialog ®File 621.

"Intermind 'pushes'140 New Web Channels, Thre Times That of Marimba, Backweb and Ifusion Combined"; *SchwabOnline*; Feb. 6, 1997; 2 pages.

"Internet Current Awareness Service"Searcher: Magazine/ Database Prof., v.3 n.10 p.8(1) Nov./Dec. 1995, Dialog Accession No. 00086120 in Dialog ®File 256.

Internet Marketing Discussion list archive: Re: Rotating sponsor banners ?, Dec. 5, 1995, file:///J/3367/–2/references/references(general)/Re Rotating sponsor banners.htm.

Internet Marketing Discussion list archive: Rotating sponsor banners ?, Dec. 2, 1995, file///J/3367–2/references/references(general)Rotating sponsor banners2.htm.

Internet Marketing Discussion list archive: Rotating sponsor banners?, Nov. 30, 1995, file:///J/3367–2 references/references(general) Rotating sponsor banners.htm.

"Internet study shows push technology takes up significant bandwidth... Sixth International World Wide Web Conference"Business Wire Apr. 7, 1997, Dialog Accession No. 00757278 in Dialog ®File 621.

"IRG acquires intertect,"PR Newswire, Dec. 2, 1996, Dialog Accession No. 00703704, in Dialog ®File 621.

Jackson et al.; "InterMail: A Prototype Hypermedia Mail System"; *Hypertext 91 Proceedings*; Dec. 1991, pp. 405–409.

"Journalist Delivers Your Own Personalized Newspaper"; *IAC News*; 1997; 1 page.

"Journalist: Your Personalized Newspaper for CompuServe"User Guide, 1994.

Kirkpatrick, "What's Selling on the Internet"; *Kirkpatrick Enterprises; Inc.*; 1996–2000; pp. 1–36.

Kramer; "Remote Possibilites; Gateways Let Remote Users Exchange Mail Via Web Browsers"; *PC Week*; Apr. 15, 1996, 13(15): 3 pages; Dialog File 233: Microcomputer Abstracts; 0420777.

LaRosa, "Marketing Slays The Downsizing Dragon"; *Information Today*; Mar. 1, 1992, 9(3), pp. 58–59, Dialog File 233: Microcomputer Abstracts; 0271126.

"LaserCard™enables quiet, high quality printing on IBM system/36 and system/38 midrange computers"*News Release*; Mar. 6, 1988.

"Leading Newspaper Ramp Up Interactive Advertising Development," *Electronic Marketplace Reports*, vol. 9, No. 4, Feb. 21, 1995, p. 4.

Levine; "Knowing Where You Browse?"; *comp.society.privacy*, Sep. 21, 1995; pp. 1–5.

Lewis, Peter H., "The New York Times introduces a Web Site", *The New York Times*, Jan. 22, 1996, p. C7.

Lexis database,"Individual Launches Newspage Direct"PR Newswire 1996.

Lexis database; "FreeLoader, Inc. Announces the First Service to Deliver the Internet Offline"; *PR Newswire Association, Inc.*; Jan. 19, 1996; 3 pages.

Lexis database, "FreeMark Communications and Sports-Ticker enter online sports information distribution agreement; Popular sports content first of a series of innovative content offerings to be delivered free to email users"Business Wire 1996.

Lexis database, "Getting Wilrad With ST"; *Times Newspapers Limited*; Jan. 22, 1995; 1 page.

Lexis database; "On–Line Mortgate Service Will Operate Over Internet"; *National Thrift News, Inc.*; Oct. 31, 1994; 3 pages.

Lexis database, "W3.com Introduces first visitor–tracking software for web sites; software increases interactivity, provides powerful tracking and cutomization features while simplifying web site development"Business Wire 1995.

Lexis database, "Cover Story: free mail, part two; two companies announce free internet e–mail services"IAC (SM) Newsletter Database (TM), Future Systems, Inc., Multimedia & Videodisc Monitor 1995.

Lexis database, "Firm to offer free net mail"Computerworld 1995.

Lexis database, "Productview interactive to launch free email service this year"IAC (SM) Newsletter Database (TM) M2 Communications, M2 Presswire 1995.

Lexis database, "No shortage of online choices"Mill Hollow Corporation, DM New 1995.

"Licence for Ronald A. Katz Technology Licensing LP. Patents Obtained by HP"; *PR News*; Mar. 18, 2002, 4 pages.

Lockwood, "All The News That's Fit to Telecommunicate"; A+*The Independent Guide for Apple Computing*, Jun. 1986, 4(6), pp. 93–96; Dialog File 233: Microcomputer Abstracts; 0023714.

Lu; "Computers Making Impacts in Crosswork Markert"; *Crossword Tournament: New York Times*; Aug. 16, 1996.

"Macromedia's Shockwave brings animation and entertainment to internet push technology"PR Newswire Feb. 25, 1997, Dialog Accession No. 00744301 in Dialog ®File 621.

Maddox, "More Hits For Your Web Sites"; *Net Access*; Feb. 26, 1996; News clipping.

"Madison Avenue's OnLine Leaps"Newpaper Article.

Makulowich: "A Net Explorer's Log"; *Online*; Nov. 1, 1996, 20(6): pp. 40–42; Dialog file 233: Micro–compute Abstracts; 0441925.

"McAfee announces PC Medic 97 and NetMedic 97;... by proactively preventing common Windows 96 problems"; *Business Wire*Mar. 18, 1997, Dialog Accession No. 00747856 in Dialog ®File 621.

"McAfee launces enterprise SecureCast; first to deliver... McAfee and BackWeb pioneer new software distribution channel"Business Wire Feb. 26, 1997, Dialog Accession No. 00740253 in Dialog®File 62.

"McAfee launches VirusScan 3.0;... detects 100% of viruses in latest secure computing magazine review"Business Wire March 3, 1997, Dialog Accession No. 00741540 in Dialog®File 621.

"McGraw–Hill news available on Dialcom"News Release Jul. 27, 1988, Dialog Accession No. 00199385 in Dialog®File 621.

"MCI Acquires Equifax's Stake in FYI Onlone"; *Electronic Information Report*, Oct. 21, 1994; 15(38).

"Mead Data Central adds Trinet databases to Exchange™"Jan. 17, 1966, Dialog Accession No. 00120619 in Dialog ®File 621.

"Media tracking service watches cyberspace: RTV offers swatch to monitor internet"PR Newswire Feb. 20, 1996. Dialog Accession No. 00581154 in Dialog®File 621.

Memon; "Free E–mail is Here, But With Ads Aplenty"; *Bacon's* ; Jul. 27, 1995; News clipping.

"Mercury, Center Intros NewsHound Clipping Service"; *Newsbytes Ness Network*; pg. N/A.

"Microsoft products now available through online interactive atOnce software"Business Wire Jan. 15, 1996. Dialog Accession No. 00565507 in Dialog ®File 621.

Miller, "News On–Demand for Multimedia Networks"; *ACM Multimedia*; 1993; pp. 383–392.

Mitchell, *PC World*, "Two Free Programs Deliver News to Your PC"1996.

Mohan, "Firm to Offer Free Net Mall"; Jul. 10, 1995; 1 page. (Newspaper Article Clipping).

Mohan, "Free mail on the net forces users to trade off privacy"; Computerworld, Inc., Nov. 27, 1995.

Nelson; "Information Distribution System: PointCast I–Server Pleases All"; *Info World*; Nov. 16, 1996; pp. IW/3 and IW/8.

Net Results: Web Marketing That Works... Media: The Many Faces of Web Advertising, wysiwyg://2/file:/J3367/–2/references/references...Ia The Many Faces of Web Advertising.htm.

"NETdelivery and ICat announce strategic partnership"PR Newswire Feb. 11, 1997, Dialog Accession No. 00733524 in Dialog ®File 621.

"Net delivery announces release of 1.1–a unique push product product for the Internet"PR Newswire March 1997, Dialog Accession No. 00744055 in Dialog®File 621.

"New custom file capability for Nexis"May 1, 1985, Dialog Accession No. 0017314 in Dialog®File 621.

"New subject group files, pricing for Nexis™"May 1, 1985, Dialog Accession No. 00117268 in Dialog®File 621.

"News Alert introduce Real–Time Electronic Clipping Service"; *Information Today*, Jun. 1, 1995, 12 (6); p. 14; Dialog ®File 233: Microcomputer Abstracts; 0387603

"News Alert to Introduce Real–Time"Information Today, v. 12 No. 6, p. 14(1), Jun. 1995, Dialog Accession No. 00078844 in Dialog ©File 266.

"Newsday direct available to Prodigy subscribers at no additional fee"Business Wire Oct. 28, 1995, Dialog Accession No. 00543429 in Dialog ®File 621.

"NewsHound Sniffs Out Stories"; *Open Systems Today*; Nov. 28, 1994; No. 164; p. 36.

"Newsnet and American Business Information present business America –online"News Release Mar. 18, 1993. Dialog Accession No. 00350165 in Dialog ®File 621.

"NewsNet Newly Enhanced NwsFlash"; *Information Today*; Apr. 1, 1990, 7(4); p. 4, Dialog File 233: Microcomputer Abstracts; 0254449.

"Newsnet offers an electronic news dipping service called NewsFlash"Marketing News, Nov. 25, 1983. p. 23, Dialog Accession No. 00969003.

"Newsnet to convert online system to PLS search software"PR Newswire Nov. 15, 1994, Dialog Accession No. 00502206 in Dialog ®File 621.

"Newsnet unveils major new enhancements"PR Newswire May 3, 1995, Dialog Accession No. 00616765 in Dialog ®File 621.

"Nexis®adds radio transcripts of Dougherty Daily ad broadcasts"Mar. 11, 1986, Dialog Accession No. 00126985 in Dialog ®File 621.

"N.Y. Times Mno. unveiled World Wide Web site, The New York Times on Web. (Comm Daily Notebook)"Communications Daily, Jan. 23, 1996; v. 16 No. 15, p. 6(2), Dialog Accession No. 08418048 in Dialog ®File 148.

O'Connor; "Ads to Pay for Free E–Mail Service"; *Bacon's*, Jun. 29, 1995; News clipping.

O'Connor, "Free A–mail Service Stated for the Fall: Limited Urban Areas to Try OUt Advertiser–Supported Messaging Service"; *Business*; Jul. 01, 1995; p. C7 (Lexis Nexis).

O'Connell; "Turning On To Screen Savers"; *IAC News*; 1997; 2 pages.

Gjala, "Staying Alert Via Online Clipping Services"; *Onliner*; Sep. 1991; 15(5), pp. 80–82.

"Online data push"InformationWeek n. 619, pp. 6–12, 66, 68, Feb. 24, 1997, Dialog Accession No. 5529660 in Dialog ®File 2.

"Online Interactive's FreeShop Online achieves one million electronic orders.... "Business Wire, Feb. 7, 1996, Dialog Accession No. 00575091, in Dialog®File 621.

"On–line software maps DB2 direction"News Release Mar. 27, 1991, Dialog Accession No. 00294253 in Dialgo ®File 621.

"Online–Time, Inc."*Report on Electronic Commerce*; Nov. 12, 1996; 3(23).

Overton, *PC World*, "PointCast 1.1: More Content for News Junkies"1997.

"Paley opens communications consulting firm"PR Newswire Sep. 30, 1983, Dialog Accession No. 01906440 in Dialog ®File 148.

"Patent Office May Minder Hoppping of Bunny Accross Computersscreens"; *Wahington Times*; 1997, 2 pages.

"Patterns of use, exposure in paper's audiotex system–"Newspaper Research Journal (INRS), 16(1):48–59 1995, Dialog Accession No. 02586508, in Dialog®File 484.

"PC World Online chooses Lanacom to deliver next generation "push"to mor than half a million monthly line users"Business Wire, Apr. 9, 1997, Dialog Accession No. 00758089 in Dialog®File 621.

PCN, PointCast, Inc. PointCast 1.0, "we created a splash screen explaining the software," Feb. 1996.

"PED Deliers Personalized Newspaper To Users Desktops"; *IAC News*; 1987; 2 pages.

"PED Software introduced Journalist, Software That Allow Users to Retrieve and Print Data From the Prodigy Online Service"; *Newsbytes News Network*; Apr. 5, 1994; Dialog 01014310.

Pinella et al.; "Individual , Inc. Announced Today Shipment of A New Release Of Its Flagship"; *Businesswire*; Sep. 18, 1995; 2 pages.

Phillips; "An Interpersonal Multimedia Visualization System"; *IEEE Computer Graphics & Applications*; 1991; pp. 20–27.

Phillips, "Media View: A General Multimedia Digital Publication System"; *Communications of the ACM*, 34(7): 76–83 1981.

PointCast unveils free news service –Tech News –CNET-.com, Feb. 13, 1996, file:///J/3367/–2/references/reference...unveils free news service (Feb. 96).htm.

Postel, et al., Information Sciences Institute, ISI Research Report, "The 1st Experimental Multimedia Mail System"pp. 1–27 1986.

Prodidy promotion, Read all about the Prodigy interactive personal service of its kind that lets each member of your family personalize it to his or her interest and priorities, 6 pages.

Ramanathan et al.; "Architectures for Personalized Multimedia"; *IEEE*; 1994; pp. 37–46.

Ramanathan et al., "Towards Personalized Multimedia Dia-l–Up Services"; *Computer Networks and ISDN Systems*, 26:1305–1322 1994.

Rapozs: "J–Server: Gotta Have It"*PC Week*; Oct. 28, 1996; 12(43); 1 page.

Raymond; "Newsflash: Or One Cybranians's Quest for Electronic News Delivery"; *Special Libraries; Fall 1994*; vol. 85: Issue 4; pp. 270–273.

Reinheimer; "Information on Demand's Multi–File Elec-tronic Clipping Service"; *National Online Meeting*; New York, NY; May 5–7, 1987.

Robert Hobbes Zakon, HJobbes Internet Timeline v5.6.–the definitive ARP Arter& Internet history. http:/www.za-kon.org/robert/internet/timeline/.

Rodriguez; "Real–Time Group Conferencing to Ship"; *News/Networlding*; Oct. 10, 1994; p. 49.

Roybeal et al.; "Large–Scale Demonstration Test Plan For Digfaco Data Acquisition System"; *Lockheed Idaho Tech-nologies, Co.*: Nov. 1994; p. 40; Dialog File 6: NTIS; 1852842.

Rudich. "How Customizable Nes Services Can Help You Reduce Clutter (and Guilty)"; *Link–Up*; 1996. 13(5); pp. 8–9; Dialog File 233; Microcomputer Abstract; 0435810. Sample Web page.

Sanders, *Business Week*, PC Meets the TV; The Plot Thick-ens, pp. 94–95, 1996.

"Scala's new CEO brings Madison Avenue and Holywood perspective to multimedia computer televison"PR Newswire Mar. 17, 1997, Dialog Accession No. 00748917 in Dialog ®File 621.

Schoenfield; "Developers Plan Free E–mail"; *Online Mar-ketplace*; Jun. 1995; 2 pages.

"Search Serviices & Gateways"; *Database Searcher*, Jun. 1, 1991, 7(5); pp. 31–33; Dialog File 233: MicroComputer Abstracts; 0242553.

Seldman's Online Insider for the Week Ending May 3, 1996, vo. 3 No. 18, http://www.onlineinsider.com/html/archives/050396 html.

Eno; "MultiMedia Information Broadcasting Service Present"; *IEEE*, 1994, pp. 117–120.

Shel@1 blackjacktime.com, e–mail re: Advertising article about CNET, Jan. 17, 2002.

Shermen, "The Executive's NewsStand NewsNet Can Help Track Your Company's Image Your Company, Your Clients and Your Industry"; *Link–Up*, Mar.1, 1990, 7(2), pp. 20–21; Dialog File 233: Microcomputer Abstracts; 0256018.

"Slimware announces alliance with intermind to push enter-prise data to users desktops"Business Wire Mar. 12, 1997, Dialog Accession No. 00748045 in Dialog ®File 621.

"Sky Computer chosen as compute processor for Broadcast Data Systems, Inc."News Release Aug. 24, 1992, Dialog Accession No. 00335658 in Dialog®File 621.

Slaby; "SendPoint Unveils Hoover NewsAlert For Win-dows: Powerful Intelligent–Agent Based Software Monitor Provides Real–Time News for Critical Decision Making"; *Businesswire*; Oct. 30, 1995; 2 pages.

Smith, The World–Wide–Web, Dec. 11, 1995, file:///J/3367/– 2/references/references(general/web (Dec. 95).htm.

Soltes, The World–Wide–Web, Dec. 11, 1005, file:///3367/– 2/references/references(general/web(Dec. 95).htm.

Soltes; "Catch The Wave"; *Bacon's*; Aug. 16, 1996, News clipping.

Sponsor of the Day Newsletter Nov. 1996.http.//www.c-ris.com/–raydaly/sponjjnw.html.

"StarBurst Communications to bring true "push"technology to the Internet"Business Wire Mar. 3, 1997, Dialog Acces-sion No. 00743147 in Dialog ®File 621.

"Starfish Software announces corporated 10–user paks....now available in new money–saving 10–packs"Busi-ness Wire Feb. 6, 1996, Dialog Accession No. 00574412 in Dialog ®File 621.

"Starfish Software Inc. Introduces "Earth Time"... for online preview and download"Business Wire Jan. 23, 1996, Dialog Accession No. 00569318 in Dialog ®File 621.

"Starfish Software first to leverage Sun's Java... Sun's Hot Java and Netscape's Navigator 2.0..."Business Wire Nov. 13, 1996, Dialog Accession No. 00545472 in Dialog®File 621.

"Starfish Software ships Earthtime 2.0; The essential world clock... as a Netscape Navigator 2.0 plug–in,"Business Wire, Mar. 12, 1996, Dialog Accession No. 00589215, in Dialog ®File 621.

Still; "An Agency's View of Electronic Monitoring", *Jour-nal of the Society of Motion Picture and Television Engi-neers*, Mar. 1975; 64(3); pp. 172–173; Dialog File 2: INSPEC; 00782712.

Story et al.; "The RightPages Image–Based Electronic Library for Alerting and Browsing"*IEEE*, Sep. 1992; pp. 17–25.

"Suddenly Videotex is finding an audience: Boston CitNet... free videotex svcs & charging for advertising"Business Week. Oct. 19, 1987, pp. 92, 94 Dialog Accession No. 01784027 in Dialog ®File 16.

"Sun–Sentinel Launches Interactive Real Estate Services on the Internet"PR Newswire, Apr. 11, 1996, Dialog Accession No. 00600800 in Dialog ®File 621.

Tannenbaum; "Patent Approved, Patent Pending"; *Wall Street Journal Interactive Edition*; 1999.

Targeted ads soon to pop up –Tech News –CNET.com file:///J/3367/–2/references/references...started in 97)Tech News –CNET com.htm, Feb. 19, 1997.

"Technology industry & corporate customers push Marimba to the top"PR Newswire Feb. 24, 1997, Dialog Accession No. 00737499 in Dialog®File 621.

"TechWeb's breaking news and information now "pushed"...techWeb channel keeps..."Business Wire Feb. 12, 1997, Dialog Accession No. 00730658 in Dialog ®File 621.

"Tektronix brings embedded–software engineers more tools for decreasing time to market"News Release Apr. 7, 1995, Dialog Accession No. 00516600 in Dialog®File 621.

"Telebase launches electronic clipping services"PR News-wire May 7, 1991, Dialog Accession No. 00295190 in Dialog ®File 621.

"Telecommunications Information from Phillips Publishing available online through Newsnet"Jun. 12, 1985, Dialog Accession No. 00117476 in Dialog ®File 621.

"The Hook is The Look Of The Journal"; *Business Wekk*; Aug. 16, 1993,; No. 3332; p. 102A.

The Journal of American Underground Computer. ISSN 1074–3111, vol. 1, Issue 8, Apr. 21, 1995.

"The Rauters Business Report"Asia–Pacific Business Report Mar. 4, 1996, Dialog Accession No. 2619020, in Dialog ®File 611.

The Sout Report –Apr. 6, 1996, A Publication of Internet Scout Computer Science Department, University of Wis-consin,            http:///scout.cs.wise.edu/reoprt/sr/1996/scout–960405.html.

The Scout Report–May 3, 1996; A Publication of Internet Scout Computer Science Department, University of Wisconsin, file:///J/3367/–2/references/references/...a)/The Scout Report –May 3, 1996.htm.

"The world's most useful online business library adds full–text archives of The New York Times"Business Wire Oct. 31, 1995, Dialog Accession No. 00543679 in Dialog ®File 621.

"The World Wide Web as a Universal Interface to Government Services"; *Center for Technology in Government, University at Albany*; Project Report 96–2; 1996.

"Their E–mail Could Become Free Mail"; *Bacon's*; Jul. 7, 1995; News clipping.

Thimm; "A Multimedia Enhanced CSCW Teleservice for Wide Area Cooperative Authoring of Multimedia Documents"; *Sigois Bulletin*; Dec. 1994, 15(2); pp. 49–57.

"Time Warner's Pathfinder; Compuserve Inc. and Open Markert Inc. Announce a Breakthrough for the Internet. " PR Newsire, Apr. 11, 1996, Dialog Accession No. 00601438 in Dialog ®File 621.

"TMS and Mercury mail to develop personalized internet e–mail products"PR Newswire Jun. 14, 1996, Dialog Accession No. 00628917 in Dialog ®File 621.

TreasureHunt.com–Related Websites, wyswyg:/2/file:/J/ 3367–2/reference/references(general)/Game Websites.htm.

Ubols; "New Shades of Blue: IBM's John Patrick Sees Opportunity For Big Blue All Over The Internet"; *Internet World*; Mar. 1, 1995, 6(3); pp. 62–66, Dialog File 233: Microcomputer Abstracts; 0378621.

"UCA&L announces new internet divison... to help clients reach, communcate with, and market to customers online," Business Wire, Mar. 5, 1996, Dialog Accession No. 00586617, in Dialog ®File 621.

"UK: Home Computer From Your Oown Correspondent"; *Reuters Info Svcs.*; 1996; 2 pages.

Van Kirk: "Lotus Notes Tied to Internet"; *News/Networking*; Oct. 10, 1994, p. 49.

Value International –Web Projects, file:///J/3367/–2/references/reference... International –Web Projects(96–98).htm.

"Virtual Dom tops (sic) into real life of students; fully dorm suite puts students live on the Web for all to see," PR Newswire, Oct. 31, 1995, Dialog Accession No. 00543165, in Dialog®File 61.

Volokh: "Cheap Speech and What It Will Do"; *Yale Law Journal*; May 1995; 104(7); pp. 1605–1650.

Waxweb v.2.0, Apr. 3, 1995, file:///J/3367/–2/references/references(general)vwaxweb.v2.0.htm.

"Web News With A Personal Touch: Individual, Inc. Offers Ad–Backer, Customized Information Source"; *Advertising Age*: Apr. 3, 1995; 68(14); p. 25.

Web Programming Unleashed, Copyright 1996 by Sams.net Publishing, First edition.

Webb; "Telebase Launches Clipping Service ECS May Now Be Accessed by Users Directly Through Telebase"; *Link–Up*, May 1, 1991, 6(3); pp. 1 and 39, Dialog File No. 233: Microcomputer Abstracts; 0240805.

Wilder; "Free E–mail –For A Price"; *Bacon's*; Nov. 27, 1995; News clipping.

Wilder; "Get News While Your PC Sleeps"; *NetAccess*; Feb. 26, 1996: p. 77; http://techweb.amp.com.

Williamson; This E–mail Message Is Brought to You by...; *Advertising Age*; Apr. 17, 1995, newclipping.

Winer, "DaveNet"; 1994–2000; pp. 1–8.

Wireless: Wireless Advertising Gets Support From Consumers, file:///J/3367/–2/references/references(general)/advertising.htm.

"Yahoo!BackWeb Channel Guide"; *Yahoo Channel Guide: What's Going On!*; 2 pages.

Yoshida; "Group Formed To Oversee 1394 Patent Licensing": *Systems & Software News*; Nov. 23, 1999; pp. 1–3.

Zakon, Hobbes Internet Timeline Copyright ®1993–2002 http://www.zakon.org/robert/intenet/timeline. 24 pages.

"ZD Net celebrates first year of web advertising program as top–grossing content provider with 63 April Advertisers," PR Newswire, Apr. 15, 1996, Dialog Accession No. 00602035, in Dialog®File 621.

Zuckerman; "Microsoft and Pointcast in Broadcast Alliance"; *New York Times*: Dec. 12, 1996; 1 page.

Zuckermann; "Pushing the Envelope on Delivery of Customized Internet"; *New York Times*; Dec. 9, 1996: 2 pages.



FIG. 1



18
HOUSE HAND STATUS OPTIONS
A♥ CONTINUING HIT
PLAYER HAND(S) STATUS OPTIONS LAST BET TOTAL BET
3♠ K♥ 5♠ STND NONE $50 $200
3♣ 8♦ PICK OPTION STND, HIT, DBL, BET $50 $200 $50 $200
MOST RECENT BET : $30 ACCEPT / CANCEL
INSURANCE BET: $25 ACCEPTED
AMOUNT AVAILABLE FOR BETTING: $1,000
ELAPSED PLAYING TIME: 45min REMAINING PLAYING TIME: 3hr/15min
TOURNAMENT ID: 12-28-6
GAMES PLAYED: 8 GAME NUMBER: 16
RULES: INSURANCE PAYS 3:1
DOUBLE DOWN AFTER SPLITTING ALLOWED ONCE
MIN BET: $25
PLAYER: I.B. SMITH
ACTIVATE
QUIT
HELP
HIT 1
INS 2
BET 3
STND 4
CANCEL BET 5
$5 6
DBL 7
CANCEL LAST 8
$25 9
SPLIT 0
$500
$100
ACCEPT
SLOW
SPEED OF PLAY
FAST
208
302
300
304
320
324
328
342
216
221
288
292
296
336
312
224
220
284
204
228
248
268
244
232
252
276
272
236
256
264
260
240
280

Fig. 2



FIG. 3

FIG. 4A



START

THE BLACKJACK GAME
CONTROLLER 14 IS INITIALIZED

408

CARD DEALER MODULE 38 OUTPUTS AT
REGULAR INTERVALS RANDOM CARD
REPRESENTATIONS TO THE BLACKJACK
PLAYER EVALUATOR 34 AND THE HOUSE
BLACKJACK PLAYING MODULE 42

416

WAIT FOR NEXT PLAYER INPUT

424

COMMUNICATION INTERFACE 22 RECEIVES A BLACKJACK
GAME REQUEST FROM AN INTERNET CLIENT NODE 318
(GAMING STATION 18) AND TRANSMITS THE REQUEST TO
THE BLACKJACK DRIVER 26

430

IS THE REQUEST RELATED TO A
CURRENT BLACKJACK GAME AND/OR
BLACKJACK TOURNAMENT?

436

NO        YES

DOES THE
PLAYER
REQUEST TO
ENTER A
BLACKJACK
TOURNAMENT?

448

NO        YES

THE BLACKJACK DRIVER 26 USES THE
PLAYER'S ID PROVIDED WITH THE
REQUEST FOR RETRIEVING ANY
STATUS INFORMATION FROM THE
DATABASE SYSTEM 28 REGARDING
ANY CURRENT BLACKJACK GAME
AND/OR BLACKJACK TOURNAMENT
IN WHICH THE PLAYER MAY BE
CURRENTLY INVOLVED

476

PROCESS
MISCELLANEOUS
REQUESTS

470

DOES THE PLAYER REQUEST
TO COMMENCE A NEW
BLACKJACK GAME IN A
CURRENT TOURNAMENT?

480

NO        YES



454
THE BLACKJACK DRIVER 26 DETERMINES A BLACKJACK TOURNAMENT AND ENTERS THE PLAYER
520
IS THE PLAYER REQUEST RELATED TO A PLAY IN A CURRENTLY ACTIVE BLACKJACK GAME?
YES
NO
458
CREATE A CONFIRMATION RECORD IDENTIFYING THE BLACKJACK TOURNAMENT IN WHICH THE PLAYER IS ENTERED
PROCESS MISCELLANEOUS REQUESTS
524
OUTPUT THE CONFIRMATION RECORD TO THE PLAYER AT HIS/HER INTERNET CLIENT NODE 318 (GAMING STATION 18)
528
IS THE PLAYER REQUEST FOR A NEW CARD REPRESENTATION?
YES
NO
462
PROCESS OTHER BLACKJACK GAME REQUESTS
576
ENTER INTO THE DATA-BASE 28 INFORMATION INDICATING THE BLACKJACK TOURNAMENT IN WHICH THE PLAYER HAS BEEN ENTERED
THE BLACKJACK DRIVER OUTPUTS A NEW BLACKJACK GAME CONFIGURATION TO THE PLAYER
466
580

FIG. 4B



532

FOR WHOM?

HOUSE          PLAYER

536

THE BLACKJACK DRIVER 26 COMMUNICATES WITH THE HOUSE BLACKJACK PLAYING MODULE 42 FOR OBTAINING A NEW BLACKJACK GAME CONFIGURATION FOR THE CURRENT BLACKJACK GAME, WHEREIN THE NEW GAME CONFIGURATION INCLUDES THE MOST RECENTLY OUTPUT CARD REPRESENTATION FROM THE CARD DEALER MODULE 38 AS THE NEXT CARD REPRESENTATION IN THE HOUSE HAND FOR THE BLACKJACK GAME FROM WHICH THE CURRENT PLAYER'S REQUEST CAME

568

THE BLACKJACK PLAYER EVALUATOR 34 DETERMINES A NEW BLACKJACK GAME CONFIGURATION FOR THE CURRENT BLACKJACK GAME, WHEREIN THE NEW GAME CONFIGURATION INCLUDES THE MOST RECENTLY OUTPUT CARD REPRESENTATION FROM THE CARD DEALER MODULE 38 AS THE NEXT CARD REPRESENTATION FOR THE PLAYER'S HAND(S)

THE HOUSE BLACKJACK PLAYING MODULE 42 OUTPUTS BLACKJACK GAME CONFIGURATION INFORMATION INDICATING THE NEW HOUSE HAND CARD REPRESENTATION AND ANY PLAYER RESPONSE(S)

THE BLACKJACK PLAYER EVALUATOR 34 DETERMINES THE NEXT BLACKJACK PLAY OPTIONS AND OUTPUTS A NEW BLACKJACK GAME CONFIGURATION TO THE BLACKJACK DRIVER 26

542          572

FIG. 4C



IS THERE A FURTHER PLAYER RESPONSE POSSIBLE?

546

YES    NO

550

THE BLACKJACK DRIVER 26 OUTPUTS A BLACKJACK GAME CONFIGURATION TO THE PLAYER AT HIS/HER INTERNET CLIENT NODE 318 (GAMING STATION 18)

556

THE BLACKJACK DRIVER 26 SENDS THE BLACKJACK GAME RESULTS TO THE WAGER ACCOUNTING MODULE 30 FOR UPDATING THE PLAYER'S ACCOUNT

THE WAGER ACCOUNTING MODULE 30 RESPONDS WITH UPDATED ACCOUNTING INFORMATION TO BE PROVIDED TO THE PLAYER

560

564

THE BLACKJACK DRIVER 26 OUTPUTS THE RESULTS OF THE BLACKJACK GAME AND THE PLAYER'S UPDATED ACCOUNT INFORMATION

484

THE BLACKJACK DRIVER 26 REQUESTS CONFIRMATION FROM THE WAGER ACCOUNTING MODULE 30 THAT THE PLAYER CAN COMMENCE A NEW BLACKJACK GAME IN THE CURRENT TOURNAMENT

488

IS CONFIRMATION GIVEN?

NO    YES

FIG. 4D



THE BLACKJACK DRIVER 26
OUTPUTS A MESSAGE TO THE
PLAYER AT HIS/HER INTERNET
CLIENT NODE 318 (GAMING STATION
18) INDICATING THAT A NEW GAME
CANNOT BE COMMENCED IN THE
CURRENT TOURNAMENT

492

CREATE A BLACKJACK GAME
RECORD FOR THE PLAYER

494

496

THE BLACKJACK DRIVER 26 REQUESTS THE
BLACKJACK PLAYER EVALUATOR 34 TO PROVIDE
AN INITIAL BLACKJACK GAME CONFIGURATION

500

THE HOUSE BLACKJACK PLAYING MODULE 42 RESPONDS
WITH AN INITIAL BLACKJACK GAME CONFIGURATION
INCLUDING THE INITIAL CARD REPRESENTATION FOR THE
HOUSE HAND, THIS INITIAL CARD REPRESENTATION BEING
THE MOST RECENT CARD REPRESENTATION PROVIDED TO IT
BY THE CARD DEALER MODULE 38

THE BLACKJACK DRIVER 26 STORES INFORMATION
REGARDING THE IDENTITY AND INITIAL CONFIGURATION
FOR THE PLAYER IN THE DATABASE 28

504

THE BLACKJACK DRIVER 26 OUTPUTS AN INITIAL
BLACKJACK GAME CONFIGURATION FOR THE NEW
GAME TO THE PLAYER AT HIS/HER INTERNET CLIENT
NODE 318 (GAMING STATION 18)

508

FIG. 4E

| | VALUES OF CARDS FROM CARD SEQUENCE OUPUT BY THE CARD DEALER MODULE 38 → | | | | | | | | 604 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3 | 5 | 7 | 2 | 9 | 8 | 10 | 10 | |
| BLACK JACK GAME 610 | PLAYER HAND EVALUATION | 3 | | 10 | — | 19 | | | | |
| | HOUSE HAND EVALUATION | | 5 | | | | 13 | 23 | | |
| BLACK JACK GAME 614 | PLAYER HAND EVALUATION | | 5 | | | — | 13 | — | 23 | |
| | HOUSE HAND EVALUATION | | | — | 2 | | | | | |
| BLACK JACK GAME 620 | PLAYER HAND EVALUATION | | | 7 | | 16 | | | | |
| | HOUSE HAND EVALUATION | | | | 2 | | 10 | 20 | | |
| BLACK JACK GAME 626 | PLAYER HAND EVALUATION | | | | | 9 | | 19 | | |
| | HOUSE HAND EVALUATION | | | | | | 8 | | 18 | |

606

FIG. 5

U.S. Patent

Mar. 30, 2004

Sheet 10 of 14

US 6,712,702 B2

A1650



FIG. 6A

U.S. Patent

Mar. 30, 2004

Sheet 11 of 14

US 6,712,702 B2

A1651



FIG. 6B

U.S. Patent

Mar. 30, 2004

Sheet 12 of 14

US 6,712,702 B2

A1652



FIG. 7

U.S. Patent

Mar. 30, 2004

Sheet 13 of 14

US 6,712,702 B2

A1653



FIG. 8A

U.S. Patent

Mar. 30, 2004

Sheet 14 of 14

US 6,712,702 B2

A1654



FIG. 8B

US 6,712,702 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD AND SYSTEM FOR PLAYING GAMES ON A NETWORK

### RELATED APPLICATIONS

The present patent application is a continuation of prior U.S. patent application Ser. No. 09/140,979 filed Aug. 27,1998 (now U.S. Pat. No. 6,264,560), which: (a) claims the benefit of U.S. Provisional Patent Application No. 60/058,006 filed Aug. 28, 1997, and (b) is a continuation-in-part of U.S. patent application Ser. No. 09/105,401 filed Jun. 26, 1998 (now U.S. Pat. No. 6,183,366), which is a continuation of U.S. patent application Ser. No. 08/759,895 filed Dec. 3, 1996 (now U.S. Pat. No. 5,823,879) which claims the benefit of both U.S. Provisional Patent Application No. 60/010,361 filed Jan. 19, 1996 and U.S. Provisional Patent Application No. 60/010,703 filed Jan. 26, 1996. The entire disclosure of the prior applications are considered to be part of the disclosure of the present application and are incorporated herein be reference.

### FIELD OF THE INVENTION

The present invention is related to a method and apparatus for automating the playing games such as blackjack in, e.g., a game tournament context so that they can be played continuously and asynchronously by a potentially large plurality of players substantially, and wherein information related to goods and services for sale can be exchanged between players and sponsors of advertisements presented during the playing of a game.

### BACKGROUND OF THE INVENTION

The cost effective automation of playing certain games, like blackjack, has been difficult due to the fact that these games typically require a dealer and only a relatively small number of players may play the game with a single dealer. However, with the popularity of local and wide-area data communication networks, it is desirable to have an auto-mated gaming system for games such as blackjack wherein large numbers of players may cost-effectively and efficiently play such games.

Furthermore, it has been difficult to cost-effectively pro-vide a network gaming system on such networks as the Internet in that gaming restrictions prohibit wagering and ante fees in most contexts except such situations as local area networks within a casino. However, since many players have an interest in playing casino-type games, it would also be desirable to have a way to benefit from interests in such games. Accordingly, it would be desirable to have a system that utilized a gaming context as a vehicle for delivering product and/or service information to users of a network such as the Internet. In particular, it would be desirable to have a data processing system that provided a large number of players with the ability to substantially asynchronously play casino-style games on the Internet for prizes at a reduced risk or at substantially no risk, wherein the data processing system coordinated the presentation of products and/or services from sponsors of the games so that there is a coordinated, interactive exchange of information between players and sponsors regarding advertisements, samples, prizes and questionnaires related to sponsor -products and/or services.

Accordingly, since the present invention, as described in the sections hereinbelow, addresses the above-discussed problems within the context of playing blackjack, an over-view of this particular game is provided so that the novelty

and various related aspects of the present invention may be more fully appreciated.

Description of Blackjack

The card game of blackjack is a game of chance played between a designated player known as a "dealer" and one or more other players. Basically, each player plays against the dealer in the sense that each player attempts to achieve a collection or hand of cards having a total score for the hand closer to the value 21 than the score of the hand of the dealer. However, if a player's card hand goes over 21, the player may lose any wagers bet on the hand regardless of the value of the card hand of the dealer.

In further detail, blackjack is typically played with one or more standard playing card decks wherein each card has a value. In particular, each of the face cards has the value of 10, and non-face card has a value identical to the numerical value as indicated on the card, except for aces. That is, for aces a value may be assigned of either 1 or 11, depending on which value a player deems most beneficial to his/her hand.

In one conventional method for playing blackjack, at the commencement of a blackjack hand, each player initially is provided with two cards and the dealer also receives two cards. Typically, one of the dealer's cards is dealt with the value of the card showing whereas the other card is dealt with the value of the card hidden. However, variations on when the dealer receives his/her cards may depend on the blackjack gaming rules where blackjack is being played but, in any case, one of the dealer's cards must be face-up before the players exercise various wagering options beyond an initial ante.

After a player has reviewed his/her cards, the player may request one or more additional cards in an attempt to get: (a) a value for a card hand that will be greater than the hand the dealer will have, and (b) a value for the card hand that is less than or equal to 21. Further, a player may under certain circumstances, as will be described below, simultaneously play more than one hand of cards against the dealer's cards. However, in requesting such additional cards, a player runs the risk of "busting" each hand played wherein the player loses his/her wager(s) on a card hand by adding cards to the hand until a value exceeding 21 occurs. Further note that such busting of a hand occurs regardless of whether or not the dealer has a card hand value of less than or equal to 21.

Note that after each player has ceased to request further cards (i.e., each player "stands" on his cards), the dealer either takes one or more further cards (i.e., "hits") according to predetermined blackjack rules as established, for example, by the gaming establishment where the blackjack game is being conducted. In general, the dealer must take additional cards if his/her current card count total is less than 17 and the dealer must decline further cards if the dealer's hand has a value of 17 or more. However, there are various rules regarding whether a dealer may stand or hit when the card count total is a "soft 17." That is, one of the dealer's cards is an ace (and therefore may have a value of 1 or 11) and one of the values for the dealer's hand is 17. For example, the dealer may be required to take a hit on a soft 17.

Since a hit(s) taken by the dealer is performed after all players have exercised their wagering options, the final numerical value of the dealer'hand is then compared to the final numerical value of each of the player's hand(s) to determine the winning and losing wagers. Note that if the dealer's hand exceeds the value of 21, then any player that has not busted wins the wagers for their hand(s) regardless of the hand's total value. Alternatively, if the dealer's card hand is less or equal to 21, then it is compared with each of

<table>
<tr><td>3</td><td>4</td></tr>
</table>

the player's card hand(s) and in each comparison the card hand with the closest total value to 21 without exceeding 21 wins. Of course, ties are possible. In such cases (called a "push"), the player's wager(s) on his/her card hand are returned.

It is typical in blackjack to have at least three additional player options depending on the circumstances of play. A first such option is known as "doubling down" wherein if the player's first two cards have a value within a predetermined range (e.g., 10 or 11), then the player may double his or her wager and-once dealt a single additional card, the total of the three card hand becomes the value for the player's hand. Alternatively, another, option is that of "splitting pairs" wherein if the player's first two cards are identical with the exception of suit (i.e., a pair), then the pair may be split so that two card hands are created with one card of the pair in each hand. Thus, the player must wager on each of the hands at least the initial wagering or ante amount. Subsequently, a second card and any subsequent successive cards are dealt to each of the separate hands as the player requests and the results of both hands are compared to the dealer's hand, assuming neither the dealer nor either of the player's two hands busts.

In a third option, played immediately after each player has been dealt their first two cards and the dealer has been dealt at least a first card, a player may request "insurance" under the circumstances where the dealer's single face-up card is an ace. In this circumstance, the player is betting that the dealer has blackjack (i.e., a card value total of 21). If the dealer does not have blackjack, then the insurance bet is forfeited and the player plays his/her blackjack hand as if the insurance bet were never made. Note that the player can typically wager an insurance bet of one-half of the amount of his/her initial blackjack wager or ante and if the dealer has blackjack, then the dealer (or the gaming establishment) pays the player double or triple his/her insurance bet.

Further note that options for splitting pairs and doubling down may interact with one another according to certain pre-established gaming establishment rules wherein, for example, a player may double down on one or more of his/her split hands.

Additionally, there are blackjack tournaments having tournament entrants that compete against each other for tournament prizes. In such tournaments each entrant has a fixed initial number of points that can be wagered in a pre-established number of tournament blackjack games to be played. Accordingly, the player having the highest number of points at the end of the tournament wins the tournament. Note that in such tournaments, there may be specific guidelines established at the beginning of the tournament for varying the blackjack gaming rules between tournament games. For example, rules may vary on when a player may split pairs repeatedly during the same blackjack game. Also, double down rules may vary so that, for example, after a splitting of pairs, a player may be allowed to double down on any two cards or, alternatively, an additional wager of less than the initial. wager may be acceptable when a player requests to double down.

However, in all known variations of blackjack, players are only allowed to enter a blackjack game at the completion of a previous game and, further, there is a relatively small number of players that can play blackjack at a dealer's station simultaneously. Accordingly, it is desirable to provide a system for playing blackjack wherein potentially a very larger number of players can play blackjack simultaneously from a single dealer station and wherein players can commence playing blackjack at their own discretion without waiting for a previous blackjack game to complete.

## SUMMARY OF THE INVENTION

The present invention is a computerized interactive advertising system (i.e., method and apparatus) for exchanging information regarding goods and/or services between a first population of users (hereinafter also known as "players" or "users") and a second population of users (hereinafter also known as "sponsors" or "advertisers"). In particular, the sponsors or advertisers may present information related to goods and/or services to the players using the present invention and the players may view this information while, for example, interacting with the present invention for playing a game such as blackjack, craps, roulette, poker, pai gow or the like. Moreover, a player may also interact with the present invention so that the player has the capability for responding to sponsor or advertiser presented questionnaires, as well as for purchasing or viewing sponsor goods and/or services. Thus, the present invention provides an information exchange service within a gaming context for enticing players to view and/or interact with sponsor presentations such as interactive advertisements.

It is also an aspect of the present invention that each player or user is presented with advertisements for products and/or services, wherein it is believed the player will be receptive to the advertisement. That is, the present invention selectively presents advertisements to each player, according to stored characteristics and preferences of the player that the present invention has determined from, for example, player supplied personal information, player responses to questions, and/or analysis of player interactions such as player requests for additional information related an advertisement. Thus, such a selective presentation of advertisements allows a sponsor or advertiser to provide information related to relatively extensive or expensive promotionals (e.g., demonstrations, samples, discounts, trial subscriptions, prizes, bonuses) to players most likely to subsequently purchase the advertised product or service. Consequently, such selectivity can greatly increase the cost effectiveness of advertising, wherein the term, advertising (or advertising presentation), as used herein is understood to include not only product or service presentations that are merely informational, but also more interactive advertising presentations such as promotionals wherein discounts, free samples or a trial usage may be offered.

Moreover, it is an aspect of the present invention that each player may interact with and play a game at a time and pace (i.e., tempo) substantially of the player's choosing. In particular, the player is not bound by a required order or sequence of play involving other players, even though the player may be in competition with other players. In fact, a player may cease play for an extended time while in the midst of a game and subsequently continue the game at the point where the player ceased to play. Thus, if the present invention is easily accessible, then players may interact with the present invention at their leisure.

Accordingly, in a related aspect of the present invention, it is intended that players (morelgenerally, users) are able to interact with the present invention remotely, as for example, via the Internet and/or an interactive cable television network. Thus, using an Internet embodiment as an exemplary embodiment of the present invention, a gaming web site may be provided wherein players may access the interactive gaming capabilities of the present invention and substantially simultaneously also be presented with sponsor or advertiser provided information related to goods and/or services of the sponsor or advertiser (those two terms being used substantially interchangeably to denote e.g., those who

US 6,712,702 B2

5

provide advertising to users and/or subsidize game playing, product promotionals or network access). Moreover, the sponsor provided information may include, for example, hypertext links (also denoted hyperlinks) that allow players to activate, for example, network transfers for obtaining additional information regarding a sponsor's goods and/or services regardless of the status of any game in which a player may be currently involved at the gaming web site.

It is a further aspect in one embodiment of the present invention that a player is able to commence play of a game at substantially any time the player accesses the present invention. That is, it is not necessary for any previous game being played by other players to be completed for the player to commence play. In other words, games provided by the present invention may be continuously and asynchronously commenced or entered by players.

It is a further aspect of the present invention to require each player to use a distinct identification provided when the player "registers" with the present invention before playing any games so that a network site for the invention may be able to identify each player. Accordingly, it is an aspect of the present invention during registration, that each player provides personal information about him/herself both for gaming identification and for use as selection criteria by sponsors or advertisers for presenting particular presentations. For example, in the case of an Internet embodiment of the present invention, such registering can be performed via the Internet prior to play of any games at a gaming/advertising web site. Thus, players may be required to provide the present invention with information about themselves such as name, address, E-mail address, age, sex, and/or other player characteristics deemed pertinent to one or more sponsors or advertisers. Accordingly, the present invention provides a sponsor or advertiser with the capability to target its presentations substantially only to players or users having selected characteristics as, for example, determined from player information provided when registering with a network site for the present invention.

It is a further aspect of the present invention to have players compete against one another for prizes in one or more gaming tournaments. Using the Internet embodiment of the present invention as illustrative, a gaming/advertising web site for the present invention may partition the population of players into competitive groups wherein each group includes the players for a distinct tournament. Moreover, the present invention may determine a competitive group according to criteria such as: (a) the game(s) to be played in the tournament; (b) a skill level for the players (e.g., as determined by play in a previous tournament(s)); (c) particular player characteristics such as age, area of residence, home ownership, etc.; (d) particular player lifestyle traits such as traits exhibited by exercise enthusiasts or cruise ship enthusiasts; and (e) particular player preferences such as preferences related to jewelry, personal care products or particular sports.

It is a further aspect of the present invention to allow players to play games offered by the present invention without incurring financial risk or charges beyond those that are typical for the network being used in accessing the present invention.

It is a particular aspect of the present invention to provide blackjack and other casino-style games such as craps, roulette, poker, pai gow, or variations thereof, wherein such games may be played by a plurality of players continuously and asynchronously, and wherein each game is likely to be unique from all other games being played concurrently.

6

Furthermore, in a related aspect of the present invention, such games may be automated so as to not require a manual dealer. Also, the present invention may be played, in one embodiment, in a gaming establishment (e.g., casino) using low cost gaming stations at which players may play such games entirely electronically. Alternatively, in another embodiment, the present invention may be used to play such casino style games as blackjack on the Internet. In this later embodiment, a blackjack game controller for the present invention communicates with blackjack players at Internet client nodes via a web site from which the blackjack game controller is accessed. Thus, blackjack players may play blackjack in the privacy of their own homes and at their leisure since the present invention does not require that a particular tempo of a blackjack game be maintained.

Additionally, the present invention utilizes novel varieties in such games, as blackjack, that make the games more enjoyable for users. For example, using variations of blackjack as illustrative, in one novel embodiment wherein the dealer functions are automated by a dealer module, this module can play blackjack with a plurality of players concurrently such that each player appears to be playing exclusively with the dealer module (e.g., "head-to-head"). Moreover, in one blackjack embodiment, each blackjack game is played asynchronously from other concurrent blackjack games with the dealer module. Furthermore, the dealer module may play a different dealer card hand with each player. In particular, the initial one (or two) cards (or card representations) dealt to the dealer for each game are unlikely to be the same for any two blackjack games being played with the dealer module; i.e., the probability of any two concurrently played blackjack games being identical is substantially equal to chance. Accordingly, this variation is particularly worthwhile when players are playing remotely through a network such as the Internet. Alternatively, in a different blackjack variation, the dealer module and each player concurrently playing blackjack with the dealer module may be provided with cards (or card representations) from the beginning of an identical sequence of card representations. Thus, each concurrently playing player receives an identical initial card hand and the dealer is also dealt an identical initial card hand. Subsequently, the card hands within each concurrent game will vary only if players request further cards differently. Accordingly, this variation of blackjack is particularly useful in tournament blackjack played within the confines of a casino, wherein the play of each player in the tournament is synchronized to start and stop within a predetermined interval. Note that this variation of blackjack is enjoyed by tournament players in that the tournament players may consider it a better or fairer way for demonstrating blackjack playing skill.

Other features and benefits of the present invention will become apparent from the detailed description with the accompanying figures contained hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of the present invention wherein this embodiment may be used within a blackjack gaming establishment such as a casino;

FIG. 2 provides a representation of the gaming stations 18 of FIG. 1 wherein these gaming stations are used in gaming establishments for playing blackjack;

FIG. 3 is a block diagram of an alternative embodiment of the present invention wherein the present invention is used to play blackjack on the Internet;

FIGS. 4A–4E represent a flowchart for the processing performed by the blackjack game controller 14 when pro-

US 6,712,702 B2

7

cessing blackjack requests from players in either of the embodiments of FIG. 1 or FIG. 3;

FIG. 5 provides a simple example of the operation of the present invention for playing a novel variation of blackjack wherein four blackjack games are shown being played asynchronously with the blackjack game controller;

FIGS. 6A and 6B are a block diagram of an Internet embodiment of the present invention;

FIG. 7 is a diagram illustrating how a user navigates through web pages of the World Wide Web for accessing the game/advertisement web site 308 (FIG. 6) functionality; and

FIGS. 8A and 8B are an alternative embodiment of the game/advertisement web site 308. In particular, FIGS. 8A and 8B is a block diagram of an alternative embodiment of the present invention wherein an advertisement sending daemon (i.e., TCP/IP daemon ad sender on the host computer 308) and an advertisement receiving daemon 806 (on the client end user machine 318) communicate for periodically displaying advertisements and other announcements to a user on the end user machine 318.

## DETAILED DESCRIPTION

In FIG. 1, a block diagram is presented of a first embodiment of an electronic system 10 for the present invention for playing blackjack, wherein data flows are represented by solid arrows and control flows are represented by dashed arrows. In particular, the embodiment of FIG. 1 presents an architecture for the present invention for use on, for example, a local network within a casino, wherein low cost gaming stations may be utilized. Accordingly, the blackjack gaming system 10 includes a blackjack game controller 14 electronically connected to one or more potentially remote gaming stations 18 so that for each gaming station a player may play blackjack. In the blackjack gaming system 10, the blackjack game controller 14 functions substantially as a dealer would in a manually operated blackjack game and each gaming station 18 provides a blackjack player with an electronic representation of a blackjack game wherein it may appear that the player (i.e., user) at the gaming station 18 is the only player playing against the dealer (i.e., "head-to-head" against the blackjack game controller 14). Accordingly, each gaming station 18, as will be discussed with reference to FIG. 2 below, includes a display for displaying both the dealer's cards and the player's cards. Each gaming station 18 also includes player interaction capabilities for requesting additional cards, activating various blackjack player options at appropriate times, and potentially increasing various wagers at predetermined phases of a blackjack game. Further note that each gaming station 18, when in operation, may request a security code to be provided by a player for identifying himself/herself or, alternatively, the gaming station may request the player to insert an electronic card (not shown) into the gaming station 18 so that information electronically encoded upon the card is read at the gaming station and transferred to the blackjack controller 14.

Referring now to the internal structure of the blackjack game controller 14, a gaming station interface 22 is provided for interfacing with each of the gaming stations 18. In particular, the gaming station interface 22 buffers data signals between the other components included within the blackjack game controller 14 and the gaming stations 18. For example, the gaming station interface 22 may have speed matching buffers in order to adjust for differences in speed between the blackjack game controller 14 and the gaming stations 18. A blackjack driver 26 exchanges data

8

with the gaming station interface 22. The blackjack driver 26 substantially coordinates the operation of the blackjack game controller 14. In particular, the following capabilities are substantially provided by the blackjack driver 26:

(1.1) identifies each player requesting to play blackjack at one of the gaming stations 18;

(1.2) creates internal data structures for communication with other modules of the blackjack game controller 14 regarding each blackjack game being played; in particular, blackjack gaming data objects or records are (re)instantiated with each player request, such data objects providing sufficient information for the blackjack game controller 14 to properly respond to each received player request;

(1.3) determines the output of the blackjack game controller 14 to each of the active gaming stations 18;

(1.4) distributes blackjack gaming data between other modules of the blackjack game controller 14; and

(1.5) provides card representations to gaming stations 18.

In performing the above tasks, the blackjack driver 26 communicates with a blackjack player registration and playing status database 28. The database system 28 maintains in persistent storage information regarding each blackjack player. In particular, the database system 28 maintains:

(2.1) information identifying each player; e.g., a unique player identification code;

(2.2) information regarding, for example, each blackjack player's financial status; in particular, a credit limit and a current amount of funds (either to be paid or received from the player);

(2.3) for each person registered to play blackjack, information regarding the status or context of any game the player is presently playing; that is, sufficient information is stored so that the blackjack game controller 14 can retrieve this information and continue a blackjack game in response to receiving a player's request;

(2.4) for each person registered to play blackjack, information regarding any blackjack tournament that the player is playing; in particular, since such a tournament typically requires a tournament player to complete a specified number of blackjack games in a predetermined amount of time and/or to complete a specified number of blackjack games out of a total number of blackjack games, the following types of information maybe stored: (a) information relating to the number of blackjack games completed by the player; (b) information related to the time and/or the number of games remaining in the tournament; and (c) information related to the amount of funds or points in the player's account for the tournament.

The blackjack driver 26 communicates with a wager accounting module 30 wherein the wager accounting module provides the following capabilities:

(3.1) determines various wagering limit parameters for the next one or more blackjack games to be played (e.g., the wagering limit per game and the total wagering limit per player); and

(3.2) performs wagering accounting for each player's wins and losses.

Thus, the wager accounting module 30 is instrumental in initializing a new blackjack game in that this module receives and maintains financial information related to each currently active player at a gaming station 18. Thus, the wager accounting module 30 has a communication data channel with the blackjack player registration and playing

US 6,712,702 B2

9

status database **28** so that the wager accounting module **30** may retrieve information for determining whether the player has, for example, sufficient financial resources to cover potential wagering losses. Of course, to provide waging evaluation information to other controller **14** modules, the wager accounting module **30** receives identifying information from each such module requesting an evaluation.

The blackjack driver **26** also communicates with a blackjack player evaluator **34**. The blackjack player evaluator **34** receives, from each player (via instantiations of blackjack gaming data objects from the blackjack driver **26**), all blackjack player requests except the data from each player indicating an amount to be wagered. Thus, the blackjack player evaluator **34**:

(4.1) determines each player's options during blackjack games; and

(4.2) responds to player requests for hits or to, for example, split pairs.

Thus, the blackjack player evaluator **34** enforces the gaming establishment rules related to player options during a blackjack game. Note, however, that in responding to certain player requests, the blackjack player evaluator **34** communicates with the wager accounting module **30** to confirm that a proper wager accompanies the requested option and that the wager is acceptable to the wager accounting module **30**.

The blackjack player evaluator **34** is supplied with data corresponding to blackjack card representations from a card generator module **38**. The card generator module **38** generates, for example, an ordered collection or sequence of substantially random card representations and each such card representation is provided to the blackjack player evaluator **34**, wherein the blackjack player evaluator responds to each player's valid hit request by outputting the most recent card representation received from the card generator module **38**. That is, each player at a gaming station **18** receives a card representation according to when the player's request is received by the blackjack player evaluator **34**.

Further, note that the card generator module **38** also supplies the same card representations as supplied to the blackjack player evaluator **34** to a house blackjack playing module **42**, wherein this latter module plays the dealer's hand in each blackjack game. Thus, the house blackjack playing module **42** enforces the blackjack gaming rules on behalf of the gaming establishment. In particular, this module determines when and how insurance bets can be made related to the dealer's cards. Note, as with the blackjack player evaluator **34**, the house blackjack playing module **42** outputs, when required to provide the dealer's hand with another card representation at a gaming station **18**, the most recent card representation received from the card generator module **38**. Further note that the house blackjack playing module **42** provides control information to the blackjack driver **26**, particularly regarding activation of the blackjack insurance option. This information, in turn, is conveyed to the blackjack player evaluator **34** so that this latter evaluator may activate the insurance option for each player at an active gaming station **18**.

A blackjack hand evaluator **46** is also in communication with the blackjack driver **26**. The blackjack hand evaluator **46** evaluates each player's hand(s) in comparison to the dealer's blackjack hand for determining the win/loss/tie for each player's hand. Thus, the dealer's hand and the one or more hands played by each player at a gaming station **18** is supplied to the blackjack hand evaluator **46**. Subsequently, this evaluator outputs win/loss/tie results to the gaming stations **18** via the blackjack driver **26** and the gaming

10

station interface **22**. Further, the blackjack hand evaluator **46** also outputs win/loss/tie results along with the identity of the player playing each hand to the, wager accounting module **30** so that wager credits and debits for each player's account may be updated according to the last or most recent blackjack game results.

In FIG. 2, an embodiment of a gaming station **18** is illustrated. The gaming station **18** includes a player input area **204** wherein a player may press touch-sensitive portions of a thin film laminated with blackjack player operations and requests. Immediately above the player input area is a player output display area **208** for displaying blackjack gaming information related to the player. Optionally, each gaming station **18** may include a player identification card reader **216** so that a blackjack player may identify him/herself at a gaming station **18** by swiping a magnetic identification portion of a player identification card (not shown) through the card slot **220** thereby allowing the card reader **216** to transmit the player's encoded identification upon his/her card to the blackjack game controller **14**. However, it should be noted that other configurations of the gaming station **18** are also contemplated by the present invention. In particular, gaming station **18** may not have a card reader **216**. Instead, a blackjack player may be required to register either manually or automatically at a site remote from the gaming station **18**, or, alternatively personal identification numbers may be provided to players for identifying themselves via the player input area **204** wherein, for example, a numeric digit provided in the lower bottom portion of some of the touch-sensitive areas may be used by the player to input a personal identification number. Further, the arrangement of the touch-sensitive portions of the player input area **204** and the format of the display area **208** (both being discussed in detail below) may have other arrangements and still be within the scope of the present invention.

Describing in detail now the touch-sensitive portions of the player input area **204**, an activate/enter next game button **220** is provided. This button is used to initially activate the gaming station **18** so that a "request to play" signal is transmitted to the blackjack driver **26**. That is, assuming a player activates this button at a gaming station **18**, the blackjack driver **26** responds by requesting that the player input his/her identification via, for example, placing an identification card in the card reader **216** and/or a personal identification number via the player input area **204**. Additionally, note that the button **220** may be pressed at the end of a blackjack game for indicating that the player wishes to play another blackjack game. Note that in one embodiment of the present invention when consecutive games are played by a player, the player need only press the button **220** to commence a new game. That is, the player's identification need not be entered for each consecutive game played (assuming the button **220** is activated within a predetermined time after the last game has terminated).

The player input area **204** also includes a quit button **224** that a player may press to explicitly indicate the player's desire to terminate any further gaming at the gaming station **18**.

Additionally, buttons **228** through **248** provide the player with the capabilities to request the following blackjack gaming requests:

(5.1) The "HIT" button **228** allows the player to request another card to be dealt to him/her.

(5.2) The "STND" button **232** allows the player to stand on a current blackjack hand.

(5.3) The "DBL" button **236** allows the player to double down under appropriate circumstances as determined by the blackjack player evaluator **34**.

**11**

(5.4) The "SPLIT" button **240** allows the player to split the player's first two cards into two separate blackjack hands when these first two cards are identical.

(5.5) The "INS" button **244** allows the player to request insurance under the circumstances where the dealer's single face-up card is an ace.

(5.6) The "BET" button **248** allows the player to request that a bet or wager be entered during a blackjack game. Note that subsequent to requesting a bet via the "BET" button **248**, the buttons **252** through **264** areactivated so that the player may input various betting amounts. In particular, buttons **252** through **264** provide the player with the option to bet $5.00 (button **252**), $25.00 (button **256**), $100.00 (button **260**) and $500.00 (button **264**). Moreover, a sequence of the buttons **252** through **264** may be pressed for obtaining a bet not provided by a single button. For example, to bet $130.00, the player presses consecutively each of the buttons **252**, **256** and **260** (in any order) exactly once.

The player input area **204** also includes various confirm and cancel buttons **268** through **276**. The accept button **268** allows the user to accept a last input. For example, it is an aspect in the present embodiment of the invention that after each user input, the input is accepted either by the player explicitly pressing the accept button **268** or by allowing a predetermined amount of time to expire after the last player input. The "CANCEL BET" button **272** allows the user to cancel an immediately preceding bet that was input. However, note that if a time limit is exceeded for placing a bet due to, for example, the player pressing the "CANCEL" button **272**, then any minimum bet required will be auto-matically wagered on the player's behalf by the wager accounting module **30**. Further, the "CANCEL LAST" but-ton **276** may be used by the player to cancel the immediately preceding wager of one of the dollar amount buttons **252** through **264**. Thus, if a player intended to bet $125.00 by pressing first the button **260** followed by the button **256** but instead pressed the button sequence **260** and **264**, then the player may press the button **276** for canceling the $500.00 bet associated with button **264** and subsequently the player presses the button **256** to obtain the desired bet of $125.00. Note further that pressing the "CANCEL LAST" button twice in succession also cancels the entire bet.

A "SPEED OF PLAY" button **280** may be optionally provided on the player input area **204**. This button allows the player to specify to the blackjack driver **26**, for example, the predetermined amount of time after a player input to wait before each subsequent input is automatically accepted. In one embodiment of the present invention, the "SPEED OF PLAY" button **280** includes active areas at each end of the button, wherein if the user presses the "slower" end of the button **280**, then the predetermined time(s) for automatically accepting a player input is lengthened. Alternatively, if the player presses the "faster" end of the button **280**, then the predetermined default acceptance time(s) becomes shorter. However, it is important to note that the tempo of the blackjack game is, using the present invention, no longer as important as in typical blackjack gaming situations. That is, since each blackjack player using the present invention is not playing in sequence with other players, there is less concern about speedily playing so as not to delay other players.

Lastly, the player input area **204** includes a "HELP" button **284** for allowing the player to request assistance from, for example, the personnel of the gaming establish-ment providing the gaming station **18**.

Referring now to display area **208**, the screen display provided here is but one of a number of contemplated screen

**12**

layouts for the present invention. In particular, the screen layout illustrated in display area **208** is a representative layout for use in playing tournament blackjack. Thus, when other modes of blackjack are played other than tournament blackjack, then it is within the scope of the present invention to modify the fields represented in the display area **208** according to the player needs for the type of blackjack being played. Further, it is important to note that in one embodiment, the display **208** is in color so that, for example, diamonds and hearts are in red and spades and clubs are in black, and various fields of the display area **208** may be highlighted for focusing a player's attention on the portion of the display providing information most relevant to the player's currently permissible options.

Describing now the fields currently presented in display **208**, at the top of the display is the house hand area **288**: (a) for providing a representation of the cards that have been dealt to the house; (b) for providing a status of the house hand (i.e. one of: "STND" for standing, "BUSTED," when the value of the house hand exceeds **21**, and "CONTINU-ING" when the house may take additional hits. That is, this field provides an annotation "house hand:" followed by a representation for at least one card that has been dealt to the house; i.e., an ace of hearts. In the player's hand area **292** of the display area **208**, there are five columns providing information related to each blackjack hand the player is currently playing in the blackjack game. The columns pro-vide the following information:

(6.1) The "PLAYER HAND(S)" column provides, in each row of this column, a different blackjack hand that is being played simultaneously by the player in the cur-rent blackjack game. Thus, two blackjack hands are presently represented as being played simultaneously by the player on the display area **208**. That is, an upper or first hand having a three of spades, king of hearts, and a five of spades, and, a lower or second blackjack hand having a three of clubs and an eight of diamonds. (Note, when a player chooses to double down, card representations in common between two blackjack hands may be displayed in a row between the remain-ing card representations for both hands. Alternatively, card representations in common between blackjack hands may be duplicated in the blackjack hands to which the common cards representations apply.)

(6.2) A "STATUS" column for indicating the current status of each blackjack hand the player is playing. That is, for the first or upper hand that the player currently is playing the status is "STND" thereby indicating that the player has elected to stand on this hand. Alternatively, for the second or lower hand a status of "PICK OPTION" is provided thereby indicating that it is the player's turn to pick a blackjack playing option for this hand. Note that there are at least three possible values for the status field of each blackjack hand being played. That is, in addition to the two represented in FIG. **2**, a "BUSTED" status value is output for indi-cating that the value of the related blackjack hand has exceeded **21**.

(6.3) The "OPTIONS" column provides, for each black-jack hand being played, an indication of the permissible blackjack plays that the player currently may select from for the related blackjack hand in the same row. Thus, for the first hand illustrated in area **292**, there are no options remaining for the player to play related to this hand. However, on the second hand, four permis-sible player inputs are displayed as options to the player. That is, the player may stand on the related hand

US 6,712,702 B2

13

(STND) by pressing button **232**, the player may request
a hit (HIT) by pressing button **228**, the player may
double down (DBL) by pressing button **236** and the
player may bet an additional wager by pressing button
**248** and subsequently putting a bet amount using
buttons **252** through **264**.

(6.4) The "LAST BET" column displays to the player
his/her last bet for each blackjack hand the player is
currently playing. In particular, for both the upper and
lower hands shown in area **292**, the player's last bet
was $50.00.

(6.5) The "TOTAL BET" column displays to the player
the total bet the player has wagered on the blackjack
hand to which it relates. For example, in FIG. **2**, in both
the upper and lower player's blackjack hands
displayed, the player has bet a total of $200.00.

Below the player hand area **292** is the player information
area **296** wherein additional blackjack gaming information
relating to the player is displayed. In particular, labeled line
**300** displays the most recent bet amount that the player has
requested along with a tag indicating the status (e.g.,
"ACCEPT/CANCEL") of the most recent bet. Note that the
status may be: (a) "ACCEPTED" for explicitly or implicitly
indicating the acceptance of a displayed wager (via the
player pressing the accept button **268** or by default due to a
time limit expiring); (b) "CANCELLED" for explicitly
indicating the cancellation of the last entered wager (via the
player pressing either of the cancel buttons **272** or **276**); (c)
"REJECTED", this status being displayed due to the wager
accounting module **30** rejecting the player's most recent bet;
and (d) "ACCEPT/CANCEL" for indicating that the present
invention is waiting a predetermined amount of time for the
player to explicitly accept or cancel the most recent bet.
Thus, in the example of line **300** in FIG. **2**., the player has
indicated a most recent bet of $30.00 and the blackjack
driver **26** has output a status of "ACCEPT/CANCEL" as in
(d) above. Further note that the blackjack hand(s) to which
this most recent bet applies may be designated in any of a
number of ways such as, for example, highlighting the
row(s) in the player hand area **292** of the blackjack hand(s)
to which the most recent bet of line **300** applies. Alternately,
an indicator such as arrows **302** may be used as in FIG. **2** to
indicate to the player that the most recent bet is to be applied
to both the upper and lower blackjack hand(s).

Additionally, note that line **304** displays the annotation
"INSURANCE BET:" together with any insurance amount
that has been bet by the player. Accordingly, the dollar
amount on line **304** and the notation at the right end of the
line pertain, respectively, to the amount that has been bet as
insurance, and the status of this bet (i.e., one of
"ACCEPTED", "CANCELLED", "REJECTED" or
"ACCEPT/CANCEL" as in line **300**).

In line **312** of the player information area **296**, the total
amount of funds available by the player for betting is
displayed. For example, line **312** of FIG. **2** indicates that the
player has a total amount for betting of $1,000.00. Note that
the wager accounting module **30** maintains this total amount
available for betting and updates it after each blackjack
game.

The lower three lines **320**, **324** and **328** of the player
information area **296** provide blackjack player information
that is particularly useful when playing in a blackjack
tournament. Thus, the information in these three lines may
not be displayed when the present invention is used by
players not in a tournament. In line **320**, two fields are
provided for displaying playing time information. The left-
most field, annotated by the label "ELAPSED PLAYING

14

TIME:", displays the total amount of time the player has
played blackjack (which in this case is 45 minutes).
Alternatively, the rightmost field, annotated by the label
"REMAINING PLAYING TIME:", displays the time
remaining in the tournament.

In line **324** an identifier for any tournament associated
with the present blackjack game is displayed.

In line **328**, up to two additional fields are provided that
are useful in tournament blackjack. The leftmost field having
an annotation of "GAMES PLAYED:" displays to the player
the number of blackjack games he/she has completed within
a tournament. Note that in some blackjack tournaments each
player is required to complete a certain predetermined
number of games within a predetermined allotted time
period. For example, a blackjack tournament may require
each player to play 50 games within a predetermined inter-
val (such as four days). Relatedly, but optionally, in black-
jack gaming contexts where the total number of blackjack
games in the tournament is meaningful, the rightmost field
of line **328**, having the annotation "GAME NUMBER:",
displays to the player the total number of tournament games
that have been completed thus far in the tournament.
Accordingly, using at least the leftmost annotated field in
line **328** and "REMAINING PLAYING TIME:" annotated
field of line **320**, the player is able to determine the number
of remaining games in the tournament that he/she must play.

Further note that other blackjack game values are con-
templated by the present invention. For example, a field
providing the number of games remaining that a player must
play in the tournament may be added (or substituted for) in
addition to the current values in the player information area
**296**.

In a next display **208** lower area, denoted the rules area
**336**, blackjack house rules are displayed. In particular, the
house rules displayed in area **336** allow variations upon the
typical blackjack rules that a player is likely to assume if not
presented with information to the contrary. Note that by
providing these additional rules on the display of gaming
stations **18**, successive blackjack games may be provided
with different house blackjack rules thereby creating an
increased interest in each game by the players and requiring
additional blackjack playing skills from the players. Note
that three house rules are provided in the present display area
**336**. That is, (a) insurance for the present blackjack game
pays 3 to 1 odds (instead of the typical 2 to 1 odds); (b) the
player may double down after splitting only once; and (c) the
minimum bet is $25.00 for the current game.

Lastly, the display **208** includes a player identification
area **342** for identifying the player currently playing black-
jack at the gaming station **18**. The present player area **342**,
includes a field having the current player's name (e.g., I. B.
SMITH). However, other fields identifying the player are
also contemplated by the present invention including, for
example, a player identification number such as the number
that may be encoded upon a player identification card used
in conjunction with the card reader **216** for identifying the
player.

FIG. **3** presents a second embodiment of the blackjack
gaming system of the present invention. In this embodiment,
the blackjack game controller **14** is substantially the same as
described hereinabove. However, this controller **14** is now
accessible through an Internet web site **308** so that blackjack
players at Internet client nodes **318** can play blackjack on the
blackjack game controller **14** via the Internet **324** (or more
particularly, via the World Wide Web).

Accordingly, describing the web site **308** in more detail,
it includes an Internet interface **332** for receiving and

US 6,712,702 B2

15 | 16

supplying communications between the Internet 324 and the remainder of the web site 308. The Internet interface 332, in turn, communicates with World Wide Web server 340: (a) for validating and/or initiating registration of web site users (e.g., blackjack players) at web site 308; and (b) for interpreting Internet requests for routing and/or activating web site 308 modules that can fulfill such requests. Thus, the World Wide Web server 340 may access the database system 28 for determining the registration identity of, for example, a blackjack player. Additionally, upon receiving user registration confirmation regarding an Internet (e.g., World Wide Web) request, the World Wide Web server 340 activates instantiations of modules known as common gateway interface (CGI) scripts, each CGI script 348 instantiation (or, for simplicity, each such instantiation also being referred to as a CGI script 348) being: (a) for interpreting and processing Internet requests according to the semantics of a web site 308 application associated with the CGI script; and (b) for constructing Internet responses from output from the associated application. Thus, there are one or more common gateway interface modules provided wherein each CGI script 348 (instantiation) invokes the blackjack game controller 14 to process a single Internet blackjack request from an Internet client node 318 where a player is playing blackjack, and subsequently the CGI script 348 constructs an appropriate Internet response from the output received from the blackjack game controller 14.

Since the embodiment of the blackjack game controller 14 of FIG. 3 is substantially identical to that of FIG. 1, a description of its internal structure is not repeated here. However, it is worthwhile to note that the embodiment of FIG. 3 is particularly appropriate when the blackjack game controller 14 executes on a different or remote processor from that of, for instance, the processor performing the CGI script(s) 348. Further, note that if the blackjack game controller 14 executes on the same processor as the other web site 308 modules of FIG. 3, then the communication interface 22 may be unnecessary, and additionally, much of the functionality of the other components of the blackjack game controller 14 may be incorporated into one or more CGI scripts 348. Thus, for example, the blackjack player evaluator 34 functionality may be incorporated into one CGI script 348 while house blackjack playing module 42 functionality may be incorporated into another CGI script.

There are also noteworthy distinctions between the gaming stations 18 of FIGS. 1 and 2 and the Internet client nodes 318 of FIG. 3 as well as distinctions in blackjack play interactions. For example, the following distinctions may be provided:

(7.1) Due to the potentially lengthy delays that occur on the Internet, the embodiment of FIG. 3 does not provide for automatic acceptance of a blackjack play (e.g., acceptance of an input bet or a default to a minimum ante) due to a time period expiring. Thus, the speed of play is determined by the responsiveness of each player and the responsiveness of the Internet.

(7.2) Players may play blackjack in tournaments against one another on the Internet wherein, for each tournament entered by a player, he/she receives, without cost, a predetermined number of points to use for playing in the tournament. Note that prizes may be awarded to tournament winners as incentive to play in such blackjack tournaments. Further note that the time period to complete a tournament may be substantially more lengthy than the time periods for typical blackjack tournament play. For example, a tournament may extend for 90 days since players can play at their leisure.

(7.3) The input keys of gaming station 18 of FIG. 1 may be also presented on the display screens of Internet client nodes 318 wherein the input buttons of gaming station 18 now become active buttons on a blackjack web page generated by the web site 308 and presented to a player at an Internet client node 318. However, note that at least the speed of play key 280 is not necessary, as mentioned in reference to the embodiment of FIGS. 1 and 2 since the speed of play is of diminished importance.

(7.4) There may be other types of information output to an Internet client node 318 in addition to the information displayed in FIG. 3. In particular, advertising information may be provided with each web site 308 response to a player regarding, for example, blackjack tournament sponsors and prizes.

In FIGS. 4A–4E, a flowchart is presented of the high level steps performed by the blackjack game controller 14 when processing player requests in either of the embodiments of FIGS. 1 or 3 for playing a novel blackjack variation wherein new eligible card representations are generated periodically regardless of whether they are dealt in a blackjack game or not and wherein the blackjack players may play the game asynchronously from one another. In step 408, the blackjack game controller 14 is initialized so that it may process blackjack player requests and output appropriate responses to each player's request. Subsequently, in step 416, the card generator module 38 commences to output at regular intervals (e.g., less than two seconds such as every 0.5 seconds) random card representations to both the blackjack player evaluator 34 and the house blackjack playing module 42. Thus, for as long as the blackjack game controller 14 is properly responding to blackjack player requests, the card generator module 38 continuously and regularly outputs card representations. Concomitantly with the actions in step 416, the remaining steps of FIGS. 4A–4E are performed. Thus, in step 424, the controller 14 waits for a (next) blackjack player input, such inputs being, for example, requests to enter a new blackjack tournament, requests to commence a new blackjack game within a tournament, requests to process a blackjack game play request, a request for information regarding the players account, and a request for help information (such as how to play blackjack).

Upon receiving a blackjack player request, in step 430 the communication interface 22 queues the request and subsequently transmits the request to the blackjack driver 26. In step 436, a determination is made as to whether the player's request is related to a current blackjack game and/or Current blackjack tournament. If not, then step 448 is encountered wherein an additional determination is made as to whether the player's request is to enter a new blackjack tournament. If so, then in step 454 the blackjack driver 26 determines a blackjack tournament and enters the player into the tournament. Note that in providing this function, the blackjack player 26 communicates with the wager accounting module 30 to confirm that the player is eligible to enter a new tournament. Thus, the blackjack driver 26 supplies the wager accounting module 30 with at least the player's identification and a specification of the tournament in which the player may be entered. Note that the tournament selection may be provided by the player in some embodiments of the present invention. Alternatively, the blackjack driver 26 may select a tournament for the player using tournament information stored in the database system 28. Assuming that the wager accounting module 30 responds with a confirmation that the player may be entered into the selected tournament, in step 458, the blackjack driver 26 creates a

confirmation record identifying the blackjack tournament in which the player is entered. Subsequently, in step **462** the blackjack driver **26** outputs information in the confirmation record to the player at his/her Internet client node **318** (gaming station **18**). Thus, in the embodiment of FIG. 3 of the present invention, the output of step **462** (and all subsequent such outputs to a blackjack player) are output from the blackjack driver **26** to the communication interface **22** for queuing until the output can be transmitted to the CGI script **348** that initiated the player request to which this output is a response. Subsequently, the output is transmitted to the World Wide Web server **340** and to the Internet interface **332** for transmitting on the Internet **324** and thereby being routed to the Internet client node **318** where the player is playing blackjack.

Following step **462**, in step **466**, the blackjack driver **26** enters, into the database system **28**, information indicating the blackjack tournament in which the player has been entered. Note that the information entered here into the database system **28** is subsequently accessible both by the blackjack driver **26** and the wager accounting module **30** for determining the tournament(s) in which the player has been entered. Following this step, since the player's request has been processed, the flow of control loops back to step **424** to wait for the next player input from a player at an Internet client node **318** or alternatively a gaming station **18**.

Returning now to step **448**, if the player has not requested to enter a blackjack tournament then step **470** is encountered to process any miscellaneous blackjack player requests not related to a current blackjack game and/or blackjack tournament. For example, a player may request accounting information related to his/her blackjack gaming account. Assuming such requests are processed and responded to in this step, the flow of control again returns to step **424** to wait for a next player input.

Returning now to step **436**, if the player request is related to a current blackjack and/or blackjack tournament, then step **476** is encountered wherein the blackjack driver **426** uses the player's identification (ID) provided with the request for retrieving any status information from the database system **28** regarding any current blackjack game and/or blackjack tournament in which the player may be currently involved. Subsequently, in step **480**, a determination is made as to whether the player request is to commence a new blackjack game in a current tournament. If so, then in step **484** the blackjack driver **26** requests confirmation from the wager accounting module **30** that the player can commence with a new blackjack game in the current tournament. That is, the wager accounting module **30** determines whether the player has sufficient tournament credits to continue in the tournament. Following this, in step **488**, the blackjack driver **26** determines whether a confirmation has been received from the wager accounting module **30**. If no such confirmation is provided, then in step **492**, the blackjack driver **26** outputs a message to the player at his/her Internet client node **318** (gaming station **18**) indicating that no further blackjack games in the current tournament may be played by the player.

Alternatively, if in step **488** the blackjack driver **26** receives confirmation from the wager accounting module **30**, then in step **494** the blackjack driver **26** creates a blackjack game record for fulfilling the player's request. Note that in creating the new blackjack game data record, the blackjack driver **26** communicates with the wager accounting module **30** to both debit the player's account for any initial ante corresponding to commencing the new blackjack game and also to output to the blackjack driver **26**

data of this transaction for subsequently outputting to the player. Following this step, in step **496**, the blackjack driver **26** requests the blackjack player evaluator **34** to provide an initial blackjack game configuration for the new blackjack game. Subsequently, in step **500**, the blackjack player evaluator **34** responds with an initial blackjack game configuration, wherein this configuration includes the initial card representation for the player's hand (as shown, for example, in area **292** of FIG. 2). Note that this initial card representation is the most recent card representation provided to the blackjack player evaluator **34** by the card generator module **38**. Thus, note that if two player requests to commence a new blackjack game were transmitted to the blackjack driver **26** in rapid succession, then step **500** may be performed for each of the requests before the dealer module **38** outputs a new random card representation to the blackjack player evaluator **34**. Consequently, in such a case both players will be presented with an identical initial card representation for the player's hand. Subsequently, in step **504**, the blackjack driver **26** stores information regarding the identity and initial configuration of the new blackjack game for the player in the database system **28**. In particular, a blackjack game identifier for the new game is stored and associated with the identity of the blackjack player and the tournament. to which the game is associated. Following step **500**, in step **504**, the blackjack driver **26** stores information regarding the new blackjack game for the player in the database system **28**. In particular, the following information is stored regarding the initial configuration of the new blackjack game: the player's identity, the identity of the tournament for which the new game corresponds, and identifier identifying the new game, and an initial configuration for the new blackjack game including card representations and any initial required bets. Further, note that throughout the course of each blackjack game played by a player, the blackjack driver **26** and the wager accounting module **30** update information in the database system **28** as the game configuration changes due to interactions between the player and the blackjack game controller **14**. Thus, for a blackjack game underway, each request from a player for continuing the game with a next play, need not provide the entire game configuration to the blackjack game controller **14**. Instead, only sufficient information is required in the request for the blackjack driver **26** and/or the wager accounting module **30** to retrieve information related to the blackjack game configuration corresponding to the player's request. Following step **504**, in step **508**, the blackjack driver **26** outputs an initial blackjack game configuration for the new game to the player at his/her Internet client node **318** (gaming station **18**). Subsequently, the flow of control once again returns to step **424** to await a next player input to the controller **14**.

Returning now to step **480**, if it is determined here that the player request is not to commence a new blackjack game in a current tournament, then step **520** is encountered wherein a determination is made as to whether the player request is related to a play in a currently active blackjack game. If not, then in step **524** the blackjack game controller **14** processes miscellaneous requests such as, for example, a request for special blackjack rules relating to a current game and/or tournament, the number of players remaining in the current tournament, the player's ranking in the current tournament, and the prizes for winners of the current tournament. Subsequently, assuming such miscellaneous requests are responded to, in step **524**, the flow of control for the present flowchart returns to **424** to await a next player input.

Alternatively, if in step **520** the player request is related to a play in a currently active blackjack game, then in step **528**

US 6,712,702 B2

19                                                          20

a further determination is made as to whether the player request is for a new card representation. If so, then in step **532**, a determination is made as to whether the card request is for the house or for the player. If the card request is from the house, then in step **536** the blackjack driver **26** communicates with the house blackjack playing module **42** for obtaining a new blackjack game configuration for the current blackjack game, wherein the new game configuration includes the most recently output card representation from the card generator module **38** as the next card representation in the house hand for the blackjack game from which the current player's request came. Subsequently, in step **542** the house blackjack playing module **42** outputs blackjack game configuration information indicating the new house hand card representation and any player response(s) that the player may exercise in responding to the new blackjack game configuration.

Upon receiving the house blackjack playing module **42** output, in step **546**, the blackjack driver **26** determines whether there is a further player response in the present game by invoking one or both of the blackjack player evaluator **34** and the blackjack hand evaluator **46**. If there are additional possible player responses, then in step **550** the blackjack driver **26** outputs a blackjack game configuration to the player at his/her Internet client node **318** (gaming station **18**) so that the player may exercise one of his/her available game options. Subsequently, having processed the-player's request the flow of control again loops back to step **424** to await a next player input. Alternatively, if in step **546** the blackjack driver **26** determines that there are no further possible player responses, then the current blackjack game is complete and the blackjack driver **26** in step **556** activates the blackjack hand evaluator **46** for evaluating the blackjack game hands so that the blackjack hand evaluator can activate the wager accounting module **30** to update the player's account (according to the results of the blackjack game) in the database system **28**. Following this step, in step **560** the wager accounting module **30** outputs to the blackjack driver **26** updated accounting information to be provided to the player. In step **564**, the blackjack driver **26** outputs the results of the blackjack game and the players updated account information to the player. Also, note that the blackjack driver **26** updates the database system **28** regarding the completion of the present blackjack game as well as any further status information related to the player and the tournament to which the present blackjack game is associated. Subsequently, having processed the player's request, the flow of control again loops back to step **424** to await a next player input.

Alternatively, if in step **532** it is determined that the player's request is for a new card representation for the player, then in step **568** the blackjack driver **26** activates the blackjack player evaluator **34** for obtaining, a new blackjack game configuration for the current blackjack game, wherein the new game configuration includes the most recently output card representation from the card generator module **38** as the next card representation for the player's hand(s). Subsequently, in step **572** the blackjack player evaluator **34** determines the next blackjack play options the player may exercise for the present game and then outputs the new blackjack configuration with these options to the blackjack driver **26**. Following this, the steps **546** and subsequent steps are performed as described above.

Returning now to step **528**, if the player request is not for a new card representation then step **576** is encountered wherein the blackjack game controller **14** processes other blackjack player game requests such as requests for additional bets, cancellations of bets, a request to stand on a particular player hand, a request to split a pair of card representations, or a request for insurance. Assuming, that such requests as described above are processed, in step **580** the blackjack driver **26** subsequently outputs a new blackjack game configuration to the player according to the processing performed in step **576**. Also, note that the blackjack driver **26** updates the database system **28** with information relating to the new blackjack game configuration so that it may be retrieved upon a subsequent player request relating to the present game. Following this step, the flow of control for the present flowchart loops back to step **424** to again wait for another player input.

FIG. 5 presents a simple example of the operation of the present invention for playing blackjack wherein four blackjack games are shown being played asynchronously with the blackjack game controller **14**. To describe FIG. 5 in detail, note first that the row of numbers **604** across the top of the figure represents a sequence of values of successive card representations output by the card generator module **38**. That is, in a first time interval a card representation having a value of three is output, in a second time interval a card representation having a value of five is output, in a third time interval a card representation having a value of seven is output and so on across the row. Below row **604** are blackjack game rows **606**, wherein each blackjack game row **606** represents a series of events that occur in each blackjack game **610** through **626** over the course of time corresponding, to the series of card values **604**. In particular, the numerical entries within each blackjack game row **606** correspond to the values of the player and house card hands as additional cards are added to the player and house hands of each blackjack game. For example, referring to blackjack game row **610**, assuming this blackjack game commences with the player's hand obtaining the card representation for the leftmost card value of the sequence **604** (i.e. the value three), the player s hand has a corresponding value of three. Subsequently, if the house blackjack playing module **42** is activated for this game to output (i.e. deal) an initial card representation to the house during the second time interval (i.e. the card generator module **38** has output a card representation of five), then the house hand initially has a value of five. Subsequently, if in the third interval the player for blackjack game **610** provides a request for another card, then the card representation corresponding to the value of seven in sequence **604** is provided to the player and therefore the player's hand has a total value of ten. Following the incorporation of the seven into the player's hand, this blackjack game is delayed so that the next time interval corresponding to the value of two in sequence **604** is not dealt to either the player or the house in blackjack game **610**. Note that it is an important aspect of the present invention that card representations generated by the card generator module **38** are only incorporated into a particular blackjack game when a request for such a card representation is made during the time the card representation is the most recent output from the card,generator module **38**. Thus, one or more card representations output by the card generator module **38** during a blackjack game may not be used in the game. More precisely, it is typical (although not shown in the example of FIG. 5) that substantially any length or subsequence of consecutive card representations output by the card generator module **38** may be ignored within a given blackjack game due to time delays occurring in the game. Thus, in some circumstances such delays could be as long as a number of days if the player, for example, did not request another hit during such a time interval.

US 6,712,702 B2

21

Continuing now with the remaining plays of blackjack game **610**, note that in the fifth time interval the player requests a hit thereby obtaining a card representation having a value of nine and thus obtaining a player's hand value of nineteen. Subsequently, the house takes hits for the next two consecutive card representations having values eight and ten respectively. Thus, the house hand busted when the value of twenty-three was obtained for the house hand.

Blackjack game rows **606** for blackjack games **614** through **626** may be interpreted similarly to the description above for blackjack game **610**. Note however that each of these games commence at a different time interval in that each game commences with a different card representation taken as the first hit for the player's hand. That is, the first card representation dealt in each of the blackjack games **610** through **626** is different and further each of the card representations requested corresponding to values of the sequence **604** is different for each blackjack game. Therefore, substantially every blackjack game, even if played concurrently with other blackjack games, will have unique player hands and house hands. Thus, not only can a large number of asynchronous blackjack games be played simultaneously head-to-head with the house, but also there may be a greater degree of confidence by the blackjack players that the house is not manipulating card representations in that blackjack players may substantially determine the timing for substantially all hits in a blackjack game (for both the player hand and the house hand) and thereby reduce any suspicions that the card representations are being manipulated. Moreover, in one embodiment, the players may request the sequence of card representations that were generated during the course of a game.

Note that the present invention also may include other blackjack variations as well. In particular, referring to step **416** (FIG. **4A**) again, instead of generating card representations at regular intervals, this step may simply activate the card generator module **38** so that it generates a substantially random card representation on demand whenever a request for a new card representation is made (e.g., steps **536** and **568**).

Additionally, in another blackjack variation, particularly suited for tournament blackjack where each player can be monitored, the players play each play of a blackjack game synchronously as blackjack is typically played with a human dealer in casinos. However, in the present variation, each player is provided with the identical card representations for their initial cards. Subsequently, each player hand and the house (i.e., dealer) hand varies between players only when players play their blackjack hands differently. That is, for each synchronously played blackjack game among a plurality of players, the same sequence of card representations is available to each player and the house blackjack playing module **42** so that, for example, the dealt card representations in each game between one of the players and the house blackjack playing module are identical for players playing the same sequence of plays throughout the game. Accordingly, as one skilled in the art will appreciate, for each blackjack game, it may be necessary for the card generator module **38** to maintain a predetermined sequence (or ordered collection) of card representations throughout the game so that players playing differently may be dealt an appropriately sequenced card representation. Moreover, it may also be necessary for the house blackjack dealer playing module **42** to provide sufficient control information to the card generator module **38** so that the card generator module can respond with the appropriate card representation from the predetermined sequence.

22

Another embodiment of the present invention is presented in FIGS. **6A** and **6B**, wherein this embodiment is enhanced for presenting sponsor or advertiser product and/or service advertising to qualified players that adequately match a predetermined player profile such as a demographic profile of a particular group of players. Accordingly, in FIGS. **6A** and **6B**, there is a game/advertisement controller **604** for providing substantially the same functionality as the blackjack game controller **14** (FIG. **3**) except that games other than blackjack may also be played (such as poker, craps, pai gow and roulette). Additionally, the game/advertisement controller **604** also performs functions related to matching particular advertising with the users (i.e., players) playing the various games provided by the game/advertisement web site **308**, wherein each user communicates with the web site **308** on a corresponding Internet client node **318** (alternatively interactive cable television node). That is, the present FIGS. **6A** and **6B** present the high level modules for matching players having desired user characteristics (e.g., profiles) with advertising from sponsors or advertisers requesting players with such user characteristics. In particular, only the players with such desired profiles qualify for receiving a particular advertisement and/or promotional (i.e., advertising) from a particular sponsor or advertiser. Accordingly, it is an aspect of the present invention that various criteria may be used to make such a determination as to which players (or, more generally, users) receive which advertising. For example, one or more of the following attributes may be used in matching users with advertising presentations:

(8.1) age,

(8.2) sex,

(8.3) financial status,

(8.4) location or residence,

(8.5) education,

(8.6) marital status,

(8.7) amount of recreational time,

(8.8) personal tastes and/or habits (e.g., smoker/non-smoker, preferences for sports, movies, liquor, foods, clothes, vacations, cars, etc.),

(8.9) size of household,

(8.10) number of children, and

(8.11) categorizations of users according to network interactions such as the type of web sites accessed, the type of advertising for which the user seeks additional information, the risk tolerance in playing games such as blackjack.

To provide (or, match) particular users with particular advertising, data (or user information items) on each user is maintained in the form of a user profile in the user (player) database **28** which is an enhanced version of the blackjack player registration and playing status database **28** of FIG. **3**. The user profiles are populated with such user related information as in (8.1) through (8.11). This information is obtained when users register at the web site **308** when users respond to explicit questions subsequently asked of them, or by monitoring the network activities of users. Note that user profiles may vary in length, depending on the amount of information obtained on each user. Moreover, different types of information may be obtained for different types of users. For example, for users having assets of more than one million dollars, these users may be requested to enter their favorite vacation destination location since this may be important for certain advertisers. However, for users whose assets are less than forty thousand dollars, no such infor-

US 6,712,702 B2

23                                                    24

mation may be obtained since the information would be likely irrelevant to any advertiser. Thus, in one embodiment of the user profiles, each user profile has a variable length section for storing user information items not uniform across all users. Moreover, in such an embodiment, each user information item stored in the variable length section may be considered as a pair, wherein the first component of each pair indicates or references a question, user attribute, or user classification to which the second component provides an answer or value related to the first component. Thus, for example, for a particular user, an information item may provide the pair: (4, "Madrid"), wherein "4" identifies the attribute: "favorite vacation destination location," and "Madrid" is the value for this attribute, as one skilled in the art will understand.

Alternatively, data related to the advertisers or sponsors may reside in a different database, the advertiser database 612. Accordingly, this database stores demographic profiles which, in one embodiment, have a data structure substantially identical to the user profile data structure. Such demographic profiles may have a variable length section for specifying requested values for user information items that may be provided in (potentially only a relatively small, number of) user profiles. In some embodiments, a demographic profile includes a reference to the advertiser's or sponsor's identity, a reference to the advertising to be presented and a variable length section of demographic item pairs, wherein the first component of each pair has the same interpretation as the first component of a user information item pair and the second component of the pair specifies a desired value or range of values that the advertiser or sponsor prefers. Further, note that, in some embodiments, each demographic item pair may have additional information associated with it such as a perceived importance of the demographic item pair to the advertiser or sponsor. Thus, such additional information may be in the form of a normalized scalar value wherein a value of one indicates that the demographic item pair is of highest importance whereas a value of zero indicates that the demographic item is substantially irrelevant to the advertiser or sponsor. Accordingly, regardless of the particular embodiment of the demographic profiles, the users' demographic profiles are used to match (i.e., select) one or more corresponding advertising presentations with a particular target group of users that, presumably, are likely to purchase the product and/or service portrayed in such advertising presentations. Thus, since such advertising presentations may be provided to only users who are likely to be subsequent customers, advertisers and/or sponsors may provide to these users specifically targeted advertising having relatively expensive promotionals such as product or service discounts, free samples, or a trial usage.

Accordingly, to perform the selecting or matching of users with such demographic profiles, for each user, the user profiles stored in the user database 28 are compared with the demographic profiles by the advertising selection engine 618. Note that there are numerous techniques for performing such a comparison for selecting a group of users. In particular, a precise match may be required between each demographic item pair and a corresponding user information item pair so that the second component of the user information item pair is (within) a desired range as specified in the corresponding demographic item pair. Alternatively, various weighting statistical techniques may be used for determining a "similarity" measurement when not all demographic pairs are required to precisely match a demographic profile. In one embodiment, the similarity measurement may

be provided by a statistical analysis module that determines the users that most closely match the corresponding demographic profile for an advertising presentation. Thus, in order for a user to be selected, the similarity measurement between the user's profile and a corresponding demographic profile may be required to be above a predetermined threshold. Additionally, note that the advertising selection engine 618 may perform the matching of users with advertising presentations as a background or non-real time process so that, for example, for each user profile in the user database 28, there is a related table identifying the advertising presentations that are candidates for presentation to the corresponding user when, for instance, this user communicates with the game/advertisement web site 308.

Moreover, it is important to note that at least in one embodiment of the present invention, the advertising selection engine 618 may, for a particular demographic profile, periodically re-evaluate user profiles in the user database 28 for reselecting the group of users to which an advertising presentation is to be presented. Thus, users previously selected may be requalified or disqualified and users previously disqualified may be now qualified for selection due to, for example, an enhanced user profile.

Accordingly, the present invention may commence or cease transmitting a category of advertising to a user whose user profile is enhanced with additional information. For example, if a user indicates that he/she is currently considering the purchase of a new car, then adverting for purchasing a car may be transmitted to the user. Alternatively, once the present invention is notified that, for example, a car has been purchased or that no further car advertising is are desired, then a further enhancement of the user's profile may be performed so that no further advertising from the category of car advertising is transmitted to the user.

Note that the present invention provides for flexibly creating, deleting and modifying categories of advertisements by providing techniques for linking demographic item pairs that are similarly related to a category record or object. Thus, at least the following advertising categories may be provided by the present invention: sports categories (e.g., baseball, soccer, hockey, etc.), food related categories (e.g., restaurants, grocery stores, food items), exercise related advertising (e.g., bicycles, in-line skates, skiing), insurance related advertising (e.g., auto insurance, life insurance), political related advertising (e.g., for or against a particular political candidate), and geographical related advertising (e.g., for users living in a particular area such as the Denver metropolitan area). Thus, the advertising selection engine 618 supplies the selected advertising presentations to the HTML display engine 622 for translating this data so that it may subsequently be included in an HTML output to the user by the common gateway interface 348.

More precisely, the selected advertisement data is joined in the HTML display engine 622 (at least in one operation of the present invention) with a token 628 representing, for example, a gaming card (for a current user game) that has been issued by the token generator (module) 38, this generator being an enhanced version of the card generator module 38 of FIG. 3. The generated token is supplied initially to the game play engine 632 for processing user gaming requests according to the rules of the game being played. That is, the game play engine 632 determines, for each available game: (a) how each token may be "played"; (b) who receives the token, for example, the user or the house playing module 42; and (c) the result of playing the token. Note that in one embodiment, the token generator 38 generates tokens on request by, for example, the house

US 6,712,702 B2

25 26

playing module **42** and/or the player options evaluators **34**, wherein the tokens generated are appropriate to the game being played. Alternatively, in another embodiment, the token generator **38** may generate random tokens and the game play engine **632** transforms the tokens into appropriate randomized values for the games offered, as one skilled in the art will appreciate. Furthermore, other embodiments for supplying randomized tokens to a plurality of different games are within the scope of the present invention. Additionally, the game play engine **632** contacts the player database **28** to maintain the status of the user in relation to the particular game being played as well as the user's relationship to all of the other users (if, for example, the user is involved in a tournament offered at the game/ advertisement web site **308**). Note that, as one skilled in the art will appreciate, in one embodiment of the game play engine **632**, its internal modules provide a similar architecture and functionality to the correspondingly labeled modules of FIG. **3**, albeit additionally, for games other than blackjack (e.g., "head-to-head" poker, craps, roulette, and pai gow).

The common gateway interface or CGI scripts **348** transfer data between the HTML display engine **622** and the World Wide Web server **340** which, as one skilled in the art will understand, may be a plurality of high level executable programs as discussed in the description of CGI scripts **348** for FIG. **3**. The World Wide Web server **340**, in turn, transfers the data to the Internet TCP/IP stack **332** that interfaces with the Internet **324** for transferring the data to an intended Internet client node **318** having an appropriate World Wide Web browser **640**.

The present embodiment maintains information on the status of games being played and user responses to advertising in the user database **28**. Moreover, additional advertiser specific information (e.g., desired demographic profiles, advertisements, promotional, and information related to user responses) is provided in the advertiser database **612**. Accordingly, as discussed above, the demographic profiles in the advertiser database **612** may include schemas or templates having fields for designating one or more of the attributes (8.1) through (8.11). Moreover, the databases **28** and **612** may maintain records of various types of pertinent statistics such as: (a) the advertising presentations presented to each user; (b) the time, date and number of presentations of a particular advertising presentation; and (c) the detected user responses to the advertising. Thus, this information may provide advertisers or sponsors with enhanced feedback as to the efficacy of their products, services and presentations thereof. For example, an advertiser may be able to query the user and advertiser databases **28** and **612** to obtain such feedback as:

(9.1) who has seen a particular advertisement;

(9.2) when it was seen;

(9.3) the number of times the advertisement was accessed:

    (a) by any particular user;

    (b) by all users; and

(9.4) the number of favorable and/or unfavorable responses.

Referring now to FIG. **7**, a diagram is presented providing one embodiment of the access routes or paths users navigate in accessing the features of the game/advertisement web site **308**. In particular, upon initiating Internet contact with the game/advertisement web site **308**, a user is first presented with the opening page **700** identifying the web site **308**. Subsequently, the user can access the benefits and registration pages **704** for viewing general information related to web site **308** and also for registering at the web site (as is discussed in further detail below). Alternatively, the user may access one or more "Lobby" pages **708** to view the gaming and information exchange capabilities as, for example, provided by advertisers. Assuming the user is registered at the game/advertisement web site **308**, the user may proceed from the LOBBY **708** to the game page **710**, wherein a game **726** or game rules **730** can be selected for playing, via the introduction to game pages **728**. Alternatively, the user may instead access one or more index pages **714** having, for example, listings of organizations to which the user may be allowed to access depending on the affiliations of the user (e.g., a member of a particular membership discount store chain). Additionally, from the index page(s) **714** substantially any user may access an advertisement or promotional provided by an advertiser on an advertiser page(s) **722**. However, it is an aspect of the present invention that information related to certain promotionals provided by advertisers or sponsors are restricted. That is, such promotionals may be only presented to users having a demographic Drofile that has been determined by the present invention to be sufficiently compatible with a desired user profile for the advertiser or sponsor to warrant providing such a promotional. Thus, the present invention provides access to certain advertiser promotionals only to "qualified" users who are, for example, considered likely subsequent purchasers of the advertiser's products and/or services. Additionally, such promotionals may also be presented to users who express an interest in a particular product or service advertised. For example, users who (a) request additional or supplemental information related to an advertised item, or (b) provide a favorable response to such advertising (by, for instance, indicating a preference for an advertised item), or (c) respond to a questionnaire related to personal information or marketing survey information may also be provided with information regarding promotionals. Thus, advertisers or sponsors may offer relatively substantial or expensive promotionals via the present invention to such users as well. Moreover, the present invention may also utilize such demographic profiles to prohibit a user not sufficiently matching such a demographic profile from gaining access to a corresponding promotional. Accordingly, in one embodiment of the present invention, when the user accesses an advertiser page **722**, the user's profile (in the user database **28**) is compared with the demographic profiles in the advertiser data base **612** for determining any promotionals that can be presented to the user.

Moreover, from the index page **714** the user may be provided with the ability to link into various web sites or web site pages. That is, the user may be provided with the ability to link into another web site or web page at any time a link is made available (typically a hypertext link). Additionally, note that similar links may be accessible by users while playing a game **726**. However, these links may generally hyperlink the user to an advertiser page **722** within the game/advertisement web site **308** so that the user may be exposed to further information and/or presented with promotional options for an advertised item. For instance, certain advertising hyperlinks may be integrated into the presentation of plays of a game **726**. Accordingly, since an aspect of the present invention is to repeatedly integrate different advertising presentations (and any related hyperlinks) into the play of a game **726**, a user may repeatedly be enticed to seek out additional information about different products or services by activating the related hyperlinks. Moreover, it is also an aspect of the present invention that when such hyperlinks provide the user with access to a different web site, that at least a portion of the display of the user's Internet

US 6,712,702 B2

27

28

client node **318** maintains a graphical format associated with the game/advertisement web site **308**, and that the user may leave and return to the web site **308** without the user being aware of accessing another web site. Moreover, by monitoring user input related to an advertising presentation, the present invention is able to provide feedback to an advertiser as to, for example, the number of times the advertising presentation is accessed by users for such additional information about products or services.

Also note that some advertisements (presented via advertiser pages **722** or as part of a game play presentation) may be interactive with the user wherein the user may perform a transaction such as making a reservation (e.g., an airline or hotel reservation). Further, a user may be given the opportunity to provide positive and negative opinions or responses on, for example, various advertisements, promotionals and other related matters by expressing such responses upon accessing advertisement related information. Thus, it is an aspect of the present invention to be able to conduct "test marketing" in that statistically representative groups of users may be selected for determining:

(10.1) the efficacy or appeal of one advertisement in comparison to another advertisement for a particular advertised item;

(10.2) the profile of the users that are responsive to a particular advertising presentation; and/or

(10.3) whether a particular group of users, for example, having similar user profiles favorably respond to a particular advertising presentation. For example, the present invention may determine such a response: (a) by detecting an activation of a hyperlink, (b) by detecting a response to questions presented, and/or (c) by determining the length of time the advertising presentation is displayed or visible.

Accordingly, input response data may be transmitted to the game/advertisement web site **308** and retained for subsequent statistical evaluation. Thus, resulting aggregate statistics can be made available to, for example, advertisers or sponsors, thereby preserving the privacy of the users. In particular, statistics may be made available for:

(11.1) providing information about, for example, the efficacy of certain advertising presentations (e.g., the number of positive responses to such presentations and/or the number of advertised items sold directly through the advertisements at the game/advertisement web site **308**);

(11.2) providing information related to the number and profile of users accessing certain advertising presentations;

(11.3): determining measurements related to the number of different (groups of) users to which an advertising presentation has been presented;

(11.4) determining the total number of presentations of a particular advertisement;

(11.5) determining the cost of advertising presentations to the advertisers and billing the advertisers for such costs according to, for example, at least one of: (a) the number of users to which an is presented, (b) the number of promotionals requested or (c) the number of network user communications (i.e., hits) with the web site **308**;

(11.6) determining if an advertising presentation should be discontinued because the advertiser's cost limits have been reached, such limits being, for example, related to a total number of presentations of an advertising presentation. Note that, in one embodiment, it is

an aspect of the present invention to charge an advertiser for each presentation to a user; or

(11.7) determining which of an advertising presentation and a different second advertising presentation (from the same advertiser) is most effective when both are provided to various selected (groups of) users, so that the advertiser or sponsor may then have a basis for choosing the most appropriate of the two advertising presentations in future advertising.

Additionally, it is an aspect of the present invention that it may also maintain statistics (and/or related information) for:

(12.1) providing "real time" game rankings of users (players) involved in a gaming tournament provided by the game/advertisement web site **308**. Note that such rankings may be provided to a user so that he/she may know his/her standing and the number of players remaining in the tournament; and

(12.2) providing a "style of personality" of the game playing users so that, for example, a risk tolerance of such users may be estimated and used to determine if a particular user might be interested in a particular product or service. Thus, such "style of personality" statistics for a user may be stored in the user's profile. For example, the information captured here may include: average size of wager, average size of wager in comparison to the total amount that could be wagered, length of time playing in a single session, the ratio of the number of wagers on high risk plays presented, and the skill of the player.

Accordingly, the following aspects of the present invention are noteworthy:

(13.1) the user may be provided with free access or reduced cost access to other areas of the Internet **324** upon viewing the presentations of certain organizations and/or advertisers. Note that the ability to reduce the cost of accessing the Internet may act as a vehicle for attracting various users;

(13.2) the index page **714** gives a user the opportunity to access a particular organization (e.g., organizations **718**) that the user may belong to or any particular advertiser (e.g., advertisers **722**) without going through any games although the user may be required to go through the "LOBBY" page(s) **708** and thereby be exposed to advertising and/or the opportunity to join a game;

(13.3) a user may also be able to go from an initial organization page **718** to an introductory game page **728** (e.g., for a game **726**) but, unless authorized, may not be provided with further access to the organization's web pages or the game;

(13.4) while playing a game **726**, the user has the ability to access further information related to an advertisement or promotional being presented;

(13.5) during the playing of a game **726** (e.g., blackjack), the user may be allowed to review and/or stepwise replay a previous portion of a game **726** during a current gaming session;

(13.6) when in a particular organization page **718**, the user may be required to return to the index page **714** before linking into an advertiser **722** unless a direct link has been provided for some reason on the particular organization web page. Moreover, the user may access the game page **710** from the index page **714** and vice versa;

(13.7) a user may either go directly into playing a particular game **726** (as authorized) or to a rules section

US 6,712,702 B2

29                                                    30

**730** for reviewing the rules for the corresponding game **726**. Note that a user may always access the rules section **730** during the corresponding game **726**;

(13.8) there is a help feature for providing information such as:

    a) how to do some particular action or the reason for some action or the reason an action is blocked. For example, the reason for an inability to access a certain web page, the reason for an inability to make a particular game play, such as a bet, stand or hit in the game of blackjack and/or the reason for a particular result of a certain bet, hit, stand or other user play in a game such as blackjack;

    b) for contacting a gaming referee for resolving gaming conflicts. Such a referee will be available to resolve any dispute. Note that the user can notify the management operating the present invention of a problem via, for example, notification forms displayed when a notification button is activated.

Referring now to an alternative embodiment of the present invention presented in FIG. **8**, wherein the game/advertisement web site **308** coordinates with a third party Internet access service provider **810** (or interactive cable television provider) for providing Internet **324** (cable television) access to users on a reduced cost or free basis once a user has registered with the web server **340** (cable television provider). That is, the game/advertisement web site **308** contacts the user's Internet service provider **810** and arranges to subsidize the user's Internet service charges in return for the gaming advertisement web site **308** being able to repeatedly download to the user's Internet client node **318** (or alternatively, interactive cable television node), unrequested information such as advertising for presentation to the user.

Accordingly, a prospective user of the present invention can sign up or register with the game/advertisement web site **308** for reduced Internet service fees by dialing into an Internet service provider **810** with normal serial dialing and after gaining Internet access, subsequently log on to the web site **308** as a user identified by the generic user identifier "NEW." Each user identified by "NEW" is forced into a connection with an enrollment or registration program so he/she can provide information requested by the present invention that can subsequently be used in determining which advertising to present to this user according to, for example, advertiser preferences. Thus, when registration is completed, the present embodiment of the invention downloads, for example, an ad viewer program **812** and a communications daemon (e.g., ad receiver daemon **806**) to the user's Internet client node **318**, wherein this daemon allows the game/advertisement web site **308** to download to the user's Internet client node **318** unrequested information such as advertising repeatedly. Accordingly, assuming the daemon **806** is installed, the user may access not only the gaming and advertisement services of the web site **308**, but also access substantially the entire Internet through the web site **308** at a reduced cost. Thus, whenever the end user processor **318** connects with the Internet service provider **810**, the game/advertisement web site **308** is alerted by the Internet service provider **810** and the DISPLAY ENGINE **622** starts up the downloaded daemon **806** via Internet communications with the user's Internet client node **318**. Subsequently, the DISPLAY ENGINE **622** periodically sends selected advertising to the daemon **806**. Accordingly, the daemon **806** utilizes the ad viewer program **812** to coordinate the display of the advertising presentation.

Note that various alternative embodiments related to the architecture and functionality of FIG. **8** are also within the

scope of the present invention. For example, instead of communicating with a plurality of third-party Internet service providers **806** for determining when users registered with the present invention are accessing the Internet via subsidized Internet connections, the game/advertisement web site **308** may include or be related to a dedicated Internet service provider **806** so that when a user registers with the present invention, the user is provided with a new Internet access code for the dedicated Internet service provider **806** and the user's Internet access fees may be subsidized.

However, regardless of how the present invention subsidizes Internet access, the game/advertisement controller **604** is notified whenever each subsidized user connects to the Internet or disconnects from the Internet. Additionally, certain reliability features are included in the daemon **806** and ad view program **812** for assuring that advertising is indeed presented to the user. For example, there may be periodic transmissions from each subsidized user's Internet client node **318** to the web site **308** verifying that both the daemon **806** and the ad view program **812** are active. Note that whenever any advertising is received at the user's Internet client node **318**, the daemon **806** transfers the advertising to the ad viewer program **812** which, in turn, converts the transmitted information to a displayable format and forces the display of the user's Internet client node **318** to present the advertising unobscured to the user.

Additionally, note that in certain contexts the DISPLAY ENGINE **622** may transmit a message to an Internet Service Provider **806** indicating that no further Internet access will be subsidized due to a predetermined number of advertising presentation display failures.

An additional and/or alternative description of the embodiment of the present invention shown in FIGS. **8A** and **8B** is as follows: users may use the present invention to access the INTERNET **324** on a reduced cost or free basis, by using whatever TCP/IP SLIP/PPP package they desire and registering with the web server **308**. That is, a user can sign up or register by dialing into a terminal server with normal serial dialing and log on as a user identified by the identifier "NEW." User "NEW" is then forced into a connection to an enrollment or registration program so he/she can provide information requested by the present invention. When enrollment is completed, the present invention allows the user to download a communications daemon (e.g., ad receiver daemon **806**) to the user's Internet client node **318**. The user may then install the daemon on their machine (Internet client node **318**) and dial-up with their favorite TCP/IP package.

However, upon accessing the host **308**, the user accesses basic functionality of the DISPLAY ENGINE **622** that starts up the downloaded daemon **806**. The network host **308** periodically queries each active port on the terminal servers (e.g., Internet client node **318**) to get the IP address and then send a short message to the daemon **806** which is listening in on a specific port. The DISPLAY ENGINE **622** may also disable access by an end user machine **318** after a certain number of failures.

Note that the host **308** periodically sends an item to the downloaded daemon **806** to display. The daemon then displays the message (advertisement) in a window (of the WWW browser **640**) on the user's screen.

In another embodiment of the present invention, game tournaments may be provided, wherein the players of such a tournament play instances of a game on a communications network such as the Internet, a cable network, an interactive television network, or an intranet (such as in a casino). Such

US 6,712,702 B2

31                                      32

game tournaments provide for the playing of a plurality of instances of a game by each of a plurality of players. In general, a tournament is a multi-level structure, wherein at a first level players are grouped within the tournament into groups and the players within a group compete against one another when playing one or more instances of the game. At a higher level of the tournament, winning players from a lower level (e.g., the first level hereinabove) are partitioned into one or more groups such that for each of these new groups, the players within the group compete against one another by playing instances of the game, or, alternatively, by playing instances of a modified version wherein one or more rules of the game are changed (such as described hereinabove when discussing blackjack).

Below is a brief itemization of some of the novel tournament aspects of the present invention.

1. The participants usually register by identifying themselves in such fashion so that they may be recognized by those managing the tournament and/or the other participants as participating members of the tournament.

   a. The participants need not register by responding to all identification questions at one time that may be provided, but instead may respond to a few questions submitted at various times while the tournament is in progress.

2. Keeping score is performed by using a numeric indication, tokens, chips, or another indication of the number of credits acquired by each participant in the tournament.

3. There are game rules set forth by which the participants acquire or lose their credits for each game involved in the tournament.

   a. An objective by which a participant wins a tournament depends upon the participants acquiring or losing their credits within the rules of each tournament.

     i. The participants usually have the ability to access their scores and determine their ranking in the round or tournament they are in.

     ii. The participants may be placed into various groups wherein they operate under different rules from the other participants depending upon the group to which they were assigned.

   b. Dice, cards or other objects may be used during the game to determine the winner(s).

   c. The methods by which the tournament is operated may include a plurality of rounds in which the participants are divided into groups and the participants in each round compete against other participants in the round to determine the winner of the round.

     i. A winner(s) is similarly chosen from each round until a winner(s) is determined to be the winner(s) of the tournament.

     ii. The rounds may vary in number and size, but usually, although not necessarily, each round consists of fewer participants since only the winner(s) of each round advance into the next and final rounds.

      (1) There may be situations in which the rules may allow one or more persons who have not participated in an earlier round to be placed into an advanced round.

   d. The participants may or may not be questioned about their personal preferences, beliefs or attitude during the tournament, which responses may be placed into

a data base for further questions or qualify them to be involved in other rounds or other aspects of the tournament. Note this aspect of the invention is similar to previous embodiments of the invention described hereinabove regarding advertising during the playing of a game.

   e. The tournament may or may not include a "sudden death" or special round containing special rules for winning that differ from the rules for the tournament leading up to the special round.

   f. The game rules may allow additional participants to enter the tournament after many of the other participants have qualified to be placed into an advance round by obtaining a special score that may be related to the scores of those who did advance or by complying and satisfying any other such special rules that may allow a participant to qualify to play in a tournament that is in progress and in which most or many of the other participants are playing in an advanced round of the tournament.

   g. The rules may provide for a tournament within a tournament in which special rules may qualify the participants to play in and/or win a tournament which relates in some fashion to the participants and rules of another tournament that is already in progress.

     i. The rules may provide for a tournament within a tournament within a tournament in the same fashion as set forth above.

     ii. The participants may be designated as a part of a particular group wherein the success of one of the participants determines the success of the other participants in the group.

     iii. The participants may or may not have the ability to delete themselves or to be deleted and moved from one such group to another group within the tournament(s).

The foregoing discussion of the invention has been presented for purposes of illustration and description. Further, the description is not intended to limit the invention to the form disclosed herein. Consequently, variation and modification commiserate with the above teachings, within the skill and knowledge of the relevant art, are within the scope of the present invention. The embodiment described hereinabove is further intended to explain the best mode presently known of practicing the invention and to enable others skilled in the art to utilize the invention as such, or in other embodiments, and with the various modifications required by their particular application or uses of the invention.

What is claimed is:

1. A method of playing game instances on the Internet, comprising:

   first receiving player identification at a game playing Internet accessible node (GPIAN) for first and second players;

   transmitting, via the Internet, from the GPIAN, first information related to communications between: (a) the GPIAN, and (b) a first Internet accessible node from which the first player communicates with the GPIAN;

   wherein said first information is utilized in subsequent Internet communications between the GPIAN and the first Internet accessible node;

   wherein said first information is stored on the first Internet accessible node so that it is available in subsequent different Internet connections by the first player;

   second receiving, via the Internet, at the GPIAN, first responsive information indicative of said first information being present on said first Internet accessible node;

US 6,712,702 B2

33      34

first playing with the first player a first instance of a game, wherein one or more game play representations are transmitted to the first player via the first Internet accessible node;

second playing with the second player a second instance of a game, wherein one or more game play representations are transmitted to the second player and from the GPIAN while the first player is playing the first instance;

transmitting to at least one of the first and second players, respectively, during one of said first and second games instances, a presentation substantially unrelated to plays of the one game instance, wherein said presentation is advertising a product or service;

wherein said step of second receiving at the GPIAN occurs when the first player has reconnected the first Internet accessible node to the Internet after said first information has been stored on the first Internet accessible node and said first Internet accessible node has disconnected from the Internet.

**2.** The method of claim **1**, further comprising the following steps:

identifying at least one of the first and second players as requesting to join one of one or more game tournaments, wherein each tournament includes a plurality of instances of a game for playing by each of the players identified, wherein for each of the players, at least one of the following (a) and (b) must be satisfied for the player to complete one of the tournaments:

(a) a predetermined number of instances of the game must be played by the player;

(b) a predetermined amount of time must elapse between the commencement of the tournament and the termination of the tournament;

for each tournament, the following steps are performed:

(A1) selecting the identified players to be included in the tournament;

(A2) grouping the players into groups, wherein for each group, the players therein compete against one another in playing instances of the game;

(A3) determining one or more winning players for each group;

(A4) establishing a modified version of the game by changing a rule of the game while retaining another rule for the game;

(A5) combining the winning players from different groups into one or more new groups for competing against one another in playing instances of the modified version of the game.

**3.** The method as claimed in claim **1** further including:

for the first player, the following steps are performed:

(A) receiving, from the GPIAN via the Internet, one or more interactive game presentations for presenting on at least a portion of a display for the first Internet accessible node, and wherein said interactive game presentations are interactive, via the Internet, between the first player and said GPIAN;

(B) providing, to the first Internet accessible node, concurrently with at least one of the interactive game presentations, said advertising presentation;

(C) providing to the first player over time, one or more additional advertising presentations, each said additional advertising presentation for providing information related to one of a product and a service;

(D) receiving, via the Internet, data indicative of an action by the first player in response to one of said first and said additional advertising presentations, wherein said data is transmitted:

(i) from said first Internet accessible node, and

(ii) to a destination node of the Internet, said destination node identified at said first Internet accessible node by a destination Internet address used for transmitting said data;

(E) transmitting to the first player, via the Internet, another presentation for presenting to the first player at said first Internet accessible node, wherein said another presentation is responsive to said step (D).

**4.** The method of claim **1**, further including:

(a) periodically transmitting one of said additional advertising presentations to said first Internet accessible node;

(b) forcing a display of at least one of said presentation and said additional advertising presentations to be exposed on a display at said first Internet accessible node;

(c) transmitting further information to said first Internet accessible node, said further information related to the product or service of the advertising presentation;

(d) presenting said advertising presentation on said first Internet accessible node, wherein at least a portion of a display maintains a graphical format displayed prior to said present step of presenting.

**5.** The method of claim **1**, further

generating first and second sequences of electronic card representations, respectively, for playing the first game and the second game;

wherein said first and second sequences have at least different card representations in at least one identical card representation position, in each of said first and second sequences.

**6.** The method of claim **1**, wherein further including comparing a requested wager by the first player with an acceptable wager limit.

**7.** The method of claim **1**, wherein said first and second players play their games via differently addressed Internet nodes for accessing said GPIAN.

**8.** The method as claimed in claim **7**, wherein said first information includes executable instructions for receiving advertisement information via the network.

**9.** The method of claim **7**, wherein said step of transmitting includes transmitting from one of: a World Wide Web server and an Internet interface.

**10.** The method as claimed in claim **7**, further including repeatedly performing the following steps:

determining, for at least one of said first and second players, a corresponding opponent's play that is responsive to a play made by the at least one player, and presenting, via a transmission on the network, a presentation of the corresponding opponent's play to the at least one player.

**11.** The method as claimed in claim **10**, wherein said opponent's play is determined without manual intervention during said opponent's play.

**12.** A method of playing a game on a communications network, comprising:

first receiving player identification, for first and second players, at a game playing network accessible node (GPNAN);

transmitting, via the network, from the (GPNAN, first information related to communications between: (a1) the GPNAN, and (a2) a first network accessible node from which the first player communicates with the GPNAN;

US 6,712,702 B2

35                                                    36

wherein said first information is utilized in subsequent network communications between the GPNAN and the first network accessible node, and wherein said first information is stored on the first network accessible node so that it is available in a subsequent different network connection by the first player;

second receiving at the GPNAN, via the network, first responsive information indicative of said first information being present on said first network accessible node;

using, by the GPNAN, said first responsive information for one or more of (b1) providing the first player with access to a service offered by the GPNAN, (b2) determining that a network transmission received at the first network accessible node will be processed in a predetermined expected manner, and (b3) determining that the first network accessible node has a predetermined program element available;

first playing, with the first player, a first game instance of a game, wherein one or more corresponding game play representations of the first game instance are transmitted from the GPNAN to the first player via the first network accessible node, wherein for at least most game plays by the first player, there is a responsive game play transmission on the network by the GPNAN;

second playing with the second player a second game instance of a game, wherein one or more corresponding game play representations of the second game instance are transmitted from the GPNAN to a second network accessible node for presenting the game play representations of the second game instance to the second player, wherein the game play representations of the second game instance are transmitted to the second network accessible node while the first player is playing the first game instance;

transmitting by the GPNAN to at least the first player, additional information on the network, wherein said transmitting of said additional information has, as a consequence, a display of an advertising presentation on said first network accessible node, said display occurring concurrently with a display of one of the corresponding game play representations for playing the first game instance, said advertising presentation presenting advertising related to a purchase of a product or service;

wherein said step of second receiving at the GPNAN occurs when the first player has reconnected the first network accessible node to the network after (i) and (ii) following: (i) said first information has been stored on the first network accessible node, and (ii) said first network accessible node has disconnected from the network.

13. The method of claim 12, wherein said additional information is transmitted during the playing of said first game instance.

14. The method of claim 13, wherein said additional information is transmitted in a different network transmission from the transmission of the one corresponding game play representation.

15. The method of claim 15, wherein said display of the advertising being made visible to the first player is not a response from an immediately previous input by the first player.

16. The method of claim 13, wherein said additional information is transmitted concurrently with a response from the GPNAN to a game play transmission by the first player.

17. The method of claim 13, wherein said advertising presentation accepts an input from the first player for presenting further information on the first network accessible node.

18. The method of claim 12, further including a step of selecting said advertising presentation using a result from comparing information about the first player with information related to said advertising presentation.

19. The method of claim 18, wherein said information related to said advertising presentation includes profile information for identifying a player to which said advertising presentation is to be presented.

20. The method of claim 18, wherein said step of selecting includes:

accessing personal information about the first player; and

using said personal information for identifying said advertising presentation (AD), wherein said personal information includes data satisfying a predetermined criteria corresponding to the AD.

21. The method of claim 12, wherein said advertising presentation changes from a first display to a second display of another advertising presentation without there being an intervening input by the first player.

22. The method of claim 21, wherein said step of transmitting results in, periodically, an advertising presentation currently being displayed at the first network accessible node being replaced by a display of a different advertising presentation.

23. The method of claim 21, wherein said advertising presentation does not affect a change in playing the first game instance.

24. The method of claim 21, wherein at least one of said advertising presentation and said another advertising presentation is capable of receiving an input from the the first player for requesting additional advertising information.

25. The method of claim 12, wherein for at least most game plays by the second player, there is a responsive game play transmission on the network by the GPNAN.

26. The method of claim 12, wherein said step of using includes determining whether a program element downloaded in response to an input by the first player to the GPNAN is properly performing.

27. The method of claim 12, wherein at least one of said steps of claim 12 includes a step of the GPNAN communicating on the network with an Internet Protocol.

28. The method of claim 12, wherein the second player plays the second game at a second network accessible node that has a different network identification from the first network accessible node.

29. The method as claimed in claim 12, further including a step of:

outputting, from the GPNAN, a network transmission (T) to the second player, wherein as a consequence of T, at least one interactive advertising presentation is presented to the second player.

30. The method of claim 29 further including providing to the second player over time, one or more additional outputs from the GPNAN, wherein as a consequence of said one or more additional outputs, one or more additional advertising presentations are presented to the second player, each said additional advertising presentation for providing information related to one of a product and a service.

31. The method of claim 29, further including a step of:

third receiving, via the network, data indicative of an action by the second player in response to said at least one interactive advertising presentation and said additional advertising presentations, wherein said data is transmitted:

(i) from said second network accessible node, and

(ii) to a destination node of the network, said destination node identified at said second network acces-

37

sible node by a destination network address used for transmitting said data.

**32.** The method of claim **31**, further including a step of: transmitting to the second player, via the network, another presentation for presenting to the player at said second network accessible node, wherein said another presentation is responsive to said third receiving step.

**33.** The method of claim **12**, wherein the first and second games are card games.

**34.** The method of claim **33**, wherein said step of first playing includes transmitting a sequence of card representations from the GPNAN to the first player for playing said first game, wherein said sequence is not transmitted by the GPNAN to the second player for playing said second game.

**35.** The method of claim **34**, wherein said step of second playing includes transmitting a sequence of card representations from the GPNAN to the second player for playing said second game, wherein said sequence is not transmitted by the GPNAN to the first player for playing said first game.

**36.** The method as claimed in claim **33**, further including a step of transmitting a dealer's card hand in each of said first and second games.

**37.** The method as claimed in claim **12**, wherein for the first and second games, and a probability of said first and second players each receiving an identical sequence of game play configurations is substantially equal to chance.

**38.** The method of claim **12**, wherein for substantially every play of said first game by the first player there is a corresponding transmission on the network between said GPNAN and said first player, wherein said corresponding transmission occurs prior to a subsequent game play by the first player in said first game.

**39.** The method of claim **38**, wherein for substantially every play of said second game by the second player, there is a corresponding transmission on the network between said GPNAN and said second player, wherein said corresponding transmission occurs prior to a subsequent game play by the second player in said second game.

**40.** The method of claim **12**, further including transmitting, via the network, from the GPNAN, second information related to communications between: (a) the GPNAN, and (b) the second network accessible node, wherein said second information is utilized in subsequent network communications between the GPNAN and the second network accessible node, and wherein said second information is stored on the second network accessible node so that it is available in subsequent different network connections by the second player.

**41.** The method of claim **40**, wherein said second information includes executable instructions for receiving advertisement information via the network.

**42.** The method as claimed in claim **12**, further including a step of maintaining a status of each of said first and second games so that each of said first and second games are played with a same effect as if the other of said first and second games were not being played.

**43.** The method as claimed in claim **12**, further including a step of selecting the advertising presentation using personal information supplied by the first player.

**44.** The method of claim **12**, further including a step of providing to the first player a ranking of another player that plays a game with the GPNAN, wherein said ranking is used to determine a prize for at least one of the players being ranked.

**45.** The method of claim **12**, wherein said step of first playing includes accessing the network at one of: a reduced network charge, and free of charge.

**46.** The method as claimed in claim **12**, wherein said step of first playing includes storing a current configuration of said first game, and accessing said current configuration

38

using player identification data provided with a game play request received from the first player.

**47.** The method as claimed in claim **12**, further including a step of receiving a wager request from the first player via a transmission on the network, and determining whether the wager request is acceptable.

**48.** The method of claim **12**, wherein one or more of said steps of first and second playing include providing one or more Internet transmissions, cable television transmissions, and local area network transmissions to one of the first and second players playing, respectively, the first and second games.

**49.** The method of claim **12**, further including playing of a third game between said GPIAN and the second player, wherein a third collection of one or more game play representations is transmitted to the second player, and wherein the transmissions of the game play representations for the third collection and the first collection overlap in time.

**50.** The method of claim **12**, further comprising the following steps:

identifying at least one of the first and second players as requesting to join one of one or more game tournaments, wherein each tournament includes a plurality of instances of a game for playing by each of the players identified, wherein for each of the players, at least one of the following (a) and (b) must be satisfied for the player to complete one of the tournaments:

(a) a predetermined number of instances of the game must be played by the player;

(b) a predetermined amount of time must elapse between the commencement of the tournament and the termination of the tournament;

for each tournament, the following steps are performed:

(A1) selecting the identified players to be included in the tournament;

(A2) grouping the players into groups, wherein for each group, the players therein compete against one another in playing instances of the game; and

(A3) determining one or more winning players for each group.

**51.** The method of claim **50**, further including for at least one of the tournaments:

establishing a modified version of the game by changing a rule of the game while retaining another rule for the game; and

combining the winning players from different groups into one or more new groups for competing against one another in playing instances of the modified version of the game.

**52.** An apparatus for playing a game on a communications network, comprising:

a store for storing player identification, for first and second players, said store accessible by a game playing network accessible node (GPNAN);

a network interface for transmitting, via the network, from the GPNAN, first information related to communications between: (a1) the GPNAN, and (a2) a first network accessible node from which the first player communicates with the GPNAN;

wherein said first information is utilized in subsequent network communications between the GPNAN and the first network accessible node, and wherein said first information is stored on the first network accessible node so that it is available in a subsequent different network connection by the first player;

wherein said network interface receives, via the network, first responsive information indicative of said first information being present on said first network accessible node;

wherein said first responsive information is used for one or more of: (b1) providing the first player with access to a service offered by the GPNAN, (b2) determining that a network transmission received at the first network accessible node will be processed in a predetermined expected manner, and (b3) determining that the first network accessible node has a predetermined program element available;

a game controller for playing a first game instance of a game with the first player, wherein one or more corresponding game play representations of the first game instance are transmitted from the GPNAN to the first player via the first network accessible node, wherein for at least most game plays by the first player, there is a responsive game play transmission on the network by the GPNAN;

wherein said game controller plays a second game instance of a game with the second player, wherein, one or more corresponding game play representations of the second game instance are transmitted from the GPNAN to a second network accessible node for presenting the game play representations of the second game instance to the second player, wherein the game play representations of the second game instance are transmitted to the second network accessible node while the first player is playing the first game instance;

one or more programmatic elements for combining advertising related information with game playing information to obtain a resulting combination that is in a format: (a) acceptable for being transmitted on the network by the GPNAN to at least the first player, and (b) processed by the first network accessible node so that, as a consequence of such processing, a display of an advertising presentation on said first network accessible node is provided, said display occurring concurrently with a display of one of the corresponding game play representations for playing the first game instance, said advertising presentation presenting advertising related to a purchase of a product or service;

wherein said GPNAN receives said first responsive information for identifying the first player, and said GPNAN receives said first responsive information when the first player has reconnected the first network accessible node to the network after (i) and (ii) following: (i) said first information has been stored on the first network accessible node, and (ii) said first network accessible node has disconnected from the network.

**53.** An apparatus for a service on a communications network, comprising:

a store for storing user identification, for first and second users, said store accessible by a service providing network accessible node (SPNAN);

a network interface for transmitting, via the network, from the SPNAN, first information related to communications between: (a1) the SPNAN, and (a2) a first network accessible node from which the first user communicates with the SPNAN;

wherein said first information is utilized in subsequent network communications between the SPNAN and the first network accessible node, and wherein said first information is stored on the first network accessible node so that it is available in a subsequent different network connection by the first user;

wherein said network interface receives, via the network, first responsive information indicative of said first information being present on said first network accessible node;

wherein said first responsive information is used for one or more of: (b1) providing the first user with access to a service offered by the SPNAN, (b2) determining that a network transmission received at the first network accessible node will be processed in a predetermined expected manner, and (b3) determining that the first network accessible node has a predetermined program element available;

a controller for providing access to an instance of a first service to the first user, wherein one or more corresponding service display representations of the first service are transmitted from the SPNAN to the first user via the first network accessible node, wherein at least most of the service display representations are interactive with the first user for providing corresponding responsive transmissions on the network via the SPNAN during the instance of the first service;

wherein said SPNAN provides a second instance of a service with the second user, wherein one or more corresponding service representations for the second instance are transmitted from the SPNAN to a second network accessible node for presenting the service representations of the second instance to the second user, wherein the service representations of the second instance are transmitted to the second network accessible node while the first user is interacting with the instance of the first service;

one or more programmatic elements for combining advertising related information with service related information to obtain a resulting combination that is in a format: (a) acceptable for being transmitted on the network by the SPNAN to at least the first user, and (b) processed by the first network accessible node so that, as a consequence of such processing, a display of an advertising presentation corresponding to said advertising information is provided on said first network accessible node, said display occurring concurrently with a display of one of the corresponding service representations for the instance of the first service, said advertising presentation presenting advertising related to a purchase of a product or service;

wherein said SPNAN receives said first responsive information for identifying the first user, and said SPNAN receives said first responsive information when the first user has reconnected the first network accessible node to the network after (i) and (ii) following: (i) said first information has been stored on the first network accessible node, and (ii) said first network accessible node has disconnected from the network.

**54.** The method as claimed in claim **53**, wherein when the network is the Internet, each of the instance of the first service and the second instance is one or more of:

(a) a game; and

(b) substantially any interactive service available on the Internet through an Internet service provider by which the user accesses the Internet, such that when the user connects to the Internet, said Internet service provider provides a communication to a predetermined website that subsequently transmits said said advertising information to said first network accessible node.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 6,712,702 B2                                          Page 1 of  1
APPLICATION NO. : 09/811173
DATED                    : March 30, 2004
INVENTOR(S)        : Sheldon F. Goldberg and John Van Antwerp

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page, item [60] Related U.S. Application should read as follows:

Delete "Aug. 28,", and insert --Aug. 27,-- therein.

Signed and Sealed this

Thirty-first Day of March, 2009

JOHN DOLL
*Acting Director of the United States Patent and Trademark Office*

US007496943B1

(12) **United States Patent**
Goldberg et al.

(10) **Patent No.:** **US 7,496,943 B1**
(45) **Date of Patent:** **Feb. 24, 2009**

(54) **NETWORK SYSTEM FOR PRESENTING ADVERTISING**

(75) Inventors: **Sheldon F. Goldberg**, Henderson, NV (US); **John Van Antwerp**, Springdale, MD (US)

(73) Assignee: **Beneficial Innovations, Inc.**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/502,285**

(22) Filed: **Feb. 11, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 09/105,401, filed on Jun. 26, 1998, now Pat. No. 6,183,366, which is a continuation of application No. 08/759,895, filed on Dec. 3, 1996, now Pat. No. 5,823,879.

(60) Provisional application No. 60/010,703, filed on Jan. 26, 1996, provisional application No. 60/010,361, filed on Jan. 19, 1996.

(51) **Int. Cl.**
*H04H 9/00* (2006.01)
*A63F 11/00* (2006.01)
*G06Q 30/00* (2006.01)

(52) **U.S. Cl.** .............................. **725/22**; 463/42; 705/14

(58) **Field of Classification Search** .................. 705/10, 705/14, 26; 709/217–219; 707/10, 501.1; 463/41–42; 345/701, 730; 725/22
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,796,433 A | 3/1974 | Fraley et al. | |
| 3,848,193 A | 11/1974 | Martin et al. | .................. 325/53 |
| 3,987,398 A | 10/1976 | Fung | ........................... 325/309 |
| 4,170,782 A | 10/1979 | Miller | ......................... 358/84 |

| | | | |
|---|---|---|---|
| 4,186,413 A | 1/1980 | Mortimer | .................... 358/146 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 733983 | 4/1943 | .................... 21/72 |

(Continued)

OTHER PUBLICATIONS

U.S. Patent Application: Auxier et al., "Interactive Information Super Highway Prize Network". Sep. 2, 1994.

(Continued)

*Primary Examiner*—Dmitry Suhol
*Assistant Examiner*—Robert Mosser
(74) *Attorney, Agent, or Firm*—Sheridan Ross P.C.

(57) **ABSTRACT**

A networked system is disclosed for presenting advertising during on-line interactions between a user and a service of a network (e.g., the Internet, interactive cable, and/or a LAN). Advertisements (ads) are presented to a networked user unrequestedly during user interactions with the service. The user can activate the ads (via hyperlinks) for receiving additional advertising. The system gathers user data and/or develops user profiles for selectively presenting ads, promotionals, discounts, etc. targeted to receptive users. In exchange for viewing such selective presentations, on-line access to the service is provided, the service including, e.g., (a) playing on-line interactive games (e.g., blackjack and poker), (b) providing access to the network itself (e.g., an Internet service provider), and/or (c) providing access to substantially any interactive service accessible via (b). The system can provide free/reduced cost network services to the user for viewing unrequested advertising. The system can be provided for a casino.

**109 Claims, 14 Drawing Sheets**



**US 7,496,943 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,224,644 A | 9/1980 | Lewis et al. | 360/72.2 |
| 4,283,709 A | 8/1981 | Lucero et al. | 340/147 |
| 4,287,592 A | 9/1981 | Paulish et al. | 370/88 |
| 4,288,809 A | 9/1981 | Yabe | 358/12 |
| 4,305,101 A | 12/1981 | Yarbrough et al. | 360/69 |
| 4,307,446 A | 12/1981 | Barton et al. | 364/200 |
| 4,338,644 A | 7/1982 | Staar | 360/132 |
| 4,339,798 A | 7/1982 | Hedges et al. | 364/412 |
| 4,347,498 A | 8/1982 | Lee et al. | 340/825.02 |
| 4,355,806 A | 10/1982 | Buck et al. | 273/85 G |
| 4,381,522 A | 4/1983 | Lambert | |
| 4,405,946 A | 9/1983 | Knight | 358/192.1 |
| 4,429,385 A | 1/1984 | Cichelli et al. | 370/92 |
| 4,467,424 A | 8/1984 | Hedges et al. | 364/412 |
| 4,476,488 A | 10/1984 | Merrell | 358/86 |
| 4,488,179 A | 12/1984 | Kruger et al. | 358/181 |
| 4,494,197 A | 1/1985 | Troy et al. | 364/412 |
| 4,528,643 A | 7/1985 | Freeny, Jr. | 364/900 |
| 4,531,187 A | 7/1985 | Uhland | 364/412 |
| 4,536,791 A | 8/1985 | Campbell et al. | 358/122 |
| 4,575,579 A | 3/1986 | Simon et al. | 178/4 |
| 4,602,279 A | 7/1986 | Freeman | 358/86 |
| 4,614,342 A | 9/1986 | Takashima | 273/85 |
| 4,636,951 A | 1/1987 | Harlick | 364/412 |
| 4,641,205 A | 2/1987 | Beyers, Jr. | 360/33.1 |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. | 358/84 |
| 4,691,351 A | 9/1987 | Hayashi et al. | 380/10 |
| 4,691,354 A | 9/1987 | Palminteri | 380/15 |
| 4,701,794 A | 10/1987 | Froling et al. | 358/147 |
| 4,706,121 A | 11/1987 | Young | 358/142 |
| 4,745,468 A | 5/1988 | Von Kohorn | 358/84 |
| 4,751,578 A | 6/1988 | Reiter et al. | 358/183 |
| 4,751,669 A | 6/1988 | Sturgis et al. | 345/115 |
| 4,760,527 A | 7/1988 | Sidley | 364/412 |
| 4,768,110 A | 8/1988 | Dunlap et al. | 360/33.1 |
| 4,775,935 A | 10/1988 | Yourick | 364/401 |
| 4,815,030 A | 3/1989 | Cross et al. | 364/900 |
| 4,821,102 A | 4/1989 | Ichikawa et al. | 358/183 |
| 4,823,122 A | 4/1989 | Mann et al. | 340/825.28 |
| 4,829,569 A | 5/1989 | Seth-Smith et al. | 380/10 |
| 4,842,275 A | 6/1989 | Tsatskin | 273/1 R |
| 4,845,739 A | 7/1989 | Katz | 379/92 |
| 4,856,787 A | 8/1989 | Itkis | 273/237 |
| 4,866,700 A | 9/1989 | Berry et al. | 370/58.1 |
| 4,868,866 A | 9/1989 | Williams, Jr. | 380/49 |
| 4,873,662 A | 10/1989 | Sargent | 364/900 |
| 4,875,164 A | 10/1989 | Monfort | 364/412 |
| 4,876,592 A | 10/1989 | Von Kohorn | 358/84 |
| 4,890,321 A | 12/1989 | Seth-Smith et al. | 380/20 |
| 4,902,020 A | 2/1990 | Auxier | 273/256 |
| 4,908,707 A | 3/1990 | Kinghorn | 358/147 |
| 4,908,713 A | 3/1990 | Levine | 385/335 |
| 4,926,255 A | 5/1990 | Von Kohorn | 358/84 |
| 4,926,327 A | 5/1990 | Sidley | 364/412 |
| 4,974,149 A | 11/1990 | Valenti | 364/200 |
| 4,975,904 A | 12/1990 | Mann et al. | 370/85.1 |
| 4,975,905 A | 12/1990 | Mann et al. | 370/85.1 |
| 4,977,455 A | 12/1990 | Young | 358/142 |
| 4,987,486 A | 1/1991 | Johnson et al. | 358/86 |
| 4,991,011 A | 2/1991 | Johnson et al. | 358/141 |
| 4,992,940 A | 2/1991 | Dworkin | 364/401 |
| 4,994,908 A | 2/1991 | Kuban et al. | 358/86 |
| 5,001,554 A | 3/1991 | Johnson et al. | 358/86 |
| 5,008,853 A | 4/1991 | Bly et al. | 364/900 |
| 5,009,429 A | 4/1991 | Auxier | 273/240 |
| 5,034,807 A | 7/1991 | Von Kohorn | 358/84 |
| 5,038,022 A | 8/1991 | Lucero | 235/380 |
| 5,053,889 A | 10/1991 | Nakano et al. | 358/480 |
| 5,057,915 A | 10/1991 | Von Kohorn | 358/84 |
| 5,058,108 A | 10/1991 | Mann et al. | 370/85.1 |
| 5,073,931 A | 12/1991 | Audebert et al. | 380/23 |
| 5,075,771 A | 12/1991 | Hashimoto | 358/84 |
| 5,077,607 A | 12/1991 | Johnson et al. | 358/86 |
| 5,083,271 A | 1/1992 | Thacher et al. | |
| 5,093,918 A | 3/1992 | Heyen et al. | 395/725 |
| 5,099,319 A | 3/1992 | Esch et al. | 358/86 |
| 5,105,184 A | 4/1992 | Pirani et al. | 340/721 |
| 5,133,075 A | 7/1992 | Risch | 395/800 |
| 5,141,234 A | 8/1992 | Boylan et al. | |
| 5,151,789 A | 9/1992 | Young | 385/194.1 |
| 5,159,549 A | 10/1992 | Hallman, Jr. et al. | 364/412 |
| 5,177,680 A | 1/1993 | Tsukino et al. | 364/401 |
| 5,182,640 A | 1/1993 | Takano | 358/86 |
| 5,187,787 A | 2/1993 | Skeen et al. | 395/600 |
| 5,200,823 A | 4/1993 | Yoneda et al. | 358/146 |
| 5,220,420 A | 6/1993 | Hoarty et al. | 358/86 |
| 5,220,501 A | 6/1993 | Lawlor et al. | 364/408 |
| 5,220,657 A | 6/1993 | Bly et al. | 395/425 |
| 5,224,706 A | 7/1993 | Bridgeman et al. | 273/85 |
| 5,227,874 A | 7/1993 | Von Kohorn | 358/84 |
| 5,230,048 A | 7/1993 | Moy | 395/600 |
| 5,231,493 A | 7/1993 | Apitz | 358/146 |
| 5,233,533 A | 8/1993 | Edstrom et al. | 364/468 |
| 5,241,465 A | 8/1993 | Oba et al. | 364/401 |
| 5,257,789 A | 11/1993 | LeVasseur | 273/309 |
| 5,257,810 A | 11/1993 | Schorr et al. | 273/292 |
| 5,261,042 A | 11/1993 | Brandt | 395/156 |
| 5,265,033 A | 11/1993 | Vajk et al. | 364/514 |
| 5,283,639 A | 2/1994 | Esch et al. | 348/6 |
| 5,283,731 A | 2/1994 | Lalonde | 364/401 |
| 5,283,734 A | 2/1994 | Von Kohorn | 364/412 |
| 5,283,856 A | 2/1994 | Gross et al. | 395/51 |
| 5,285,272 A | 2/1994 | Bradley et al. | 348/6 |
| 5,301,028 A | 4/1994 | Banker et al. | 348/570 |
| 5,305,195 A | 4/1994 | Murphy | 364/401 |
| 5,319,455 A | 6/1994 | Hoarty et al. | 348/7 |
| 5,319,707 A | 6/1994 | Wasilewski et al. | 380/14 |
| 5,320,356 A | 6/1994 | Cauda | 273/292 |
| 5,321,241 A | 6/1994 | Craine | 235/380 |
| 5,326,104 A | 7/1994 | Pease et al. | 273/292 |
| 5,337,155 A | 8/1994 | Cornelis | 348/473 |
| 5,339,239 A | 8/1994 | Manabe et al. | 364/401 |
| 5,343,239 A | 8/1994 | Lappington et al. | 348/12 |
| 5,343,300 A | 8/1994 | Hennig | 348/478 |
| 5,345,594 A | 9/1994 | Tsuda | 455/18 |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,351,970 A | 10/1994 | Fioretti | 273/439 |
| 5,353,218 A | 10/1994 | De Lapa et al. | 364/401 |
| 5,355,480 A | 10/1994 | Smith et al. | 395/600 |
| 5,357,276 A | 10/1994 | Banker et al. | 348/7 |
| 5,361,393 A | 11/1994 | Rossillo | 395/650 |
| 5,377,354 A | 12/1994 | Scannell et al. | 395/650 |
| 5,393,067 A | 2/1995 | Paulsen et al. | 273/292 |
| 5,398,932 A | 3/1995 | Eberhardt et al. | 273/138 A |
| 5,403,015 A | 4/1995 | Forte et al. | 273/304 |
| 5,404,505 A | 4/1995 | Levinson | 395/600 |
| 5,414,773 A | 5/1995 | Handelman | 380/49 |
| 5,426,594 A | 6/1995 | Wright et al. | 364/514 R |
| 5,428,606 A | 6/1995 | Moskowitz | 370/60 |
| 5,429,361 A | 7/1995 | Raven et al. | 273/138 A |
| 5,431,407 A | 7/1995 | Hofberg et al. | 273/292 |
| 5,434,978 A | 7/1995 | Dockter et al. | 395/200 |
| 5,437,462 A | 8/1995 | Breeding | 273/292 |
| 5,440,262 A | 8/1995 | Lum et al. | 327/544 |
| 5,442,771 A | 8/1995 | Filepp et al. | 395/650 |
| 5,446,919 A | 8/1995 | Wilkins | 455/6.2 |
| 5,471,629 A | 11/1995 | Risch | 395/800 |
| 5,483,466 A | 1/1996 | Kawahara et al. | 364/514 C |
| 5,491,517 A | 2/1996 | Kreitman et al. | |
| 5,498,003 A | 3/1996 | Gechter | 273/434 |
| 5,504,675 A * | 4/1996 | Cragun et al. | 364/401 |
| 5,505,449 A | 4/1996 | Eberhardt et al. | 273/138 A |
| 5,507,491 A | 4/1996 | Gatto et al. | 273/139 |
| 5,508,731 A | 4/1996 | Kohorn | 348/1 |

**US 7,496,943 B1**
Page 3

| | | | |
|---|---|---|---|
| 5,511,160 A | 4/1996 | Robson | 395/162 |
| 5,515,098 A | 5/1996 | Carles | 348/8 |
| 5,526,035 A | 6/1996 | Lappington et al. | 348/13 |
| 5,526,427 A | 6/1996 | Thomas et al. | 380/20 |
| 5,528,490 A | 6/1996 | Hill | 364/403 |
| 5,532,923 A | 7/1996 | Sone | 364/138 |
| 5,537,586 A | 7/1996 | Amram et al. | 395/600 |
| 5,539,450 A | 7/1996 | Handelman | 348/12 |
| 5,539,822 A | 7/1996 | Lett | 380/20 |
| 5,544,892 A | 8/1996 | Breeding | 273/292 |
| 5,549,300 A | 8/1996 | Sardarian | 273/292 |
| 5,557,658 A | 9/1996 | Gregorek et al. | 379/67 |
| 5,557,721 A | 9/1996 | Fite et al. | 395/148 |
| 5,559,312 A | 9/1996 | Lucero | 235/380 |
| 5,561,707 A | 10/1996 | Katz | 379/88 |
| 5,569,082 A | 10/1996 | Kaye | 463/17 |
| 5,572,643 A * | 11/1996 | Judson | 395/793 |
| 5,576,951 A | 11/1996 | Lockwood | 395/227 |
| 5,577,266 A | 11/1996 | Takahisa et al. | 455/66 |
| 5,579,537 A | 11/1996 | Takahisa | 455/66 |
| 5,581,479 A | 12/1996 | McLaughlin et al. | 364/514 A |
| 5,583,563 A | 12/1996 | Wanderscheid et al. | 348/9 |
| 5,585,866 A | 12/1996 | Miller et al. | 348/731 |
| 5,586,257 A | 12/1996 | Perlman | 463/42 |
| 5,586,766 A | 12/1996 | Forte et al. | 273/309 |
| 5,586,936 A | 12/1996 | Bennett et al. | 463/42 |
| 5,586,937 A | 12/1996 | Menashe | 463/41 |
| 5,589,892 A | 12/1996 | Knee et al. | 348/731 |
| 5,592,212 A | 1/1997 | Handelman | 348/12 |
| 5,593,349 A | 1/1997 | Miguel et al. | 463/30 |
| 5,597,162 A | 1/1997 | Franklin | 273/292 |
| 5,597,307 A | 1/1997 | Redford et al. | 434/118 |
| 5,600,364 A | 2/1997 | Hendricks et al. | 348/1 |
| 5,600,366 A | 2/1997 | Schulman | 348/9 |
| 5,603,502 A | 2/1997 | Nakagawa | 273/292 |
| 5,605,334 A | 2/1997 | McCrea, Jr. | |
| 5,610,653 A | 3/1997 | Abecassis | 348/110 |
| 5,611,730 A | 3/1997 | Weiss | 463/20 |
| 5,613,190 A | 3/1997 | Hylton | 455/3.1 |
| 5,613,191 A | 3/1997 | Hylton et al. | 455/3.1 |
| 5,613,912 A | 3/1997 | Slater | 463/25 |
| 5,617,565 A | 4/1997 | Augenbraun et al. | 395/604 |
| 5,624,265 A | 4/1997 | Redford et al. | 434/307 |
| 5,624,316 A | 4/1997 | Roskowski et al. | 463/45 |
| 5,630,204 A | 5/1997 | Hylton et al. | 455/3.3 |
| 5,634,051 A | 5/1997 | Thomson | 395/605 |
| 5,635,979 A | 6/1997 | Kostreski et al. | 348/13 |
| 5,638,426 A | 6/1997 | Lewis | 379/90 |
| 5,640,193 A | 6/1997 | Wellner | 348/7 |
| 5,643,088 A | 7/1997 | Vaughn et al. | 463/40 |
| 5,655,966 A | 8/1997 | Werdin, Jr. et al. | 463/25 |
| 5,659,350 A | 8/1997 | Hendricks et al. | 348/6 |
| 5,659,793 A | 8/1997 | Escobar et al. | 395/807 |
| 5,660,391 A | 8/1997 | Klasee | 273/292 |
| 5,664,948 A | 9/1997 | Dimitriadis et al. | 373/307 R |
| 5,669,817 A | 9/1997 | Tarantino | 463/13 |
| 5,675,752 A | 10/1997 | Scott et al. | 395/333 |
| 5,679,077 A | 10/1997 | Pocock et al. | 463/19 |
| 5,684,863 A | 11/1997 | Katz | 379/88 |
| 5,684,918 A | 11/1997 | Abecassis | 386/83 |
| 5,687,331 A | 11/1997 | Volk et al. | 395/327 |
| 5,687,971 A | 11/1997 | Khaladkar | 273/269 |
| 5,688,174 A | 11/1997 | Kennedy | 463/37 |
| 5,689,431 A | 11/1997 | Rudow et al. | 364/449.7 |
| 5,697,844 A | 12/1997 | Von Kohorn | 463/40 |
| 5,702,104 A | 12/1997 | Malek et al. | 273/292 |
| 5,702,305 A | 12/1997 | Norman et al. | 463/42 |
| 5,707,287 A | 1/1998 | McCrea, Jr. | 463/27 |
| 5,708,780 A * | 1/1998 | Levergood et al. | 395/200.12 |
| 5,708,845 A | 1/1998 | Wistendahl et al. | 395/806 |
| 5,709,603 A | 1/1998 | Kaye | 463/17 |
| 5,711,715 A | 1/1998 | Ringo et al. | 473/9 |
| 5,713,574 A | 2/1998 | Hughes | 273/292 |
| 5,713,795 A | 2/1998 | Kohorn | 463/17 |
| 5,717,860 A * | 2/1998 | Graber et al. | 395/200.12 |
| 5,718,431 A | 2/1998 | Ornstein | 273/292 |
| 5,722,418 A | 3/1998 | Bro | 128/732 |
| 5,724,091 A | 3/1998 | Freeman et al. | 348/13 |
| 5,724,106 A | 3/1998 | Autry et al. | 348/734 |
| 5,724,424 A * | 3/1998 | Gifford | 380/24 |
| 5,724,425 A | 3/1998 | Chang et al. | 380/25 |
| 5,729,212 A | 3/1998 | Martin | 340/870.28 |
| 5,729,279 A | 3/1998 | Fuller | 348/8 |
| 5,732,338 A | 3/1998 | Schwob | 455/158.5 |
| 5,732,949 A | 3/1998 | Josephs | 273/292 |
| 5,734,589 A | 3/1998 | Kostreski et al. | 364/514 A |
| 5,734,853 A | 3/1998 | Hendricks et al. | 395/352 |
| 5,735,525 A | 4/1998 | McCrea, Jr. | 273/309 |
| 5,735,742 A | 4/1998 | French | 463/25 |
| 5,737,619 A | 4/1998 | Judson | 715/500 |
| 5,740,369 A | 4/1998 | Yokozawa et al. | 395/200.47 |
| 5,740,549 A * | 4/1998 | Reilly et al. | 705/14 |
| 5,746,656 A | 5/1998 | Bezick et al. | 463/42 |
| 5,748,742 A | 5/1998 | Tisdale et al. | 380/49 |
| 5,749,735 A | 5/1998 | Redford et al. | 434/307 |
| 5,749,785 A | 5/1998 | Rossides | 463/25 |
| 5,751,338 A | 5/1998 | Ludwig, Jr. | 348/17 |
| 5,752,160 A | 5/1998 | Dunn | 455/5.1 |
| 5,755,621 A | 5/1998 | Marks et al. | 463/42 |
| 5,759,101 A | 6/1998 | Von Kohorn | 463/40 |
| 5,767,894 A | 6/1998 | Fuller et al. | 348/8 |
| 5,768,382 A | 6/1998 | Schneier et al. | 380/23 |
| 5,770,533 A | 6/1998 | Franchi | 463/42 |
| 5,774,591 A | 6/1998 | Black et al. | 382/236 |
| 5,774,664 A | 6/1998 | Hidary et al. | 395/200.48 |
| 5,774,670 A | 6/1998 | Montulli | |
| 5,774,869 A | 6/1998 | Toader | 705/10 |
| 5,779,242 A | 7/1998 | Kaufmann | 273/459 |
| 5,779,549 A | 7/1998 | Walker et al. | 463/42 |
| 5,781,245 A | 7/1998 | Van Der Weij et al. | 348/563 |
| 5,781,246 A | 7/1998 | Alten et al. | 348/569 |
| 5,787,156 A | 7/1998 | Katz | 379/93.13 |
| 5,788,507 A | 8/1998 | Redford et al. | 434/307 |
| 5,788,574 A | 8/1998 | Ornstein et al. | 463/25 |
| 5,789,892 A | 8/1998 | Takei | 318/687 |
| 5,791,991 A * | 8/1998 | Small | 463/41 |
| 5,793,413 A | 8/1998 | Hylton et al. | 348/12 |
| 5,794,210 A | 8/1998 | Goldhaber et al. | 705/14 |
| 5,795,156 A | 8/1998 | Redford et al. | 434/118 |
| 5,796,945 A | 8/1998 | Tarabella | 395/200.9 |
| 5,798,785 A | 8/1998 | Hendricks et al. | 348/1 |
| 5,799,267 A | 8/1998 | Siegel | 704/1 |
| 5,800,268 A | 9/1998 | Molnick | 463/40 |
| 5,802,220 A | 9/1998 | Black et al. | 382/276 |
| 5,805,154 A | 9/1998 | Brown | 715/327 |
| 5,809,481 A * | 9/1998 | Baron et al. | 705/14 |
| 5,809,482 A | 9/1998 | Strisower | 705/30 |
| 5,812,769 A * | 9/1998 | Graber et al. | 395/200.12 |
| 5,815,551 A | 9/1998 | Katz | 379/88 |
| 5,816,918 A | 10/1998 | Kelly et al. | 463/16 |
| 5,818,438 A | 10/1998 | Howe et al. | 348/9 |
| 5,823,879 A * | 10/1998 | Goldberg et al. | 463/42 |
| 5,828,734 A | 10/1998 | Katz | 379/93.13 |
| 5,830,067 A | 11/1998 | Graves et al. | 463/40 |
| 5,830,068 A | 11/1998 | Brenner et al. | 463/42 |
| 5,831,527 A | 11/1998 | Jones, II et al. | 340/540 |
| 5,835,126 A | 11/1998 | Lewis | 348/6 |
| 5,839,725 A | 11/1998 | Conway | 273/244 |
| 5,839,905 A | 11/1998 | Redford et al. | 434/307 R |
| 5,848,396 A | 12/1998 | Gerace | 705/10 |
| 5,848,397 A * | 12/1998 | Marsh et al. | 705/14 |
| 5,851,149 A | 12/1998 | Kidos et al. | 463/42 |
| 5,857,911 A | 1/1999 | Fioretti | 463/40 |
| 5,871,398 A | 2/1999 | Schneier et al. | 463/16 |
| 5,875,108 A | 2/1999 | Hoffberg et al. | 364/146 |
| 5,879,233 A | 3/1999 | Stupero | 463/11 |

| | | | | |
|---|---|---|---|---|
| 5,880,769 A | 3/1999 | Nemirofsky et al. | 348/12 | |
| 5,885,158 A | 3/1999 | Torango et al. | 463/27 | |
| 5,898,762 A | 4/1999 | Katz | 379/93.12 | |
| 5,901,246 A | 5/1999 | Hoffberg et al. | 382/209 | |
| 5,901,287 A | 5/1999 | Bull et al. | 395/200.48 | |
| 5,903,317 A | 5/1999 | Sharir et al. | 348/589 | |
| 5,911,582 A | 6/1999 | Redford et al. | 434/307 | |
| 5,916,024 A | 6/1999 | Von Kohorn | 463/40 | |
| 5,917,725 B | 6/1999 | Thacher et al. | 364/410.1 | |
| 5,917,893 A | 6/1999 | Katz | 379/93.02 | |
| 5,918,213 A | 6/1999 | Bernard et al. | 705/26 | |
| 5,933,811 A | 8/1999 | Angles et al. | 705/14 | |
| 5,935,004 A | 8/1999 | Tarr et al. | 463/40 | |
| 5,937,163 A | 8/1999 | Lee et al. | 395/200.48 | |
| 5,948,061 A | 9/1999 | Merriman et al. | 709/219 | |
| 5,957,695 A | 9/1999 | Redford et al. | 434/307 | |
| 5,964,463 A | 10/1999 | Moore, Jr. | 273/274 | |
| 5,971,397 A | 10/1999 | Miguel et al. | 273/371 | |
| 5,987,498 A | 11/1999 | Athing et al. | 709/203 | |
| 5,990,927 A | 11/1999 | Hendricks et al. | 348/6 | |
| 5,996,006 A | 11/1999 | Speicher | 709/218 | |
| 5,999,808 A | 12/1999 | LaDue | 455/412 | |
| 6,002,393 A | 12/1999 | Hite et al. | | |
| 6,005,561 A | 12/1999 | Hawkins et al. | 345/327 | |
| 6,025,837 A | 2/2000 | Matthews, III et al. | 345/327 | |
| 6,035,021 A | 3/2000 | Katz | 379/93.12 | |
| 6,038,554 A | 3/2000 | Vig | 705/400 | |
| 6,081,750 A | 6/2000 | Hoffberg et al. | 700/17 | |
| 6,085,256 A | 7/2000 | Kitano et al. | 709/303 | |
| 6,154,207 A | 11/2000 | Farris et al. | 345/327 | |
| 6,183,366 B1 * | 2/2001 | Goldberg et al. | 43/42 | |
| 6,185,586 B1 | 2/2001 | Judson | 715/513 | |
| 6,208,805 B1 | 3/2001 | Abecassis | 386/126 | |
| 6,236,360 B1 | 5/2001 | Rudow et al. | 342/357.13 | |
| 6,240,555 B1 | 5/2001 | Shoff et al. | 725/110 | |
| 6,264,560 B1 * | 7/2001 | Goldberg et al. | 463/42 | |
| 6,287,201 B1 | 9/2001 | Hightower | | |
| 6,289,319 B1 | 9/2001 | Lockwood | 705/35 | |
| 6,323,894 B1 | 11/2001 | Katz | 348/15 | |
| 6,330,021 B1 | 12/2001 | Devaux | 348/14.04 | |
| 6,335,965 B1 | 1/2002 | Katz | 379/93.12 | |
| 6,349,134 B1 | 2/2002 | Katz | 379/92.01 | |
| 6,457,025 B2 | 9/2002 | Judson | 715/501.1 | |
| 6,553,178 B2 | 4/2003 | Abecassis | | |
| 6,712,702 B2 | 3/2004 | Schatz | | |
| 2001/0041053 A1 | 11/2001 | Abecassis | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 29 18 846 | 11/1980 |
| DE | 33 25 810 C2 | 10/1985 |
| DE | 36 21 263 A1 | 7/1988 |
| EP | 0113022 A2 | 11/1983 |
| EP | 0 566 454 A1 | 4/1993 |
| EP | 0 697 613 A2 | 2/1996 |
| EP | 0 843 272 A1 | 5/1998 |
| EP | 0 871 132 A1 | 10/1998 |
| EP | 1 126 715 A2 | 8/2001 |
| EP | 0 688 489 B1 | 11/2001 |
| GB | 2 034 995 A | 10/1979 |
| GB | 2 034 995 | 6/1980 |
| GB | 2121569 | 12/1983 |
| GB | 2 141 907 | 1/1985 |
| GB | 2 141 907 A | 1/1985 |
| GB | 2183882 A | 6/1987 |
| GB | 2 185 670 | 7/1987 |
| GB | 2 185 670 A | 7/1987 |
| GB | 2205188 A | 11/1988 |
| GB | 2 207 314 | 1/1989 |
| GB | 2 207 314 A | 1/1989 |
| GB | 2 256 549 A | 9/1992 |
| GB | 2 256 549 | 12/1992 |
| GB | 2 281 434 A | 1/1995 |

| | | |
|---|---|---|
| JP | 64-18380 | 1/1989 |
| JP | 320459 | 1/1990 |
| JP | 6314184 | 4/1993 |
| WO | WO 88/04507 | 6/1988 |
| WO | WO 90/07844 | 7/1990 |
| WO | WO 92/12488 | 7/1992 |
| WO | WO 93/09631 | 5/1993 |
| WO | WO 93/19427 | 9/1993 |
| WO | WO 94/14281 | 6/1994 |
| WO | WO 95/31069 | 11/1995 |
| WO | WO 96/30864 | 10/1996 |
| WO | WO 96/34466 | 10/1996 |
| WO | WO 96/36141 | 11/1996 |
| WO | WO 00/24484 | 5/2000 |

OTHER PUBLICATIONS

Advertising brochure for "Track-21", by Digital Biometrics, Inc., Gaming Division, 5600-Rowland Road, Minnetonka, MN 55343.

Advertising page-for "Tracker-Plus TP-700 Player Tracking Equipment for Table Games", by Open Technologies, 6520 Platt Ave., Suite 672, West Hills, CA 91307.

Advertising pages (15-16 and Order Form) for QOP games, in eStrategy Plus, believed to be from 1994.

Estavanik, "Designing On-Line, Multiplayer Games", in Game Developer, pp. 14-21, Premier 1994.

Horton, "The Power of ImaginNation", in Advertising Age, Mar. 7, 1994.

Information sheet for "Action Tracker Electronic Voucher System". Marketing Plan for Manifest Destiny, Inc., 1994.

O'Connell, "Advertisers Get Benched", Promo, The International Magazine for Promotion Marketing, p. 96, Mar. 1994.

Phillips; "An Interpersonal Multimedia Visualization System"; *IEEE Computer Graphics & Applications*; 1991, pp. 20-27.

Jackson et al.; "InterMail: A Prototype Hypermedia Mail System"; *Hypertext '91 Proceedings*; Dec. 1991, pp. 405-409.

Borenstein; "Multimedia Electronic Mail: Will the Dream Become a Reality?"; *Communications of the ACM*; Apr. 1991, 34(4), pp. 117-119.

Cooperstock et al.; "Why Use a Fishing Line When You Have a Net? An Adaptive Multicast Data Distribution Protocol"; *USENIX Technical Conference*; Jan. 22-26, 1996; pp. 343.352.

Thimm; "A Multimedia Enhanced CSCW Teleservice for Wide Area Cooperative Authoring of Multimedia Documents"; *SIGOIS Bulletin*; Dec. 1994, 15(2); pp. 49-57.

Zuckermann; "Pushing the Envelope on Delivery of Customized Internet"; *New York Times*; Dec. 9, 1996; 2 pgs.

Berst; "'Push' Products Redefine Internet"; *PC Week*; Nov. 25, 1996; p. 63.

Barrie et al.; "The World Wide Web As An Instructional Tool"; *Science*; Oct. 18, 1996; 274; pp. 371-372.

Brown; "LapLink Keeps In Touch"; *PC Magazine*; Jan. 7, 1997; p. 60.

Finnie; "Look, Ma! No Brower"; *PC Magazine*; Jan. 7, 1997; p. 60.

"Intermind 'pushes' 140 New Web Channels, Thre Times That of Marimba, Backweb and Ifusion Combined"; *SchwabOnline*; Feb. 6, 1997; 2 pgs.

"Patent Office May Hinder Hopping of Bunny Across Computerscreens"; *Washington Times*; 1997; 2 pgs.

Hassett et al.; "Technical Excellence Online Winner: The PointCast Network"; *PC Magazine Online*; 1996; 1 pg.

Alsop; "PointCast and Its Wannabes"; *Fortune*; Nov. 25, 1996; 2 pgs.

Abate; "Major Deal To Map Internet Future"; *San Francisco Examiner*; Dec. 12, 1996; 1 pg.

Zuckerman; "Microsoft and Pointcast in Broadcast Alliance"; *New York Times*; Dec. 12, 1996; 1 pg.

Bank; "Microsoft Picks On-Line News From PointCast"; *Wall Street Journal*; Dec. 12, 1996; 1 pg.

Bank; "Inverted Web: How Net is Becoming More Like Television To Draw Advertisers"; *Wall Street Journal*; Dec. 13, 1996; 3 pgs.

Andres; "User Friendly: PointCast's 'Push' Method Could Be The Next Wave"; *Personal Technology*; Dec. 1, 1996; 1 pg.

**US 7,496,943 B1**

Page 5

Haar; "Young Turks Point The Way Offline"; *CyerMedia*; Oct. 14, 1996; 2 pgs.

Finnie; "Free News You Can Use"; *PCCOMPUTING.COM*; 1 pg.

Rapoza; "I-Server: Gotta Have It"; *PC Week*; Oct. 28, 1996; 12(43); 1 pg.

Nelson; "Information Distribution System: PointCast I-Server Pleases All"; *Info World*; Nov. 18, 1996; p. IW/3 and IW/8.

Dieberger; "Browsing The WWW by Interacting With a Textual Virtual Envrinment—A Framework for Experimenting With Navigational Metaphors"; *Hypertext '96*; 1996; pp. 170-179.

Miller; "News On-Demand for Multimedia Networks"; *ACM Multimedia*; 1993; pp. 383-392.

Story et al.; "The RightPages Image-Based Electronic Library for Alerting and Browsing"; *IEEE*, Sep. 1992; pp. 17-25.

Ramanathan et al.; "Architectures for Personalized Multimedia"; *IEEE*; 1994; pp. 37-46.

"Yahoo! BackWeb Channel Guide!"; *Yahoo Channel Guide: What's Going On?*; 2 pgs.

Ramanathan et al.; "(Title Unknown)"; *Computer Networks and ISDN Systems*; 26; 1994; pp. 1317-1322.

O'Connell; "Turning On To Schreen Savers"; *IAC News*; 1997; 2 pgs.

"PED Delivers Personalized Newspapers To Users Desktops"; *IAC News*; 1997; 2 pgs.

"Journal: A New Prodigy Add-On"; *DB Svcs.*; 1997; 1 pg.

"Journalist Delivers Your Own Personalized Newpaper"; *IAC News*; 1997; 1 pg.

"UK: Home Computer From Your Own Correspondent"; *Reuters Info Svcs.*; 1996; 2 pgs.

"Individual, Inc. Files for U.S. Patent"; *PR Newswire*; Jul. 9, 1992.

Pinella et al.; "Individual, Inc. Announced Today Shipment Of A New Release Of Its Flagship"; *Businesswire*; Sep. 18, 1995; 2 pgs.

Slaby; "SandPoint Unveils Hoover NewsAlert For Windows: Powerful Intelligent-Agent Based Software Monitor Provides Real-Time News for Critical Decision Making"; *Businesswire*; Oct. 30, 1995; 2 pgs.

Carrig et al.; "Ziff-Davis Electronic Information Acquires SandPoint"; *PR Newswire San Francisco*; Mar. 1, 1994; 3 pgs.

Flynn et al.; "The Daily Me: Laying Out Tomorrow's (Electronic) News"; *PC Magazine*; Sep. 14, 1993; 12(15); p. 29(1).

Conhaim; "This Year In Review"; *Link-Up*; Nov./Dec. 1996; 13(6); pp. 5, 34+.

"Brave New Medium"; *Economist*; Jun. 29, 1996; 339(7972); pp. 15-16; UK 17-18.

Hollis et al.; "Addressing Customers' Wireless Data Service Needs"; *Telesis*; Oct. 1995; No. 100; pp. 56-57.

Askey; "News You've Asked To Use"; *Mediaweek*; Jun. 12, 1995; 5(24); p. 20.

"Web News With A Personal Touch: Individual, Inc. Offers Ad-Backed, Customized Information Source"; *Advertising Age*; Apr. 3, 1995; 66(14); p. 25.

"A Newspaper with a Difference On The Internet"; *Direct Marketing Magazine*; Mar. 1995; 57(11); p. 11.

"NewsHound Sniffs Out Stories"; *Open Systems Today*; Nov. 28, 1994; No. 164; p. 36.

"Mercury Center Intros NewsHound Clipping Service"; *Newsbytes Ness Network*; p. N/A.

Eng; "Bits & Bytes"; *Business Week*; Jul. 29, 1996; No. 3486; p. 68A(1).

Volokh; "Cheap Speech and What It Will Do"; *Yale Law Journal*; May 1995; 104(7); pp. 1805-1850.

"The Hook Is The Lock Of The Journal"; *Business Week*; Aug. 16, 1993; No. 3332; gs. 102A.

"Online-Time, Inc." *Report On Electronic Commerce*; Nov. 12, 1996; 3(23).

"N.Y. Times Mon. Unveiled World Wide Web Site"; *Communications Daily*; Jan. 23, 1996; 16(15).

"Individual, Inc. Sees Strong Sales, Subscriber Growth"; *Electronic Information Report*; Feb. 24, 1994; 16(8).

"MCI Acquires Equifax's Stake In FYI Online"; *Electronic Information Report*; Oct. 21, 1994; 15(38).

Kirkpatrick; "What's Selling on the Internet"; *Kirkpatrick Enterprises; Inc.*; 1996-2000; pp. 1-36.

Clarke; "Cookies"; *Xamax Consultancy Pty Ltd.*; 1996-2001; pp. 1-10.

Levine; "Knowing Where You Browse?"; *comp.society.privacy*; Sep. 21, 1995; pp. 1-5.

Winer; "DaveNet"; 1994-2000; pp. 1-6.

"News of Nerds. Stuff that Matters"; *Slashdot*; pp. 1-118.

Yoshida; "Group Formed To Oversee 1394 Patent Licensing"; *Systems & Software News*; Nov. 23, 1999; pp. 1-3.

Tannenbaum; "Patent Approved, Patent Pending"; *Wall Street Journal Interactive Edition*; 1999.

Matyjewicz; "The E-Tailer's Digest: Discussing Retailing Online"; *Gifts & Dec*; 1997; pp. 1-6.

"Time Warner's Pathfinder, Compuserve Inc. and Open Market Inc. Announce a Breakthrough for the Internet," PR Newswire, Apr. 11, 1996, Dialog Accession No. 00601438 in Dialog® File 621.

"Sun-Sentinel Launches Interactive Real Estate Service on the Internet," PR Newswire, Apr. 11, 1996, Dialog Accession No. 00600800 in Dialog® File 621.

"Harbinger Corporation Announces TrustedLink INP; The most comprehensive solution for easily building and maintaining a corporate Web site," Business Wire, Mar. 25, 1996, Dialog Accession No. 00594210 in Dialog® File 621.

"HP Internet Advisor Enhanced to Make Internetwork Testing Quicker and Easier; Windows 95 Interface Helps to Isolate Network Problems," Business Wire, Mar. 15, 1996, Dialog Accession No. 00590687, in Dialog® File 621.

"HFS and CENTURY 21 announce major initiatives . . . in providing one-stop shopping for consumers," Business Wire, Mar. 12, 1996, Dialog Accession No. 00589418, in Dialog® File 621.

"Starfish Software ships Earthtime 2.0; The essential world clock . . . as a Netscape Navigator 2.0 plug-in," Business Wire, Mar. 12, 1996, Dialog Accession No. 00589215, in Dialog® File 621.

"Boeing projects continued airline profitability, traffic growth, rational airline orders," PR Newswire, Mar. 6, 1996, Dialog Accession No. 00586684, in Dialog® File 621.

"UCA&L announces new Internet division . . . to help clients reach, communicate with, and market to customers online," Business Wire, Mar. 5, 1996, Dialog Accession No. 00586617, in Dialog® File 621.

"IDG to launch Javaworld on World Wide Web," PR Newswire, Feb. 2, 1996, Dialog Accession No. 00576930, in Dialog® File 621.

"Online Interactive's FreeShop Online achieves one million electronic orders . . . ," Business Wire, Feb. 7, 1996, Dialog Accession No. 00575091, in Dialog® File 621.

Mohan, "Free mail on the net forces users to trade off privacy," Computerworld, Inc., Nov. 27, 1995.

"Ariel Resources first quarter results, revenue increases 109 percent of comparable period last year," Business Wire, Feb. 13, 1997, Dialog Accession No. 00736050, in Dialog File® File 621.

"Game TV dedicated to the game player in all of us . . . new half-hour show," PR Newswire, Feb. 19, 1997, Dialog Accession No. 00735308, in Dialog® File 621.

"IRG acquires Intertect," PR Newswire, Dec. 2, 1996, Dialog Accession No. 00703704, in Dialog® File 621.

"Virtual Dorm tops [sic] into real life of students; fully wired dorm suite puts students' live on the Web for all to see," PR Newswire, Oct. 31, 1995, Dialog Accession No. 00543162, in Dialog® File 621.

"ZD Net celebrates first year of web advertising program as top-grossing content provider with 63 April advertisers," PR Newswire, Apr. 15, 1996, Dialog Accession No. 00602035, in Dialog® File 621. Bailey, Steve et al., "A Cautionary Tale in the News," Boston Globe, Aug. 13, 1996, p. D1.

Barna, D., "Make Money on the Internet, Maybe", Vermont Business Magazine, vol. 24, No. 7, Jul. 1996, p. 50.

"Newshound Sniffs Out Stories", Open Systems Today, No. 164, Nov. 28, 1994, p. 36.

Lewis, Peter H., "The New York Times Introduces a Web Site", The New York Times, Jan. 22, 1996, p. C7.

"Leading Newspapers Ramp Up Interactive Advertising Developments," Electronic Marketplace Reports, vol. 9, No. 4, Feb. 21, 1995, p. 4.

Flaherty, Francis, "Cyberspace Swindles: Old Scams, New Twists," The New York Times, Jul. 16, 1994, p. 25.

**US 7,496,943 B1**

Page 6

Frank, Howard, "Telcos and Newspapers Must Cooperate to Win," *Networking Management*, vol. 10, No. 7, Jun. 1992, p. 46.

Goff, Leslie, "Wash Away Those Job-Hunting Jitters. The Opportunities are Endless on the Web," *Computerworld*, Oct. 31, 1996, p. 12.

Heckhart, Christine et al., "Your High-Speed Data Services Buy Comes Down to Deciding if One Service Can Do it all or if You'll Need the Best of Breed," *Network World*, Jun. 12, 1995, p. 47.

Lexis database, "Individual Launches Newspage Direct" PR Newswire 1996.

Lexis database, "FreeMark Communications and SportsTicker enter online sports information distribution agreemen; Popular sports content first of a series of innovative content offerings to be delivered free to email users" Business Wire 1996.

Lexis database, "Pressing E-mail's Mass-Market Advantage; Printable coupons attached to elec. messages make 1-1 marketing a possibility" Mill Hollow Corporation, DM News 1995.

Lexis database, "The marketers are on-lining up for you; Interactive ads, other gimmicks kick off the internet's new era" The Washington Post 1995.

Lexis database, "Firm to offer free net mail" Computerworld 1995.

Lexis database, "Productview interactive to launch free email service this year" IAC (SM) Newsletter Database (TM) M2 Communications, M2 Presswire 1995.

Lexis database, "No shortage of online choices" Mill Hollow Corporation, DM News 1995.

Phillips, *Communications of the ACM*, 34(7):75-83 1991.

Postel et al., Information Sciences Institute, ISI Research Report, "The ISI Experimental Multimedia Mail System" pp. 1-27 1986.

Birman et al., "Exploiting Virtual Synchrony in Distributed Systems" pp. 123-138 1987.

Schroeder et al., *ACM Transactions on Computer Systems*, 2(1):3-23 1984.

Birman et al., *Sun Technology*, pp. 90-104 1989.

Forsdick et al., "Initial Experience with Multimedia Documents in Diamond" pp. 99-113 (ed. H.T. Smith) 1984.

Bulterman et al., A Structure for Transportable, Dynamic Multimedia Documents, USENIX, pp. 137-154, 1991.

CommunicationsWeek, Interactive Age, News to the desktop: Vendors deliver personalized news to users via the Net, 3 pgs. 1996.

Sanders, *Business Week*, PC Meets the TV: The Plot Thickens, pp. 94-95, 1996.

Prodigy promotion, Read all about the Prodigy interactive personal service, the only service of its kind that lets each member of your family personalize it to his or her interests and priorities, 6 pgs.

Ramanathan et al., *Computer Networks and ISDN Systems*, 26:1305-1322 1994.

Journalist User Guide, 1994.

Online Interactive, Inc., miscellaneous advertising, Seattle, WA.

Huang et al., *Software-Practice and Experience*, 24(9):785-800 1994.

Mitchell, *PC World*, "Two Free Programs Deliver News to Your PC" 1996.

Overton, *PC World*, "PointCast 1.1: More Content for News Junkies" 1997.

"Patterns of use, exposure in paper's audiotext system" Newspaper Research Journal (INRS), 16(1):48-59 1995, Dialog Accession No. 02586508, in Dialog® File 484.

"Individual, Inc. elects Michael E. Kolowich as new CEO" News Release, Sep. 3, 1996, Dialog Accession No. 06570702 in Dialog® File 16.

Individual, Inc., announces agreement to acquire FreeLoader, Inc., News Release Jun. 2, 1996, Dialog Accession No. 06306172 in Dialog® File 16.

"Individual, Inc.—company report" Investext, May 1, 1996, pp. 1-16, Dialog Accession No. 06289588 in Dialog® File 16.

"Individual Inc. named breakout company of the year by the Information Industry Association" Business Wire Oct. 23, 1995, p. 10231026, Diolog Accession No. 05782514 in Dialog® File 16.

"Dial-up electronic media director® at low cost introduced by PR Data Systems" News Release Feb. 10, 1989, p. 1, Dialog Accession No. 02140932 in Dialog® File 16.

"Suddenly, Videotex is finding an audience: Boston CitiNet . . . free videotex svcs & charging for advertising" Business Week, Oct. 19, 1987, pp. 92, 94 Dialog Accession No. 01784027 in Dialog® File 16.

"MCI acquires Equifax's stake in FYI Online" Electronic Information Report, Oct. 21, 1994 v.15, n.38, Dialog Accession No. 02592239 in Dialog® File 636.

"Despite summer doldrums, online audience claims 5.6% to 5.52 million" Information & Interactive Services Report, Oct. 7, 1994 v.15, Dialog Accession No. 02541536 in Dialog® File 636.

"Newsnet offers an electronic news clipping service called NewsFlash" Marketing News, Nov. 25, 1983, p. 23, Dialog Accession No. 00969003.

"Home information videotex services will cost subscribers $78/mo by 1990, according to Intnl Resource Development" VideoPrint, Aug. 10, 1981, p. 7, Dialog Accession No. 00679106 in Dialog® File 16.

"Home nformation videotex services are expected to be widely available . . . for the use of the new services" New Release Jul. 27, 1981, pp 1-16, Dialog Accession No. 00659126 in Dialog® File 16.

"The Reuters Business Report" Asia-Pacific Business Report Mar. 4, 1996, Dialog Accession No. 2819020 in Dialog® File 611.

"N.Y. Times Mno. unveiled World Wide Web site, The New York Times on the Web. (Comm Daily Notebook)" Communications Daily, Jan. 23, 1996, v.16, n.15, p. 6(2), Dialog Accession No. 08418048 in Dialog® File 148.

E-mail and voicemail systems. (Evolution of the Paperless Office: Legal Issues Arising out ot Technology in the Workplace, part 1), Employee Relations Law Journal, Winter 1995, 21, n.3, 5-36, Dialog Accession No. 08361735 in Dialog® File 148.

"Paley opens communications consulting firm" PR Newswire Sep. 30, 1983, Dialog Accession No. 01906440 in Dialog® File 148.

"LaserCard™ enables quiet, high quality printing on IBM system/36 and system/38 midrange computers" News Release, Mar. 6, 1988.

"eWorks! Inc. announces eWatch WebAlert—powerful, comprehensive, efficient web site monitoring designed for the corporate user" PR Newswire, Aug. 20, 1996, Dialog Accession No. 00655743 in Dialog® File 621.

"TMS and Mercury mail to develop personalized internet e-mail products" PR Newswire Jun. 14, 1996, Dialog Accession No. 00628917 in Dialog® File 621.

"Media tracking service watches cyberspace: RTV offers ewatch to monitor internet" PR Newswire Feb. 20, 1996, Dialog Accession No. 005811154 in Dialog® File 621.

"The world's most useful online business library adds full-text archives of The New York Times" Business Wire Oct. 31, 1995, Dialog Accession No. 00543679 in Dialog® File 621.

"Newsnet unveils major new enhancements" PR Newswire May 3, 1995, Dialog Accession No. 00516785 in Dialog® File 621.

"Newsnet to convert online system to PLS search software" PR Newswire Nov. 15, 1994, Dialog Accession No. 00502206 in Dialog® File 621.

"Newsnet and American Business Information present business America—online" News Release Mar. 18, 1993, Dialog Accession No. 00350155 in Dialog® File 621.

"Sky Computers chosen as compute processor for Broadcast Data Systems, Inc." News Release Aug. 24, 1992, Dialog Accession No. 00335658 in Dialog® File 621.

"Telebase launches electronic clipping services" PR Newswire May 7, 1991, Dialog Accession No. 00295190 in Dialog® File 621.

"McGraw-Hill news available on Dialcom" News Release Jul. 27, 1988, Dialog Accession No. 00199385 in Dialog® File 621.

"Nexis® adds radio transcripts of Dougherty Daily ad broadcasts" Mar. 11, 1986, Dialog Accession No. 00126985 in Dialog® File 621.

"Mead Data Central adds Trinet databases to Exchange™" Jan. 17, 1986, Dialog Accession No. 00120619 in Dialog® File 621.

"Telecommunications information from Phillips Publishing available online through Newsnet" Jun. 12, 1985, Dialog Accession No. 00117476 in Dialog® File 621.

"New custom file capability for Nexis" May 1, 1985, Dialog Accession No. 0017314 in Dialog® File 621.

"Information Access Company's 10 online databases to be offered through Mead Data Central services" May 1, 1985, Dialog Accession No. 00117313 in Dialog® File 621.

"New subject group files, pricing for Nexis®" May 1, 1985, Dialog Accession No. 00117288 in Dialog® File 621.

"Federal Reserve Board and Consumer Credit Intelligence from Business Publishers, Inc. enhances Newsnet database" Jun. 10, 1985, Dialog Accession No. 00116869 in Dialog® File 621.

"Comprehensive software directory now available on Newsnet" Aug. 29, 1985, Dialog Accession No. 00115864 in Dialog® File 621.

"Internet Current Awareness Service" Searcher: Magazine/Database Prof., v.3 n.10 p. 8(1) Nov./Dec. 1995, Dialog Accession No. 00086120 in Dialog® File 256.

"News Alert to Introduce Real-Time" Information Today, v.12 n.6 p. 14(1), Jun. 1995, Dialog Accession No. 00078844 in Dialog® File 256.

"Online clipping services deliver" PC Today, v.9 n.3 p. 20(4), Mar. 1995, Dialog Accession No. 00075350 in Dialog® File 256.

"Online data push" InformationWEEK n. 619, pp. 61-62, 66, 68, Feb. 24, 1997, Dialog Accession No. 5529660 in Dialog® File 2.

"Add-Free" Information WEEK, n.614, pp. 68, 70, Jan. 20, 1997, Dialog Accession No. 5498711 in Dialog® File 2.

"PC World Online chooses Lanacom to deliver next generation "push" software to mor than half a million monthly online users" Business Wire, Apr. 9, 1997, Dialog Accession No. 00758089 in Dialog® File 621.

"Diamond Multimedia ships the first K56FLEX modems for Macintosh computers" Business Wire Apr. 8, 1997, Dialog Accession No. 00757610 in Dialog® File 621.

"Internet study shows push technology takes up significant bandwidth . . . Sixth International World Wide Web Conference" Business Wire Apr. 7, 1997, Dialog Accession No. 00757278 in Dialog® file 621.

"Diamond Multimedia ships its first 56,000 . . . now available at retail" Business Wire Mar. 24, 1997, Dialog Accession No. 00755527 in Dialog® File 621.

"Florida business news service named among "World's Best" internet newspaper publishers by editor & publisher" Business Wire Apr. 1, 1997, Dialog Accession No. 00753847 in Dialog® File 621.

"ForeFront launches WebWhacker 3.0—. . . just got better" PR Newswire Mar. 24, 1997, Dialog Accession No. 00750722 in Dialog® File 621.

"IFN announces instant news service; . . . ILX to become first distributor" Business Wire Mar. 18, 1997, Dialog Accession No. 00749159 in Dialog® File 621.

"Scala's new CEO brings Madison Avenue and Hollywood perspective to multimedia computer television" PR Newswire Mar. 17, 1997, Dialog Accession No. 00748917 in Dialog® File 621.

"Simware announces alliance with Intermind to push enterprise data to users' desktops" Business Wire, Mar. 12, 1997, Dialog Accession No. 00748045 in Dialog® File 621.

"McAfee announces PC Medic 97 and NetMedic 97; . . . by proactively preventing cmomon Windows 95 problems" Business Wire Mar. 18, 1997, Dialog Accession No. 00747856 in Dialog® File 621.

"FirsFloor software brings 'push' technology to both busniesses and consumers through deals with Microsoft and America Online" PR Newswire Mar. 13, 1997, Dialog Accession No. 00746694 in Dialog® File 621.

"BackWeb to provide push technology for Microsoft Internet Explorer 4.0" PR Newswire Mar. 12, 1997, Dialog Accession No. 00746003 in Dialog® File 621.

"Aurum Software delivers next phase in internet push technology for sales forces" PR Newswire Mar. 11, 1997, Dialog Accession No. 00744816 in Dialog® File 621.

"CNET and inCommon announce delivery of NEWS.COM . . . for desktop delivery of CNET's popular NEWS.COM content" Business Wire Mar. 10, 1997, Dialog Accession No. 00744544 in Dialog® File 621.

"Macromedia's Shockwave brings animation and entertainment to Internet push technology" PR Newswire Feb. 25, 1997, Dialog Accession No. 00744301 in Dialog® File 621.

"ClariNet & Interest!ALERT announce push technology . . . to ClariNet's 200 ISPs and 1.5 million users" Business Wire Mar. 10, 1997, Dialog Accession No. 00744113 in Dialog® File 621.

"NETdelivery announces release of 1.1—a unique push product for the Internet" PR Newswire Mar. 1997, Dialog Accession No. 00744055 in Dialog® File 621.

"StarBurst Communications to bring true "push" technology to the Internet" Business Wire Mar. 3, 1997, Dialog Accession No. 00743147 in Dialog® File 621.

"McAfee launches VirusScan 3.0; . . . detects 100% of viruses in latest secure computing magazine review" Business Wire Mar. 3, 1997, Dialog Accession No. 00741540 in Dialog® File 621.

"McAfee launches enterprise SecureCast; first to deliver . . . ; McAfee and BackWeb pioneer new software distribution channel" Business Wire Feb. 28, 1997, Dialog Accession No. 00740253 in Dialog® File 62.

"Technology industry & corporate customers push Marimba to the top" PR Newswire Feb. 24, 1997, Dialog Accession No. 00737499 in Dialog® File 621.

"Interest!ALERT provides push technology to Island's web site visitors" Business Wire Feb. 4, 1997, Dialog Accession No. 00733654 in Dialog® File 621.

"NETdelivery and iCat announce strategic partnership" PR Newswire Feb. 11, 1997, Dialog Accession No. 00733524 in Dialog® File 621.

"Infoseek delivers personalized, current news via e-mail" PR Newswire Feb. 13, 1997, Dialog Accession No. 00731890 in Dialog® File 621.

"TechWeb's breaking news and information now "pushed". . . techWeb channel keeps . . . " Business Wire Feb. 12, 1997, Dialog Accession No. 00730658 in Dialog® File 621.

"Starfish Software announces corporate 10-user paks . . . now available in new money-saving 10-packs" Business Wire Feb. 6, 1996, Dialog Accession No. 00574412 in Dialog® File 621.

"Starfish Software Inc. introduces "EarthTime"; . . . for online preview and download" Business Wire Jan. 23, 1996, Dialog Accession No. 00569318 in Dialog® File 621.

Starfish Software Inc. introduces "EarthTime"; . . . for online preview and download' Business Wire Jan. 22, 1996, Dialog Accession No. 00569257 in Dialog® File 621.

"Starfish Software Inc. introduces "EarthTime"; . . . for online preview and download" Business Wire Jan. 23, 1996, Dialog Accession No. 00567796 in Dialog® File 621.

"Starfish Software Inc. introduces "EarthTime"; . . . for online preview and download" Business Wire Jan. 23, 1996, Dialog Accession No. 00567795 in Dialog® File 621.

"New classified Central Bank houses rates for over 5,000 U.S. publications" PR Newswire Jan. 17, 1996, Dialog Accession o. 00566464 in Dialog® File 621.

"Microsoft products now available through online interactive's atOnce software" Business Wire Jan. 15, 1996, Dialog Accession No. 00565507 in Dialog® File 621.

"HFS Incorporated, Century 21 Real Estate Corporation . . . consumer real-estate information service" Business Wire Jan. 10, 1996, Dialog Accession No. 00564626 in Dialog® File 621.

"Gartner Group announces internet-based ovantage service" Business Wire Jan. 2, 1996, Dialog Accession No. 00563106 in Dialog® File 621.

"Adobe Systems and PicturWeb form alliance . . . provide consumers with unique digital photo offering" Business Wire Jan. 4, 1996, Dialog Accession No. 00561903 in Dialog® File 621.

"CompassSearch web server search . . . add-on search server adds value to WWW sites" Business Wire Jan. 3, 1996, Dialog Accession No. 00560996 in Dialog® File 621.

"Starfish Software first to leverage Sun's Java . . . Sun's HotJava and Netscape's Navigator 2.0 . . . " Business Wire Nov. 13, 1995, Dialog Accession No. 00545472 in Dialog® File 621.

"Clickshare' one-bill, universal-password access . . . early next year" PR Newswire Sep. 15, 1995, Dialog Accession No. 00544269 in Dialog® File 621.

"Newsday direct available to Prodigy subscribers at no additional fee" Business Wire Oct. 26, 1995, Dialog Accession No. 00543429 in Dialog® File 621.

"Tektronix brings embedded-software engineers more tools for decreasing time to market" News Release Apr. 7, 1995, Dialog Accession No. 00516600 in Dialog® File 621.

"IDG books Worldwide, Inc. and Mecklermedia Corporation sign agreement to publish ten new internet/virtual reality books" PR Newswire Apr. 17, 1995, Dialog Accession No. 00514153 in Dialog® File 621.

Online services growing fast; 32.5% increase in subscribers; Jupiter projects 5 million online by end of 1994' PR Newswire Mar. 9, 1994, Dialog Accession No. 00471819 in Dialog® File 621.

"On-line software maps DB2 direction" News Release Mar. 27, 1991, Dialog Accession No. 00294253 in Dialog® File 621.

"ADR introduced electronic meeting scheduler—new ADR/email facility crosses time zones and data lines" News Release May 31, 1988, Dialog Accession No. 00192162 in Dialog® File 621.

"French firm unveils first Lotus add-in . . . and unattended electronic mail" News Release Nov. 19, 1987, Dialog Accession No. 00175902 in Dialog® File 621.

E-Tailer's Digest in Gifts & Decorative Accessories, www. etailersdigest.com Aug. 1998.

Web Programming Unleashed, Copyright 1996 by Sams.net Publishing, First Edition.

Wireless Wireless Advertising Gets Support From Consumers, file:///J//3367/-2/references/references(general)/advertising.html.

Gambling Online? You Bet!, file:///J//3367/-2/references/references(general)/internetgaming.html, May 3, 1999.

24/7 Media Prospectus, Aug. 13, 1998, pp. 1-43.

Continua Reports—Sep. 1995, file:///J//3367/-2/references/references(general)/riddler—Sep. 1995.htm.

The Journal of American Underground Computer, ISSN 1074-3111, vol. 1, issue 8, Apr. 21, 1995.

Targeted ads soon to pop up—Tech News—CNET.com file:///J//3367/-2/references/references...started in 97)Tech News—CNET_com.htm, Feb. 19, 1997.

EC2@USC—Digital Commerce Center—Internet Advertising, wysiwyg://2/file:/J//3367/-2/references...merce Center—Internet Advertising.htm.

Internet Marketing Disussion list archive: Re: Rotating sponsor banners?, Nov. 29, 1995, file:///J//3367/-2/references/references...g Discussion Fees for Web pages etc.htm.

Internet Marketing Disussion list archive: Re: Rotating sponsor banners?, Dec. 5, 1995, file:///J//3367/-2/references/references(general)/ Re Rotating sponsor banners.htm.

Internet Marketing Discussion list archive: Rotating sponsor banners?, Dec. 2, 1995, file:///J//3367/-2/references/references(general)/ Rotating sponsor banners2.htm.

Internet Marketing Discussion list archive: Rotating sponsor banners?, Nov. 30, 1995, file:///J//3367/-2/references/references(general)/Rotating sponsor banners.htm.

Waxweb v.2.0, Apr. 3, 1995, file:///J//3367/-2/references/references(general)/WAXWEB v2_0.htm.

Vblue International—Web Projects, file:///J//3367/-2/references/reference... International—Web Projects(96-98).htm.

PointCast unveils free news service—Tech News—CNET.com, Feb. 13, 1996, file:///J//3367/-2/references/reference...unveils free news service (Feb 1996).htm.

A component and communication model for push systems[1], presented at ESEC/FSE 00—Joint 7th European Software Engineering Conference 7th ACM SIGSOFT International Symposium on the Foundations of So, Sep. 6-10, 1999, Toulouse, France, file:///J//3367/-2/references/references(General)/push systems.htm.

Bibliografia Utilizzata per la stesura della tesi, http://digilander.iol.it/lmassaron/biblio.html.

Robert H'obbes' Zakon, Hobbes' Internet Timeline v5.6,—the definitive ARPANet& Internet history, http:/www.zakon.org/robert/internet/timeline/.

ADMedium Newsletter, Dec. 1, 1996, file:///J//3367/-2/references/reference.../ADMedium Newsletter (Dec. 1996 Riddler).htm.

TreasureHunt.com—Related Websites, wysiwyg://2/file:/J//3367/-2/references/references(general)/Game Websites.htm.

Net Results: Web Marketing That Works- . . . Media: The Many Faces of Web Advertising, wysiwyg://2/file:/J//3367/-2/references/references...ia The Many Faces of Web Advertising.htm.

Microsoft Explorer Web page, 1995 Microsoft Corporation.

Hyland, IAB Advertising ABC's, "Why Internet Advertising?", http://www.iab.net/advertise/content/adcontent.htm.

PCN, PointCast, Inc., PointCAst 1.0, "we created a splash screen explaining the software," Feb. 1996.

Zakon, Hobbes' Internet Timeline Copyright © 2002, http://www.zakon.org/robert/internet/timeline, 5 pages.

Abstracts from files in info-mac/comm/inet/web Aug. 18, 1996, file:/J//3367/-2/references/references/emails95-96.htm.

Seidman's Online Insider for the Week Ending May 3, 1996, vol. 3, No. 18, http://www.onlineinsider.com/html/archives/050396.html.

Digital Espresso for Aug. 27, 1996, http://www.mentorsoft.com/DE/jn960827.html.

Geocrawler, The KnowledgeArchive, from Tim Maffett Sep. 4, 1996, re: Chime script—[and other Chime news].

The Scout Report—Apr. 5, 1996, A Publication of Internet Scout Computer Science Department, University of Wisconsin, http://scout.cs.wisc.edu/reoprt/sr/1996/scout-960405.html.

The Scout Report—May 3, 1996, A Publication of Internet Scout Computer Science Department, University of Wisconsin, file:///J//3367/-2/references/references...ral)/The Scout Report—May 3, 1996.htm.

Smith, The World-Wide-Web, Dec. 11, 1996, file:///J//3367/-2/references/references(general)/web (Dec. 1995).htm.

Sponsor of the Day Newsletter, Nov. 1995, http://www.cris.com/~raydaly/spon11nw.html.

Abate; "Advertising Sponsorship Is Growing on the Internet"; *Bacon's*; Jul. 1, 1995, News clipping.

Basch; "Interchange Online Network—The Elements for Its Success Are Already in Place"; *Link-Up*; May 1, 1995, 12(3), pp. 8-9; Dialog File 233: Microcomputer Abstracts; 0385575.

Bates; "Electronic Clipping Service. A New Life for SDIs"; *Online*, Jul. 3, 1994, 18(4); pp. 43-47, 49-5; Dialog File 202: Information Science Abs.; 00184574.

Bell; The Electronic Scholar's Assistant; *Computer in Libraries*; Oct. 1990; pp. 15-16; Dialog File 61:LISA; 02087937.

Brisbin; "AppleSearch: The Latest Version of Apple's Information-Retrieval Tool Makes a Great Internet Clipping Service"; *MacUser*, Jun. 1, 1995, 11(6), p. 46, Dialog File 233: Microcomputer Abstracts; 0387029.

Cleland; "A Gaggle of Web Guides Vies For Ads"; *Advertising Age*; Apr. 17, 1995; New clipping.

"DataTimes Announces Major New Search Features, Price Cuts, Search Services & Gateways"; *Database Searcher*, Jun. 1, 1990, 6(5), pp. 27-28; Dialog File 233: Microcomputer Abstracts; 0219825.

"Dateline: Princeton, NJ: Financial Times and The Wall Street Journal Together On Dow Jones News/Retrieval"; *Information Today*; Apr. 1, 1995, 12(4); p. 1, Dialog File 233: Microcomputer Abstracts; 0382372.

Derringer; "Freemark Delays Release of Free E-Mail Until April"; *Bacon's*; Feb. 19, 1996; pp. 1, 20.

Egan; "Online Clipping Services Deliver: Electronic Tools Retrieve News You Can Use"; *PC Today*; Mar. 1, 1995, 9(3), pp. 20-24, Dialog File 233: Microcomputer Abstracts; 0379524.

Farrow; "A Route To The Internet" *Open Computing*, Jun. 1, 1994, 11(6), pp. 105-107, Dialog File 233: Microcomputer Abstracts; 0351749.

"Free E-mail Service Launched by FreeMark"; *Bacon's*; Oct. 1995; News clipping.

Fryxell; "NewsNet Stands Alone—If This Service's 800-Plus Full-Text Industry Newsletters Can't Fill Your Research Needs, Then Nothing Can"; *Link-Up*; Nov. 1, 1994, 11(6), pp. 8-9; Dialog File 233: Microcomputer Abstracts; 0366803.

"GE Debuts GEnie in Europe, Introduces Corporate Clipping Service"; *Link-Up*; Jun. 1, 2990, 7(3); pp. 1, 12, Dialog File 233: Microcomputer Abstracts; 0219292.

Gibson; Skills Count At Network Startup—INS Features Design, Operations Specialists For Hire; *PC Week*; Jan. 23, 1995, 12(3); p. 100; Dialog File 233: Microcomputer Abstract; 0373166.

Gifford et al.; "Boston Community Information System 1987-1988"; *Massachusetts Inst. of Tech., Cambridge. Lab for Computer Science*; May 1989, p. 250; Dialog File 6: NTIS; 1415753.

Gifford et al.; "Clipping Service User's Manual (Version 1.2)"; *Massachusetts Inst. Of Tech., Cambridge. Lab. for Computer Science*; Sep. 1987, p. 28, Dialof File 6: NTIS; 1326877.

**US 7,496,943 B1**

Page 9

Goldberg et al.; U.S. Appl. No. 09/811,173 Entitled Method and System for Playing Games On a Network; filed Mar. 16, 2002.

Goldberg et al.; U.S. Appl. No. 09/830,593 Entitled "A Network Advertising System Providing Games and Services", filed Apr. 26, 2001.

Gutman, "News You Need to Succedd: Electronic Newspapers' Boost Your Effectiveness"; *Success*, Mar. 1990, 38(2), p. 12; Dialog File 2: INSPEC; 03905093.

Harler; "Distribute Coupons Via E-mail" *Bacon's*; Jan. 1996; News clipping.

Hauss; "Technology Gives Early Warning Of News Breaks"; *Public Relations Journal*, May 1995; pp. 18-22.

Hawkins; "Electronic Advertising On Online Information Systems"; *Online*, Mar. 1994, 18(2); pp. 26-39; Dialog File 15: ABI/INFORM; 00836506.

Heywood, "Users Get A Closer Look at Virtual Private Networks—The Lates Monitoring Tools From Service Providers Make Sure Customers Are In The Know About Their Virtual Private Networks"; *Data Communications*; Jun. 1, 1994, 23(9), pp. 85-90, Dialog File 233: Microcomputer Abstracts; 0351803.

"Implementing On-Line Couponing"; *Merchandising/Marketing*; 1996 News clipping.

Kramer; "Remote Possibilities: Gateways Let Remote Users Exchange Mail Via Web Browsers"; *PC Week*; Apr. 15, 1996, 13(15); 3 pages; Dialog File 233: Microcomputer Abstracts; 0420777.

LaRosa, "Marketing Slays The Downsizing Dragon"; *Information Today*; Mar. 1, 1992, 9(3), pp. 58-59, Dialog File 233: Microcomputer Abstracts; 0271126.

Lockwood, "All The News That's Fit to Telecommunicate"; *A+: The Independent Guide for Apple Computing*; Jun. 1986, 4(6), pp. 93-96; Dialog File 233: Microcomputer Abstracts; 0123714.

Maddox; "More Hits For Your Web Sites"; *Net Access*; Feb. 26, 1996; News clipping.

"Madison Avenue's OnLine Leaps" Newpaper Article.

Makulowich; "A Net Explorer's Log"; *Online*; Nov. 1, 1996, 20(6), pp. 40-42; Dialog File 233: Microcomputer Abstracts; 0441925.

Memon; "Free E-mail Is Here, But With Ads Aplenty"; *Bacon's*; Jul. 27, 1995; News clipping.

"News Alert to Introduce Real-Time Electronic Clipping Service"; *Information Today*; Jun. 1, 1995, 12(6); p. 14; Dialog File 233: Microcomputer Abstracts; 0387603.

"NewsNet Newly Enhanced NewsFlash"; *Information Today*; Apr. 1, 1990, 7(4); p. 4, Dialog File 233: Microcomputer Abstracts; 0254449.

O'Connor; "Ads to Pay for Free E-Mail Service" *Bacon's*; Jun. 29, 1995; News clipping.

Ojala, "Staying Alert Via Online Clipping Services"; *Online*; Sep. 1991; 15(5), pp. 80-82.

Rodriquez; "Real-Time Group Conferencing to Ship"; *News/Networking*; Oct. 10, 1994; p. 49.

Roybal et al.; "Large-Scale Demonstration Test Plan For Digface Data Acquisition System", *Lockhead Idaho Technologies, Co.*; Nov. 1994, p. 40; Dialog File 6: NTIS; 1852842.

Rudich, "How Customizable Nes Services Can Help You Reduce Clutter (and Guilt)"; *Link-Up*; Sep. 1, 1996, 13(5); pp. 8-9; Dialog File 233: Microcomputer Abstract; 0435810.

Schoenfeld; "Developers Plan Free E-mail"; *Online Marketplace*; Jun. 1995; 2 pgs.

"Search Services & Gateways"; *Database Searcher*, Jun. 1, 1991, 7(5); p. 31-33; Dialog File 233: MicroComputer Abstracts; 0242553.

Seno; "MultiMedia Information Broadcasting Service "Present""; *IEEE*, 1994, pp. 117-120.

Sherman, "The Executive's NewsStand NewsNet Can Help Track Your Company's Image Your Company, Your Clients and Your Industry"; *Link-Up*, Mar. 1, 1990, 7(2), pp. 20-21; Dialog File 233: Microcomputer Abstracts; 0256018.

Skov; "An Electronic SDI Service For The Danish Chemical Industry and Research"; *Libri*; 1968; 18(3-4), pp. 204-215; Dialog File 61: LISA; 02017349.

Soltes; "Catch The Wave"; *Bacon's*; Aug. 16, 1995, News clipping.

Still; "An Agency's View of Electronic Monitoring"; *Journal of the Society of Motion Picture and Television Engineers*; Mar. 1975; 84(3); p. 172-173; Dialog File 2: INSPEC; 00782712.

"Their E-mail Could Become Free Mail"; *Bacon's*; Jul. 7, 1995; News clipping.

Ubois; "New Shades of Blue: IBM's John Patrick Sees Opportunity For Big Blue All Over The Internet"; *internet World*; Mar. 1, 1995, 6(3); pp. 62-66, Dialog File 233: Microcomputer Abstracts; 0378521.

Van Kirk; "Lotus Notes Tied to Internet"; *News/Networking*; Oct. 10, 1994, p. 49.

Webb; "Telebase Launches Clipping Service ECS May Now Be Accessed by Users Directly Through Telebase"; *Link-Up*, May 1, 1991, 8(3); pp. 1 and 39, Dialog File No. 233: Microcomputer Abstracts; 0240805.

Wilder; "Free E-mail—For A Price"; *Bacon's*; Nov. 27, 1995; News clipping.

Williamson; This E-mail Message is Brought to You by . . . ; *Advertising Age*; Apr. 17, 1995, newclipping.

Wingfield; "Juno offers Free E-mail Service To End-Users"; *Bacon's* Jul. 10, 1995; News clipping.

"Licence for Ronald A. Katz Technology Licensing L.P. Patents Obtained by HP"; *PR News*; Mar. 18, 2002; 4 pgs.

Levitz; "Tallahassee Free-Net: The Keystone of a Florida Network of Community Information Systems"; *Journal of Educational Media and Library Science*; Summer 1994; 31(4); pp. 364-373.

Yan et al.; "SIFT: A Tool for Wide-Area Information Dissemination"; *USENIX Technical Conference*; Jan. 16-20, 1995; pp. 177-186.

Million, "Games People Play"; *Daily Spectrum*, Jun. 9, 1995; 7 pgs.

"Notification of Transmittal of International Preliminary Examination Report" dated Jan. 25, 2001 for International Patent Application Serial No. PCT/US99/25131 with an international filing date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Written Opinion" dated Aug. 16, 2000 for International Patent Application Serial No. PCT/US99/25131 with an international filing date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Notification of Transmittal of the International Search Report or the Declaration" dated Jan. 31, 2000 for International Patent Application Serial No. PCT/US99/25131 with an international filing date of Oct. 26, 1999, and a priority date of Oct. 26, 1998.

"Notification of Transmittal of International Preliminary Examination Report" dated Jan. 12, 1998 for International Patent Application Serial No. PCT/US97/00872 with an international filing date of Jan. 17, 1997, and a priority date of Jan. 19, 1996.

"Notification of Transmittal of the International Search Report or the Declaration" dated May 12, 1997 for International Patent Application Serial No. PCT/US97/00872 with an international filing date of Jan. 17, 1997, and a priority date of Jan. 19, 1996.

"The World Wide Web as a Universal Interface to Government Services"; *Center for Technology in Government, University at Albany/SUNY*; 1996; 136 pgs.

"PAPA 5"; Feb. 1995; http://www.ece.umd/edu/~dstewart/pinball/PAPA5/guide.txt.

"PAPA 6, 1998 World Pinball Championships"; Feb. 1998; http:www.glue.umd.edu/~dstewart/pinball/PAPA 6/.

"Archive of Pervious Versions of My Home Pate"; *Free Software Humor & Jokes Personal*; Version 3. mid, Oct. 1996 to present; 2 pgs.

"Cash is the Riddler's Draw"; Jun. 8, 1995; 1 pg.

"Free Software & Tips"; *Free Software Humor & Jokes Personal*; date unknown; 4 pgs.

"List of Some of Rajiv's Technology Related Work"; *Home Free Software Humor & Jokes Personal*; date unknown; 5 pgs.

Resnick; "WWW> Rotating Sponsorship Banner on WWW Pages"; *Net-Happenings Moderator*; Oct. 28, 1995; 2 pgs.

"Marketing: Ads Delivered In Real Time"; *Northern Light Technology, LLC*; 1997-2002; 2 pgs.

Steinwascher "Expert Report of Dr. Kurt Steinwascher", dated Jun. 6, 2006, 555 pages.

Adams, "Benificial Innovation's Reponse to Electronic Arts[1] and Pogo Corporation's First Set of Interrogatories", Case No. CV 05-5803 JFW (JWJx), Nov. 2005, 37 pages.

QuickTrack Brochure, Jun. 1995, 6 pages.

Koch "Maxim Sponsors blackjack on 'Net", Las Vegas Sun, Oct. 2, 1996, 1 page.

Rosenbloom, "Letter to Julien A. Adams", Dec. 6, 2007, 43 pages.

**US 7,496,943 B1**

Page 10

Nathan, "Trintex Completive Analysis", Robert R. Nathan Associates, Inc., Doc. Page Identifier(s):PRGY 0002-0166,Winter 1987/1988.

Papes, memo subject: "Shopping Application", Doc. Page Identifier(s):PRGY 0168, Nov. 16, 1988.

Bellar, "TPF Driver System", Doc. Page Identifier(s):PRGY 0169-0178, Apr. 17, 1985.

Merritt, "Trintex Keyword Architecture", Doc. Page Identifier(s):PRGY 0180-0226, Aug. 11, 1986.

Ragusa, "Commercial Analysis Report", Doc. Page Identifier(s):PRGY 0227-0239, Dec. 1988.

Author unknown, "Reception System Functional Objectives", Doc. Page Identifier(s):PRGY 0240-0310, Jan. 15, 1986.

Author unknown, "Reception Systems Functional Specifications", Doc. Page Identifier(s):PRGY 0311-0356, Feb. 20, 1986.

Beattie, memo subject: "PODB Definitions", Doc. Page Identifier(s):PRGY 0358-0381, Sep. 26, 1986.

Ashkennas et al., memo subject: "Producer System", Doc. Page Identifier(s):PRGY 0382-0394, Sep. 17, 1986.

Author unknown, memo subject: "Heading ID's", Doc. Page Identifier(s):PRGY 0395, date unknown.

Author unknown, memo subject: "Network Naming Standards", Doc. Page Identifier(s):PRGY 0396-0398, date unknown.

Ashkennas, memo subject: "Interface Task Force Minutes", Doc. Page Identifier(s):PRGY 0399-0401, May 29, 1986.

Ashkennas, memo subject: "Producer 2 Batch Code", Doc. Page Identifier(s):PRGY 0402-0431, May 15, 1986.

Ashkennas, memo subject: "Interface Task Force Minutes", Doc. Page Identifier(s):PRGY 0432-0435, Jun. 2, 1986.

Author unknown, memo subject: "Producer Tools", Doc. Page Identifier(s):PRGY 0436-0437, Sep. 22, 1986.

Author unknown, memo subject: "Producer System", Doc. Page Identifier(s):PRGY 0438-0439, date unknown.

Ashkennas, et al., memo subject: "Producer System Interim Plan", Doc. Page Identifier(s):PRGY 0440-0478, Sep. 17, 1986.

Ashkennas, et al., memo subject: "Producer Systems/Applications Development Interim Transition Plan", Doc. Page Identifier(s):PRGY 0479-0502, Aug. 21, 1986.

Bracken, memo subject: "Producer Host Envir. Spec.", Doc. Page Identifier(s):PRGY 0503-0589, Aug. 27, 1986.

Author unknown, memo subject: "The Producer—App. Interface", Doc. Page Identifier(s):PRGY 0590-0592, date unknown.

Ragusa, memo subject: "Commercial Analysis Report", Doc. Page Identifier(s):PRGY 0593-0605, Dec. 1988.

Pooth, memo subject: "TPF Driver Demo Project", Doc. Page Identifier(s):PRGY 0606-0658, Jul. 9, 1985.

Author unknown, memo subject: "Trintex Application Model Dev. Proposal", Doc. Page Identifier(s):PRGY 0655-0690, Aug. 1985.

Author unknown, memo subject: "Question and Answer Models", Doc. Page Identifier(s):PRGY 0691-0709, Nov. 1, 1985.

Author unknown, memo subject: "Objectives of the Task Force", Doc. Page Identifier(s):PRGY 0710-0728, date unknown.

Dawley, memo subject: "Richard Merritt's Promotion", Doc. Page Identifier(s):PRGY 0729, Oct. 16, 1986.

Author unknown, memo subject: "Reception System/Api Team Reorganization", Doc. Page Identifier(s):PRGY 0730, date unknown.

Sederholm, memo subject: "Design Review", Doc. Page Identifier(s):PRGY 0731-0732, Feb. 21, 1986.

Author unknown, memo subject: "Publishing—Early Launch Work Plan", Doc. Page Identifier(s):PRGY 0733-0739, Nov. 20, 1985.

Dawley, memo subject: "App. Group Model (AGM)", Doc. Page Identifier(s):PRGY 0740, Feb. 6, 1986.

Dawley, memo subject: "Routing Slip", Doc. Page Identifier(s):PRGY 0741, Jan. 25, year unknown.

Author unknown, memo subject: "Chart", Doc. Page Identifier(s):PRGY 0742-0744, date unknown.

Author unknown, memo subject: "Reception System Issues", Doc. Page Identifier(s):PRGY 0745-0779, Aug. 8, 1986.

Author unknown, memo subject: "Retail Dependencies", Doc. Page Identifier(s):PRGY 0780, date unknown.

Appleman, memo subject: "Issues and Actions", Doc. Page Identifier(s):PRGY 0781-0782, Jan. 21, 1987.

Abrahams, memo subject: "Filter and Memory Problems", Doc. Page Identifier(s):PRGY 0783-0785, May 26, 1987.

Appleman, memo subject: "A Discussion of the State of the Trintex", Doc. Page Identifier(s):PRGY 0786-0791, May 28, 1987.

Dawley, memo subject: "Survey of keyword lengths", Doc. Page Identifier(s):PRGY 0792, Feb. 18, 1987.

Author unknown, memo subject: "API Planning Session", Doc. Page Identifier(s):PRGY 0793-0800, Aug. 27, 1986.

Dawley, memo subject: "Your memo of Feb. 3, 1986", Dog. Page Identifier(s):PRGY 0801-0805, Feb. 10, 1986.

Sederholm, memo subject: "TBOL Ref.", Doc. Page Identifier(s):PRGY 0806-0809, Feb. 3, 1986.

MacAry, memo subject: "AVT Storyboard Issues", Doc. Page Identifier(s):PRGY 0810-0812, Feb. 17, 1986.

Langer, memo subject: "Client Development", Doc. Page Identifier(s):PRGY 0813, Mar. 5, 1986.

Bellar et al., memo subject: "TPF Driver System", Doc. Page Identifier(s):PRGY 0814-0822, Apr. 12, 1985.

Author unknown, memo subject: "Trintex System Architecture", Doc. Page Identifier(s):PRGY 0823-0847, May 15, 1985.

Author unknown, memo subject: "Initial Product Req.", Doc. Page Identifier(s):PRGY 0848-0849, Jan. 8, 1986.

Author unknown, memo subject: "Study Group Objectives", Doc. Page Identifier(s):PRGY 0850, date unknown.

Urbanski, memo subject: "Formalization of the development of Trintex", Doc. Page Identifier(s):PRGY 0851, Mar. 18, 1986.

Author unknown, memo subject: "Driver 1", Doc. Page Identifier(s):PRGY 0852, Jun. 30, 1985.

Bellar, memo subject: "Establishing a reliable and effective procedure", Doc. Page Identifier(s):PRGY 0853-0862, Aug. 28, 1985.

Appleman, "APPL CORE", Doc. Page Identifier(s):PRGY 0863-0899, Mar. 18, 1988.

Author unknown, "Table of Contents", Doc. Page Identifier(s):PRGY 0901-0953, date unknown.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0954-0955, Apr. 9, year unknown.

Author unknown, "Notes", Doc. Page Identifier(s):PRGY 0956; Mar. 29, 1985.

Author unknown, "Chart", Doc. Page Identifier(s):PRGY 0957, Apr. 12, 1985.

Author unknown, "Notes", Doc. Page Identifier(s):PRGY 0958-0960, Mar. 29, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0961, Apr. 2, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0962, Apr. 3, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0963, Apr. 8, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0964-0966, Apr. 3, 1985.

Author unknown, "Notes", Doc. Page Identifier(s):PRGY 0967-0968, Apr. 4, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0969, Apr. 8, 1985.

Author unknown, "Task Force Notes", Doc. Page Identifier(s):PRGY 0970, Apr. 3, 1985.

Author unknown, "Trintex Architecture", Doc. Page Identifier(s):PRGY 0971-0975, Mar. 31, 1985.

Author unknown, "General Ground Rules Notes", Doc. Page Identifier(s):PRGY 0976-0988, date unknown.

Memo subject: "Trintex System Proposal", Doc. Page Identifier(s):PRGY 0989, date unknown.

Author unknown, memo subject: "Data collection Requirements Notes", Doc. Page Identifier(s):PRGY 0990, date unknown.

Author unknown, memo subject: "Business System Interface Notes", Doc. Page Identifier(s):PRGY 0991, Mar. 15, 1985.

Author unknown, memo subject: "TPF2 Functions", Doc. Page Identifier(s):PRGY 0992-1000, Mar. 26, 1985.

Author unknown, memo subject: "Mission Notes", Doc. Page Identifier(s):PRGY 1001-1014, date unknown.

Schwartz, memo subject: "Delivery System Launch Obj.", Doc. Page Identifier(s):PRGY 1015-1038, Mar. 6, 1985.

Author unknown, memo subject: "Reception Subsystems Notes", Doc. Page Identifier(s):PRGY 1039, Apr. 2, 1985.

Author unknown, memo subject: "High Level Function Placement", Doc. Page Identifier(s):PRGY 1040-1047, Mar. 26, 1985.

Author unknown, memo subject: "Reception Subsystems Notes", Doc. Page Identifier(s):PRGY 1048, Apr. 2, 1985.

Author unknown, memo subject: "Keywords Notes", Doc. Page Identifier(s):PRGY 1049-1052, Mar. 22, 1985.

Author unknown, memo subject: "Matrix", Doc. Page Identifier(s):PRGY 1053-1067, date unknown.

Wolf, memo subject: "Notes", Doc. Page Identifier(s):PRGY 1068, Mar. 26, 1985.

Author unknown, memo subject: "High Level Function Placement", Doc. Page Identifier(s):PRGY 1069-1076, Mar. 26, 1985.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1077-1078, Mar. 19, 1985.

Sweeney, memo subject: "Notes", Doc. Page Identifier(s):PRGY 1079, Mar. 19, year unknown.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1080-1081, Mar. 19, 1985.

Author unknown, memo subject: "Meeting Today", Doc. Page Identifier(s):PRGY 1082, Mar. 25, 1985.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1083, Mar. 19, 1985.

Author unknown, memo subject: "Trintex Architecture Group Work Plan", Doc. Page Identifier(s):PRGY 1084-1085, date unknown.

Author unknown, memo subject: "Task Desc. Notes", Doc. Page Identifier(s):PRGY 1086, Mar. 22, year unknown.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1087, Mar. 15, 1985.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1088, Mar. 14, 1985.

Author unknown, memo subject: "Application Layer Notes", Doc. Page Identifier(s):PRGY 1089-1091, date unknown.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1092-1094, date unknown.

Author unknown, memo subject: "Function Placement Notes", Doc. Page Identifier(s):PRGY 1095, date unknown.

Author unknown, memo subject: "Arch. Group Notes", Doc. Page Identifier(s):PRGY 1096-1097, Mar. 20, 1985.

Author unknown, memo subject: "Arch Overview Notes", Doc. Page Identifier(s):PRGY 1098, Mar. 14, 1985.

Author unknown, memo subject: "Application Program Interface", Doc. Page Identifier(s):PRGY 1100, date unknown.

Author unknown, memo subject: "Object for TTS_MNU01", Doc. Page Identifier(s):PRGY 1101, Feb. 17, 1986.

Author unknown, memo subject: "Notes", Doc. Page Identifier(s):PRGY 1102, date unknown.

Author unknown, memo subject: "Trintex", Doc. Page Identifier(s):PRGY 1103-1113, date unknown.

Heilbrunn memo subject: "Production Description", Doc. Page Identifier(s):PRGY 1114-1169, Mar. 31, 1986.

Author unknown, memo subject: "Founding and Charter Member Satisfaction Survey", Doc. Page Identifier(s):PRGY 1171-1211, Sep. 1988.

Author unknown, memo subject: "Strategy Conference", Doc. Page Identifier(s):PRGY 1212-1217, 1993.

Edelhart "Ten Commandments, Revisited", PC Week, Doc. Page Identifier(s): PRGY 1218-1219, May 30, 1988.

Author unknown, memo subject: "Qualitative Analysis: Prodigy Interactive Personal Service: "The Market" Focus Groups", Elrick and Lavidge, inc., Doc. Page Identifier(s):PRGY 1220-1241, Oct. 1988.

Day, memo subject: "September Executive Measurements Package", Doc. Page Identifier(s):PRGY 1242-1244, Oct. 21, 1988.

"Targeting Consumer Influentials", The Public Pulse, Doc. Page Identifier(s): PRGY 1245-1248, Mar. 1988, 4 pages.

"Information Gateways—New Life For Videotex?", Institute For The Future, Doc. Page Identifier(s): PRGY 1249, May 1988, 1 page.

"E-Mail Vendors", O'Dwyer's PR Services Report, Doc. Page Identifier(s): PRGY 1250-1251, Jun. 1988.

Carroll "IBM Unveils Midrange Computer Line In Bid To Reverse Slide in Market Share", The Wall Street Journal, Doc. Page Identifier(s): PRGY 1252, Jun. 22, 1988.

"Captain lacks popularity", Japan Economic Journal, Doc. Page Identifier(s): PRGY 1253, Mar. 29, 1986.

Mochizuki et al., "Digital Videotex System", Review of the Electrical Communication Laboratories, vol. 32, No. 6, 1984, 1044-1050, Doc. Page Identifier(s): PRGY 1254-1260.

Nakano et al., "Digital Videotex Communication Processing Equipment", Review of the Electrical Communication Laboratories, vol. 32, No. 6, 1984, 1051-1057, Doc. Page Identifier(s): PRGY 1261-1267.

Ito "Captain Commercial Service Starts Now", JTR, Doc. Page Identifier(s): PRGY 1268-1276, Jan. 1985, pp. 17-25.

Kobayashi et al., "Videotex Terminals for the INS Model System", Review of the Electrical Communication Laboratories, vol. 33, No. 2, 1985, p. 277-283, Doc. Page Identifier(s): PRGY 1277-1283.

Hecht, "What You Can Get Online", Computers & Electronics, Doc. Page Identifier(s): PRGY 1284-1297, Feb. 1985.

Leichtman, "Making Online Databases Useful", Computers & Electronics, Doc. Page Identifier(s): PRGY 1289-1291, Feb. 1985.

"Guide To Online Information Services", Computers & Electronics, Doc. Page Identifier(s): PRGY 1292-1294, Feb. 1985.

"Database Aids", Computers & Electronics, Doc. Page Identifier(s): PRGY 1295, Feb. 1985.

Weis, memo subject: "Prodigy Services Company June 6 comments", Doc. Page Identifier(s):PRGY 1298-1326, Jun. 7, 1988.

Author unknown, "The Prodigy Service Background", Doc. Page Identifier(s):PRGY 1327-1329, date unknown.

Author unknown, memo subject: "Prodigy Services Company", Doc. Page Identifier(s):PRGY 1330, date unknown.

"Final Report Prodigy Kroger Grocery Shopping Service", Elrick and Lavidge, inc., Doc. Page Identifier(s): PRGY 1331-1356, Sep. 1988.

Author unknown, memo subject: "Trintex Questions and Answers", Doc. Page Identifier(s):PRGY 1357-1371, date unknown.

Author unknown, memo subject: "Reception System Technical Review", Doc. Page Identifier(s):PRGY 1372-1427, date unknown.

Horowitz, "TLPEO4010", Doc. Page Identifier(s):PRGY 1428, Jun. 9, 1986.

Horowitz, "TLCR0000.DEF", Doc. Page Identifier(s):PRGY 1429, Apr. 16, 1986.

Horowitz, "TLPH4010", Doc. Page Identifier(s):PRGY 1430, Jun. 17, 1986.

Horowitz, "TLCP0040", Doc. Page Identifier(s):PRGY 1431, Apr. 16, 1986.

Horowitz, "TLCR0040", Doc. Page Identifier(s):PRGY 1432, Jun. 17, 1986.

Author unknown, "Reception System Technical Review", Doc. Page Identifier(s):PRGY 1433-1441, date unknown.

Author unknown, "Reception System", Doc. Page Identifier(s):PRGY 1442-1466, Jun. 18, 1986.

Author unknown, "Membership Marketing Agenda", Doc. Page Identifier(s):PRGY 1468-1516, 1988.

Mandel "Interactive Consumer Information Services", SRI International, Doc. Page Identifier(s):PRGY 1517-1554, 1988.

Aumente "The New Wave Of Computer Information Services", Washington Journalism Review, Doc. Page Identifier(s):PRGY 1555-1558, Nov. 10, 1988.

Barmash "No Major Cuts Expected in Advertising by Sears", New York Times, Doc. Page Identifier(s): PRGY 1559, Nov. 10, 1988.

"Virus fears stalk companies" USA Today, Doc. Page Identifier(s): PRGY 1560-1561, Nov. 10, 1988.

"The Prodigy Approach To The Mass Market", The Seelinger Letter, Doc. Page Identifier(s): PRGY 1562-1574, Aug. 25, 1988.

Amparano et al., "Phone Firms Battle Cable-TV Operators Over Providing Fiber-Optic Home Links", The Wall Street Journal, Doc. Page Identifier(s): PRGY 1575-1576, Sep. 9, 1988.

"Joe Anonini Shakes Up Kmart", Gallagher Report, Doc. Page Identifier(s): PRGY 1577, Aug. 8, 1988.

Mangum "Business cable to launch show on PCs", Gannett Westchester Newspapers, Doc. Page Identifier(s): PRGY 1578, Sep. 5, 1988.

Miller et al., "New Big Blue Akers's Drive to Mend IBM Is Shaking Up Its Vaunted Traditions", The Wall Street Journal, Doc. Page Identifier(s): PRGY 1579-1581, Nov. 11, 1988.

Author unknown, "Retail Sales Training Kit", Doc. Page Identifier(s): PRGY 1582-1599, date unknown.

Author unknown, "Trintex Assistant Design Document", Doc. Page Identifier(s): PRGY 1602-1604, date unknown.

Galambos, memo subject: "Human Factors Driver 7.1 Report", Doc. Page Identifier(s): PRGY 1605-1630, Jun. 26, 1987.

Merritt, memo subject: "Your Memo dated Feb. 26", Doc. Page Identifier(s): PRGY 1631-1632, date unknown.

Author unknown , "Charts", Doc. Page Identifier(s): PRGY 1633-1637, Apr. 4, 1986.

Tummolo, memo subject: "leave zip Phase I Implementation Design", Doc. Page Identifier(s): PRGY 1638-1640, Feb. 23, 1987.

Tummolo, memo subject: "leave zip Phase I Implementation Design", Doc. Page Identifier(s): PRGY 1641-1643, Feb. 23, 1987.

Tummolo, memo subject: "leave/zip Phase I Detail Design", Doc. Page Identifier(s): PRGY 1645-1646, Feb. 23, 1987.

Author unknown, "Look/Zip Design Considerations", Doc. Page Identifier(s): PRGY 1647-1654, Feb. 3, 1987.

Gitlitz, memo subject: "Content Architecture", Doc. Page Identifier(s): PRGY 1655-1659, Mar. 9, 1987.

Author unknown, "Notes", Doc. Page Identifier(s): PRGY 1660-1662, Feb. 10, 1987.

Briney, memo subject: "Trintex Assistant Feedback", Doc. Page Identifier(s): PRGY 1663, Feb. 22, 1987.

Author unknown, "Viewpath, PS Development", Doc. Page Identifier(s): PRGY 1664-1682, date unknown.

Merritt, memo subject, "Trintex assistant Project Plan", Doc. Page Identifier(s): PRGY 1683-1686, Feb. 18, 1987.

Galambos, memo subject: "Guide", Doc. Page Identifier(s): PRGY 1687-1689, Feb. 19, 1987.

Author unknown, "Memo", Doc. Page Identifier(s): PRGY 1690, date unknown.

Goldes, memo subject: "Single Key Help Access", Doc. Page Identifier(s): PRGY 1691-1692, Feb. 3, 1987.

MacAry, memo subject: "Perf. Plan for Richard Merritt", Doc. Page Identifier(s): PRGY 1693-1694, Jan. 28, 1987.

Rothman, memo subject: "Zip", Doc. Page Identifier(s): PRGY 1695-1696, Jan. 29, 1987.

Author unknown, "Where Questions", Doc. Page Identifier(s): PRGY 1697-1699, date unknown.

Heilbrunn, memo subject: "Image Capture", Doc. Page Identifier(s): PRGY 1700-1702, Mar. 5, 1987.

Mueller, memo subject: "Trintex Assistant Harford", Doc. Page Identifier(s): PRGY 1703, Feb. 9, 1987.

Merritt, memo subject: "Trintex Assistant Project Plan", Doc. Page Identifier(s): PRGY 1704-1707, Feb. 18, 1987.

Galambos, memo subject., "Trintex Assistant Application Coding", Doc. Page Identifier(s): PRGY 1708, Jan. 20, 1987.

Author Unknown, memo subject: "Trintex Assistant Capabilities", Doc. Page Identifier(s): PRGY 1709-1711, Aug. 15, 1987.

Merritt, memo subject: "Trintex Assistant Functions", Doc. Page Identifier(s): PRGY 1712-1713, Aug. 15, 1987.

Galambos, memo subject: "Copy/File for Hartford", Doc. Page Identifier(s): PRGY 1714-1715, Jan. 26, 1987.

Starr Software Inc., "Invoice to Computer City", Doc. Page Identifier(s): PRGY 1716-1717, Jan. 30, 1987.

Author unknown, "Trintex Assistant Status", Doc. Page Identifier(s): PRGY 1718-1727, Jan. 13, 1987.

Matyckas, "Trintex Assistant Reception System Implementation Issues", Doc. Page Identifier(s): PRGY 1728-1731, Mar. 20, 1987.

Matyckas, "Simplified Process Flow of the Keyboard Mgr.", Doc. Page Identifier(s): PRGY 1732-1741, Mar. 20, 1987.

Author unknown, "Menu", Doc. Page Identifier(s): PRGY 1742, date unknow.

Heilbrunn, memo subject: "Trintex Assistant Versioning", Doc. Page Identifier(s): PRGY 1743, Nov. 23, 1987.

Galambos, memo subject: "Decoder Macros for Physical Key Names", Doc. Page Identifier(s): PRGY 1744-1745, May 6, 1987.

Heilbrunn, memo subject: "Comments", Doc. Page Identifier(s): PRGY 1746, Oct. 28, 1987.

Author unknown, "TTX Assistant", Doc. Page Identifier(s): PRGY 1747, Oct. 10, 1987.

Author unknown, "Out of Plan in Order of Priority", Doc. Page Identifier(s): PRGY 1748, Oct. 7, 1987.

Galambos, memo subject: "Your Trintex Assistant Memo of Feb. 2, 1987", Doc. Page Identifier(s): PRGY 1749-1750, Feb. 19, 1987.

Author unknown, "Viewpath Programs(Driver 5)", Doc. Page Identifier(s): PRGY 1754, Jul. 16, 1986.

Tummolo, "Viewcopy", Doc. Page Identifier(s): PRGY 1755, Jul. 16, 1986.

Tummolo, "ViewP1", Doc. Page Identifier(s): PRGY 1756, Jul. 15, 1986.

Tummolo, "ViewP2", Doc. Page Identifier(s): PRGY 1757-1759, Jul. 14, 1986.

Tummolo, "ViewP3", Doc. Page Identifier(s): PRGY 1760, Jul. 14, 1986.

Tummolo, "ViewP4", Doc. Page Identifier(s): PRGY 1761, Jul. 15, 1986.

Tummolo, "ViewP5", Doc. Page Identifier(s): PRGY 1762-1763, Jul. 16, 1986.

Tummolo, "ViewP6", Doc. Page Identifier(s): PRGY 1764-1765, Jul. 16, 1986.

Tummolo, "ViewP8", Doc. Page Identifier(s): PRGY 1766, Jul. 16, 1986.

Merritt, memo subject: "Enhancements", Doc. Page Identifier(s): PRGY 1767-1768, Sep. 9, 1987.

Merritt, memo subject: "Trintex Assistant Project Plan", Doc. Page Identifier(s): PRGY 1769-1773, Feb. 18, 1987.

Leibman, memo subject: "memo (title unknown)", Doc. Page Identifier(s): PRGY 1774, date unknown.

Author unknown, memo subject "Jumpwords", Doc. Page Identifier(s): PRGY 1775-1779, date unknown.

Goldes, memo subject: "Design Spec: Help Hub", Doc. Page Identifier(s): PRGY 1780-1791, Apr. 22, 1987.

Author unknown, memo subject: "Trintex Code Promotion", Doc. Page Identifier(s): PRGY 1792-1793, Apr. 15, 1987.

Author unknown, memo subject: "Browse-D7.Hold.Tbolo", Doc. Page Identifier(s): PRGY 1794, Jun. 5, 1987.

Galambos, memo subject: "Copy/File for Hartford", Doc. Page Identifier(s): PRGY 1795-1796, Jan. 26, 1987.

Briney, memo subject: "Generic Copy Approach", Doc. Page Identifier(s): PRGY 1797-1799, Feb. 22, 1987.

Galambos, memo subject: "13 byte jumpwords", Doc. Page Identifier(s): PRGY 1800, Feb. 25, 1987.

Heyman, memo subject: "Keywords, Jumpwords", Doc. Page Identifier(s): PRGY 1801-1805, Mar. 5, 1987.

Galambos, memo subject: "User Profiles", Doc. Page Identifier(s): PRGY 1806-1812, Feb. 6, 1987.

Goldes, memo subject: "Help Guidelines", Doc. Page Identifier(s): PRGY 1813-1841, Apr. 7, 1987.

Galambos, memo subject: "Decoder Macros for Phys. Key names", Doc. Page Identifier(s): PRGY 1842-1843, May 6, 1987.

Author unknown, "Trintex Assist.", Doc. Page Identifier(s): PRGY 1844-1851, Apr. 27, 1987.

Author unknown, memo subject: "Guide", Doc. Page Identifier(s): PRGY 1852-1893, Feb. 19, 1987.

Tummolo, memo subject: "Leave/zip external dependencies", Doc. Page Identifier(s): PRGY 1894-1895, Apr. 2, 1987.

Galambos, memo subject: "Your Trinex Assit memo of Feb. 2, 1987", Doc. Page Identifier(s): PRGY 1896-1897, Feb. 19, 1987.

Beall, memo subject: "Trintex Assist.", Doc. Page Identifier(s): PRGY 1898-1899, Feb. 2, 1987.

Author unknown, memo subject: "Harford Development Plan", Doc. Page Identifier(s): PRGY 1900-1902, Date unknown.

Gitlitz, memo subject: Content Architecture, Doc. Page Identifier(s): PRGY 1903-1905, Feb. 27, 1987.

Tummolo, memo subject: "Menu Issues", Doc. Page Identifier(s): PRGY 1906, Oct. 16, 1986.

Briney, memo subject: "Generic Copy Approach", Doc. Page Identifier(s): PRGY 1907-1909, Feb. 22, 1987.

Author unknown, memo subject: "Notes", Doc. Page Identifier(s): PRGY 1910, Date unknown.

Carney, memo subject: "Guide Maps", Doc. Page Identifier(s):PRGY 1911, Feb. 26, 1987.

Gitlitz, memo subject: Holding Frame, Doc. Page Identifier(s):PRGY 1912, Feb. 20, 1987.

Galambos, memo subject: "File", Doc. Page Identifier(s):PRGY 1913, Feb. 23, 1987.

Galambos, memo subject: "Copy/File for Hartford", Doc. Page Identifier(s):PRGY 1914, Feb. 23, 1987.

Galambos, memo subject: "Jumpwords and Architecture", Doc. Page Identifier(s):PRGY 1915, Feb. 5, 1987.

Tummolo, memo subject: "TTX Assist.", Doc. Page Identifier(s): PRGY 1916, Feb. 17, 1987.

Tummolo, memo subject: "TTX Assist", Doc. Page Identifier(s):PRGY 1917, Feb. 17, 1987.

Author unknown, memo subject: "Screen Description", Doc. Page Identifier(s):PRGY 1918-1926, Date unknown.

Dorst, memo subject: "Service Date", Doc. Page Identifier(s):PRGY 1927, Dec. 8, 1988.

Author unknown, memo subject: "Proposal for Richard Merritt", Doc. Page Identifier(s):PRGY 1928-1929, Date unknown.

Author unknown , memo subject: "Notes", Doc. Page Identifier(s):PRGY 1930, Date unknown.

Merritt, "Quick Quotes", Doc. Page Identifier(s):PRGY 1931-1934, Mar. 30, 1988.

Author unknown, memo subject: "Quick Quotes", Doc. Page Identifier(s):PRGY 1935 Mar. 22, 1988.

Author unknown, memo subject: "PCS2—Network Simulator", Doc. Page Identifier(s):PRGY 1936, Mar. 29, 1988.

Author unknown, memo subject: "Quick Quotes", Doc. Page Identifier(s):PRGY 1937-1941, Mar. 30, 1988.

Author unknown, memo subject: "Quick Quotes", Doc. Page Identifier(s):PRGY 1942-1945, Mar. 22, 1988.

Author unknown, memo subject: "Current Stocks", Doc. Page Identifier(s):PRGY 1946-1952 Mar. 30, 1988.

Author unknown, memo subject: "Notes on Dow Jones", Doc. Page Identifier(s):PRGY 1953 Mar. 15, 1988.

Author unknown, API Support Group Weekly Bulletin, Doc. Page Identifier(s):PRGY 1954, Apr. 10, 1987.

Author unknown, memo subject: "API Support Group Notes", Doc. Page Identifier(s):PRGY 1955-1964, Apr. 7, 1987.

Author unknown, memo subject: "API Planning Session", Doc. Page Identifier(s):PRGY 1965-1980, Aug. 26, 1987.

Author unknown, memo subject: "API Planning Session", Doc. Page Identifier(s):PRGY 1981-1985, Aug. 27, 1987.

Merritt, memo subject: "Application Development", Doc. Page Identifier(s):PRGY 1986-1987, Mar. 14, 1986.

Author unknown, "Dialogue with Hewitt", Doc. Page Identifier(s):PRGY 1988, Nov. 1985.

Stewart, "Notes", Doc. Page Identifier(s):PRGY 1989-1990 Apr. 19, 1985.

Author unknown, memo subject: "Assumptions about object+traffic", Doc. Page Identifier(s):PRGY 1991-1997 4/18?.

Author unknown, memo subject: "Incompletely determined objects", Doc. Page Identifier(s):PRGY 1998-1999 4/19?.

Author unknown, memo subject: "Unique Keys", Doc. Page Identifier(s):PRGY 2000-2001, 4/19/?.

Author unknown, memo subject: "Applications", Doc. Page Identifier(s):PRGY 2002-2005, 4/18/?.

Merritt, memo subject: "Notes on TPF Classes", Doc. Page Identifier(s):PRGY 2006-2008, May 10, 1985.

Author unknown, memo subject: "Notes to Norm", Doc. Page Identifier(s):PRGY 2009-2010, 9/18/?.

Esposito, memo subject: "TPF Task Force Results", Doc. Page Identifier(s):PRGY 2011-2012, Mar. 11, 1986.

Maggie, memo subject: "System Dev. Training Program", Doc. Page Identifier(s):PRGY 2013-2014, Mar. 11, 1986.

Merritt, memo subject: "UAL Next Week", Doc. Page Identifier(s):PRGY 2015-2016, Mar. 26, 1986.

Hewitt, "Letter to United Airlines (Kotar)", Doc. Page Identifier(s):PRGY 2017-2018, Dec. 18, 1985.

Merritt, memo subject: "Achievement Ward", Doc. Page Identifier(s):PRGY 2019-2025, Feb. 27, 1986.

Merritt, memo subject: "Application Development", Doc. Page Identifier(s):PRGY 2026-2027, Mar. 14, 1986.

Merritt (Notes from Richard), memo subject: "For the API Support Group", Doc. Page Identifier(s):PRGY 2028-2029, date unknown.

Author unknown, memo subject: "3 Topics", Doc. Page Identifier(s):PRGY 2039-2033, 3/4?.

Merritt, memo subject: "Application programmers reference manual", Doc. Page Identifier(s):PRGY 2034-2037, Jul. 23, 1986.

Merritt, memo subject: "API Support Group Status", Doc. Page Identifier(s):PRGY 2038-2044, Jul. 23, 1986.

Author unknown, memo subject: "Notes for the Month of August", Doc. Page Identifier(s):PRGY 2045-2046, date unknown.

Author unknown, memo subject: "APi Planning Session", Doc. Page Identifier(s):PRGY 2047-2048, Mar. 19, 1986.

Merritt, memo subject: "Tasks for the API coordination Group", Doc. Page Identifier(s):PRGY 2049-2054, Mar. 25, 1986.

Author unknown, "API Cordiation/support Group", Doc. Page Identifier(s):PRGY 2055-2060, date unknown.

Author unknown, "Standard Form application Documentation", Doc. Page Identifier(s):PRGY 2061-2083, date unknown.

Author unknown, "Product Design System Flow", Doc. Page Identifier(s):PRGY 2084-2086,date unknown.

Author unknown, "Product Design Panels", Doc. Page Identifier(s):PRGY 2087-2097, Jun. 16, 1986.

Author unknown, "Discussion Draft/Notes", Doc. Page Identifier(s):PRGY 2098-2099, May 29, 1986.

Urbanski, memo subject: "Nonprogramming environment for application development", Doc. Page Identifier(s):PRGY 2100-2102, Jun. 27, 1986.

Dawley, "GDA/ADW Dawley Presentation", Doc. Page Identifier(s):PRGY 2103-2116, Jun. 27, 1986.

Harmse, memo subject: "PS Development", Doc. Page Identifier(s):PRGY 2117-2118, Feb. 2, 1986.

Author unknown , memo subject: "Delivery Plan Highlights", Doc. Page Identifier(s):PRGY 2119-2120, Jan. 17, 1985.

Author unknown , memo subject: "Trintex Launch Level", Doc. Page Identifier(s):PRGY 2121-2150, Jan. 27, 1986.

Author unknown , memo subject: "Trintex Launch Level", Doc. Page Identifier(s):PRGY 2153-2312, Jan. 27, 1986.

Author unknown, "4.0 Functional Additions", Doc. Page Identifier(s):PRGY 2200-2299, date unknown.

Author unknown, "Prodigy We're Bringing The Future Home", Doc. Page Identifier(s):PRGY 2313-2322, date unknown.

Author unknown , memo subject: "Trintex Background", Doc. Page Identifier(s):PRGY 2323-2326, date unknown.

Author unknown , memo subject: "Prod. System-Host Design", Doc. Page Identifier(s):PRGY 2328-2349, Jan. 12, 1987.

Author unknown, memo subject: "Producer Object assembly", Doc. Page Identifier(s):PRGY 2350-2380, Jan. 29, 1987.

Author unknown, memo subject: "Producer Workstation", Doc. Page Identifier(s):PRGY 2381-2390, Feb. 17, 1987.

Author unknown, "TPW System overview", Doc. Page Identifier(s):PRGY 2391-2395, Feb. 19, 1987.

Author unknown, "Producer A Object ID Assignment", Doc. Page Identifier(s):PRGY 2396-2401, Apr. 8, 1987.

Author unknown, "Consolidated Functional Requirements", Doc. Page Identifier(s):PRGY 2401-2459, Apr. 5, 1985.

Author unknown, memo subject: "TPW—Producer A", Doc. Page Identifier(s):PRGY 2460-2462, Mar. 4, 1987.

Author unknown, memo subject: "QC Requirements (Linkage)", Doc. Page Identifier(s):PRGY 2463-2471, Mar. 6, 1987.

Author unknown, memo subject: "ParmScript Specification", Doc. Page Identifier(s):PRGY 2472-2480, May 1, 1987.

Whited et al., "Up/Download Supporting New Naming Conventions", Doc. Page Identifier(s):PRGY 2481-2491, May 12, 1987.

Author unknown, memo subject: "Producer System Data Flow", Doc. Page Identifier(s):PRGY 2492, Jan. 27, 1987.

Dawley, memo subject: "Producer System Format", Doc. Page Identifier(s):PRGY 2493-2499, Apr. 24, 1987.

Author unknown, memo subject: "Notes", Doc. Page Identifier(s):PRGY 2500-2508, date unknown.

Dedrick, memo subject: "A Language for Describing TBOL", Doc. Page Identifier(s):PRGY 2509-2513, Feb. 24, 1987.

Author unknown, memo subject: "The Trintex Producer Workstation", Doc. Page Identifier(s):PRGY 2514-2516, Jan. 21, 1987.

Author unknown, "The Bulletin", Doc. Identifier(s):PRGY 2517, date unknown.

Lyons, memo subject: "API Support Group Notes", Doc. Page Identifier(s):PRGY 2518-2519, date unknown.

Author unknown, memo subject: "Trintex External Provider Activities", Doc. Page Identifier(s):PRGY 2520-2526, Feb. 8, 1988.

Author unknown, memo subject: "External Provider Environment", Doc. Page Identifier(s):PRGY 2527, May 1988.

Author unknown, "EPAPO Project Status Update", Doc. Page Identifier(s):PRGY 2528-2530, May 18, 1988.

Author unknown, "Prodigy Services Company", Doc. Page Identifier(s):PRGY 2531-2567, Jun. 15, 1989.

Heilbrunn, memo subject: "Trintex Product Descriptor", Doc. Page Identifier(s):PRGY 2568-2614, Feb. 23, 1987.

Author unknown, "CPEP looking to Prodigy for the Latest Informaiton", Science Museum of Connecticut, Doc. Page Identifier(s):PRGY 2616, Nov./Dec. 1988.

Markham, "From fantasy to fact at the end of a fingertip", Times, London, England, Doc. Page Identifier(s):PRGY 2617, Nov. 22, 1988.

Haglund, "Detroiters will get new buying power in their PCs next year", Sunday Chronicle, Muskegon, Michigan, Doc. Page Identifier(s):PRGY 2618, Nov. 27, 1988.

Author unknown, "Prodigy making another attempt at videotext services", Knight-Ridder Newspaper Service, Doc. Page Identifier(s):PRGY 2619-2620, Nov. 20, 1988.

Sims, "New Atlantic Cable Makes More Calls Possible", The New York Times, Doc. Page Identifier(s):PRGY 2620-2621, Dec. 14, 1988.

Markoff, "IBM to Sell Rolm to Siemens", The New York Times, Doc. Page Identifier(s):PRGY 2622-2623, Dec. 14, 1988.

Author unknown, "Banking from signup to sign on", Sunday Capital, Annapolis, Mo. Doc. Page Identifier(s):PRGY 2624, Nov. 20, 1988.

Author unknown, "GTE Corp. Makes Waves in Videotext Market", Gallagher Report, NY, NY, Doc. Page Identifier(s):PRGY 2624, Nov. 21, 1988.

Killette, "French Minitel Services Coming To America", Communications Week, Doc. Page Identifier(s):PRGY 2625, Nov. 7, 1988.

Horwitt, "Freed Bells ready network services", Computerworld, Doc. Page Identifier(s):PRGY 2626, Dec. 12, 1988.

Author unknown, "Bell Atlantic, IBM Get Directory System Pact for New Zealand", Wall Street Journal, Doc. Page Identifier(s):PRGY 2627, Dec. 15, 1988.

Author unknown, "Fewer Tots Expected by the Year 2000", Wall Street Journal, Doc. Page Identifier(s):PRGY 2627, Dec. 15, 1988.

Fisher, "Deepr Into The Well", Microtimes, Doc. Page Identifier(s):PRGY 2628-2630, Mid-Dec. 1988.

Hudson et al., "IBM to extend antitrust accord with EC commission Beyond '90", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2631, Dec. 15, 1988.

Andrews, "Uses Grow for Video Alterations", The New York Times, Doc. Page Identifier(s):PRGY 2632-2633, Dec. 15, 1988.

Author unknown, "The CPC Newsletter", Doc. Page Identifier(s):PRGY 2634-2641, Dec. 1988.

Author unknown, "Prodigy Services Company", Doc. Page Identifier(s):PRGY 2642, date unknown.

Klelner, "Prodigy: The Future On Line?", The San Francisco Guardian Doc. Page Identifier(s):PRGY 2643-2647, Nov. 30, 1988.

Author unknown, "Vanguard draws investors", USA Today, Doc. Page Identifier(s):PRGY 2648, Dec. 6, 1988.

Henderson, "Funds offer strong, safe asset growth", USA Today, Doc. Page Identifier(s):PRGY 2649, Dec. 6, 1988.

Miller, "IBM's PC Chief, William Low, Moves to Xerox", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2650, Dec. 6, 1988.

Feinberg, "Bust or Boom?", Adweek's Marketing Week\, Doc. Page Identifier(s):PRGY 2651-2656, Dec. 5, 1988.

Essex, "Prodigy: An On-Line Service for the Masses", PC Resource, Doc. Page Identifier(s):PRGY 2657-2658, Jan. 1989.

Rebello, "Super chip puts mainframe on desktop", USA Today, Doc. Page Identifier(s):PRGY 2659, Dec. 9, 1988.

Author unknown, "U.S. computer firms counting on Europe", USA Today, Doc. Page Identifier(s):PRGY 2660, Dec. 9, 1988.

Miller et al., "IBM to Sell Part Of Rolm's Line, Investors Told", The Wall street Journal, Doc. Page Identifier(s):PRGY 2660, Dec. 9, 1988.

Author unknown, "Prodigy Advertisement", Women's Wear Daily, Doc. Page Identifier(s):PRGY 2661-2662, Dec. 5, 1988.

Author unknown, "Industry firms join computer listing service", Photo Marketing, Jackson, MI, Doc. Page Identifier(s):PRGY 2663, Nov. 1988.

Haglund, "IBM, Sears gamble on videotex system", Nationally Syndicated Article, Doc. Page Identifier(s):PRGY 2663, Nov. 30, 1988.

Author unknown, "Groceries Delivered By Computer", the Alpharetta Revue, Doc. Page Identifier(s):PRGY 2664, Dec. 1, 1988.

Author unknown, "BellSouth A New Service For Cable TV", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2664, Dec. 7, 1988.

Miller, "IBM Signals New PC-Mainframe Strategy", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2665, Dec. 7, 1988.

Menninger, "Pioneering on-line service hangs on", Greater Sacramento Business Journal, Sacramento, CA, Doc. Page Identifier(s):PRGY 2666, Nov. 14, 1988.

Bailey, "Sears Offers Added Credit To Boost Holiday Volume", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2667, Dec. 7, 1988.

Kantrow et al., "Chemical's Exit Not Fatal Blow to Home Banking", American Banker, Doc. Page Identifier(s):PRGY 2668-2669, Dec. 7, 1988.

Author unknown, "Who's Who in Video Banking Nationwide", Doc. Page Identifier(s):PRGY 2670, Dec. 7, 1988.

Carroll, "IBM'S Telecommunications Effort With Rolm Unit Has Turned Sour", The Wall Street Journal, Doc. Page Identifier(s):PRGY 2671, Dec. 12, 1988.

Author unknown, "Prodigy", Doc. Page Identifier(s):PRGY 2672-2744, Jan. 1988.

Author unknown, "Appl. Dev. Reference Manual", Doc. Page Identifier(s):PRGY 2745-3027, Dec. 2, 1987 to Mar. 28, 1988.

Lexis database, "W3.com Introduces first visitor-tracking software for web sites; software increases interactivity, provides powerful tracking and customization features while simplifying web site development" Business Wire 1995.

Lexis database, "Cover Story: free mail, part two; two companies announce free internet e-mail services" IAC (SM) Newsletter Database (TM), Future Systems, Inc, Multimedia & Videodisc Monitor 1995.

"UK: Home Computer From Your Own Correspondent"; Reuters Info Svcs.; 1996; 2 pgs.

Fried; "NewsNet: An Offering of Current and Specialized Information"; Online; Jul. 1985; 9(4); pp. 99-105.

Lexis database; "On-Line Mortgage Service Will Operate Over Internet"; National Thrift News, Inc.; Oct. 31, 1994; 3 pgs.

Lexis database; "FreeLoader, Inc. Announces the First Service to Deliver the Internet Offline"; PR Newswire Association, Inc.; Jan. 19, 1996; 3 pgs.

Lexis database; "Getting Wired With ST"; Times Newspapers Limited; Jan. 22, 1995; 1 pg.

"PED Software Introduced Journalist, Software That Allows Users to Retrieve and Print Data From the Prodigy Online Service"; Newsbytes News Network; Apr. 5, 1994; Dialog 01014310.

Raymond; "NewsFlash: Or One Cybrarian's Quest for Electronic News Delivery"; Special Libraries; Fall 1994; vol. 85; Issue 4; pp. 270-273.

Reinheimer; "Information on Demand's Multi-File Electronic Clipping Service"; National Online Meeting; New York; NY; May 5-7, 1987.

Wilder; "Get News While Your PC Sleeps"; Net Access; Feb. 26, 1996: p. 77; http://techweb.amp.com.

O'Connor; "Free E-mail Service Slated For The Fall; Limited Urban Areas To Try Out Advertiser-Supported Messaging Service"; Jul. 1, 1995; The Austin-American-Statesman; 2 pages.

"AOL Virtual Museum Other Online Services"; Aug. 17, 2001; 5 pages.

"AOL Virtual Museum 10,000 Free Hours"; Dec. 19, 2001; 4 pages.

Rowland; "Internet at a crossroads"; originally published in the Toronto Star newspaper on Jun. 13, 1996; 7 pages.

"Free Internet Access From AT&T—Have They Lost Their Minds?!!?"; Discount Long Distance Digest News; Feb. 27, 1996; 2 pages.

Smith, David; "Re: More on AT&T Internet"; Nov. 8, 1995; 1 page.

"Internet Access Pricing In The OECD"; 45 pages; date unknown.

von Klitzing; "Seven Mile-Boots"; Internet News; From OEM 6 OneEurope Magazine No. 6 available at http://www.karl.aegee.org/oem-pub.nsf/0871f09451d3ee53c1256322004f795b/44473cd7408db6224125659f0040908a?OpenDocument ; Feb. 24, 1995; 3 pages.

Dedrick, "A Consumption Model For Targeted Electronic Advertising"; Intel Architecture Labs; IEEE MultiMedia; 1995; pp. 41-49.

Adams; "Game Credits"; available at http://www.designersnotebook.com/Game_Credits/game_credits.htm; undated; 8 pages.

"World's First Banner-Ad"; undated; 2 pages.

White; "Hand-held gambling devices may be in a casino near you"; Las Vegas Sun; May 26, 2005; 3 pages.

Chan; "Globalization of Internet Access"; Proceedings of The IEEE International Conference on Industrial Technology, 1996; pp. 485-488.

"Internet Chess Club" From Wikipedia, the free encyclopedia.; Jun. 29, 2005; 2 pages.

"Washington, DC History"; Last modified Mar. 12, 2003; Copyright 1995-2005 Hagen Software; 5 pages.

"ManifestDestiny Marketing, Inc. Business Plan"; ManifestDestiny Marketing Inc.; date unknown; 35 pages.

"America Online Acquires ImagiNation Network from AT&T"; AT&T News Release; Aug. 6, 1996, (2 pages).

"Case's Ladder: The World's Largest Gaming Leaguel"; http://www.igl.net., 1 pg., (printed on Mar. 2, 2005).

"ELO Rating System"; http://en.wikipedia.org/wiki/ELO_rating_system, 5 pgs., (printed on Mar. 2, 2005).

"For People New to IGS Pandanet"; http://www.pandanet.co.jp/English/guide/intro.htm, 2 pgs. (printed on Mar. 2, 2005).

"ICC Help: FIDErating"; http://www.chessclub.com/help/FIDErating, 3 pgs. (printed on Mar. 2, 2005).

"ICC Help: Ratings"; http://www.chessclub.com/help/ratings, 2 pgs., (printed on Mar. 2, 2005).

"Internet Chess Club"; http://en.wikipedia.org/wiki/Internet_Chess_Club, 2 pgs. (printed on Mar. 2, 2005).

Lu; "Computers Making Inroads in Crossword Market"; Crossword Tournament: New York Times; Aug. 18, 1996, (6 pgs.)

"Mech Warrior 2: 31st Century Combat"; http://www.mechreg.com, 1 pg., (printed on Mar. 2, 2005).

"New Site Design & Features"; http://www.igl.net/wwwstaff/messages/66.shtml, 4 pgs., (printed on Mar. 2, 2005).

"Online Wold Timeline"; Mar. 4, 2000; (37 pgs).

"The History of the Mech warrior 2: Registry"; http://www.mechreg.com/history.htm, 2 pgs., (printed on Mar. 2, 2005).

"The Mech Warrior: Registry, Level 2 Ladder, Top 25"; http://www.mechreg.com/ladder2.htm, 2 pgs., (printed on Mar. 2, 2005).

"HotWired Goes Live", available at http://www.hotwired.com/, Oct. 1994, 4 pages.

"New Newsletter: Tradewinds—Trade magazine coverage of the Net", Tradewinds, Kenneth Liss (Editor), vol. 1, No. 2, Nov. 1994, 9 pages.

"San Jose Mercury News Now Publishing on the World Wide Web", All Mega News, Jan. 18, 1995, 2 pages.

Klecker email "Subject: Re: Cookies?", Jul. 12, 1996, 2 pages.

U.S. Appl. No. 10/994,054, filed Nov. 18, 2004, Goldberg et al.

"Game Credits: Published Games"; International hobo; (date unknown); 7 pages.

Goldberg; "The History of Coomputer Gaming Part 5—PLATO Aln't Just Greek"; (date unknown); 3 pp.

Koster; "Raph's Page: Online World Timeline"; Ralph's Website, gamming section; Feb. 20, 2002; 37 pp.

Markowitz; "War Dewar Mega Wars: Multiplayer Online Tactical Combat"; Sep. 1, 2000; 6 pp.

Gomes; "Cookies"; Feb. 13, 1996; 8 pp.

Bell; "NETstuff: Free Personalized Internet news"; PointCast; Feb. 14, 1996; http://www.monitor.co/monitor/issues/vol3iss7/netstuff.html; 1 p.

Brian; "Cookies (Client-Side Persistent Information) and Their Use"; Netscape; 1995; 2 pp.

Frook; "PointCast Gets Personal"; PointCast; Feb. 22, 1996; 1 p.

Nieuwenhuysen et al.; "Document+program Hybrids in the Internet, and Their Impact on Information Transfer in Science and Technology"; University Library, Vrije Universiteit Brussel, Pleinlaan 2, B-1050 Brussels—Belgium; http://educate1.lib.chalmers.se/iaul/proceedcontents/fullpaper/nieuw.html; 2 pp.

Graetz; "The Origin of Spacewar"; Creative Computing, 39E> Hanover Avenue, Morris Plains, NJ 07950; 1981; 15 pp.

Russell et al.; "Spacewar"; Maury Markowitz; 2000; 12 pp.

Waugh "Request for Ex Parte Reexamination of Patent No. 6,264,560", dated Jan. 31, 2008, 2542 pages.

Maurer et al., "Frequently Asked Questions About Poker", rec.gambling Usenet Newsgroup, available at http://groups.google.com/group/rec.answers/msg/9f0812cdfdd732e82, posted Feb. 28, 1995, 40 pages.

Manual "Manny" Raposa, "BJ Tourney at the IP", rec.gambling Usenet Newsgroup, available at http://groups.google.com/group/rec.gambling/msg/eabdbc28789394b0, posted Feb. 24, 1992, 3 pages.

Eliezer, "Navigating Main Street: a user's experience with interactive TV; GTE Main Street", 9 The Seybold Report on Desktop Publishing No. 5, 3 (Jan. 15, 1995), 9 pages.

Netrek BRMH-1.7 Client Source Code, http://ftp.netrek.org/pub/netrek/mirrors/ftp.csua.berkely.edu.old/netrek/old/BRMH-1.7.tar.gz (last modified Oct. 16, 1993), 783 pages.

Netrek Server2.5p14 Server Source Code, http://ftp.netrek.org/pub/netrek/mirrors/ftp.solace.mh.se/netrek/servers/vanilla/Server2.5p14.tar.gz (last Modified Dec. 15, 1994), 1300 pages.

McFadden, "The History of Netrek, through Jan. 1, 1994", rec.games.netrek Usenet Newsgroup, available at http://groups.google.com/group/rec.games.netrek/msg/66264d6b5a4b1470, (posted May 1, 1994), 17 pages.

Rumsey Re: Beta testers for port of BRM 3.0 to Win 3.1/NT wanted, rec.games.netrek Usenet Newsgroup, available at http://groups.google.com/group/rec.games.netrek/browse_frm/thread/9400abb64afd9810/2ba31d76f61174d0, (posted Feb. 12, 1994), 11 pages.

Gray "Internet Growth Summary", available at http://www.mit.edu/people/mkgray/net/internet-growth-summary.html, last visited Dec. 17, 2007, 2 pages.

Lewis, "Microsoft Seeks Internet Market; Netscape Slides", NY Times, Dec. 8, 1995, available at http://query.nytimes.com/gst/fullpage.html?res=9E00EEDE1F39F93BA35751C1A963958260&sec=&spon=&pagewanted=all, 4 pages.

Declaration of David Ahn (including Exhibit A-S), Dec. 14, 2007, 134 pages.

Holub "Netrek Server List", available at http://groups.google.com/group/rec.games.netrek/msg/8dbc01d4abee5ace, Last-Updated Dec. 21, 1993, 8 pages.

Google groups Rec.games.netrek, Search for dave ahn, available at http://groups.google.com/group/rec.games.netrek/earch?q=dave+ahn&start=0&scoring=d&, date unknown, 1 page.

Ahn "Help getting res-rsa working with server . . . " available at http://groups.google.com/group/rec.games.netrek/browse_frm/thread/4da4c5af59745a61/fde76eab98a25b8a, dated Nov. 15, 1994, 3 pages.

"How far back does Google's Usenet archive go?", available at http://groups.google.com/support/bin/answer.py?answer=46439&topic=9246, 2007, 3 pages.

Holub "rec.games.netrek FAQ List", available at http://groups.google.com/group/rec.games.netrek/msg/9bbd5514020d51fa, last-updated Jul. 21, 1994, 9 pages.

Holub "rec.games.netrek FAQ List", available at http://groups.google.com/group/rec.games.netrek/browse_frm/thread/35a84ea78ce38bdb/9bbd5514020d51fa, last-updated Jul. 21, 1994, 28 pages.

Holub "Netrek FTP list", available at http://groups.google.com/group/rec.games.netrek/msg/ac03262b6ac8c4c1, last-updated Jul. 21, 1994, 10 pages.

Murase "Re: Windows Client", available at http://groups.google.com/group/rec.games.netrek/browse_frm/thread/d6ecc5c095bf8a38, Sep. 30, 1994, 6 pages.

Murase "Re: Windows Client", available at http://groups.google.com/group/rec.games.netrek/msg/20da2a42b64333a8, Oct. 1, 1004, 2 pages.

Trown "New Server Release", available at http://groups.google.com/group/rec.games.netrek/msg/d7fb4451975e6fb2, Aug. 9, 1994, 1 page.

Hadley "BRMH-1.7 available", available at http://groups.google.com/group/rec.games.netrek/msg/00b0aa5dfdb1ba99, Oct. 15, 1993, 2 pages.

Ivey "Re: AGRI poppage (was Re: Bombing a planet—is it an art?)", available at http://groups.google.com/group/rec.games.netrek/msg/df66eac4e839bc59, Aug. 17, 1994, 3 pages.

Trown "Re: Netrek server help !", available at http://groups.google.com/group/rec.games.netrek/browe_frm/thread/e728557051dc0c13/4f1af10b05d68ac8, Nov. 19, 1994, 4 pages.

Ahn "Re: www.netrek.org—no longer the game?", available at http://groups.google.com/group/rec.games.netrek/msg/ee9a7af9f7a39305, Oct. 23, 1998, 2 pages.

Holub "Netrek FTP list", available at http://groups.google.com/group/rec.answers/msg/ebcb9a14c0d4de78, last-updated Dec. 14, 1994,11 pages.

"Netrek Software Archive", available at http://ftp.netrek.org/pub/netrek/mirrors/ftp.csua.berkely.edu.old/netrek/old, Apr. 16, 1999, 3 pages.

"Netrek Software Archive", available at http://ftp.netrek.org/pub/netrek/mirrors/ftp.solace.mh.se/netrek/servers/vanilla, Jan. 5, 2000, 1 page.

"List of files in BRMH-1.7.tar.gz", Oct. 15, 1993, 3 pages.

"List of files in Server2.5p14.tar.gz", Aug. 9, 1994, 5 pages.

Declaration of Kevin Smith, Dec. 17, 2007, 6 pages.

Kuester "Web Ad Revenue Climbed 42.6 Percent in Third Quarter", Jupiter Communications, Nov. 20, 1996, available at http://web.archive.org/web/19961228211028/http://www.jup.com/jupiter/release/nov96/adspend.adspend.shtml, 6 pages.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

FIG. 4A



START

THE BLACKJACK GAME CONTROLLER 14 IS INITIALIZED          408

CARD DEALER MODULE 38 OUTPUTS AT REGULAR INTERVALS RANDOM CARD REPRESENTATIONS TO THE BLACKJACK PLAYER EVALUATOR 34 AND THE HOUSE BLACKJACK PLAYING MODULE 42          416

WAIT FOR NEXT PLAYER INPUT          424

COMMUNICATION INTERFACE 22 RECEIVES A BLACKJACK GAME REQUEST FROM AN INTERNET CLIENT NODE 318 (GAMING STATION 18) AND TRANSMITS THE REQUEST TO THE BLACKJACK DRIVER 26          430

IS THE REQUEST RELATED TO A CURRENT BLACKJACK GAME AND/OR BLACKJACK TOURNAMENT?          436

NO                    YES

DOES THE PLAYER REQUEST TO ENTER A BLACKJACK TOURNAMENT?          448

YES

NO

PROCESS MISCELLANEOUS REQUESTS          470

THE BLACKJACK DRIVER 26 USES THE PLAYER'S ID PROVIDED WITH THE REQUEST FOR RETRIEVING ANY STATUS INFORMATION FROM THE DATABASE SYSTEM 28 REGARDING ANY CURRENT BLACKJACK GAME AND/OR BLACKJACK TOURNAMENT IN WHICH THE PLAYER MAY BE CURRENTLY INVOLVED          476

DOES THE PLAYER REQUEST TO COMMENCE A NEW BLACKJACK GAME IN A CURRENT TOURNAMENT?          480

NO          YES



454

THE BLACKJACK DRIVER 26 DETERMINES A BLACKJACK TOURNAMENT AND ENTERS THE PLAYER

520

IS THE PLAYER REQUEST RELATED TO A PLAY IN A CURRENTLY ACTIVE BLACKJACK GAME?

NO        YES

458

CREATE A CONFIRMATION RECORD IDENTIFYING THE BLACKJACK TOURNAMENT IN WHICH THE PLAYER IS ENTERED

PROCESS MISCELLANEOUS REQUESTS

524

OUTPUT THE CONFIRMATION RECORD TO THE PLAYER AT HIS/HER INTERNET CLIENT NODE 318 (GAMING STATION 18)

528

IS THE PLAYER REQUEST FOR A NEW CARD REPRESENTATION?

NO        YES

462

PROCESS OTHER BLACKJACK GAME REQUESTS

576

ENTER INTO THE DATA-BASE 28 INFORMATION INDICATING THE BLACKJACK TOURNAMENT IN WHICH THE PLAYER HAS BEEN ENTERED

THE BLACKJACK DRIVER OUTPUTS A NEW BLACKJACK GAME CONFIGURATION TO THE PLAYER

466

580

FIG. 4B



532

FOR WHOM?

HOUSE          PLAYER

536

568

THE BLACKJACK DRIVER 26 COMMUNICATES WITH THE HOUSE BLACKJACK PLAYING MODULE 42 FOR OBTAINING A NEW BLACKJACK GAME CONFIGURATION FOR THE CURRENT BLACKJACK GAME, WHEREIN THE NEW GAME CONFIGURATION INCLUDES THE MOST RECENTLY OUTPUT CARD REPRESENTATION FROM THE CARD DEALER MODULE 38 AS THE NEXT CARD REPRESENTATION IN THE HOUSE HAND FOR THE BLACKJACK GAME FROM WHICH THE CURRENT PLAYER'S REQUEST CAME

THE BLACKJACK PLAYER EVALUATOR 34 DETERMINES A NEW BLACKJACK GAME CONFIGURATION FOR THE CURRENT BLACKJACK GAME, WHEREIN THE NEW GAME CONFIGURATION INCLUDES THE MOST RECENTLY OUTPUT CARD REPRESENTATION FROM THE CARD DEALER MODULE 38 AS THE NEXT CARD REPRESENTATION FOR THE PLAYER'S HAND(S)

THE HOUSE BLACKJACK PLAYING MODULE 42 OUTPUTS BLACKJACK GAME CONFIGURATION INFORMATION INDICATING THE NEW HOUSE HAND CARD REPRESENTATION AND ANY PLAYER RESPONSE(S)

THE BLACKJACK PLAYER EVALUATOR 34 DETERMINES THE NEXT BLACKJACK PLAY OPTIONS AND OUTPUTS A NEW BLACKJACK GAME CONFIGURATION TO THE BLACKJACK DRIVER 26

542

572

FIG. 4C



IS THERE A FURTHER PLAYER RESPONSE POSSIBLE?
546
YES
NO
550
556
THE BLACKJACK DRIVER 26 OUTPUTS A BLACKJACK GAME CONFIGURATION TO THE PLAYER AT HIS/HER INTERNET CLIENT NODE 318 (GAMING STATION 18)
THE BLACKJACK DRIVER 26 SENDS THE BLACKJACK GAME RESULTS TO THE WAGER ACCOUNTING MODULE 30 FOR UPDATING THE PLAYER'S ACCOUNT
THE WAGER ACCOUNTING MODULE 30 RESPONDS WITH UPDATED ACCOUNTING INFORMATION TO BE PROVIDED TO THE PLAYER
560
564
THE BLACKJACK DRIVER 26 OUTPUTS THE RESULTS OF THE BLACKJACK GAME AND THE PLAYER'S UPDATED ACCOUNT INFORMATION
484
THE BLACKJACK DRIVER 26 REQUESTS CONFIRMATION FROM THE WAGER ACCOUNTING MODULE 30 THAT THE PLAYER CAN COMMENCE A NEW BLACKJACK GAME IN THE CURRENT TOURNAMENT
488
IS CONFIRMATION GIVEN?
NO
YES

FIG. 4D

THE BLACKJACK DRIVER 26
OUTPUTS A MESSAGE TO THE
PLAYER AT HIS/HER INTERNET
CLIENT NODE 318 (GAMING STATION
18) INDICATING THAT A NEW GAME
CANNOT BE COMMENCED IN THE
CURRENT TOURNAMENT

492

CREATE A BLACKJACK GAME
RECORD FOR THE PLAYER

494

496

THE BLACKJACK DRIVER 26 REQUESTS THE
BLACKJACK PLAYER EVALUATOR 34 TO PROVIDE
AN INITIAL BLACKJACK GAME CONFIGURATION

500

THE HOUSE BLACKJACK PLAYING MODULE 42 RESPONDS
WITH AN INITIAL BLACKJACK GAME CONFIGURATION
INCLUDING THE INITIAL CARD REPRESENTATION FOR THE
HOUSE HAND, THIS INITIAL CARD REPRESENTATION BEING
THE MOST RECENT CARD REPRESENTATION PROVIDED TO IT
BY THE CARD DEALER MODULE 38

THE BLACKJACK DRIVER 26 STORES INFORMATION
REGARDING THE IDENTITY AND INITIAL CONFIGURATION
FOR THE PLAYER IN THE DATABASE 28

504

THE BLACKJACK DRIVER 26 OUTPUTS AN INITIAL
BLACKJACK GAME CONFIGURATION FOR THE NEW
GAME TO THE PLAYER AT HIS/HER INTERNET CLIENT
NODE 318 (GAMING STATION 18)

508

FIG. 4E

A1711

| VALUES OF CARDS FROM CARD SEQUENCE OUPUT BY THE CARD DEALER MODULE 38 → | | 604 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 3 | 5 | 7 | 2 | 9 | 8 | 10 | 10 |
| BLACK JACK GAME 610 | PLAYER HAND EVALUATION | 3 | | 10 | – | 19 | | | |
| | HOUSE HAND EVALUATION | | 5 | | | | 13 | 23 | |
| BLACK JACK GAME 614 | PLAYER HAND EVALUATION | | 5 | | | – | 13 | – | 23 |
| | HOUSE HAND EVALUATION | | | | – | 2 | | | |
| BLACK JACK GAME 620 | PLAYER HAND EVALUATION | | | 7 | | 16 | | | |
| | HOUSE HAND EVALUATION | | | | 2 | | 10 | 20 | |
| BLACK JACK GAME 626 | PLAYER HAND EVALUATION | | | | | 9 | | 19 | |
| | HOUSE HAND EVALUATION | | | | | | 8 | | 18 |

606

FIG. 5

U.S. Patent

Feb. 24, 2009

Sheet 10 of 14

US 7,496,943 B1

A1712



FIG. 6A

U.S. Patent

Feb. 24, 2009

Sheet 11 of 14

US 7,496,943 B1

A1713



FIG. 6B

U.S. Patent

Feb. 24, 2009

Sheet 12 of 14

US 7,496,943 B1

A1714



FIG. 7



FIG. 8A

U.S. Patent    Feb. 24, 2009    Sheet 13 of 14    US 7,496,943 B1

A1715

U.S. Patent

Feb. 24, 2009

Sheet 14 of 14

US 7,496,943 B1



FIG. 8B

US 7,496,943 B1

| 1 | 2 |

# NETWORK SYSTEM FOR PRESENTING ADVERTISING

## RELATED APPLICATIONS

The present application is a continuation of prior U.S. application Ser. No. 09/105,401 filed Jun. 26, 1998 (now U.S. Pat. No. 6,183,366), which is a continuation of U.S. application Ser. No. 08/759,895 filed Dec. 3, 1996 (now U.S. Pat. No. 5,823,879), which claims the benefit of the following two applications: U.S. Provisional Application Ser. No. 60/010, 361 filed Jan. 19, 1996 and U.S. Provisional Application Ser. No. 60/010,703 filed Jan. 26, 1996. The entire disclosure of each of the above-identified applications is considered to be part of the disclosure of the present application and is hereby fully incorporated by reference.

## FIELD OF THE INVENTION

The present invention is related to a method and apparatus for automating the playing games such as blackjack so that they can be played continuously and asynchronously by a potentially large plurality of players substantially, and wherein information related to goods and services for sale can be exchanged between players and sponsors of advertisements presented during the playing of a game.

## BACKGROUND OF THE INVENTION

The cost effective automation of playing certain games, like blackjack, has been difficult due to the fact that these games typically require a dealer and only a relatively small number of players may play the game with a single dealer. However, with the popularity of local and wide-area data communication networks, it is desirable to have an automated gaming system for games such as blackjack wherein large numbers of players may cost-effectively and efficiently play such games.

Furthermore, it has been difficult to cost-effectively provide a network gaming system on such networks as the Internet in that gaming restrictions prohibit wagering and ante fees in most contexts except such situations as local area networks within a casino. However, since many players have an interest in playing casino-type games, it would also be desirable to have a way to benefit from interests in such games. Accordingly, it would be desirable to have a system that utilized a gaming context as a vehicle for delivering product and/or service information to users of a network such as the Internet. In particular, it would be desirable to have a data processing system that provided a large number of players with the ability to substantially asynchronously play casino-style games on the Internet for prizes at a reduced rate or at substantially no risk, wherein the data processing system coordinated the presentation of products and/or services from sponsors of the games so that there is a coordinated, interactive exchange of information between players and sponsors regarding advertisements, samples, prizes and questionnaires related to sponsor products and/or services.

Accordingly, since the present invention, as described in the sections hereinbelow, addresses the above-discussed problems within the context of playing blackjack, an overview of this particular game is provided so that the novelty and various related aspects of the present invention may be more fully appreciated.

Description of Blackjack:

The card game of blackjack is a game of chance played between a designated player known as a "dealer" and one or more other players. Basically, each player plays against the dealer in the sense that each player attempts to achieve a collection or hand of cards having a total score for the hand closer to the value 21 than the score of the hand of the dealer. However, if a player's card hand goes over 21, the player may lose any wagers bet on the hand regardless of the value of the card hand of the dealer.

In further detail, blackjack is typically played with one or more standard playing card decks wherein each card has a value. In particular, each of the face cards has the value of 10, and non-face card has a value identical to the numerical value as indicated on the card, except for aces. That is, for aces a value may be assigned of either 1 or 11, depending on which value a player deems most beneficial to his/her hand.

In one conventional method for playing blackjack, at the commencement of a blackjack hand, each player initially is provided with two cards and the dealer also receives two cards. Typically, one of the dealer's cards is dealt with the value of the card showing whereas the other card is dealt with the value of the card hidden. However, variations on when the dealer receives his/her cards may depend on the blackjack gaming rules where blackjack is being played but, in any case, one of the dealer's cards must be face-up before the players exercise various wagering options beyond an initial ante.

After a player has reviewed his/her cards, the player may request one or more additional cards in an attempt to get: (a) a value for a card hand that will be greater than the hand the dealer will have, and (b) a value for the card hand that is less than or equal to 21. Further, a player may under certain circumstances, as will be described below, simultaneously play more than one hand of cards against the dealer's cards. However, in requesting such additional cards, a player runs the risk of "busting" each hand played wherein the player loses his/her wager(s) on a card hand by adding cards to the hand until a value exceeding 21 occurs. Further note that such busting of a hand occurs regardless of whether or not the dealer has a card hand value of less than or equal to 21.

Note that after each player has ceased to request further cards (i.e., each player "stands" on his cards), the dealer either takes one or more further cards (i.e., "hits") according to predetermined blackjack rules as established, for example, by the gaming establishment where the blackjack game is being conducted. In general, the dealer must take additional cards if his/her current card count total is less than 17 and the dealer must decline further cards if the dealer's hand has a value of 17 or more. However, there are various rules regarding whether a dealer may stand or hit when the card count total is a "soft 17." That is, one of the dealer's cards is an ace (and therefore may have a value of 1 or 11) and one of the values for the dealer's hand is 17. For example, the dealer may be required to take a hit on a soft 17.

Since a hit(s) taken by the dealer is performed after all players have exercised their wagering options, the final numerical value of the dealer's hand is then compared to the final numerical value of each of the player's hand(s) to determine the winning and losing wagers. Note that if the dealer's hand exceeds the value of 21, then any player that has not busted wins the wagers for their hand(s) regardless of the hand's total value. Alternatively, if the dealer's card hand is less or equal to 21, then it is compared with each of the player's card hand(s) and in each comparison the card hand with the closest total value to 21 without exceeding 21 wins. Of course, ties are possible. In such cases (called a "push"), the player's wager(s) on his/her card hand are returned.

It is typical in blackjack to have at least three additional player options depending on the circumstances of play. A first such option is known as "doubling down" wherein if the

US 7,496,943 B1

3

player's first two cards have a value within a predetermined range (e.g., 10 or 11), then the player may double his or her wager and once dealt a single additional card, the total of the three card hand becomes the value for the player's hand. Alternatively, another option is that of "splitting pairs" wherein if the player's first two cards are identical with the exception of suit (i.e., a pair), then the pair may be split so that two card hands are created with one card of the pair in each hand. Thus, the player must wager on each of the hands at least the initial wagering or ante amount. Subsequently, a second card and any subsequent successive cards are dealt to each of the separate hands as the player requests and the results of both hands are compared to the dealer's hand, assuming neither the dealer nor either of the player's two hands busts.

In a third option, played immediately after each player has been dealt their first two cards and the dealer has been dealt at least a first card, a player may request "insurance" under the circumstances where the dealer's single face-up card is an ace. In this circumstance, the player is betting that the dealer has blackjack (i.e., a card value total of 21). If the dealer does not have blackjack, then the insurance bet is forfeited and the player plays his/her blackjack hand as if the insurance bet were never made. Note that the player can typically wager an insurance bet of one-half of the amount of his/her initial blackjack wager or ante and if the dealer has blackjack, then the dealer (or the gaming establishment) pays the player double or triple his/her insurance bet.

Further note that options for splitting pairs and doubling down may interact with one another according to certain pre-established gaming establishment rules wherein, for example, a player may double down on one or more of his/her split hands.

Additionally, there are blackjack tournaments having tournament entrants that compete against each other for tournament prizes. In such tournaments each entrant has a fixed initial number of points that can be wagered in a pre-established number of tournament blackjack games to be played. Accordingly, the player having the highest number of points at the end of the tournament wins the tournament. Note that in such tournaments, there may be specific guidelines established at the beginning of the tournament for varying the blackjack gaming rules between tournament games. For example, rules may vary on when a player may split pairs repeatedly during the same blackjack game. Also, double down rules may vary so that, for example, after a splitting of pairs, a player may be allowed to double down on any two cards or, alternatively, an additional wager of less than the initial wager may be acceptable when a player requests to double down.

However, in all known variations of blackjack, players are only allowed to enter a blackjack game at the completion of a previous game and, further, there is a relatively small number of players that can play blackjack at a dealer's station simultaneously. Accordingly, it is desirable to provide a system for playing blackjack wherein potentially a very larger number of players can play blackjack simultaneously from a single dealer station and wherein players can commence playing blackjack at their own discretion without waiting for a previous blackjack game to complete.

SUMMARY OF THE INVENTION

The present invention is a computerized interactive advertising system (i.e., method and apparatus) for exchanging information regarding goods and/or services between a first population of users (hereinafter also known as "players" or

4

"users") and a second population of users (hereinafter also known as "sponsors" or "advertisers"). In particular, the sponsors or advertisers may present information related to goods and/or services to the players using the present invention and the players may view this information while, for example, interacting with the present invention for playing a game such as blackjack, craps, roulette, poker, pai gow or the like. Moreover, a player may also interact with the present invention so that the player has the capability for responding to sponsor or advertiser presented questionnaires, as well as for purchasing or viewing sponsor goods and/or services. Thus, the present invention provides an information exchange service within a gaming context for enticing players to view and/or interact with sponsor presentations such as interactive advertisements.

It is also an aspect of the present invention that each player or user is presented with advertisements for products and/or services, wherein it is believed the player will be receptive to the advertisement. That is, the present invention selectively presents advertisements to each player, according to stored characteristics and preferences of the player that the present invention has determined from, for example, player supplied personal information, player responses to questions, and/or analysis of player interactions such as player requests for additional information related an advertisement. Thus, such a selective presentation of advertisements allows a sponsor or advertiser to provide information related to relatively extensive or expensive promotionals (e.g., demonstrations, samples, discounts, trial subscriptions, prizes, bonuses) to players most likely to subsequently purchase the advertised product or service. Consequently, such selectivity can greatly increase the cost effectiveness of advertising, wherein the term, advertising (or advertising presentation), as used herein is understood to include not only product or service presentations that are merely informational, but also more interactive advertising presentations such as promotionals wherein discounts, free samples or a trial usage may be offered.

Moreover, it is an aspect of the present invention that each player may interact with and play a game at a time and pace (i.e., tempo) substantially of the player's choosing. In particular, the player is not bound by a required order or sequence of play involving other players, even though the player may be in competition with other players. In fact, a player may cease play for an extended time while in the midst of a game and subsequently continue the game at the point where the player ceased to play. Thus, if the present invention is easily accessible, then players may interact with the present invention at their leisure.

Accordingly, in a related aspect of the present invention, it is intended that players (more generally, users) are able to interact with the present invention remotely, as for example, via the Internet and/or an interactive cable television network. Thus, using an Internet embodiment as an exemplary embodiment of the present invention, a gaming web site may be provided wherein players may access the interactive gaming capabilities of the present invention and substantially simultaneously also be presented with sponsor or advertiser provided information related to goods and/or services of the sponsor or advertiser (those two terms being used substantially interchangeably to denote e.g., those who provide advertising to users and/or subsidize game playing, product promotionals or network access). Moreover, the sponsor provided information may include, for example, hypertext links (also denoted hyperlinks) that allow players to activate, for example, network transfers for obtaining additional information regarding a sponsor's goods and/or services regardless of

5

6

the status of any game in which a player may be currently involved at the gaming web site.

It is a further aspect in one embodiment of the present invention that a player is able to commence play of a game at substantially any time the player accesses the present invention. That is, it is not necessary for any previous game being played by other players to be completed for the player to commence play. In other words, games provided by the present invention may be continuously and asynchronously commenced or entered by players.

It is a further aspect of the present invention to require each player to use a distinct identification provided when the player "registers" with the present invention before playing any games so that a network site for the invention may be able to identify each player. Accordingly, it is an aspect of the present invention during registration, that each player provides personal information about him/herself both for gaming identification and for use as selection criteria by sponsors or advertisers for presenting particular presentations. For example, in the case of an Internet embodiment of the present invention, such registering can be performed via the Internet prior to play of any games at a gaming/advertising web site. Thus, players may be required to provide the present invention with information about themselves such as name, address, E-mail address, age, sex, and/or other player characteristics deemed pertinent to one or more sponsors or advertisers. Accordingly, the present invention provides a sponsor or advertiser with the capability to target its presentations substantially only to players or users having selected characteristics as, for example, determined from player information provided when registering with a network site for the present invention.

It is a further aspect of the present invention to have players compete against one another for prizes in one or more gaming tournaments. Using the Internet embodiment of the present invention as illustrative, a gaming/advertising web site for the present invention may partition the population of players into competitive groups wherein each group includes the players for a distinct tournament. Moreover, the present invention may determine a competitive group according to criteria such as: (a) the game(s) to be played in the tournament; (b) a skill level for the players (e.g., as determined by play in a previous tournament(s)); (c) particular player characteristics such as age, area of residence, home ownership, etc.; (d) particular player lifestyle traits such as traits exhibited by exercise enthusiasts or cruise ship enthusiasts; and (e) particular player preferences such as preferences related to jewelry, personal care products or particular sports.

It is a further aspect of the present invention to allow players to play games offered by the present invention without incurring financial risk or charges beyond those that are typical for the network being used in accessing the present invention.

It is a particular aspect of the present invention to provide blackjack and other casino-style games such as craps, roulette, poker, pai gow, or variations thereof, wherein such games may be played by a plurality of players continuously and asynchronously, and wherein each game is likely to be unique from all other games being played concurrently. Furthermore, in a related aspect of the present invention, such games may be automated so as to not require a manual dealer. Also, the present invention may be played, in one embodiment, in a gaming establishment (e.g., casino) using low cost gaming stations at which players may play such games entirely electronically. Alternatively, in another embodiment, the present invention may be used to play such casino style games as blackjack on the Internet. In this later embodiment,

a blackjack game controller for the present invention communicates with blackjack players at Internet client nodes via a web site from which the blackjack game controller is accessed. Thus, blackjack players may play blackjack in the privacy of their own homes and at their leisure since the present invention does not require that a particular tempo of a blackjack game be maintained.

Additionally, the present invention utilizes novel varieties in such games, as blackjack, that make the games more enjoyable for users. For example, using variations of blackjack as illustrative, in one novel embodiment wherein the dealer functions are automated by a dealer module, this module can play blackjack with a plurality of players concurrently such that each player appears to be playing exclusively with the dealer module (e.g., "head-to-head"). Moreover, in one blackjack embodiment, each blackjack game is played asynchronously from other concurrent blackjack games with the dealer module. Furthermore, the dealer module may play a different dealer card hand with each player. In particular, the initial one (or two) cards (or card representations) dealt to the dealer for each game are unlikely to be the same for any two blackjack games being player with the dealer module; i.e., the probability of any two concurrently played blackjack games being identical is substantially equal to chance. Accordingly, this variation is particularly worthwhile when players are playing remotely through a network such as the Internet. Alternatively, in a different blackjack variation, the dealer module and each player concurrently playing blackjack with the dealer module may be provided with cards (or card representations) from the beginning of an identical sequence of card representations. Thus, each concurrently playing player receives an identical initial card hand and the dealer is also dealt an identical initial card hand. Subsequently, the card hands within each concurrent game will vary only if players request further cards differently. Accordingly, this variation of blackjack is particularly useful in tournament blackjack played within the confines of a casino, wherein the play of each player in the tournament is synchronized to start and stop within a predetermined interval. Note that this variation of blackjack is enjoyed by tournament players in that the tournament players may consider it a better or fairer way for demonstrating blackjack playing skill.

Other features and benefits of the present invention will become apparent from the detailed description with the accompanying figures contained hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of the present invention wherein this embodiment may be used within a blackjack gaming establishment such as a casino;

FIG. 2 provides a representation of the gaming stations 18 of FIG. 1 wherein these gaming stations are used in gaming establishments for playing blackjack;

FIG. 3 is a block diagram of an alternative embodiment of the present invention wherein the present invention is used to play blackjack on the Internet;

FIGS. 4A-4E represent a flowchart for the processing performed by the blackjack game controller 14 when processing blackjack requests from players in either of the embodiments of FIG. 1 or FIG. 3;

FIG. 5 provides a simple example of the operation of the present invention for playing a novel variation of blackjack wherein four blackjack games are shown being played asynchronously with the blackjack game controller;

FIGS. 6A and 6B are a block diagram of an Internet embodiment of the present invention;

US 7,496,943 B1

7

FIG. **7** is a diagram illustrating how a user navigates through web pages of the World Wide Web for accessing the game/advertisement web site **308** (FIG. **6**) functionality; and

FIGS. **8**A and **8**B are an alternative embodiment of the game/advertisement web site **308**. In particular, FIGS. **8**A and **8**B is a block diagram of an alternative embodiment of the present invention wherein an advertisement sending daemon (i.e., TCP/IP daemon ad sender on the host computer **308**) and an advertisement receiving daemon **806** (on the client end user machine **318**) communicate for periodically displaying advertisements and other announcements to a user on the end user machine **318**.

### DETAILED DESCRIPTION

In FIG. **1**, a block diagram is presented of a first embodiment of an electronic system **10** for the present invention for playing blackjack, wherein data flows are represented by solid arrows and control flows are represented by dashed arrows. In particular, the embodiment of FIG. **1** presents an architecture for the present invention for use on, for example, a local network within a casino, wherein low cost gaming stations may be utilized. Accordingly, the blackjack gaming system **10** includes a blackjack game controller **14** electronically connected to one or more potentially remote gaming stations **18** so that for each gaming station a player may play blackjack. In the blackjack gaming system **10**, the blackjack game controller **14** functions substantially as a dealer would in a manually operated blackjack game and each gaming station **18** provides a blackjack player with an electronic representation of a blackjack game wherein it may appear that the player (i.e., user) at the gaming station **18** is the only player playing against the dealer (i.e., "head-to-head" against the blackjack game controller **14**). Accordingly, each gaming station **18**, as will be discussed with reference to FIG. **2** below, includes a display for displaying both the dealer's cards and the player's cards. Each gaming station **18** also includes player interaction capabilities for requesting additional cards, activating various blackjack player options at appropriate times, and potentially increasing various wagers at predetermined phases of a blackjack game. Further note that each gaming station **18**, when in operation, may request a security code be provided by a player for identifying himself/herself or, alternatively, the gaming station may request the player to insert an electronic card (not shown) into the gaming station **18** so that information electronically encoded upon the card is read at the gaming station and transferred to the blackjack controller **14**.

Referring now to the internal structure of the blackjack game controller **14**, a gaming station interface **22** is provided for interfacing with each of the gaming stations **18**. In particular, the gaming station interface **22** buffers data signals between the other components included within the blackjack game controller **14** and the gaming stations **18**. For example, the gaming station interface **22** may have speed matching buffers in order to adjust for differences in speed between the blackjack game controller **14** and the gaming stations **18**. A blackjack driver **26** exchanges data with the gaming station interface **22**. The blackjack driver **26** substantially coordinates the operation of the blackjack game controller **14**. In particular, the following capabilities are substantially provided by the blackjack driver **26**:

(1.1) identifies each player requesting to play blackjack at one of the gaming stations **18**;

(1.2) creates internal data structures for communication with other modules of the blackjack game controller **14** regarding each blackjack game being played; in particular, black-

8

jack gaming data objects or records are (re)instantiated with each player request, such data objects providing sufficient information for the blackjack game controller **14** to properly respond to each received player request;

(1.3) determines the output of the blackjack game controller **14** to each of the active gaming stations **18**;

(1.4) distributes blackjack gaming data between other modules of the blackjack game controller **14**; and

(1.5) provides card representations to gaming stations **18**.

In performing the above tasks, the blackjack driver **26** communicates with a blackjack player registration and playing status database **28**. The database system **28** maintains in persistent storage information regarding each blackjack player. In particular, the database system **28** maintains:

(2.1) information identifying each player; e.g., a unique player identification code;

(2.2) information regarding, for example, each blackjack player's financial status; in particular, a credit limit and a current amount of funds (either to be paid or received from the player);

(2.3) for each person registered to play blackjack, information regarding the status or context of any game the player is presently playing; that is, sufficient information is stored so that the blackjack game controller **14** can retrieve this information and continue a blackjack game in response to receiving a player's request;

(2.4) for each person registered to play blackjack, information regarding any blackjack tournament that the player is playing; in particular, since such a tournament typically requires a tournament player to complete a specified number of blackjack games in a predetermined amount of time and/or to complete a specified number of blackjack games out of a total number of blackjack games, the following types of information may be stored: (a) information relating to the number of blackjack games completed by the player; (b) information related to the time and/or the number of games remaining in the tournament; and (c) information related to the amount of funds or points in the player's account for the tournament.

The blackjack driver **26** communicates with a wager accounting module **30** wherein the wager accounting module provides the following capabilities:

(3.1) determines various wagering limit parameters for the next one or more blackjack games to be played (e.g., the wagering limit per game and the total wagering limit per player); and

(3.2) performs wagering accounting for each player's wins and losses.

Thus, the wager accounting module **30** is instrumental in initializing a new blackjack game in that this module receives and maintains financial information related to each currently active player at a gaming station **18**. Thus, the wager accounting module **30** has a communication data channel with the blackjack player registration and playing status database **28** so that the wager accounting module **30** may retrieve information for determining whether the player has, for example, sufficient financial resources to cover potential wagering losses. Of course, to provide waging evaluation information to other controller **14** modules, the wager accounting module **30** receives identifying information from each such module requesting an evaluation.

The blackjack driver **26** also communicates with a blackjack player evaluator **34**. The blackjack player evaluator **34** receives, from each player (via instantiations of blackjack gaming data objects from the blackjack driver **26**), all black-

9

jack player requests except the data from each player indicating an amount to be wagered. Thus, the blackjack player evaluator **34**:

(4.1) determines each player's options during blackjack games; and

(4.2) responds to player requests for hits or to, for example, split pairs.

Thus, the blackjack player evaluator **34** enforces the gaming establishment rules related to player options during a blackjack game. Note, however, that in responding to certain player requests, the blackjack player evaluator **34** communicates with the wager accounting module **30** to confirm that a proper wager accompanies the requested option and that the wager is acceptable to the wager accounting module **30**.

The blackjack player evaluator **34** is supplied with data corresponding to blackjack card representations from a card generator module **38**. The card generator module **38** generates for example, an ordered collection or sequence of substantially random card representations and each such card representation is provided to the blackjack player evaluator **34**, wherein the blackjack player evaluator responds to each player's valid hit request by outputting the most recent card representation received from the card generator module **38**. That is, each player at a gaming station **18** receives a card representation according to when the player's request is received by the blackjack player evaluator **34**.

Further, note that the card generator module **38** also supplies the same card representations as supplied to the blackjack player evaluator **34** to a house blackjack playing module **42**, wherein this latter module plays the dealer's hand in each blackjack game. Thus, the house blackjack playing module **42** enforces the blackjack gaming rules on behalf of the gaming establishment. In particular, this module determines when and how insurance bets can be made related to the dealer's cards. Note, as with the blackjack player evaluator **34**, the house blackjack playing module **42** outputs, when required to provide the dealer's hand with another card representation at a gaming station **18**, the most recent card representation received from the card generator module **38**. Further note that the house blackjack playing module **42** provides control information to the blackjack driver **26**, particularly regarding activation of the blackjack insurance option. This information, in turn, is conveyed to the blackjack player evaluator **34** so that this latter evaluator may activate the insurance option for each player at an active gaming station **18**.

A blackjack hand evaluator **46** is also in communication with the blackjack driver **26**. The blackjack hand evaluator **46** evaluates each player's hand(s) in comparison to the dealer's blackjack hand for determining the win/loss/tie for each player's hand. Thus, the dealer's hand and the one or more hands played by each player at a gaming station **18** is supplied to the blackjack hand evaluator **46**. Subsequently, this evaluator outputs win/loss/tie results to the gaming stations **18** via the blackjack driver **26** and the gaming station interface **22**. Further, the blackjack hand evaluator **46** also outputs win/loss/tie results along with the identity of the player playing each hand to the wager accounting module **30** so that wager credits and debits for each player's account may be updated according to the last or most recent blackjack game results.

In FIG. **2**, an embodiment of a gaming station **18** is illustrated. The gaming station **18** includes a player input area **204** wherein a player may press touch-sensitive portions of a thin film laminated with blackjack player operations and requests. Immediately above the player input area is a player output display area **208** for displaying blackjack gaming information related to the player. Optionally, each gaming station **18** may

10

include a player identification card reader **216** so that a blackjack player may identify him/herself at a gaming station **18** by swiping a magnetic identification portion of a player identification card (not shown) through the card slot **220** thereby allowing the card reader **216** to transmit the player's encoded identification upon his/her card to the blackjack game controller **14**. However, it should be noted that other configurations of the gaming station **18** are also contemplated by the present invention. In particular, gaming station **18** may not have a card reader **216**. Instead, a blackjack player may be required to register either manually or automatically at a site remote from the gaming station **18**, or, alternatively personal identification numbers may be provided to players for identifying themselves via the player input area **204** wherein, for example, a numeric digit provided in the lower bottom portion of some of the touch-sensitive areas may be used by the player to input a personal identification number. Further, the arrangement of the touch-sensitive portions of the player input area **204** and the format of the display area **208** (both being discussed in detail below) may have other arrangements and still be within the scope of the present invention.

Describing in detail now the touch-sensitive portions of the player input area **204**, an activate/enter next game button **220** is provided. This button is used to initially activate the gaming station **18** so that a "request to play" signal is transmitted to the blackjack driver **26**. That is, assuming a player activates this button at a gaming station **18**, the blackjack driver **26** responds by requesting that the player input his/her identification via, for example, placing an identification card in the card reader **216** and/or a personal identification number via the player input area **204**. Additionally, note that the button **220** may be pressed at the end of a blackjack game for indicating that the player wishes to play another blackjack game. Note that in one embodiment of the present invention when consecutive games are played by a player, the player need only press the button **220** to commence a new game. That is, the player's identification need not be entered for each consecutive game played (assuming the button **220** is activated within a predetermined time after the last game has terminated).

The player input area **204** also includes a quit button **224** that a player may press to explicitly indicate the player's desire to terminate any further gaming at the gaming station **18**.

Additionally, buttons **228** through **248** provide the player with the capabilities to request the following blackjack gaming requests:

(5.1) The "HIT" button **228** allows the player to request another card to be dealt to him/her.

(5.2) The "STND" button **232** allows the player to stand on a current blackjack hand.

(5.3) The "DBL" button **236** allows the player to double down under appropriate circumstances as determined by the blackjack player evaluator **34**.

(5.4) The "SPLIT" button **240** allows the player to split the player's first two cards into two separate blackjack hands when these first two cards are identical.

(5.5) The "INS" button **244** allows the player to request insurance under the circumstances where the dealer's single face-up card is an ace.

(5.6) The "BET" button **248** allows the player to request that a bet or wager be entered during a blackjack game.

Note that subsequent to requesting a bet via the "BET" button **248**, the buttons **252** through **264** are activated so that the player may input various betting amounts. In particular, buttons **252** through **264** provide the player with the option to bet $5.00 (button **252**), $25.00 (button **256**), $100.00 (button

US 7,496,943 B1

11

260) and $500.00 (button 264). Moreover, a sequence of the buttons 252 through 264 may be pressed for obtaining a bet not provided by a single button. For example, to bet $130.00, the player presses consecutively each of the buttons 252, 256 and 260 (in any order) exactly once.

The player input area 204 also includes various confirm and cancel buttons 268 through 276. The accept button 268 allows the user to accept a last input. For example, it is an aspect in the present embodiment of the invention that after each user input, the input is accepted either by the player explicitly pressing the accept button 268 or by allowing a predetermined amount of time to expire after the last player input. The "CANCEL BET" button 272 allows the user to cancel an immediately preceding bet that was input. However, note that if a time limit is exceeded for placing a bet due to, for example, the player pressing the "CANCEL" button 272, then any minimum bet required will be automatically wagered on the player's behalf by the wager accounting module 30. Further, the "CANCEL LAST" button 276 may be used by the player to cancel the immediately preceding wager of one of the dollar amount buttons 252 through 264. Thus, if a player intended to bet $125.00 by pressing first the button 260 followed by the button 256 but instead pressed the button sequence 260 and 264, then the player may press the button 276 for cancelling the $500.00 bet associated with button 264 and subsequently the player presses the button 256 to obtain the desired bet of $125.00. Note further that pressing the "CANCEL LAST" button twice in succession also cancels the entire bet.

A "SPEED OF PLAY" button 280 may be optionally provided on the player input area 204. This button allows the player to specify to the blackjack driver 26, for example, the predetermined amount of time after a player input to wait before each subsequent input is automatically accepted. In one embodiment of the present invention, the "SPEED OF PLAY" button 280 includes active areas at each end of the button, wherein if the user presses the "slower" end of the button 280, then the predetermined time(s) for automatically accepting a player input is lengthened. Alternatively, if the player presses the "faster" end of the button 280, then the predetermined default acceptance time(s) becomes shorter. However, it is important to note that the tempo of the blackjack game is, using the present invention, no longer as important as in typical blackjack gaming situations. That is, since each blackjack player using the present invention is not playing in sequence with other players, there is less concern about speedily playing so as not to delay other players.

Lastly, the player input area 204 includes a "HELP" button 284 for allowing the player to request assistance from, for example, the personnel of the gaming establishment providing the gaming station 18.

Referring now to display area 208, the screen display provided here is but one of a number of contemplated screen layouts for the present invention. In particular, the screen layout illustrated in display area 208 is a representative layout for use in playing tournament blackjack. Thus, when other modes of blackjack are played other than tournament blackjack, then it is within the scope of the present invention to modify the fields represented in the display area 208 according to the player needs for the type of blackjack being played. Further, it is important to note that in one embodiment, the display 208 is in color so that, for example, diamonds and hearts are in red and spades and clubs are in black, and various fields of the display area 208 may be highlighted for focusing a player's attention on the portion of the display providing information most relevant to the player's currently permissible options.

12

Describing now the fields currently presented in display 208, at the top of the display is the house hand area 288: (a) for providing a representation of the cards that have been dealt to the house; (b) for providing a status of the house hand (i.e. one of: "STND" for standing, "BUSTED", when the value of the house hand exceeds 21, and "CONTINUING" when the house may take additional hits. That is, this field provides an annotation "house hand:" followed by a representation for at least one card that has been dealt to the house; i.e., an ace of hearts. In the player's hand area 292 of the display area 208, there are five columns providing information related to each blackjack hand the player is currently playing in the blackjack game. The columns provide the following information:

(6.1) The "PLAYER HAND(S)" column provides, in each row of this column, a different blackjack hand that is being played simultaneously by the player in the current blackjack game. Thus, two blackjack hands are presently represented as being played simultaneously by the player on the display area 208. That is, an upper or first hand having a three of spades, king of hearts, and a five of spades, and, a lower or second blackjack hand having a three of clubs and an eight of diamonds. (Note, when a player chooses to double down, card representations in common between two blackjack hands may be displayed in a row between the remaining card representations for both hands. Alternatively, card representations in common between blackjack hands may be duplicated in the blackjack hands to which the common cards representations apply.)

(6.2) A "STATUS" column for indicating the current status of each blackjack hand the player is playing. That is, for the first or upper hand that the player currently is playing the status is "STND" thereby indicating that the player has elected to stand on this hand. Alternatively, for the second or lower hand a status of "PICK OPTION" is provided thereby indicating that it is the player's turn to pick a blackjack playing option for this hand. Note that there are at least three possible values for the status field of each blackjack hand being played. That is, in addition to the two represented in FIG. 2, a "BUSTED" status value is output for indicating that the value of the related blackjack hand has exceeded 21.

(6.3) The "OPTIONS" column provides, for each blackjack hand being played, an indication of the permissible blackjack plays that the player currently may select from for the related blackjack hand in the same row. Thus, for the first hand illustrated in area 292, there are no options remaining for the player to play related to this hand. However, on the second hand, four permissible player inputs are displayed as options to the player. That is, the player may stand on the related hand (STND) by pressing button 232, the player may request a hit (HIT) by pressing button 228, the player may double down (DBL) by pressing button 236 and the player may bet an additional wager by pressing button 248 and subsequently putting a bet amount using buttons 252 through 264.

(6.4) The "LAST BET" column displays to the player his/her last bet for each blackjack hand the player is currently playing. In particular, for both the upper and lower hands shown in area 292, the player's last bet was $50.00.

(6.5) The "TOTAL BET" column displays to the player the total bet the player has wagered on the blackjack hand to which it relates. For example, in FIG. 2, in both the upper and lower player's blackjack hands displayed, the player has bet al. total of $200.00.

Below the player hand area 292 is the player information area 296 wherein additional blackjack gaming information relating to the player is displayed. In particular, labeled line

US 7,496,943 B1

13

300 displays the most recent bet amount that the player has requested along with a tag indicating the status (e.g., "ACCEPT/CANCEL") of the most recent bet. Note that the status may be: (a) "ACCEPTED" for explicitly or implicitly indicating the acceptance of a displayed wager (via the player pressing the accept button 268 or by default due to a time limit expiring); (b) "CANCELLED" for explicitly indicating the cancellation of the last entered wager (via the player pressing either of the cancel buttons 272 or 276); (c) "REJECTED", this status being displayed due to the wager accounting module 30 rejecting the player's most recent bet; and (d) "ACCEPT/CANCEL" for indicating that the present invention is waiting a predetermined amount of time for the player to explicitly accept or cancel the most recent bet. Thus, in the example of line 300 in FIG. 2, the player has indicated a most recent bet of $30.00 and the blackjack driver 26 has output a status of "ACCEPT/CANCEL" as in (d) above. Further note that the blackjack hand(s) to which this most recent bet applies may be designated in any of a number of ways such as, for example, highlighting the row(s) in the player hand area 292 of the blackjack hand(s) to which the most recent bet of line 300 applies. Alternately, an indicator such as arrows 302 may be used as in FIG. 2 to indicate to the player that the most recent bet is to be applied to both the upper and lower blackjack hand(s).

Additionally, note that line 304 displays the annotation "INSURANCE BET:" together with any insurance amount that has been bet by the player. Accordingly, the dollar amount on line 304 and the notation at the right end of the line pertain, respectively, to the amount that has been bet as insurance, and the status of this bet (i.e., one of "ACCEPTED", "CANCELLED", "REJECTED" or "ACCEPT/CANCEL" as in line 300).

In line 312 of the player information area 296, the total amount of funds available by the player for betting is displayed. For example, line 312 of FIG. 2 indicates that the player has a total amount for betting of $1,000.00. Note that the wager accounting module 30 maintains this total amount available for betting and updates it after each blackjack game.

The lower three lines 320, 324 and 328 of the player information area 296 provide blackjack player information that is particularly useful when playing in a blackjack tournament. Thus, the information in these three lines may not be displayed when the present invention is used by players not in a tournament. In line 320, two fields are provided for displaying playing time information. The leftmost field, annotated by the label "ELAPSED PLAYING TIME:", displays the total amount of time the player has played blackjack (which in this case is 45 minutes). Alternatively, the rightmost field, annotated by the label "REMAINING PLAYING TIME:", displays the time remaining in the tournament.

In line 324 an identifier for any tournament associated with the present blackjack game is displayed.

In line 328, up to two additional fields are provided that are useful in tournament blackjack. The leftmost field having an annotation "GAMES PLAYED:" displays to the player the number of blackjack games he/she has completed within a tournament. Note that in some blackjack tournaments each player is required to complete a certain predetermined number of games within a predetermined allotted time period. For example, a blackjack tournament may require each player to play 50 games within a predetermined interval (such as four days). Relatedly, but optionally, in blackjack gaming contexts where the total number of blackjack games in the tournament is meaningful, the rightmost field of line 328, having the annotation "GAME NUMBER:", displays to the player the total number of tournament games that have been completed

14

thus far in the tournament. Accordingly, using at least the leftmost annotated field in line 328 and "REMAINING PLAYING TIME:" annotated field of line 320, the player is able to determine the number of remaining games in the tournament that he/she must play.

Further note that other blackjack game values are contemplated by the present invention. For example, a field providing the number of games remaining that a player must play in the tournament may be added (or substituted for) in addition to the current values in the player information area 296.

In a next display 208 lower area, denoted the house area 336, blackjack house rules are displayed. In particular, the house rules displayed in area 336 allow variations upon the typical blackjack rules that a player is likely to assume if not presented with information to the contrary. Note that by providing these additional rules on the display of gaming stations 18, successive blackjack games may be provided with different house blackjack rules thereby creating an increased interest in each game by the players and requiring additional blackjack playing skills from the players. Note that three house rules are provided in the present display area 336. That is, (a) insurance for the present blackjack game pays 3 to 1 odds (instead of the typical 2 to 1 odds); (b) the player may double down after splitting only once; and (c) the minimum bet is $25.00 for the current game.

Lastly, the display 208 includes a player identification area 342 for identifying the player currently playing blackjack at the gaming station 18. The present player area 342, includes a field having the current player's name (e.g., I. R. SMITH). However, other fields identifying the player are also contemplated by the present invention including, for example, a player identification number such as the number that may be encoded upon a player identification card used in conjunction with the card reader 216 for identifying the player.

FIG. 3 presents a second embodiment of the blackjack gaming system of the present invention. In this embodiment, the blackjack game controller 14 is substantially the same as described hereinabove. However, this controller 14 is now accessible through an Internet web site 308 so that blackjack players at Internet client nodes 318 can play blackjack on the blackjack game controller 14 via the Internet 324 (or more particularly, via the World Wide Web).

Accordingly, describing the web site 308 in more detail, it includes an Internet interface 332 for receiving and supplying communications between the Internet 324 and the remainder of the web site 308. The Internet interface 332, in turn, communicates with World Wide Web server 340: (a) for validating and/or initiating registration of web site users (e.g., blackjack players) at web site 308; and (b) for interpreting Internet requests for routing and/or activating web site 308 modules that can fulfill such requests. Thus, the World Wide Web server 340 may access the database system 28 for determining the registration identity of, for example, a blackjack player. Additionally, upon receiving user registration confirmation regarding an Internet (e.g., World Wide Web) request, the World Wide Web server 340 activates instantiations of modules known as common gateway interface (CGI) scripts, each CGI script 348 instantiation (or, for simplicity, each such instantiation also being referred to as a CGI script 348) being: (a) for interpreting and processing Internet requests according to the semantics of a web site 308 application associated with the CGI script; and (b) for constructing Internet responses from output from the associated application. Thus, there are one or more common gateway interface modules provided wherein each CGI script 348 (instantiation) invokes the blackjack game controller 14 to process a single Internet blackjack request from an Internet client node 318 where a

US 7,496,943 B1

15

player is playing blackjack, and subsequently the CGI script **348** constructs an appropriate Internet response from the output received from the blackjack game controller **14**.

Since the embodiment of the blackjack game controller **14** of FIG. **3** is substantially identical to that of FIG. **1**, a description of its internal structure is not repeated here. However, it is worthwhile to note that the embodiment of FIG. **3** is particularly appropriate when the blackjack game controller **14** executes on a different or remote processor from that of, for instance, the processor performing the CGI script(s) **348**. Further, note that if the blackjack game controller **14** executes on the same processor as the other web site **308** modules of FIG. **3**, then the communication interface **22** may be unnecessary, and additionally, much of the functionality of the other components of the blackjack game controller **14** may be incorporated into one or more CGI scripts **348**. Thus, for example, the blackjack player evaluator **34** functionality may be incorporated into one CGI script **348** while house blackjack playing module **42** functionality may be incorporated into another CGI script.

There are also noteworthy distinctions between the gaming stations **18** of FIGS. **1** and **2** and the Internet client nodes **318** of FIG. **3** as well as distinctions in blackjack play interactions. For example, the following distinctions may be provided:

(7.1) Due to the potentially lengthy delays that occur on the Internet, the embodiment of FIG. **3** does not provide for automatic acceptance of a blackjack play (e.g., acceptance of an input bet or a default to a minimum ante) due to a time period expiring. Thus, the speed of play is determined by the responsiveness of each player and the responsiveness of the Internet.

(7.2) Players may play blackjack in tournaments against one another on the Internet wherein, for each tournament entered by a player, he/she receives, without cost, a predetermined number of points to use for playing in the tournament. Note that prizes may be awarded to tournament winners as incentive to play in such blackjack tournaments. Further note that the time period to complete a tournament may be substantially more lengthy than the time periods for typical blackjack tournament play. For example, a tournament may extend for 90 days since players can play at their leisure.

(7.3) The input keys of gaming station **18** of FIG. **1** may be also presented on the display screens of Internet client nodes **318** wherein the input buttons of gaming station **18** now become active buttons on a blackjack web page generated by the web site **308** and presented to a player at an Internet client node **318**. However, note that at least the speed of play key **280** is not necessary, as mentioned in reference to the embodiment of FIGS. **1** and **2** since the speed of play is of diminished importance.

(7.4) There may be other types of information output to an Internet client node **318** in addition to the information displayed in FIG. **3**. In particular, advertising information may be provided with each web site **308** response to a player regarding, for example, blackjack tournament sponsors and prizes.

In FIGS. **4A-4E**, a flowchart is presented of the high level steps performed by the blackjack game controller **14** when processing player requests in either of the embodiments of FIG. **1** or **3** for playing a novel blackjack variation wherein new eligible card representations are generated periodically regardless of whether they are dealt in a blackjack game or not and wherein the blackjack players may play the game asynchronously from one another. In step **408**, the blackjack game controller **14** is initialized so that it may process blackjack player requests and output appropriate responses to each

16

player's request. Subsequently, in step **416**, the card generator module **38** commences to output at regular intervals (e.g., less than two seconds such as every 0.5 seconds) random card representations to both the blackjack player evaluator **34** and the house blackjack playing module **42**. Thus, for as long as the blackjack game controller **14** is properly responding to blackjack player requests, the card generator module **38** continuously and regularly outputs card representations. Concomitantly with the actions in step **416**, the remaining steps of FIGS. **4A-4E** are performed. Thus, in step **424**, the controller **14** waits for a (next) blackjack player input, such inputs being, for example, requests to enter a new blackjack tournament, requests to commence a new blackjack game within a tournament, requests to process a blackjack game play request, and a request for information regarding the players account, and a request for help information (such as how to play blackjack).

Upon receiving a blackjack player request, in step **430** the communication interface **22** queues the request and subsequently transmits the request to the blackjack driver **26**. In step **436**, a determination is made as to whether the players request is related to a current blackjack game and/or current blackjack tournament. If not, then step **448** is encountered wherein an additional determination is made as to whether the player's request is to enter a new blackjack tournament. If so, then in step **454** the blackjack driver **26** determines a blackjack tournament and enters the player into the tournament. Note that in providing this function, the blackjack player **26** communicates with the wager accounting module **30** to confirm that the player is eligible to enter a new tournament. Thus, the blackjack driver **26** supplies the wager accounting module **30** with at least the player's identification and a specification of the tournament in which the player may be entered. Note that the tournament selection may be provided by the player in some embodiments of the present invention. Alternatively, the blackjack driver **26** may select a tournament for the player using tournament information stored in the database system **28**. Assuming that the wager accounting module **30** responds with a confirmation that the player may be entered into the selected tournament, in step **458**, the blackjack driver **26** creates a confirmation record identifying the blackjack tournament in which the player is entered. Subsequently, in step **462** the blackjack driver **26** outputs information in the confirmation record to the player at his/her Internet client node **318** (gaming station **18**). Thus, in the embodiment of FIG. **3** of the present invention, the output of step **462** (and all subsequent such outputs to a blackjack player) are output from the blackjack driver **26** to the communication interface **22** for queuing until the output can be transmitted to the CGI script **348** that initiated the player request to which this output is a response. Subsequently, the output is transmitted to the World Wide Web server **340** and to the Internet interface **332** for transmitting on the Internet **324** and thereby being routed to the Internet client node **318** where the player is playing blackjack.

Following step **462**, in step **466**, the blackjack driver **26** enters, into the database system **28**, information indicating the blackjack tournament in which the player has been entered. Note that the information entered here into the database system **28** is subsequently accessible both by the blackjack driver **26** and the wager accounting module **30** for determining the tournament(s) in which the player has been entered. Following this step, since the player's request has been processed, the flow of control loops back to step **424** to wait for the next player input from a player at an Internet client node **318** or alternatively a gaming station **18**.

Returning now to step **448**, if the player has not requested to enter a blackjack tournament then step **470** is encountered

US 7,496,943 B1

17

to process any miscellaneous blackjack player requests not related to a current blackjack game and/or blackjack tournament. For example, a player may request accounting information related to his/her blackjack gaming account. Assuming such requests are processed and responded to in this step, the flow of control again returns to step **424** to wait for a next player input.

Returning now to step **436**, if the player request is related to a current blackjack and/or blackjack tournament, then step **476** is encountered wherein the blackjack driver **426** uses the player's identification (ID) provided with the request for retrieving any status information from the database system **28** regarding any current blackjack game and/or blackjack tournament in which the player may be currently involved. Subsequently, in step **480**, a determination is made as to whether the player request is to commence a new blackjack game in a current tournament. If so, then in step **484** the blackjack driver **26** requests confirmation from the wager accounting module **30** that the player can commence with a new blackjack game in the current tournament. That is, the wager accounting module **30** determines whether the player has sufficient tournament credits to continue in the tournament. Following this, in step **488**, the blackjack driver **26** determines whether a confirmation has been received from the wager accounting module **30**. If no such confirmation is provided, then in step **492**, the blackjack driver **26** outputs a message to the player at his/her Internet client node **318** (gaming station **18**) indicating that no further blackjack games in the current tournament may be played by the player.

Alternatively, if in step **488** the blackjack driver **26** receives confirmation from the wager accounting module **30**, then in step **494** the blackjack driver **26** creates a blackjack game record for fulfilling the player's request. Note that in creating the new blackjack game data record, the blackjack driver **26** communicates with the wager accounting module **30** to both debit the player's account for any initial ante corresponding to commencing the new blackjack game and also to output to the blackjack driver **26** data of this transaction for subsequently outputting to the player. Following this step, in step **496**, the blackjack driver **26** requests the blackjack player evaluator **34** to provide an initial blackjack game configuration for the new blackjack game. Subsequently, in step **500**, the blackjack player evaluator **34** responds with an initial blackjack game configuration, wherein this configuration includes the initial card representation for the player's hand (as shown, for example, in area **292** of FIG. **2**). Note that this initial card representation is the most recent card representation provided to the blackjack player evaluator **34** by the card generator module **38**. Thus, note that if two player requests to commence a new blackjack game were transmitted to the blackjack driver **26** in rapid succession, then step **500** may be performed for each of the requests before the dealer module **38** outputs a new random card representation to the blackjack player evaluator **34**. Consequently, in such a case both players will be presented with an identical initial card representation for the player's hand. Subsequently, in step **504**, the blackjack driver **26** stores information regarding the identity and initial configuration of the new blackjack game for the player in the database system **28**. In particular, a blackjack game identifier for the new game is stored and associated with the identity of the blackjack player and the tournament to which the game is associated. Following step **500**, in step **504**, the blackjack driver **26** stores information regarding the new blackjack game for the player in the database system **28**. In particular, the following information is stored regarding the initial configuration of the new blackjack game: the player's identity, the identity of the tournament for which the new game cor-

18

responds, and identifier identifying the new game, and an initial configuration for the new blackjack game including card representations and any initial required bets. Further, note that throughout the course of each blackjack game played by a player, the blackjack driver **26** and the wager accounting module **30** update information in the database system **28** as the game configuration changes due to interactions between the player and the blackjack game controller **14**. Thus, for a blackjack game underway, each request from a player for continuing the game with a next play, need not provide the entire game configuration to the blackjack game controller **14**. Instead, only sufficient information is required in the request for the blackjack driver **26** and/or the wager accounting module **30** to retrieve information related to the blackjack game configuration corresponding to the player's request. Following step **504**, in step **508**, the blackjack driver **26** outputs an initial blackjack game configuration for the new game to the player at his/her Internet client node **318** (gaming station **18**). Subsequently, the flow of control once again returns to step **424** to await a next player input to the controller **14**.

Returning now to step **480**, if it is determined here that the player request is not to commence a new blackjack game in a current tournament, then step **520** is encountered wherein a determination is made as to whether the player request is related to a play in a currently active blackjack game. If not, then in step **524** the blackjack game controller **14** processes miscellaneous requests such as, for example, a request for special blackjack rules relating to a current game and/or tournament, the number of players remaining in the current tournament, the player's ranking in the current tournament, and the prizes for winners of the current tournament. Subsequently, assuming such miscellaneous requests are responded to, in step **524**, the flow of control for the present flowchart returns to **424** to await a next player input.

Alternatively, if in step **520** the player request is related to a play in a currently active blackjack game, then in step **528** a further determination is made as to whether the player request is for a new card representation. If so, then in step **532**, a determination is made as to whether the card request is for the house or for the player. If the card request is from the house, then in step **536** the blackjack driver **26** communicates with the house blackjack playing module **42** for obtaining a new blackjack game configuration for the current blackjack game, wherein the new game configuration includes the most recently output card representation from the card generator module **38** as the next card representation in the house hand for the blackjack game from which the current player's request came. Subsequently, in step **542** the house blackjack playing module **42** outputs blackjack game configuration information indicating the new house hand card representation and any player response(s) that the player may exercise in responding to the new blackjack game configuration.

Upon receiving the house blackjack playing module **42** output, in step **546**, the blackjack driver **26** determines whether there is a further player response in the present game by invoking one or both of the blackjack player evaluator **34** and the blackjack hand evaluator **46**. If there are additional possible player responses, then in step **550** the blackjack driver **26** outputs a blackjack game configuration to the player at his/her Internet client node **318** (gaming station **18**) so that the player may exercise one of his/her available game options. Subsequently, having processed the player's request the flow of control again loops back to step **424** to await a next player input. Alternatively, if in step **546** the blackjack driver **26** determines that there are no further possible player responses, then the current blackjack game is complete and the blackjack

US 7,496,943 B1

19

driver **26** in step **556** activates the blackjack hand evaluator **46** for evaluating the blackjack game hands so that the blackjack hand evaluator can activate the wager accounting module **30** to update the player's account (according to the results of the blackjack game) in the database system **28**. Following this step, in step **560** the wager accounting module **30** outputs to the blackjack driver **26** updated accounting information to be provided to the player. In step **564**, the blackjack driver **26** outputs the results of the blackjack game and the players updated account information to the player. Also, note that the blackjack driver **26** updates the database system **28** regarding the completion of the present blackjack game as well as any further status information related to the player and the tournament to which the present blackjack game is associated. Subsequently, having processed the player's request, the flow of control again loops back to step **424** to await a next player input.

Alternatively, if in step **532** it is determined that the player's request is for a new card representation for the player, then in step **568** the blackjack driver **26** activates the blackjack player evaluator **34** for obtaining a new blackjack game configuration for the current blackjack game, wherein the new game configuration includes the most recently output card representation from the card generator module **38** as the next card representation for the player's hand(s). Subsequently, in step **572** the blackjack player evaluator **34** determines the next blackjack play options the player may exercise for the present game and then outputs the new blackjack configuration with these options to the blackjack driver **26**. Following this, the steps **546** and subsequent steps are performed as described above.

Returning now to step **528**, if the player request is not for a new card representation then step **576** is encountered wherein the blackjack game controller **14** processes other blackjack player game requests such as requests for additional bets, cancellations of bets, a request to stand on a particular player hand, a request to split a pair of card representations, or a request for insurance. Assuming, that such requests as described above are processed, in step **580** the blackjack driver **26** subsequently outputs a new blackjack game configuration to the player according to the processing performed in step **576**. Also, note that the blackjack driver **26** updates the database system **28** with information relating to the new blackjack game configuration so that it may be retrieved upon a subsequent player request relating to the present game. Following this step, the flow of control for the present flowchart loops back to step **424** to again wait for another player input.

FIG. **5** presents a simple example of the operation of the present invention for playing blackjack wherein four blackjack games are shown being played asynchronously with the blackjack game controller **14**. To describe FIG. **5** in detail, note first that the row of numbers **604** across the top of the figure represents a sequence of values of successive card representations output by the card generator module **38**. That is, in a first time interval a card representation having a value of three is output, in a second time interval a card representation having a value of five is output, in a third time interval a card representation having a value of seven is output and so on across the row. Below row **604** are blackjack game rows **606**, wherein each blackjack game row **606** represents a series of events that occur in each blackjack game **610** through **626** over the course of time corresponding to the series of card values **604**. In particular, the numerical entries within each blackjack game row **606** correspond to the values of the **604** player and house card hands as additional cards are added to the player and house hands of each blackjack game. For

20

example, referring to blackjack game row **610**, assuming this blackjack game commences with the player's hand obtaining the card representation for the leftmost card value of the sequence **604** (i.e. the value three), the player's hand has a corresponding value of three. Subsequently, if the house blackjack playing module **42** is activated for this game to output (i.e. deal) an initial card representation to the house during the second time interval (i.e. the card generator module **38** has output a card representation of five), then the house hand initially has a value of five. Subsequently, if in the third interval the player for blackjack game **610** provides a request for another card, then the card representation corresponding to the value of seven in sequence **604** is provided to the player and therefore the player's hand has a total value of ten. Following the incorporation of the seven into the player's hand, this blackjack game is delayed so that the next time interval corresponding to the value of two in sequence **604** is not dealt to either the player or the house in blackjack game **610**. Note that it is an important aspect of the present invention that card representations generated by the card generator module **38** are only incorporated into a particular blackjack game when a request for such a card representation is made during the time the card representation is the most recent output from the card generator module **38**. Thus, one or more card representations output by the card generator module **38** during a blackjack game may not be used in the game. More precisely, it is typical (although not shown in the example of FIG. **5**) that substantially any length or subsequence of consecutive card representations output by the card generator module **38** may be ignored within a given blackjack game due to time delays occurring in the game. Thus, in some circumstances such delays could be as long as a number of days if the player, for example, did not request another hit during such a time interval.

Continuing now with the remaining plays of blackjack game **610**, note that in the fifth time interval the player requests a hit thereby obtaining a card representation having a value of nine and thus obtaining a player's hand value of nineteen. Subsequently, the house takes hits for the next two consecutive card representations having values eight and ten respectively. Thus, the house hand busted when the value of twenty-three was obtained for the house hand.

Blackjack game rows **606** for blackjack games **614** through **626** may be interpreted similarly to the description above for blackjack game **610**. Note however that each of these games commence at a different time interval in that each game commences with a different card representation taken as the first hit for the player's hand. That is, the first card representation dealt in each of the blackjack games **610** through **626** is different and further each of the card representations requested corresponding to values of the sequence **604** is different for each blackjack game. Therefore, substantially every blackjack game, even if played concurrently with other blackjack games, will have unique player hands and house hands. Thus, not only can a large number of asynchronous blackjack games be played simultaneously head-to-head with the house, but also there may be a greater degree of confidence by the blackjack players that the house is not manipulating card representations in that blackjack players may substantially determine the timing for substantially all hits in a blackjack game (for both the player hand and the house hand) and thereby reduce any suspicions that the card representations are being manipulated. Moreover, in one embodiment, the players may request the sequence of card representations that were generated during the course of a game.

Note that the present invention also may include other blackjack variations as well. In particular, referring to step

US 7,496,943 B1

21

**416** (FIG. **4**A) again, instead of generating card representations at regular intervals, this step may simply activate the card generator module **38** so that it generates a substantially random card representation on demand whenever a request for a new card representation is made (e.g., steps **536** and **568**).

Additionally, in another blackjack variation, particularly suited for tournament blackjack where each player can be monitored, the players play each play for a blackjack game synchronously as blackjack is typically played with a human dealer in casinos. However, in the present variation, each player is provided with the identical card representations for their initial cards. Subsequently, each player hand and the house (i.e., dealer) hand varies between players only when players play their blackjack hands differently. That is, for each synchronously played blackjack game among a plurality of players, the same sequence of card representations is available to each player and the house blackjack playing module **42** so that, for example, the dealt card representations in each game between one of the players and the house blackjack playing module are identical for players playing the same sequence of plays throughout the game. Accordingly, as one skilled in the art will appreciate, for each blackjack game, it may be necessary for the card generator module **38** to maintain a predetermined sequence (or ordered collection) of card representations throughout the game so that layers playing differently may be dealt an appropriately sequenced card representation. Moreover, it may also be necessary for the house blackjack dealer playing module **42** to provide sufficient control information to the card generator module **38** so that the card generator module can respond with the appropriate card representation from the predetermined sequence.

Another embodiment of the present invention is presented in FIGS. **6**A and **6**B, wherein this embodiment is enhanced for presenting sponsor or advertiser product and/or service advertising to qualified players that adequately match a predetermined player profile such as a demographic profile of a particular group of players. Accordingly, in FIGS. **6**A and **6**B, there is a game/advertisement controller **604** for providing substantially the same functionality as the blackjack game controller **14** (FIG. **3**) except that games other than blackjack may also be played (such as poker, craps, pai gow and roulette). Additionally, the game/advertisement controller **604** also performs functions related to matching particular advertising with the users (i.e., players) playing the various games provided by the game/advertisement web site **308**, wherein each user communicates with the web site **308** on a corresponding Internet client node **318** (alternatively interactive cable television node). That is, the present FIGS. **6**A and **6**B present the high level modules for matching players having desired user characteristics (e.g., profiles) with advertising from sponsors or advertisers requesting players with such user characteristics. In particular, only the players with such desired profiles qualify for receiving a particular advertisement and/or promotional (i.e., advertising) from a particular sponsor or advertiser. Accordingly, it is an aspect of the present invention that various criteria may be used to make such a determination as to which players (or, more generally, users) receive which advertising. For example, one or more of the following attributes may be used in matching users with advertising presentations:

    (8.1) age,
    (8.2) sex,
    (8.3) financial status,
    (8.4) location or residence,
    (8.5) education,
    (8.6) marital status,

22

    (8.7) amount of recreational time,
    (8.8) personal tastes and/or habits (e.g., smoker/nonsmoker, preferences for sports, movies, liquor, foods, clothes, vacations, cars, etc.),
    (8.9) size of household,
    (8.10) number of children, and
    (8.11) categorizations of users according to network interactions such as the type of web sites accessed, the type of advertising for which the user seeks additional information, the risk tolerance in playing games such as blackjack.

To provide (or, match) particular users with particular advertising, data (or user information items) on each user is maintained in the form of a user profile in the user (player) database **28** which is an enhanced version of the blackjack player registration and playing status database **28** of FIG. **3**. The user profiles are populated with such user related information as in (8.1) through (8.11). This information is obtained when users register at the web site **308** when users respond to explicit questions subsequently asked of them, or by monitoring the network activities of users. Note that user profiles may vary in length, depending on the amount of information obtained on each user. Moreover, different types of information may be obtained for different types of users. For example, for users having assets of more than one million dollars, these users may be requested to enter their favorite vacation destination location since this may be important for certain advertisers. However, for users whose assets are less than forty thousand dollars, no such information may be obtained since the information would be likely irrelevant to any advertiser. Thus, in one embodiment of the user profiles, each user profile has a variable length section for storing user information items not uniform across all users. Moreover, in such an embodiment, each user information item stored in the variable length section may be considered as a pair, wherein the first component of each pair indicates or references a question, user attribute, or user classification to which the second component provides an answer or value related to the first component. Thus, for example, for a particular user, an information item may provide the pair: (4, "Madrid"), wherein "4" identifies the attribute: "favorite vacation destination location," and "Madrid" is the value for this attribute, as one skilled in the art will understand.

Alternatively, data related to the advertisers or sponsors may reside in a different database, the advertiser database **612**. Accordingly, this database stores demographic profiles which, in one embodiment, have a data structure substantially identical to the user profile data structure. Such demographic profiles may have a variable length section for specifying requested values for user information items that may be provided in (potentially only a relatively small number of) user profiles. In some embodiments, a demographic profile includes a reference to the advertiser's or sponsor's identity, a reference to the advertising to be presented and a variable length section of demographic item pairs, wherein the first component of each pair has the same interpretation as the first component of a user information item pair and the second component of the pair specifies a desired value or range of values that the advertiser or sponsor prefers. Further, note that, in some embodiments, each demographic item pair may have additional information associated with it such as a perceived importance of the demographic item pair to the advertiser or sponsor. Thus, such additional information may be in the form of a normalized scalar value wherein a value of one indicates that the demographic item pair is of highest importance whereas a value of zero indicates that the demographic item is substantially irrelevant to the advertiser or sponsor.

US 7,496,943 B1

23

24

Accordingly, regardless of the particular embodiment of the demographic profiles, the users' demographic profiles are used to match (i.e., select) one or more corresponding advertising presentations with a particular target group of users that, presumably, are likely to purchase the product and/or service portrayed in such advertising presentations. Thus, since such advertising presentations may be provided to only users who are likely to be subsequent customers, advertisers and/or sponsors may provide to these users specifically targeted advertising having relatively expensive promotionals such as product or service discounts, free samples, or a trial usage.

Accordingly, to perform the selecting or matching of users with such demographic profiles, for each user, the user profiles stored in the user database 28 are compared with the demographic profiles by the advertising selection engine 618. Note that there are numerous techniques for performing such a comparison for selecting a group of users. In particular, a precise match may be required between each demographic item pair and a corresponding user information item pair so that the second component of the user information item pair is (within) a desired range as specified in the corresponding demographic item pair. Alternatively, various weighting statistical techniques may be used for determining a "similarity" measurement when not all demographic pairs are required to precisely match a demographic profile. In one embodiment, the similarity measurement may be provided by a statistical analysis module that determines the users that most closely match the corresponding demographic profile for an advertising presentation. Thus, in order for a user to be selected, the similarity measurement between the user's profile and a corresponding demographic profile may be required to be above a predetermined threshold. Additionally, note that the advertising selection engine 618 may perform the matching of users with advertising presentations as a background or non-real time process so that, for example, for each user profile in the user database 28, there is a related table identifying the advertising presentations that are candidates for presentation to the corresponding user when, for instance, this user communicates with the game/advertisement web site 308.

Moreover, it is important to note that at least in one embodiment of the present invention, the advertising selection engine 618 may, for a particular demographic profile, periodically re-evaluate user profiles in the user database 28 for reselecting the group of users to which an advertising presentation is to be presented. Thus, users previously selected may be requalified or disqualified and users previously disqualified may be now qualified for selection due to, for example, an enhanced user profile.

Accordingly, the present invention may commence or cease transmitting a category of advertising to a user whose user profile is enhanced with additional information. For example, if a user indicates that he/she is currently considering the purchase of a new car, then advertising for purchasing a car may be transmitted to the user. Alternatively, once the present invention is notified that, for example, a car has been purchased or that no further car advertising is are desired, then a further enhancement of the user's profile may be performed so that no further advertising from the category of car advertising is transmitted to the user.

Note that the present invention provides for flexibly creating, deleting and modifying categories of advertisements by providing techniques for linking demographic item pairs that are similarly related to a category record or object. Thus, at least the following advertising categories may be provided by the present invention: sports categories (e.g., baseball, soccer, hockey, etc.), food related categories (e.g., restaurants, gro-

cery stores, food items), exercise related advertising (e.g., bicycles, in-line skates, skiing), insurance related advertising (e.g., auto insurance, life insurance), political related advertising (e.g., for or against a particular political candidate), and geographical related advertising (e.g., for users living in a particular area such as the Denver metropolitan area). Thus, the advertising selection engine 618 supplies the selected advertising presentations to the HTML display engine 622 for translating this data so that it may subsequently be included in an HTML output to the user by the common gateway interface 348.

More precisely, the selected advertisement data is joined in the HTML display engine 622 (at least in one operation of the present invention) with a token 628 representing, for example, a gaming card (for a current user game) that has been issued by the token generator (module) 38, this generator being an enhanced version of the card generator module 38 of FIG. 3. The generated token is supplied initially to the game play engine 632 for processing user gaming requests according to the rules of the game being played. That is, the game play engine 632 determines, for each available game: (a) how each token may be "played"; (b) who receives the token, for example, the user or the house playing module 42; and (c) the result of playing the token. Note that in one embodiment, the token generator 38 generates tokens on request by, for example, the house playing module 42 and/or the player options evaluators 34, wherein the tokens generated are appropriate to the game being played. Alternatively, in another embodiment, the token generator 38 may generate random tokens and the game play engine 632 transforms the tokens into appropriate randomized values for the games offered, as one skilled in the art will appreciate. Furthermore, other embodiments for supplying randomized tokens to a plurality of different games are within the scope of the present invention. Additionally, the game play engine 632 contacts the player database 28 to maintain the status of the user in relation to the particular game being played as well as the user's relationship to all of the other users (if, for example, the user is involved in a tournament offered at the game/advertisement web site 308). Note that, as one skilled in the art will appreciate, in one embodiment of the game play engine 632, its internal modules provide a similar architecture and functionality to the correspondingly labeled modules of FIG. 3, albeit additionally, for games other than blackjack (e.g., "head-to-head" poker, craps, roulette, and pai gow).

The common gateway interface or CGI scripts 348 transfer data between the HTML display engine 622 and the World Wide Web server 340 which, as one skilled in the art will understand, may be a plurality of high level executable programs as discussed in the description of CGI scripts 348 for FIG. 3. The World Wide Web server 340, in turn, transfers the data to the Internet TCP/IP stack 332 that interfaces with the Internet 324 for transferring the data to an intended Internet client node 318 having an appropriate World Wide Web browser 640.

The present embodiment maintains information on the status of games being played and user responses to advertising in the user database 28. Moreover, additional advertiser specific information (e.g., desired demographic profiles, advertisements, promotionals, and information related to user responses) is provided in the advertiser database 612. Accordingly, as discussed above, the demographic profiles in the advertiser database 612 may include schemes or templates having fields for designating one or more of the attributes (8.1) through (8.11). Moreover, the databases 28 and 612 may maintain records of various types of pertinent statistics such as: (a) the advertising presentations presented to each user;

US 7,496,943 B1

25

26

(b) the time, date and number of presentations of a particular advertising presentation; and (c) the detected user responses to the advertising. Thus, this information may provide advertisers or sponsors with enhanced feedback as to the efficacy of their products, services and presentations thereof. Thus, by maintaining data regarding information on: (i) each game played, (ii) the users and (iii) the advertisers, the host computer 10 may maintain accurate records of every type of pertinent statistics such as: all advertisements seen by all users so that the time, date and number of views are available to the advertiser to confirm and verify e.g., (9.1) through (9.3) following, and additionally, an advertiser may be able to query the user and advertiser databases 28 and 612 to obtain such feedback as:

(9.1) who has seen a particular advertisement;

(9.2) when it was seen;

(9.3) the number of times the advertisement was accessed:

(a) by any particular user;

(b) by all users; and

(9.4) the number of favorable and/or unfavorable responses.

Referring now to FIG. 7, a diagram is presented providing one embodiment of the access routes or paths users navigate in accessing the features of the game/advertisement web site 308. In particular, upon initiating Internet contact with the game/advertisement web site 308, a user is first presented with the opening page 700 identifying the web site 308. Subsequently, the user can access the benefits and registration pages 704 for viewing general information related to web site 308 and also for registering at the web site (as is discussed in further detail below). Alternatively, the user may access one or more "Lobby" pages 708 to view the gaming and information exchange capabilities as, for example, provided by advertisers. Assuming the user is registered at the game/advertisement web site 308, the user may proceed from the LOBBY 708 to the game page 710, wherein a game 726 or game rules 730 can be selected for playing, via the introduction to game pages 728. Alternatively, the user may instead access one or more index pages 714 having, for example, listings of organizations to which the user may be allowed to access depending on the affiliations of the user (e.g., a member of a particular membership discount store chain). Additionally, from the index page(s) 714 substantially any user may access an advertisement or promotional provided by an advertiser on an advertiser page(s) 722. However, it is an aspect of the present invention that information related to certain promotionals provided by advertisers or sponsors are restricted. That is, such promotionals may be only presented to users having a demographic profile that has been determined by the present invention to be sufficiently compatible with a desired user profile for the advertiser or sponsor to warrant providing such a promotional. Thus, the present invention provides access to certain advertiser promotionals only to "qualified" users who are, for example, considered likely subsequent purchasers of the advertiser's products and/or services. Additionally, such promotionals may also be presented to users who express an interest in a particular product or service advertised. For example, users who (a) request additional or supplemental information related to an advertised item, or (b) provide a favorable response to such advertising (by, for instance, indicating a preference for an advertised item), or (c) respond to a questionnaire related to personal information or marketing survey information may also be provided with information regarding promotionals. Thus, advertisers or sponsors may offer relatively substantial or expensive promotionals via the present invention to such users as well. Moreover, the present invention may also utilize such demographic profiles to pro-

hibit a user not sufficiently matching such a demographic profile from gaining access to a corresponding promotional. Accordingly, in one embodiment of the present invention, when the user accesses an advertiser page 722, the user's profile (in the user database 28) is compared with the demographic profiles in the advertiser data base 612 for determining any promotionals that can be presented to the user.

Moreover, from the index page 714 the user may be provided with the ability to link into various web sites or web site pages. That is, the user may be provided with the ability to link into another web site or web page at any time a link is made available (typically a hypertext link). Additionally, note that similar links may be accessible by users while playing a game 726. However, these links may generally hyperlink the user to an advertiser page 722 within the game/advertisement web site 308 so that the user may be exposed to further information and/or presented with promotional options for an advertised item. For instance, certain advertising hyperlinks may be integrated into the presentation of plays of a game 726. Accordingly, since an aspect of the present invention is to repeatedly integrate different advertising presentations (and any related hyperlinks) into the play of a game 726, a user may repeatedly be enticed to seek out additional information about different products or services by activating the related hyperlinks. Moreover, it is also an aspect of the present invention that when such hyperlinks provide the user with access to a different web site, that at least a portion of the display of the user's Internet client node 318 maintains a graphical format associated with the game/advertisement web site 308, and that the user may leave and return to the web site 308 without the user being aware of accessing another web site. Moreover, by monitoring user input related to an advertising presentation, the present invention is able to provide feedback to an advertiser as to, for example, the number of times the advertising presentation is accessed by users for such additional information about products or services.

Also note that some advertisements (presented via advertiser pages 722 or as part of a game play presentation) may be interactive with the user wherein the user may perform a transaction such as making a reservation (e.g., an airline or hotel reservation). Further, a user may be given the opportunity to provide positive and negative opinions or responses on, for example, various advertisements, promotionals and other related matters by expressing such responses upon accessing advertisement related information. Thus, it is an aspect of the present invention to be able to conduct "test marketing" in that statistically representative groups of users may be selected for determining:

(10.1) the efficacy or appeal of one advertisement in comparison to another advertisement for a particular advertised item;

(10.2) the profile of the users that are responsive to a particular advertising presentation; and/or

(10.3) whether a particular group of users, for example, having similar user profiles favorably respond to a particular advertising presentation. For example, the present invention may determine such a response: (a) by detecting an activation of a hyperlink, (b) by detecting a response to questions presented, and/or (c) by determining the length of time the advertising presentation is displayed or visible.

Accordingly, input response data may be transmitted to the game/advertisement web site 308 and retained for subsequent statistical evaluation. Thus, resulting aggregate statistics can be made available to, for example, advertisers or sponsors, thereby preserving the privacy of the users. In particular, statistics may be made available for:

US 7,496,943 B1

27

(11.1) providing information about, for example, the efficacy of certain advertising presentations (e.g., the number of positive responses to such presentations and/or the number of advertised items sold directly through the advertisements at the game/advertisement web site **308**);

(11.2) providing information related to the number and profile of users accessing certain advertising presentations;

(11.3) determining measurements related to the number of different (groups of) users to which an advertising presentation has been presented;

(11.4) determining the total number of presentations of a particular advertisement;

(11.5) determining the cost of advertising presentations to the advertisers and billing the advertisers for such costs according to, for example, at least one of: (a) the number of users to which an advertisement is presented, (b) the number of promotionals requested or (c) the number of network user communications (i.e., hits) with the web site **308**;

(11.6) determining if an advertising presentation should be discontinued because the advertiser's cost limits have been reached, such limits being, for example, related to a total number of presentations of an advertising presentation. Note that, in one embodiment, it is an aspect of the present invention to charge an advertiser for each presentation to a user; or

(11.7) determining which of an advertising presentation and a different second advertising presentation (from the same advertiser) is most effective when both are provided to various selected (groups of) users, so that the advertiser or sponsor may then have a basis for choosing the most appropriate of the two advertising presentations in future advertising.

Additionally, it is an aspect of the present invention that it may also maintain statistics (and/or related information) for:

(12.1) providing "real time" game rankings of users (players) involved in a gaming tournament provided by the game/advertisement web site **308**. Note that such rankings may be provided to a user so that he/she may know his/her standing and the number of players remaining in the tournament; and

(12.2) providing a "style of personality" of the game playing users so that, for example, a risk tolerance of such users may be estimated and used to determine if a particular user might be interested in a particular product or service. Thus, such "style of personality" statistics for a user may be stored in the user's profile. For example, the information captured here may include: average size of wager, average size of wager in comparison to the total amount that could be wagered, length of time playing in a single session, the ratio of the number of wagers on high risk plays presented, and the skill of the player.

Accordingly, the following aspects of the present invention are noteworthy:

(13.1) the user may be provided with free access or reduced cost access to other areas of the Internet **324** upon viewing the presentations of certain organizations and/or advertisers. Note that the ability to reduce the cost of accessing the Internet may act as a vehicle for attracting various users;

(13.2) the index page **714** gives a user the opportunity to access a particular organization (e.g., organizations **718**) that the user may belong to or any particular advertiser (e.g., advertisers **722**) without going through any games although the user may be required to go through the "LOBBY" page(s) **708** and thereby be exposed to advertising and/or the opportunity to join a game;

(13.3) a user may also be able to go from an initial organization page **718** to an introductory game page **728** (e.g., for a game **726**) but, unless authorized, may not be provided with further access to the organization's web pages or the game;

28

(13.4) while playing a game **726**, the user has the ability to access further information related to an advertisement or promotional being presented;

(13.5) during the playing of a game **726** (e.g., blackjack), the user may be allowed to review and/or stepwise replay a previous portion of a game **726** during a current gaming session;

(13.6) when in a particular organization page **718**, the user may be required to return to the index page **714** before linking into an advertiser **722** unless a direct link has been provided for some reason on the particular organization web page. Moreover, the user may access the game page **710** from the index page **714** and vice versa;

(13.7) a user may either go directly into playing a particular game **726** (as authorized) or to a rules section **730** for reviewing the rules for the corresponding game **726**. Note that a user may always access the rules section **730** during the corresponding game **726**;

(13.8) there is a help feature for providing information such as:

    a) how to do some particular action or the reason for some action or the reason an action is blocked. For example, the reason for an inability to access a certain web page, the reason for an inability to make a particular game play, such as a bet, stand or hit in the game of blackjack and/or the reason for a particular result of a certain bet, hit, stand or other user play in a game such as blackjack;

    b) for contacting a gaming referee for resolving gaming conflicts. Such a referee will be available to resolve any dispute. Note that the user can notify the management operating the present invention of a problem via, for example, notification forms displayed when a notification button is activated.

Referring now to an alternative embodiment of the present invention presented in FIG. **8**, wherein the game/advertisement web site **308** coordinates with a third party Internet access service provider **810** (or interactive cable television provider) for providing Internet **324** (cable television) access to users on a reduced cost or free basis once a user has registered with the web server **340** (cable television provider). That is, the game/advertisement web site **308** contacts the user's Internet service provider **810** and arranges to subsidize the user's Internet service charges in return for the gaming advertisement web site **308** being able to repeatedly download to the user's Internet client node **318** (or alternatively, interactive cable television node), unrequested information such as advertising for presentation to the user.

Accordingly, a prospective user of the present invention can sign up or register with the game/advertisement web site **308** for reduced Internet service fees by dialing into an Internet service provider **810** with normal serial dialing and after gaining Internet access, subsequently log on to the web site **308** as a user identified by the generic user identifier "NEW." Each user identified by "NEW" is forced into a connection with an enrollment or registration program so he/she can provide information requested by the present invention that can subsequently be used in determining which advertising to present to this user according to, for example, advertiser preferences. Thus, when registration is completed, the present embodiment of the invention downloads, for example, an ad viewer program **812** and a communications daemon (e.g., ad receiver daemon **806**) to the user's Internet client node **318**, wherein this daemon allows the game/advertisement web site **308** to download to the user's Internet client node **318** unrequested information such as advertising repeatedly. Accordingly, assuming the daemon **806** is installed, the user may access not only the gaming and advertisement ser-

US 7,496,943 B1

29                                                              30

vices of the web site **308**, but also access substantially the entire Internet through the web site **308** at a reduced cost. Thus, whenever the end user processor **318** connects with the Internet service provider **810**, the game/advertisement web site **308** is alerted by the Internet service provider **810** and the DISPLAY ENGINE **622** starts up the downloaded daemon **806** via Internet communications with the user's Internet client node **318**. Subsequently, the DISPLAY ENGINE **622** periodically sends selected advertising to the daemon **806**. Accordingly, the daemon **806** utilizes the ad viewer program **812** to coordinate the display of the advertising presentation.

Note that various alternative embodiments related to the architecture and functionality of FIG. **8** are also within the scope of the present invention. For example, instead of communicating with a plurality of third-party Internet service providers **806** for determining when users registered with the present invention are accessing the Internet via subsidized Internet connections, the game/advertisement web site **308** may include or be related to a dedicated Internet service provider **806** so that when a user registers with the present invention, the user is provided with a new Internet access code for the dedicated Internet service provider **806** and the user's Internet access fees may be subsidized.

However, regardless of how the present invention subsidizes Internet access, the game/advertisement controller **604** is notified whenever each subsidized user connects to the Internet or disconnects from the Internet. Additionally, certain reliability features are included in the daemon **806** and ad view program **812** for assuring that advertising is indeed presented to the user. For example, there may be periodic transmissions from each subsidized user's Internet client node **318** to the web site **308** verifying that both the daemon **806** and the ad view program **812** are active. Note that whenever any advertising is received at the user's Internet client node **318**, the daemon **806** transfers the advertising to the ad viewer program **812** which, in turn, converts the transmitted information to a displayable format and forces the display of the user's Internet client node **318** to present the advertising unobscured to the user.

Additionally, note that in certain contexts the DISPLAY ENGINE **622** may transmit a message to an Internet Service Provider **806** indicating that no further Internet access will be subsidized due to a predetermined number of advertising presentation display failures.

An additional and/or alternative description of the embodiment of the present invention shown in FIGS. **8**A and **8**B is as follows: users may use the present invention to access the INTERNET **324** on a reduced cost or free basis, by using whatever TCP/IP SLIP/PPP package they desire and registering with the web server **308**. That is, a user can sign up or register by dialing into a terminal server with normal serial dialing and log on as a user identified by the identifier "NEW." User "NEW" is then forced into a connection to an enrollment or registration program so he/she can provide information requested by the present invention. When enrollment is completed, the present invention allows the user to download a communications daemon (e.g., ad receiver daemon **806**) to the user's Internet client node **318**. The user may then install the daemon on their machine (Internet client node **318**) and dial-up with their favorite TCP/IP package.

However, upon accessing the host **308**, the user accesses basic functionality of the DISPLAY ENGINE **622** that starts up the downloaded daemon **806**. The network host **308** periodically queries each active port on the terminal servers (e.g., Internet client node **318**) to get the IP addresses and then send a short message to the daemon **806** which is listening in on a

specific port. The DISPLAY ENGINE **622** may also disable access by an end user machine **318** after a certain number of failures.

Note that the host **308** periodically sends an item to the downloaded daemon **806** to display. The daemon then displays the message (advertisement) in a window (of the WWW browser **640**) on the user's screen.

The foregoing discussion of the invention has been presented for purposes of illustration and description. Further, the description is not intended to limit the invention to the form disclosed herein. Consequently, variation and modification commiserate with the above teachings, within the skill and knowledge of the relevant art, are within the scope of the present invention. The embodiment described hereinabove is further intended to explain the best mode presently known of practicing the invention and to enable others skilled in the art to utilize the invention as such, or in other embodiments, and with the various modifications required by their particular application or uses of the invention.

What is claimed is:

1. A method of advertising on the Internet, wherein:

for each of one or more users accessing the Internet in a corresponding Internet connection for the user, the following occur during said corresponding Internet connection:

a request, from the user, is transmitted on the Internet, via a user node, for contacting a providing node of the Internet, said providing node provides access to information for an interactive service, wherein said request has associated therewith an Internet address that identifies the providing node, and wherein said interactive service is interactive on the Internet with the user;

the user node receives, via the providing node, said information for said interactive service;

wherein two or more display presentations from the information are presented on at least a portion of a display of the user node, wherein at least two of said display presentations are successively displayed, and there is a user input to one of said at least two display presentations, $P_1$, wherein for the user input, there is a transmission on the Internet to which a latter one of said at least two display presentations, $P_2$, is a response;

overlapping with a display of said one of the display presentations, $P_1$, at the user node is a display of a first one or more advertising presentations for providing information related to one or more of a product and a service, wherein said first one or more advertising presentations are received, via the Internet, in response to Internet transmissions by the providing node, and displayed on at least a portion of said display during the presentation of the two or more display presentations at the user node;

one or more additional advertising presentations are presented at the user node following the first one or more advertising presentations, each said additional advertising presentation for providing information related to one of a product and a service, wherein at least one of said additional advertising presentations is:

(a) received at the user node, via the Internet, in response to Internet transmissions by the providing node during the presentation of the two or more display presentations,

(b) displayed on at least a portion of said display without the user providing an input: (i) for which a consequence includes the presenting of said additional advertising presentations, and (ii) for which said first one or more advertising presentations are not a consequence, and

US 7,496,943 B1

31

(c) provides Internet addressing information for obtaining additional information about one or more purchasable products or purchasable services, comprising:

activating one or more programmatic elements, at the providing node, for combining: (1) the information for the interactive service, and (2) advertising related information for use in presenting one of: (i) the first advertising presentations, and (ii) the additional advertising presentations; and

transmitting a resulting combination of (1) and (2) on the Internet to the user.

**2.** A method of advertising on the Internet,

wherein an activation request is received, from an Internet accessible user node, for activating an instance of an interactive service accessible via the Internet;

wherein the user node interactively communicates with the instance for receiving all service transmissions from the instance transmitted to the user node that occur on a first Internet connection, said service transmissions having a plurality of instance presentations transmitted to the user node via the first Internet connection, said instance presentations interleaved with one or more responsive user communications, from the user node to said interactive services that are in response to service content presented to the user;

comprising:

first providing a sequence of advertising presentations to a user at said user node, wherein said sequence is transmitted on the first Internet connection during a total elapsed time for said service transmissions, wherein each advertising presentation of said sequence identifies at least one of a purchasable product and a purchasable service;

wherein an advertising presentation, $AP_1$, of said sequence is presented as a consequence of one or more particular communications on the first Internet connection between said Internet accessible service node and the user node, wherein one of the particular communications includes information for one of the instance presentations for the interactive service combined with advertising related information for use in displaying at least $AP_1$;

wherein for said advertising presentations transmitted in said step of first providing, (a) and (b) following hold:

(a) there is at least a second advertising presentation, $AP_2$, of said sequence wherein: (i) a presenting of $AP_2$ to the user is purposefully delayed after a presentation of $AP_1$, and (ii) there is no user input that is both: (1) after a last of said particular communications and (2) during the total elapsed time for the service transmissions, for which a consequence includes the presenting of $AP_2$;

(b) presentations of $AP_1$ and $AP_2$ provide no content that affects said responsive user communications;

wherein at least one of $AP_1$ and $AP_2$ includes link data such that when said link data is activated by a user input to said at least one of $AP_1$ and $AP_2$, data indicative of said user input is transmitted, via the first Internet connection, to a network node identified by said link data; and

obtaining information related to an efficacy of one or more of the advertising presentations presented to the user, including determining information related to a number of advertised items that are sold through the one or more advertising presentations.

**3.** The method of claim **2**, wherein said particular communications includes an Internet transmission from said Internet accessible service node to the user node, further including the steps of:

32

transmitting, via the first Internet connection, information for storing at the user node; and

receiving, via a second Internet connection, data indicative of the information stored on the user node for providing a subsequent transmission to the user node, wherein the second Internet connection is established after a termination of the first Internet connection;

wherein the data indicative of the information stored on the user node is utilized in providing the user with access to the interactive service on the second connection by the user node.

**4.** The method of claim **3**, wherein said step of first providing is dependent upon an Internet transmission by the user node that is responsive to said particular communications.

**5.** The method of claim **2**, further including a step of receiving a request to activate said instance at least partially in exchange for said sequence of advertising presentations being displayed at the user node.

**6.** The method of claim **2**, wherein at least said advertising presentation $AP_2$ is unrequested.

**7.** The method of claim **2**, further including a step of forcing at least one advertising presentation of said sequence of advertising presentations to be presented to the user so that the at least one advertising presentation is unobscured when presented.

**8.** The method of claim **2**, wherein said link data includes an Internet address.

**9.** A method for advertising on a communications network, comprising:

for each of a plurality of network users, each having a corresponding user network node, steps (A) through (K) following are performed:

(A) first receiving, at a service providing source accessed via predetermined address information indicative of a predetermined address on the network, a transmission on a first connection to the network by the user's corresponding user node, wherein the transmission is for activating a service for providing a plurality of service presentations;

(B) activating the service for interactively communicating with the user via transmissions on the network between the user node and said service providing source;

(C) first transmitting on the communications network, from said service providing source and in response to the service providing source receiving the transmission, service data of the service for presenting at the user node;

(D) second receiving, by the service, responsive data obtained from at least one network transmission, $T_1$, corresponding to an input by the user to one of the service presentations corresponding to said service data at the user node;

(E) determining second service data by the service as a response to said responsive data, wherein context data having information indicative of one or more previous user interactions with the service is accessed;

(F) second transmitting on the communications network, from said service providing source, the second service data for presenting a corresponding one of the service presentations at the user node;

wherein the steps (G) through (K) following are performed for providing advertising to the user when the user establishes a subsequent second connection to the network for communicating with the service by providing the predetermined address information to the network, wherein the second connection to the network is established after the first connection to the network is terminated;

US 7,496,943 B1

33

(G) identifying advertising related data for presenting advertising of one or more of a purchasable product or a purchasable service for one of a plurality of advertisers;

(H) determining third service data of the service, said third service data determined using the context data, said third service data being for a corresponding one of the service presentations, SP;

(I) combining the advertising related data and the third service data resulting in combined data;

(J) third transmitting, on the communications network and from the service providing source, the combined data, the combined data for presenting at the user node a combined presentation of the corresponding one service presentation, SP, and an advertising presentation corresponding to the advertising related data, wherein the advertising presentation has predetermined network link data associated therewith such that the link data is activated by a user input to the advertising presentation resulting in a corresponding network transmission of data indicative of said user input being transmitted to a predetermined network site, the network site being different from the service providing source; and

(K) receiving access information indicative of the advertising presentation being accessed by the user, wherein the access information is used in deriving advertising effectiveness information which is subsequently made available to the one advertiser.

**10**. The method of claim **9**, wherein said identifying step includes selecting the advertising related data based on profile data for the user.

**11**. The method of claim **10**, wherein the one advertiser provides profile selection information for selecting the user based on a correspondence with the user's profile data.

**12**. The method of claim **11**, wherein the profile data includes information for a geographic location related to the user.

**13**. The method of claim **11**, wherein the profile data includes information of a personal preference of the user.

**14**. The method of claim **11**, wherein the profile data includes information indicative of an age of the user.

**15**. The method as claimed in claim **9**, wherein the service includes a playing of a game, wherein said game is played according to a predetermined set of rules, and said game is at least one of: a game of chance, a game having an opponent, and a game having a total number of possible distinct game plays that is capable of being determined before playing the game.

**16**. The method of claim **15**, wherein said context data includes a representation of a configuration of a game for indicating a next play of the game.

**17**. The method of claim **9**, further including a step of changing a speed of play of a game according to said responsive data.

**18**. The method of claim **9**, further including a step of selecting the advertising related data by identifying a correspondence between: (i) user selection information for the one advertiser, and (ii) information about the user obtained from the user in a previous connection to the network.

**19**. The method of claim **9**, further including a step of receiving financial information related to a financial status of the user, wherein said financial information is used in determining whether a subsequent input by the user to the service is acceptable.

**20**. The method of claim **9**, wherein said responsive data includes a wager.

34

**21**. The method of claim **9**, further including a step of qualifying the user for viewing a particular presentation, wherein a financial status of the user is matched with predetermined financial criteria.

**22**. The method of claim **9**, wherein said first transmitting step includes:

transmitting, via the first connection, information for storing at the user node; and

receiving, via the second network connection, data indicative of the information stored on the user node for providing a subsequent transmission to the user node.

**23**. The method of claim **22**, further including:

providing the user node with network access as a result of receiving said data indicative of the information stored on the user node.

**24**. The method of claim **23**, further including a step of selecting one of first and second advertising related data as the advertising related data.

**25**. The method of claim **9**, said context data includes one or more of: a credit limit and a current amount of funds available to the user.

**26**. The method of claim **25**, wherein at least one of said first and second transmitting steps includes transmitting a representation of a game token to the user.

**27**. The method of claim **26**, further including a step of storing information effective for ranking the user with other users communicating with an instance of the service.

**28**. The method of claim **22**, wherein said second transmitting step includes transmitting information to the user node for determining whether a predetermined program is active for processing additional advertising information of said data so that said additional advertising information is presented to the user.

**29**. The method of claim **9**, further including downloading to the user node a program for presenting unrequested advertising to the user via the user node.

**30**. The method of claim **9**, wherein for one or more advertising presentations, presented to at least some of the plurality of users, a further step of determining data indicative of a number of hyperlinks activated corresponding to the one or more advertising presentations by said at least some of the plurality of users.

**31**. The method of claim **9**, wherein for one or more advertising presentations, presented to at least some of the plurality of users, a further step of determining data indicative of a number of advertised items sold to said at least some of the plurality of users wherein said advertised items are available for purchase via the one or more advertising presentations.

**32**. The method of claim **9**, further including:

collecting information about the user, wherein said information about the user is obtained from user node transmissions on the network corresponding to input provided by the user to the user node;

wherein said step of collecting includes monitoring user communications on the network with other network accessible nodes for obtaining the information about the user; and

wherein the service providing source operates substantially independently of at least most of the other network accessible nodes.

**33**. The method of claim **9**, further including a step of obtaining information about the user including data indicative of most of the following: a name, an address, an e-mail address, an age, a financial status, an educational level, a marital status, an amount of recreational time, personal tastes, and a gender.

US 7,496,943 B1

35

**34.** The method of claim **9**, wherein said second transmitting step includes transmitting, via the network, information for storing at the user node, wherein said stored information is utilized in providing the user with access to the service on the second connection by the user node.

**35.** The method of claim **34**, further including: a step of receiving identification information at said service providing source; and providing the user node with network access to the service as a result of receiving said identification information.

**36.** The method of claim **9**, further including a step of communicating with the user node for detecting an activation of a predetermined program on the user node, wherein said predetermined program is used in presenting unrequested advertising to the user.

**37.** The method of claim **9**, wherein the network includes a plurality of smaller networks connected together for providing communications therebetween, and the network has one or more of the following characteristics:

(i) the network has a common address space such that for each node, N, accessible by the network, there is a common address for N by which N can be accessed regardless of which one of the smaller networks contains N, and regardless of a source on the network for requesting a communication with N;

(ii) the network is able to support communications using the Internet Protocol (IP); and

(iii) the network provides communication access to substantially all publicly contactable e-mail addresses.

**38.** The method of claim **37**, further including:

presenting to the user the advertising presentation, wherein said the presentation of the second advertising presentation does not change the user's interactions with the service presentations.

**39.** The method as claimed in claim **9**, wherein the service includes a playing of a game, wherein said game is played according to a predetermined set of rules, and said game is at least one of: a game of chance, a game having an opponent, and a game having a total number of possible distinct game plays that is capable of being determined before playing the game; and

wherein the step of combining includes joining the advertising related data with information for a game play having at least representation of a token for the game.

**40.** The method of claim **9**, wherein said identifying step includes selecting the advertising related data based on profile data for the user.

**41.** The method of claim **40**, wherein the one advertiser provides profile selection information for selecting the user based on a correspondence with the user's profile data.

**42.** The method of claim **41**, wherein the profile data includes information for a geographic location related to the user.

**43.** The method of claim **41**, wherein the profile data includes information of a personal preference of the user.

**44.** The method of claim **41**, wherein the profile data includes information indicative of an age of the user.

**45.** The method of claim **9**, wherein said first responsive data includes a wager.

**46.** The method of claim **9**, wherein the step of (G) identifying includes selecting the advertising related data using information obtained from user responses to the service.

**47.** The method of claim **9**, wherein the service includes one or more of providing access to a plurality of organizations, providing access to a plurality of promotionals, and providing access to a plurality of games.

36

**48.** The method of claim **1**, further including receiving access information indicative of one or more advertising presentations from at least one of: (1) the first one or more advertising presentations, and (2) the one or more additional advertising presentations being accessed by the user, wherein the access information is used in deriving advertising effectiveness information.

**49.** The method of claim **1**, further including:

transmitting, via the Internet, data related to communications between: (a) the interactive service, and (b) the user;

wherein the transmitting step results in first information being stored on the user node so that it is available in a subsequently established Internet connection session by the user at the user node; and

after the user node has established the subsequent Internet connection session, a step of receiving for the interactive service, a responsive Internet transmission indicative of the first information being present on the user node.

**50.** The method of claim **1**, further including selecting the advertising related data based on profile data for the user.

**51.** The method of claim **50**, further including a step of receiving selection information from an advertiser for selecting the user based on a correspondence between the selection information and profile data.

**52.** The method of claim **51**, wherein the profile data includes information indicative of a geographic location related to the user.

**53.** The method of claim **1**, further including the steps (A) through (D) following, when the user establishes a subsequent second Internet connection for re-establishing communications with the interactive service, wherein the second Internet connection occurs after the corresponding Internet connection is terminated;

(A) identifying advertising related data for presenting advertising for one or more of a purchasable product or a purchasable service for at least one advertiser;

(B) determining additional service information for the interactive service, the additional service information determined using context data indicative of one or more previous user interactions with the interactive service during the corresponding Internet connection;

(C) combining the advertising related data and the additional service information resulting in combined data; and

(D) second transmitting the combined data to the user node.

**54.** The method of claim **53**, wherein the combined data is for presenting at the user node a combined presentation of a corresponding presentation for the interactive service, and an advertising presentation corresponding to the advertising related data, wherein the advertising presentation has predetermined Internet link data associated therewith such that the link data is activated by a user input to the advertising presentation resulting in a corresponding Internet transmission of data indicative of said user input being transmitted to a predetermined Internet site.

**55.** The method of claim **1**, further including a step of receiving access information indicative of an advertising presentation being accessed by the user;

wherein the advertising presentation is displayed at the user's node as a result of the user's node receiving the resulting combination of (1) and (2); and

wherein the access information is used in deriving advertising effectiveness information.

**56.** The method of claim **1**, further including a step of receiving financial information related to a financial status of

US 7,496,943 B1

37

the user, wherein said financial information is used in determining whether a subsequent input by the user to the interactive service is acceptable.

**57**. The method of claim **1**, further including:

transmitting, via the corresponding Internet connection, data for storing at the user node; and

receiving, via a subsequent connection to the Internet, a transmission indicative of the data stored on the user node.

**58**. The method of claim **1**, wherein for one or more advertising presentations from at least one of: (1) the first one or more advertising presentations, and (2) the one or more additional advertising presentations, the one or more advertising presentations are presented to at least some of the plurality of users, and a further step of determining data indicative of a number of hyperlinks activated corresponding to the one or more advertising presentations by said at least some of the plurality of users.

**59**. The method of claim **1**, wherein for one or more advertising presentations from at least one of: (1) the first one or more advertising presentations, and (2) the one or more additional advertising presentations, the one or more advertising presentations are presented to at least some of the plurality of users, and a further step of determining data indicative of a number of advertised items sold to said at least some of the plurality of users wherein said advertised items are available for purchase via the one or more advertising presentations.

**60**. The method of claim **1**, further including:

collecting information about the user, wherein said information about the user is obtained from user node transmissions on the Internet of input provided by the user to the user node for visiting other Internet accessible nodes;

wherein said step of collecting includes monitoring user communications on the network with the other Internet accessible nodes; and

wherein the providing node operates substantially independently of at least most of the other Internet accessible nodes.

**61**. The method of claim **1**, further including a step of communicating with the user node for detecting an activation of a predetermined program on the user node, wherein said predetermined program is used in presenting unrequested advertising to the user.

**62**. A method for advertising on a network to each user of a plurality of network users, each user using a corresponding user's node for communicating on the network, comprising:

performing steps (A) through (D), for each of the users;

(A) receiving, by an advertising presentation node accessed via predetermined address information indicative of a predetermined address on the network, one or more transmissions from the user;

(B) determining from a plurality of advertising related information items for a plurality of advertisers, one or more advertising information items, each of the one or more advertising information items for presenting, to the user, information related to a purchasable product or purchasable service of a corresponding one of the advertisers;

wherein each of said one or more advertising information items includes corresponding predetermined network address information for accessing a corresponding network node providing additional information related to one or more purchasable products or purchasable services for the corresponding advertiser;

38

(C) transmitting, by said advertising presentation node, said one or more of the advertising information items to the user;

(D) for each of a first and second of the advertisers, a step of obtaining corresponding access information indicative of an access of the corresponding network node for at least one of the advertising information items presented to the user for the advertiser;

(E) for each of the first and second of the advertisers, obtaining corresponding advertising effectiveness information indicative of an effectiveness of the at least one advertising information item for the advertiser, wherein said corresponding advertising effectiveness information is obtained from the corresponding access information obtained from the plurality of users; and

(F) providing each of the first and second advertisers with their corresponding advertising effectiveness information.

**63**. The method of claim **62**, further including:

transmitting first information for storing on the corresponding user node for the user so that the first information is available in a subsequently established network connection session by the user at the corresponding user node after a network connection for the one or more transmissions has been terminated; and

after the corresponding user node for the user has established the subsequent network connection session, a step of receiving, a responsive network transmission indicative of the first information being present on the corresponding user node for the user.

**64**. The method of claim **62**, wherein the obtaining step of (D) includes receiving information related to one of: (i) whether the at least one advertising information item for the first advertiser has been presented to the user previously, and (ii) a time when the at least one advertising information item for the first advertiser was presented to the user.

**65**. A method of advertising on the Internet, comprising:

first receiving an activation request, from an Internet accessible user node, for activating an instance of an interactive service accessible via an Internet contact with an Internet accessible service node, wherein the service node is identified by service node network address information input by a user of the user node;

wherein the user node interactively communicates with the instance of the service for receiving a plurality of service transmissions from the instance via a first Internet connection, said service transmissions for transmitting a plurality of presentations for the instance to the user node via the first Internet connection, said presentations interleaved with one or more responsive user communications from the user node to said instance of the service;

first transmitting a sequence of advertising presentations to the user at said user node, wherein said sequence is transmitted on the first Internet connection during an elapsed time for said service transmissions, wherein each advertising presentation of said sequence is for identifying at least one of a purchasable product and a purchasable service;

wherein an advertising presentation, $AP_1$, of said sequence is presented as a consequence of one or more particular communications on the first Internet connection between said service node and the user node, said particular communications being transmitted separately of all service transmissions from the instance to the user node;

wherein $AP_1$ is presented to the user during at least one transmission of said service transmissions;

wherein for said advertising presentations transmitted in said step of first transmitting, (a) and (b) following hold:

(a) there is at least a second advertising presentation, $AP_2$, of said sequence wherein: (i) a presenting of $AP_2$ to the user is purposefully delayed after a presentation of $AP_1$, and (ii) the presenting of $AP_2$ is not in response to a user input between the presentation of $AP_1$ and the presentation of $AP_2$;

(b) presentations of $AP_1$ and $AP_2$ are substantially unrelated to said responsive user communications;

wherein at least one of $AP_1$ and $AP_2$ includes link data such that when said link data is activated by a user input to said at least one of $AP_1$ and $AP_2$, data indicative of said user input is transmitted, via the first Internet connection, to a network node identified by said link data;

wherein a subsequent presentation for presenting to the user is received at the user node and from the network node via the first Internet connection, wherein said subsequent presentation is determined using said data indicative of user input, said subsequent presentation also identifying one of a purchasable product and a purchasable service; and

wherein said subsequent presentation is presented to the user during the first Internet connection.

**66**. The method of claim **65**, wherein said sequence is transmitted from said Internet accessible service node.

**67**. A method of communicating with a service providing node of the Internet, comprising:

for each of one or more users accessing the Internet, the following steps (A) through (D) are performed:

(A) first receiving, from the user via a corresponding Internet user node, a request on the Internet for contacting a service providing node of the Internet, said service providing node providing access to two or more display presentations for a service, and said service providing node being one of a plurality of nodes of the Internet each having a corresponding Internet address to which the user has Internet access independently of the other of the plurality of nodes, wherein said request has associated therewith the Internet address of a terminal destination for identifying the service providing node, and wherein said service is interactive on the Internet with the user;

(B) transmitting, via the Internet, data related to communications between the service providing node, and the user;

wherein the transmitting step results in first information being stored on the user node so that it is available in a subsequently established Internet connection session by the user via the user node;

(C) after the user node has established the subsequent Internet connection session, a step of second receiving for the service, an Internet transmission indicative of the first information being present on the user node; and

(D) outputting one or more Internet transmissions, on the subsequent Internet connection session, for presenting particular display presentations for the service;

wherein said particular display presentations for the service are presented on at least a portion of a display of the user node, wherein the particular display presentations are successively displayed, and there is a user input to one of the particular display presentations, $P_1$, for the service, the user input resulting in a transmission on the Internet to the service providing node, and to which a subsequent one of the display presentations, $P_2$, is a response;

wherein first advertising related information is received by the user node, via the subsequent Internet connection session, as a consequence of Internet transmissions by the service providing node for displaying the particular display presentations, wherein the first advertising related information is combined, prior to transmission to the user node, with information for displaying the particular display presentation $P_1$, said first advertising related information replaceable with alternative information without changing a content: (i) of the particular display presentation $P_1$, and (ii) to which the user input is responsive for the service;

wherein one or more additional advertising presentations are presented at the user node after presentation of a first advertising presentation corresponding to the first advertising related information, each said additional advertising presentation being for providing information related to one of a product and a service, wherein at least one of said additional advertising presentations is received by the user node, as a consequence of Internet transmissions by the service providing node;

wherein an action by the user, in response to an advertisement being one of: said first advertising presentation and one of said additional advertising presentations, results in resulting data being transmitted via the Internet, wherein said resulting data is transmitted: (a) from said user node, and (b) to a terminal destination node of the Internet, said destination node identified at said user node by destination Internet link information received with the advertisement;

wherein a response to the action by the user is received at the user node, via the Internet, the response providing another presentation for presenting to the user at said user node.

**68**. The method of claim **67**, wherein the service includes a playing of a game, and said step of outputting include a step providing one of the display presentations with wager related information.

**69**. The method of claim **67**, wherein the service includes a playing of a game, and further including a step of changing a time limit for accepting an input from the user when the user desires to change a speed of the game.

**70**. The method of claim **67**, wherein the service includes a playing of a game, and further including a step of providing the user with a game play ranking of a second of the users.

**71**. The method of claim **67**, wherein the service includes providing access to predetermined Internet sites Internet.

**72**. The method of claim **67**, further including obtaining information related to Internet interactions by the user, including information related to websites visited by the user.

**73**. The method of claim **67**, further including obtaining information related to Internet interactions by the user, including information related to advertising for which the user requests additional information.

**74**. The method of claim **67**, further including determining a risk tolerance of the user using information indicative of Internet communications by the user.

**75**. The method of claim **67**, further including obtaining information related to an efficacy of one or more advertising presentations presented to the users, including determining information related to a number of advertised items that are sold through the one or more advertising presentations.

**76**. The method of claim **67**, further including:

obtaining profile information for the user for use in presenting at least one advertising presentation of the first advertising presentation and additional advertising presentations;

US 7,496,943 B1

41                                                    42

transmitting the at least one advertising presentation for presenting to the user;

subsequently, enhancing the profile information to reflect additional or different user information for use in presenting to the user a subsequent at least one of the additional advertising presentations; and

wherein the enhancement of the profile information contributes to a determination of the subsequent at least one advertising presentation.

**77**. The method of claim **76**, wherein the enhancing step includes selecting a question to present to the user, wherein the selecting is dependent upon the profile information previously obtained.

**78**. The method of claim **67**, wherein the service includes a playing of a game, and further including:

storing wager related information indicative of previous wagers by the user when playing the game; and

using the wager related information for determining one of: an acceptability of another wager requested by the user, and one of the first and additional advertising presentations.

**79**. The method of claim **67**, further including:

detecting an activation of the destination Internet link information; and

using the detection for determining an efficacy of the one advertising presentation.

**80**. A method for providing product or service information while interacting with an informational service via the Internet, comprising:

performing the following substeps (A1) through (A4) for each of a plurality of Internet user nodes, after each user node has established a corresponding Internet connection session providing access to a plurality of Internet sites for contacting a plurality of informational services:

(A1) first receiving, at one of the Internet sites for accessing one of the informational services, a request on the Internet corresponding to an input by a user to the user node to access the one informational service, wherein the user node uses the user input to identify the one Internet site as a termination destination for an Internet transmission providing the request;

(A2) transmitting, via the Internet, data between: (a) the one informational service, and (b) the user;

wherein the transmitting step results in first information being stored on the user node so that it is available in a subsequently established Internet connection session by the user at the user node;

(A3) after the user node has established the subsequent Internet connection session, a step of second receiving for the one first informational service, a responsive Internet transmission indicative of the first information being present on the user node;

(A4) providing, to the user node, a plurality of Internet transmissions for presenting to the user corresponding service related information for the one informational service, wherein between each of at least some of the plurality of Internet transmissions, there is a corresponding responsive Internet transmission from the user node to the one informational service, said corresponding responsive Internet transmission being dependent upon a presentation to the user of the corresponding service related information of a previous one of the Internet transmissions;

wherein for one or more of the at least some Internet transmissions, in addition to including their corresponding service related information, each of the one or more of the at least some Internet transmissions includes cor-

responding advertising related information combined with service related information prior to transmission to the user node, said corresponding advertising related information replaceable with alternative information without changing a content of the corresponding service related information to which the user responds with the corresponding responsive Internet transmission;

wherein when presenting a content for each of the one or more of the at least some Internet transmissions to the user, a corresponding advertisement obtained using the corresponding advertising related information is presented to the user, wherein the corresponding advertisement provides information to the user: (i) related to one or more purchasable products or purchasable services, and (ii) that allows the user to perform an Internet transmission, T, for obtaining additional information about one or more purchasable products or purchasable services.

**81**. The method of claim **80**, wherein the one informational service includes a playing of a game, and said step of providing includes a step of providing wager related information to the user.

**82**. The method of claim **80**, wherein the one informational service includes a playing of a game, and further including a step of changing a time limit for accepting an input from the user when the user desires to change a speed of the game.

**83**. The method of claim **80**, wherein the one informational service includes a playing of a game, and further including a step of providing the user with a game play ranking of a second of the users.

**84**. The method of claim **80**, wherein the one informational service includes providing access to predetermined Internet sites.

**85**. The method of claim **80**, further including obtaining information related to Internet interactions by the user, including information related to websites visited by the user that are different from the one Internet site.

**86**. The method of claim **80**, further including obtaining information related to Internet interactions by the user, including information related to advertising for which the user requests additional information, wherein the additional information is obtained in response to the Internet transmission, T, which has as a terminal Internet address for a second of the Internet sites, the second Internet site being different from the one Internet site.

**87**. The method of claim **80**, further including determining a risk tolerance of the user using information indicative of Internet communications by the user, wherein the communications are related to the user losing something of value.

**88**. The method of claim **80**, further including obtaining information related to an efficacy of one or more advertising presentations presented to the users, including determining information related to advertised items that are sold from accessing the one or more advertising presentations by activating hyperlinks therefor.

**89**. The method of claim **80**, further including:

obtaining profile information for the user for use in determining at least one of the corresponding advertisements;

subsequently, enhancing the profile information to reflect additional or different user information for use in presenting to the user a subsequent at least one advertisement; and

determining the subsequent at least one advertisement to transmit to the user;

wherein the enhancement of the profile information contributes to the determination of the subsequent at least one advertisement.

US 7,496,943 B1

43

**90**. The method of claim **89**, wherein the enhancing step includes selecting a question to present to the user, wherein the selecting is dependent upon the profile information previously obtained.

**91**. The method of claim **80**, wherein the one informational service includes a playing of a game, and further including:

storing wager related information indicative of previous wagers by the user when playing the game; and

using the wager related information for determining one of: an acceptability of another wager requested by the user, and one of the advertisements for an instance of the advertising related information.

**92**. The method of claim **80**, further including:

detecting an activation by the user of Internet link information for generating the Internet transmission T; and

using the detection for determining an efficacy of the corresponding advertisement providing the Internet transmission T.

**93**. A method for playing a game on a network, comprising:

for each user of a plurality of network users, each having a corresponding user node for accessing the network, steps (A) through (I) following are performed:

(A) first receiving, at a game playing source accessed via predetermined address information indicative of a predetermined address on the network, a transmission by the user's corresponding user node, wherein the transmission is for activating a game, the game for providing a plurality of game presentations;

B) activating the game for interactively communicating with the user via transmissions on the network between the user node and said game playing source;

(C) first transmitting on the network, from said game playing source, and in response to the game playing source receiving the transmission, first game data for the game for presenting at the user node;

(D) second receiving, by the game, a first game response obtained from the network, the first game response corresponding to a game input by the user in response to a presentation of said first game data at the user node;

(E) determining second game data by the game as a response to said first game response, said second game data corresponding to a subsequent one of the game presentations to be presented to the user;

wherein said step of determining accesses context data having information indicative of a status of the user's interactions with the game is accessed;

(F) obtaining advertising data for presenting advertising of one or more of a purchasable product or a purchasable service for one of a plurality of advertisers;

(G) combining the advertising data and the second game data resulting in combined data;

(H) second transmitting, on the network and from the game playing source, the combined data, the combined data for presenting at the user node a combined presentation of the subsequent game presentation and an advertising presentation corresponding to the advertising related data, wherein the advertising presentation has predetermined network link data associated therewith such that the link data is activated by a user input to the advertising presentation resulting in a corresponding network transmission of data indicative of said user input being transmitted to a predetermined network site which provides the user node with access to the advertising presentation, the network site being different from the gaming playing source; and

(I) receiving access information indicative of the advertising presentation being accessed by the user, wherein the

44

access information is used in deriving advertising effectiveness information which is subsequently made available to the one advertiser.

**94**. The method of claim **62**, further including responding to the user input by determining additional service information for the interactive information service using context data stored at a network accessible site different from the user's node, wherein the context data is obtained from of one or more previous user interactions with the advertising presentation node, and wherein context data provides a constraint;

the responding step including:

(A) determining an additional one of the advertising information items for at least one of the advertisers;

(B) combining the additional advertising information item and the additional service information resulting in additional combined data;

wherein the additional advertising information item has corresponding predetermined network link data associated therewith such that the corresponding predetermined link data is activated by a user input to a presentation of the additional advertising information thereby resulting in a corresponding network transmission of data indicative of said user input being transmitted to a predetermined network node different from the advertising presentation node; and

(D) second transmitting the additional combined data to the user node.

**95**. The method of claim **62**, wherein the step (B) of determining includes selecting one of the one or more advertising information items by identifying a correspondence between: (i) user selection information for one of the advertisers, and (ii) information about the user obtained from previous user communications.

**96**. The method of claim **62**, further including:

transmitting, via a connection to the network, data for storing on the user's node; and

receiving, via a subsequent connection to the network, a transmission indicative of the data stored on the user's node for providing a subsequent transmission to the user node.

**97**. The method of claim **96**, further including providing the user node with network access as a result of receiving said data indicative of the information stored on the user's node.

**98**. The method of claim **62**, further including transmitting information to the user's node for determining whether a predetermined program is active for displaying the one or more of the advertising information items.

**99**. The method of claim **62**, further including downloading to the user's node a program for presenting unrequested advertising to the user via the user's node.

**100**. The method of claim **62**, a further step of determining, for at least some of the plurality of users, data indicative of a number of hyperlinks activated corresponding to the advertising information items presented to the at least some of the plurality of users.

**101**. The method of claim **62**, further including:

collecting information about the user, wherein the information about the user is obtained from transmissions of the user's node on the network corresponding to input provided by the user to the user node;

wherein said step of collecting includes monitoring the user's communications on the network with other network accessible nodes for obtaining the information about the user; and

wherein the advertising presentation node operates substantially independently of at least most of the other network accessible nodes.

US 7,496,943 B1

45

46

**102**. The method of claim **62**, further including transmitting, via the network, information for storing at the user's node, wherein the stored information is utilized in allowing the user node to access a service provided by the advertising presentation node on a connection to the network by the user's node, wherein the connection occurs after a connection to the network for the step (A) of receiving terminates.

**103**. The method of claim **62**, further including a step of communicating with the user's node for detecting an activation of a predetermined program on the user's node, wherein said predetermined program is used in presenting unrequested advertising to the user.

**104**. The method of claim **62**, further including selecting the one or more advertising information items based on profile data for the user.

**105**. The method of claim **104**, further including a step of receiving selection information from an advertiser for selecting the user based on a correspondence between the selection information and profile data.

**106**. The method of claim **104**, wherein the profile data includes information indicative of a geographic location related to the user.

**107**. The method of claim **65**, further including selecting the user for receiving at least one of the adverting presentations based on a correspondence between profile selection information provided by an advertiser, and profile data for the user.

**108**. The method of claim **107**, wherein the profile data includes information indicative of a geographic location related to the user.

**109**. The method of claim **65**, further including a step of communicating with the user node for detecting an activation of a predetermined program on the user node, wherein said predetermined program is used in presenting unrequested advertising to the user.

\*   \*   \*   \*   \*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 30th day of January, 2015, I caused this

Corrected Brief of Plaintiff–Appellant to be filed electronically with the Clerk of

the Court using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users, and one PDF copy was served via email,

upon:

> Christa M. Anderson
> John C. Bostic
> Steven A. Hirsch
> Jennifer A. Huber
> Keker & Van Nest, LLP
> 633 Battery Street
> San Francisco, CA 94111
> canderson@kvn.com
> jbostic@kvn.com
> shirsch@kvn.com
> jhuber@kvn.com

> *Counsel for Third Party Plaintiff–Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed

document, the required number of copies of the Corrected Brief of Plaintiff–

Appellant will be hand filed at the Office of the Clerk, United States Court of

Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

> */s/ Julien A. Adams*
> *Counsel for Plaintiff–Appellant*
> *Beneficial Innovations, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,627*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2010*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

January 16, 2015                                  */s/ Julien A. Adams*
                                                 *Counsel for Plaintiff–Appellant*
                                                 *Beneficial Innovations, Inc.*